JONES DAY
222 East 41st Street
New York, New York 10017
Telephone: (212) 326-3939
Facsimile: (212) 755-7306
Robert W. Gaffey
Jayant W. Tambe
Mahesh Venkatakrishnan

*Attorneys for Plaintiffs*
*Lehman Brothers Holdings Inc.*
*and Lehman Brothers OTC Derivatives Inc.*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---------------------------------------------------------------X
                                            :
In re:                                      :   Chapter 11
                                            :
LEHMAN BROTHERS HOLDINGS INC., *et al.,*    :   Case No. 08-13555 (JMP)
                                            :
                        Debtors.            :   (Jointly Administered)
                                            :
---------------------------------------------------------------X
                                            :
LEHMAN BROTHERS HOLDINGS INC. and           :
LEHMAN BROTHERS OTC DERIVATIVES INC.:
                                            :
                        Plaintiffs,         :   Adv. Proc. No. 13-_____ (JMP)
                                            :
v.                                          :
                                            :
INTEL CORP.,                                :
                                            :
                        Defendant.          :
---------------------------------------------------------------X

**ADVERSARY COMPLAINT**

Lehman Brothers Holdings Inc. ("LBHI"), on behalf of itself and as Plan

Administrator under the Modified Third Amended Joint Chapter 11 Plan of Lehman Brothers

Holdings Inc. and Its Affiliated Debtors (the "Plan"), and Lehman Brothers OTC Derivatives

Inc. ("LOTC") (and together with LBHI's affiliated debtors in the above referenced chapter 11

case, the "Debtors"), as and for their Adversary Complaint against defendant Intel Corporation ("Intel") allege as follows:

## INTRODUCTION

1. This is an action to recover collateral that was unlawfully seized by Intel in breach of a swap agreement between LOTC and Intel.

2. Under the swap agreement, Intel was required to deliver $1 billion to LOTC on August 29, 2008, and LOTC was to deliver to Intel, on September 29, 2008 (the "Settlement Date"), shares of Intel stock, with the number of shares determined by a formula based on the fluctuation in the price of Intel stock. As turned out to be the case, the swap agreement required LOTC to deliver to Intel approximately 50.5 million shares of Intel stock on the Settlement Date. Additionally, on August 29, 2008, LOTC was required to post, and it did so post, $1 billion of cash collateral to Intel.

3. On September 15, 2008, LBHI filed for bankruptcy protection pursuant to chapter 11 of title 11 of the United States Code (the "Bankruptcy Code"). Because the swap agreement designated LBHI as LOTC's Credit Support Provider, LBHI's bankruptcy filing constituted an "Event of Default." This Event of Default triggered Intel's right to terminate the swap agreement by declaring an "Early Termination Date."

4. Intel did not terminate the swap agreement on September 15, 2008, although it could have chosen to do so. Ultimately, it chose to ride out the market for two weeks. On September 29, 2008, which was also the Settlement Date for the Transaction, Intel declared an Early Termination Date and terminated the swap agreement due to LBHI's bankruptcy filing.

5.  Intel's designation of the Early Termination Date gave rise to a specific, agreed-upon procedure for determining what amounts were due upon termination. Specifically, the swap agreement required only that Intel be compensated for its losses as a result of the termination, as reasonably determined by Intel in good faith.

6.  Intel did not reasonably, or in good faith, determine its losses in accordance with the swap agreement.

7.  Upon information and belief, Intel's reasonable losses as a result of terminating the swap agreement were far less than $1 billion. Nonetheless, on September 29, 2008, Intel unlawfully seized, and has refused to return any portion of, the $1 billion cash collateral posted by LOTC under the swap agreement, and the nearly $2 million in interest that had accrued thereon as of the Settlement Date.

8.  By seizing LOTC's collateral in its entirety and by failing to return the portion of LOTC's collateral that is beyond Intel's reasonable losses, Intel breached the swap agreement and the automatic stay of the Bankruptcy Code. Accordingly, LOTC brings this action to require Intel to repay to LOTC an amount to be determined at trial, plus interest, that Intel wrongfully seized from LOTC's posted collateral.

## JURISDICTION AND VENUE

9.  This is an adversary proceeding brought pursuant to Sections 362, 541, and 542 of the Bankruptcy Code, Rules 7001 and 7003 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), and 28 U.S.C. § 2201, to recover amounts due to LOTC by Intel.

10. This Court has subject matter jurisdiction to consider and determine this matter pursuant to 28 U.S.C. §§ 157 and 1334. This is a core proceeding pursuant to 28 U.S.C.

§ 157(b).  The Court has retained jurisdiction over this matter pursuant to Section 14.1 of the Plan and paragraphs RR and 77 of the order confirming the Plan.

11. Venue is proper in this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

## PARTIES

12. On September 15, 2008 and October 3, 2008, LBHI and LOTC, respectively, commenced with this Court voluntary cases under chapter 11 of the Bankruptcy Code.  LOTC's chapter 11 case has been consolidated with LBHI's chapter 11 case for procedural purposes only, and those cases are being jointly administered pursuant to Bankruptcy Rule 1015(b).  Plaintiffs LBHI and LOTC are both Delaware corporations with their principal places of business at 1271 Sixth Avenue, New York, New York 10020.

13. On December 6, 2011, the Court approved and entered an order confirming the Plan.  The Plan became effective on March 6, 2012.  Pursuant to the Plan, LBHI, as Plan Administrator, is authorized to prosecute litigation claims on behalf of its estate and LOTC's estate.

14. Defendant Intel is a Delaware corporation with its principal place of business in Santa Clara, California.

## STATEMENT OF FACTS

**A. The Swap Agreement**

15. LOTC and Intel entered into the swap agreement at issue in this action on August 1, 2008.  The swap agreement consists of four documents:  (i) the 1992 ISDA Master Agreement, Multicurrency—Cross Border, dated as of February 1, 2008 (the "Master Agreement"); (ii) a Schedule to the Master Agreement, also dated as of February 1, 2008 (the "Schedule"); (iii) a Confirmation dated as of August 1, 2008 (the "Confirmation"); and (iv)

paragraphs 1-12 of the 1994 standard form ISDA Credit Support Annex (the "Credit Support Annex" and together with the Master Agreement, the Schedule and the Confirmation, the "Swap Agreement"), which the Confirmation incorporates by reference. Copies of the Master Agreement, the Schedule, the Confirmation and the Credit Support Annex are attached as Exhibits 1-4.

16.     Section 1 of the Confirmation required Intel to deliver a $1 billion prepayment to LOTC on August 29, 2008 (the "Prepayment"). Intel wired the Prepayment to LOTC on August 29 in four installments of $250 million.

17.     In exchange for the Prepayment, the Confirmation required LOTC to deliver to Intel on the Settlement Date: (i) a number of shares of Intel common stock, calculated based upon, among other things, a volume-weighted average price of Intel shares from September 2, 2008 through September 26, 2008 (the "Calculation Period"), determined in accordance with restrictions imposed upon an issuer's acquisition of its own shares by SEC Rule 10b-18; and (ii) a potential cash payment that increased along with the increase of the average price of Intel stock over the Calculation Period.

18.     The Swap Agreement thus allowed Intel to reduce its outstanding shares while LOTC was exposed to the risk of price movement in Intel shares. Essentially, the Swap Agreement required LOTC to deliver a certain number of shares (or shares and cash, depending upon the average price of Intel shares during the period of the trade), in exchange for Intel's prepayment to LOTC of $1 billion.

19.     Pursuant to the Swap Agreement, Intel had agreed to take more of its shares—and less cash—in satisfaction of LOTC's obligation as the volume weighted average price of those shares over the Calculation Period (the "10b-18 VWAP") declined. Here,

- 5 -

because the 10b-18 VWAP was less than $21, the Swap Agreement required LOTC to deliver to Intel approximately 50.5 million shares, and no cash, on the Settlement Date.

20. Although the Swap Agreement imposed no restrictions on LOTC as to when it had to acquire any of the shares to be delivered on the Settlement Date, LOTC had to bear certain risks, such as execution risk, volatility risk, and delivery risk, in connection with acquiring Intel's shares.

21. Starting on or about August 29, 2008, LOTC began purchasing Intel shares. Following the LBHI bankruptcy on September 15, 2008, LOTC continued to purchase Intel shares. As of September 29, 2008, LOTC had purchased approximately 39.7 million Intel shares at a cost of approximately $803 million. On September 29, 2008, the value of these shares was approximately $686 million.

### B. LOTC's Collateral

22. The Confirmation required LOTC to post, and LOTC did indeed post, $1 billion of collateral to Intel on August 29, 2008. The Swap Agreement required Intel to invest this collateral only in certain "Permitted Investments," and to provide LOTC an accounting of such investments and their earnings. *See* Confirmation § 6(i).

23. The principal amount of the posted collateral did not fluctuate in any manner and remained at $1 billion throughout the life of the Swap Agreement. Specifically, it did not rise or fall with the price of Intel's shares or the value or number of shares acquired by LOTC during Calculation Period. If the Swap Agreement went to maturity, the collateral was to be returned to LOTC in its entirety, with interest, on the Settlement Date upon delivery by LOTC of the shares required by the Swap Agreement. *See* Confirmation § 6(d)(C).

24. Pursuant to the Credit Support Annex, Intel had the right to set-off against the collateral posted by LOTC, but only to recover any amounts actually payable by LOTC to Intel pursuant to the Swap Agreement. *See* Credit Support Annex ¶ 8(a)(iii).

25. Specifically, the Schedule provided that "upon an Early Termination Date resulting from an Event of Default," a non-defaulting party may "reduce any amount or obligation due" to the defaulting party "by setting off against such amount or obligation any amounts" owed to it by the defaulting party. If the amount the non-defaulting party owes to the defaulting party "exceeds the amount or obligation to be setoff against," the non-defaulting party is obligated to pay the defaulting party "the excess … over such amount or obligation." Schedule § 5(g)

26. In addition, the Credit Support Annex made clear that, after exercising this set-off right, Intel was required to transfer to LOTC "any proceeds . . . remaining after . . . satisfaction in full of amounts payable by [LOTC]" pursuant to the Swap Agreement. *See* Credit Support Annex ¶ 8(c).

27. Intel therefore was not entitled to simply keep all of the $1 billion in collateral upon the non-delivery by LOTC of the requisite number of shares on the Settlement Date. Instead, it was necessary to determine the "amounts payable" to Intel, and the remainder of the collateral was to be returned to LOTC.

28. The Confirmation also required Intel to invest LOTC's collateral in designated interest-bearing investments and to deliver the interest on these investments to LOTC upon return of the collateral, which, as set forth in more detail below, Intel failed to do. *See* Confirmation § 6(i)(iii) & 6(j).

### C. Event of Default And Early Termination Date

29. Section 5(a) of the Master Agreement sets forth the occurrences which constitute an Event of Default under the Swap Agreement. In relevant part, the Master Agreement provides:

> **5. Events of Default and Termination Events**
>
> (a) *Events of Default*. The occurrence at any time with respect to a party or . . . any Credit Support Provider of such party . . . of any of the following events constitutes an event of default (an "Event of Default") with respect to such party:
>
> * * *
>
> (vii) *Bankruptcy*. The party, any Credit Support Provider of such party or any applicable Specified Entity of such party [. . .] (4) institutes or has instituted against it a proceeding seeking a judgment of insolvency or bankruptcy or any other relief under any bankruptcy or insolvency law or other similar law affecting creditors' rights, or a petition is presented for its winding-up or liquidation [. . .].

30. On September 15, 2008, LBHI filed for bankruptcy. Section 4(g)(i) of the Schedule designated LBHI as LOTC's "Credit Support Provider." So this was an Event of Default. By letter dated September 26, 2008, Intel declared that an Event of Default had occurred on September 15, 2008 as a result of LBHI's bankruptcy. In the same letter, Intel demanded LOTC to deliver 50,552,943 Intel shares by the Settlement Date in satisfaction of LOTC's obligations under the Swap Agreement. A copy of the letter from Intel to LOTC, dated September 26, 2008 ("September 26 Letter"), is attached as Exhibit 5.

31. Following Intel's declaration of an Event of Default as a result of LBHI's bankruptcy, Intel had the right to designate an "Early Termination Date." *See* Master Agreement § 6(a). However, Intel did not designate an Early Termination Date in its September 26 Letter.

32. Unless and until Intel designated an Early Termination Date, both parties were required to continue to perform under the Swap Agreement. Upon designation of an Early Termination Date, Section 6(c)(ii) of the Master Agreement relieved both parties of any further obligation to make "payments or deliveries." In that event, the Swap Agreement provided that "[t]he amount, if any, payable in respect of an Early Termination Date shall be determined pursuant to Section 6(e)" of the Master Agreement. *See* Master Agreement § 6(c)(ii).

**D. Loss Upon Termination Of The Swap Agreement**

33. In the Confirmation, the parties elected that "Loss and Second Method," as defined in Section 6(e) of the Master Agreement, would apply to determine a loss calculation and payment method in the event that an Early Termination Date was designated. The Second Method provides, in relevant part, that upon the designation of an Early Termination Date resulting from an Event of Default

> an amount will be payable equal to the Non-defaulting Party's Loss in respect of this Agreement. If that amount is a positive number, the Defaulting Party will pay it to the Non-defaulting Party; if it is a negative number, the Non-defaulting Party will pay the absolute value of that amount to the Defaulting Party.

Master Agreement § 6(e)(i)(4).

34. Section 14 of the Master Agreement defines "Loss" to mean, in pertinent part, the

> amount that [the Non-defaulting party] reasonably determines in good faith to be its total losses and costs (or gain, in which case expressed as a negative number) in connection with this Agreement . . . including any loss of bargain, cost of funding or, at the election of [the non-defaulting] party but without duplication, loss or cost incurred as a result of its terminating, liquidating, obtaining or reestablishing any hedge or related trading position (or any gain resulting from them). Loss includes losses and costs (or gains) in respect of any payment or delivery required to have been made . . . on or before the relevant Early Termination Date

> and not made . . . .  A party will determine its Loss *as of the relevant Early Termination Date, or, if that is not reasonably practicable, as of the earliest date thereafter as is reasonably practicable*.  A party may (but need not) determine its Loss by reference to quotations of relevant rates or prices from one or more leading dealers in the relevant markets.

Master Agreement § 14 (emphasis added).

### E.  Intel's Termination Of The Swap Agreement And Seizure Of The Collateral

35.     As explained above, Intel chose not to exercise its right to designate an Early Termination Date immediately upon LBHI's bankruptcy on September 15, 2008.  Instead, it adopted a "wait and see" attitude for the remaining two weeks of the trade.  In doing so, Intel apparently sought to create an argument to seize the entire $1 billion collateral posted by LOTC.

36.     A downward movement in the 10b-18 VWAP of Intel shares—from $19.82 on September 15 to $18.71 on September 26—increased the number of shares that LOTC was to deliver to Intel.  Specifically, as Intel stated in the September 26 Letter, 50,552,943 Intel shares were to be delivered by LOTC to Intel on September 29, 2008, the Settlement Date.  In the same letter, Intel informed LOTC that LBHI's bankruptcy constituted an "Event of Default under Section 5(a)(vii)" of the Master Agreement.  As noted above, however, Intel did not either on September 15 or on September 26 elect to declare an Early Termination Date due to LBHI's bankruptcy filing.

37.     After the close of the markets on September 29, 2008, Intel sent a letter to LOTC in which Intel reiterated that LBHI's bankruptcy constituted an Event of Default under the Master Agreement.  This time, however, Intel "designate[d] September 29, 2008 as the Early Termination Date in respect of the Transaction."  Intel acknowledged in its letter that the parties had elected "Second Method and Loss" to determine payments owed on an Event of

Default. A copy of the letter from Intel to LOTC, dated September 29, 2008 ("September 29 Letter"), is attached as Exhibit 6. LOTC did not deliver any shares to Intel on September 29.

38. Intel's September 29 Letter purported to set forth Intel's "Calculation of Loss." This "calculation" misstated that Lehman's obligation pursuant to the swap agreement was to deliver "US $1 billion in Intel common stock."

39. As set out above, LOTC was not obligated under the Swap Agreement to deliver "$1 billion in Intel common stock." The Swap Agreement did not require LOTC to deliver stock in a particular dollar amount. It required a calculated number of shares to be delivered. As Intel itself had acknowledged in its September 26 Letter, precisely 50,552,943 shares of Intel common stock were to be delivered on the Settlement Date September 29, 2008 (which was also the Early Termination Date). The price of Intel common stock as of the close of markets on September 29, 2008 was $17.27 per share. Thus, the value of 50,552,943 shares of Intel common stock on September 29, 2008 was approximately $873 million, not $1 billion.

40. Intel's September 29 Letter also purported to state Intel's "Loss" as consisting of: (i) "US $1 billion, equal to the price Intel paid on the Prepayment Date . . . and equal to the value, measured as specified in the Confirmation, of deliveries that were to be made by Lehman on or before the Early Termination Date"; and (ii) $1,966,256 interest on the $1 billion that Intel paid to LOTC. However, as noted above, $1 billion was not the "value . . . of deliveries that were to be made by Lehman," nor was interest on that amount a proper component of Intel's "Loss."

41. On September 30, 2008, Intel sent a third letter to LOTC indicating that Intel had on that day "set-off and applied the Posted Collateral held by us under the Confirmation and the Agreement, consisting of Cash, in the amount of US $1,001,966,256.00,

against the amount of US $1,001,966,256.00 payable by you under the Confirmation and the Agreement as specified in the Termination Letter." A copy of the letter from Intel to LOTC, dated September 30, 2008, is attached as Exhibit 7.

42.     Hence, Intel had seized the entire amount of LOTC's $1 billion collateral, and interest due to LOTC on that collateral, in the guise of Intel's "Loss," when all Intel was entitled to was 50,552,943 shares of Intel stock as the value of the number of shares.

### F.  Intel Did Not Make A Reasonable Determination Of Its "Loss"

43.     Intel did not make a reasonable determination of its "Loss," choosing instead to seize the $1 billion in collateral that LOTC posted in connection with the Swap Agreement, which it had no right to do. As Intel itself acknowledged in its September 26 Letter, LOTC would have satisfied its entire obligation to Intel under the Swap Agreement if LOTC had delivered 50,552,943 shares of Intel common stock on September 29, 2008.

44.     By designating an Early Termination Date on September 29, 2008, Intel did not rescind or cancel the Swap Agreement and was bound by "Second Method and Loss," as set forth in the Master Agreement, as the *exclusive means* for calculation of amounts owing pursuant to the Swap Agreement. Under the "Second Method," as chosen by the parties, "an amount will be payable equal to the Non-defaulting Party's Loss in respect of this Agreement." Master Agreement § 6(e)(i)(4). The Master Agreement, in turn, provides that "Loss" is "an amount that [the Non-defaulting] party reasonably determines in good faith to be its total losses and costs . . . in connection with this Agreement . . . including any loss of bargain, [or] cost of funding," but the Master Agreement expressly states that this amount shall be determined "as of the relevant Early Termination Date, or, if that is not reasonably practicable, as of the earliest date thereafter as is reasonably practicable." Master Agreement § 14 (emphasis added).

45. Furthermore, Intel is subject to securities regulations in connection with purchases of its own stock and in accordance with Section 10(b) of the Securities Exchange Act of 1934 and Rule 10b-5 promulgated thereunder, cannot trade in its securities while in the possession of material non-public information. Accordingly, Intel could not have purchased its shares from the open market on September 29, 2008 and for a certain "blackout period" thereafter while it was in the possession of material non-public information. On information and belief, this "blackout period" ended on November 4, 2008. Upon information and belief, Intel could have acquired 50,552,943 shares of its own common stock in a related trade over the period from November 5, 2008 through December 1, 2008, for approximately $688 million, far less than the $1 billion it seized.

46. The Swap Agreement does not provide for the self-help measure that Intel employed, *i.e.*, seizure of the $1 billion that LOTC posted as collateral. That was neither a reasonable nor a good faith determination of Intel's Loss for this transaction. Intel made an express election under this agreement that, in the event of an Early Termination Date, it would determine its Loss "as of the relevant Early Termination Date," not that it would be entitled to recover Intel's full purchase price and restore itself to a position as if the Swap Agreement had never existed. A reasonable and good faith determination of loss seeks to quantify the non-defaulting party's position as if the transaction contemplated by the agreement had taken place, not by assuming that the parties had never entered into the transaction. Nowhere in Intel's "Calculation of Loss" in its September 29 Letter did it attempt to value in any detail the Intel shares that were to be delivered on the Settlement Date. Thus, Intel's determination of Loss was neither reasonable, nor in good faith, under the Swap Agreement.

47. Under the Swap Agreement, Intel only had a right to set-off its actual Loss against the $1 billion of LOTC's collateral and return to LOTC any remaining amounts plus interest, not to seize the entire amount. Instead, Intel unlawfully seized the entire amount of the collateral, plus interest. Despite demands by LOTC, to date, Intel has refused to return any of the amounts owed to LOTC.

### G. Interest On LOTC's Collateral Improperly Seized By Intel

48. The Swap Agreement also requires Intel to pay interest to LOTC on the posted collateral.

49. First, Intel is required to pay LOTC interest on the collateral that Intel has unlawfully retained since September 29, 2008, which was the Early Termination Date as declared by Intel. The Credit Support Annex expressly provides that Intel is required to pay interest on any collateral that it fails to transfer to LOTC when due:

> A Secured Party [here, Intel] that fails to make, when due, any Transfer of Posted Collateral . . . will be obligated to pay the Pledgor [*i.e.*, LOTC] . . . an amount equal to interest at the Default Rate multiplied by the [the amount of posted collateral failed to be transferred], from (and including) the date that Posted Collateral . . . was required to be Transferred to (but excluding) the date of Transfer of that Posted Collateral [ . . .].

Credit Support Annex ¶ 11 (a).

50. The "Default Rate" is defined in the Swap Agreement as "a rate per annum equal to the cost (without proof or evidence of any actual cost) to the relevant payee (as certified by it) if it were to fund or of funding the relevant amount plus 1% per annum." Master Agreement § 14.

51. Intel has wrongfully retained LOTC's collateral since September 29, 2008. Accordingly, pursuant to paragraph 8(c) of the Credit Support Annex, Intel is required to

- 14 -

pay to LOTC interest accrued on this amount at the Default Rate, compounded daily from September 29, 2008 until the business day prior to the day on which Intel finally transfers this excess collateral and accompanying interest back to LOTC.

52. LOTC is also entitled to the interest accrued on the $1 billion collateral from the date that LOTC posted this collateral until the Early Termination Date. The Swap Agreement required Intel to invest LOTC's collateral in designated interest-bearing investments and to deliver the interest from these investments to LOTC on the Settlement Date. *See* Confirmation § 6. As Intel has acknowledged in its September 29 Letter in connection with purporting to calculate its own Loss by reference to LOTC's collateral, the interest on these investments made with LOTC's collateral was $1,966,256. LOTC is therefore entitled to this amount as well.

## FIRST CAUSE OF ACTION
### (Breach of Contract)

53. Plaintiffs repeat and incorporate the allegations contained in the preceding paragraphs as if set forth fully herein.

54. The Swap Agreement constituted a valid contract between LOTC and Intel.

55. LOTC has performed its obligations under the Swap Agreement. The Swap Agreement did not require LOTC to deliver any shares upon Intel's declaration of an Early Termination Date due to the bankruptcy filing of LBHI.

56. Intel breached the Swap Agreement by failing to return to LOTC its unlawfully seized collateral, plus interest thereon since the Early Termination Date.

57.     Intel also breached the Swap Agreement by failing to pay LOTC the interest that was or should have been earned on LOTC's collateral pursuant to the Swap Agreement from the time LOTC posted the collateral through the Early Termination Date.

58.     As a direct and proximate result of Intel's breaches of the Swap Agreement, LOTC has been deprived of a substantial sum of money in an amount to be determined at trial.

### SECOND CAUSE OF ACTION
(Turnover Under Section 542(a) of the Bankruptcy Code)

59.     Plaintiffs repeat and incorporate the allegations contained in the preceding paragraphs as if set forth fully herein.

60.     Section 542(a) of the Bankruptcy Code provides that a debtor may recover property in an action for turnover. Specifically:

> [A]n entity … in possession, custody, or control, during the case, of property that the trustee may use, sell, or lease under section 363 of this title … shall deliver to the trustee, and account for, such property or the value of such property, unless such property is of inconsequential value or benefit to the estate. 11 U.S.C. § 542(a).

61.     Money owed to a debtor is property of such debtor's estate pursuant to section 541(a) of the Bankruptcy Code because the definition of estate property includes all legal and equitable interests of a debtor in property as of commencement of the case and any interest in property that the estate acquires after commencement of the case. 11 U.S.C. § 541(a).

62.     The collateral Intel unlawfully seized constitutes property of the LOTC estate because LOTC has a legal interest in these funds consistent with section 541(a) of the Bankruptcy Code.

- 16 -

63. The interest amounts earned on LOTC's collateral from the time it was posted through the Early Termination Date are property of the LOTC estate because LOTC has a legal interest in these funds consistent with section 541(a) of the Bankruptcy Code.

64. Intel has no security interest in or other claim to the unlawfully seized collateral following the Early Termination Date.

65. The amounts Intel owes to LOTC are easily identifiable.

66. These amounts are neither of inconsequential value nor inconsequential benefit to the LOTC estate.

67. As described above, LOTC has demanded repayment of these amounts from Intel. To date, although Intel is in possession, custody, or control of such funds, Intel has refused to return them to LOTC.

68. Accordingly, pursuant to section 542(a) of the Bankruptcy Code, LOTC is entitled to immediate payment from Intel to the LOTC estate of those funds.

## THIRD CAUSE OF ACTION
(**Declaratory Judgment – Violation of the Automatic Stay Pursuant to 362(a) of the Bankruptcy Code**)

69. Plaintiffs repeat and incorporate the allegations contained in the preceding paragraphs as if set forth fully herein.

70. Section 362(a) of the Bankruptcy Code provides, in relevant part, that the filing of a petition under Title 11 of the Bankruptcy Code "operates as a stay, applicable to all entities, of – . . . (3) any act . . . to exercise control over property of the estate . . . ." 11 U.S.C. § 362(a)(3).

71. At the time LOTC filed its petition for protection under the Bankruptcy Code, the portion of LOTC's collateral that Intel unlawfully withheld constituted a substantial asset of LOTC's estate.

72. Intel's exercise of control over this portion of LOTC's collateral, including its refusal to return the funds owed to LOTC is a violation of the automatic stay under section 362(a) of the Bankruptcy Code. *See* 11 U.S.C. § 362(a)(3).

73. There is an actual controversy between the parties regarding whether the Swap Agreement requires Intel to return to LOTC the unlawfully withheld collateral.

74. Accordingly, pursuant to 28 U.S.C. § 2201 and Bankruptcy Rule 7001, LOTC requests that this Court enter a declaratory judgment that Intel's continuing failure to return the unlawfully withheld collateral constitutes a willful violation of the automatic stay under section 362(a)(3) of the Bankruptcy Code.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for judgment against Intel and an order:

(1) awarding Plaintiffs damages and interest in an amount to be determined at trial;

(2) requiring Intel to turn over to LOTC the amounts of collateral that it wrongfully seized;

(3) requiring Intel to turn over to LOTC interest on the collateral that Intel wrongfully seized as calculated in accordance with the Swap Agreement and since the Early Termination Date;

(4) requiring Intel to turn over to LOTC interest amounts earned or that should have been earned on LOTC's collateral in accordance with the Swap Agreement from the time LOTC posted the collateral with Intel through the Early Termination Date;

(5) declaring that Intel's withholding of amounts due to LOTC violates the automatic stay pursuant to section 362(a) of the Bankruptcy Code;

(6) awarding post-judgment and pre-judgment interest on the above-referenced amounts;

(7) requiring Intel to pay Plaintiffs' attorneys' fees and other costs and expenses incurred in prosecuting the causes of action described herein; and

(8) such further relief as the Court deems just and proper.

Dated: May 1, 2013  
      New York, New York

JONES DAY

/s/ Robert W. Gaffey  
Robert W. Gaffey  
Jayant W. Tambe  
Mahesh Venkatakrishnan

222 East 41st Street  
New York, New York  10017  
Telephone:  (212) 326-3939  
Facsimile:  (212) 755-7306

*Attorneys for Plaintiffs Lehman Brothers Holdings Inc. and Lehman Brothers OTC Derivatives Inc.*