John J. Buckley, Jr. (*pro hac vice*)
Daniel F. Katz (*pro hac vice*)
Edward C. Barnidge (*pro hac vice*)
Patrick H. Kim (*pro hac vice*)
David S. Kurtzer-Ellenbogen
WILLIAMS & CONNOLLY LLP
725 Twelfth Street NW
Washington, DC 20005
Tel:     (202) 434-5000
Fax:     (202) 434-5029

Craig T. Goldblatt (*pro hac vice*)
Isley Markman
WILMER CUTLER PICKERING HALE & DORR LLP
1875 Pennsylvania Avenue NW
Washington, DC 20006
Tel:     (202) 663-6000
Fax:     (202) 663-6363

*Attorneys for Defendant Intel Corporation*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re:<br><br>LEHMAN BROTHERS HOLDINGS INC., *et al.*,<br>                                        Debtors. | Chapter 11<br>Case No. 08-13555 (JMP)<br>(Jointly Administered) |
| LEHMAN BROTHERS HOLDINGS INC. and<br>LEHMAN BROTHERS OTC DERIVATIVES INC.,<br>                                        Plaintiffs,<br>v.<br>INTEL CORP.,<br>                                        Defendant. | Adv. Proc. No. 13-01340 (JMP)<br><br>**<u>RELIEF IS SOUGHT FROM A<br>UNITED STATES DISTRICT<br>JUDGE</u>** |

**NOTICE OF INTEL CORPORATION'S**
**<u>MOTION FOR WITHDRAWAL OF THE REFERENCE</u>**

PLEASE TAKE NOTICE that upon this notice of motion and the accompanying memorandum of law, Intel Corporation hereby respectfully moves this Court for entry of an order pursuant to 28 U.S.C. § 157(d), Rule 5011(a) of the Federal Rules of Bankruptcy Procedure, and Rule 5011-1 of the Local Bankruptcy Rules for the Southern District of New York withdrawing the reference by this Court to the United States Bankruptcy Court for the Southern District of New York of the Adversary Complaint filed by Lehman Brothers Holdings Inc. and Lehman OTC Derivatives Inc. in the above-captioned proceeding on May 1, 2013.

Dated: New York, New York

      January 14, 2014

By:

/s/ John J. Buckley, Jr.
John J. Buckley, Jr. (*pro hac vice*)
WILLIAMS & CONNOLLY LLP
725 Twelfth Street NW
Washington, DC 20005
Tel:    (202) 434-5000
Fax:    (202) 434-5029

*Attorney for Defendant Intel Corporation*

John J. Buckley, Jr. (*pro hac vice*)
Daniel F. Katz (*pro hac vice*)
Edward C. Barnidge (*pro hac vice*)
Patrick H. Kim (*pro hac vice*)
David S. Kurtzer-Ellenbogen
WILLIAMS & CONNOLLY LLP
725 Twelfth Street NW
Washington, DC 20005
Tel:    (202) 434-5000
Fax:    (202) 434-5029

Craig T. Goldblatt (*pro hac vice*)
Isley Markman
WILMER CUTLER PICKERING HALE & DORR LLP
1875 Pennsylvania Avenue NW
Washington, DC 20006
Tel:    (202) 663-6000
Fax:    (202) 663-6363

*Attorneys for Defendant Intel Corporation*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re:<br><br>LEHMAN BROTHERS HOLDINGS INC., *et al.*,<br>Debtors. | Chapter 11<br>Case No. 08-13555 (JMP)<br>(Jointly Administered) |
| LEHMAN BROTHERS HOLDINGS INC. and<br>LEHMAN BROTHERS OTC DERIVATIVES INC.,<br>Plaintiffs,<br>v.<br>INTEL CORP.,<br>Defendant. | Adv. Proc. No. 13-01340 (JMP)<br><br>**RELIEF IS SOUGHT FROM A**<br>**UNITED STATES DISTRICT**<br>**JUDGE** |

**INTEL CORPORATION'S MEMORANDUM IN SUPPORT OF**
**MOTION FOR WITHDRAWAL OF THE REFERENCE**

## TABLE OF CONTENTS

BACKGROUND ................................................................................................................. 2

I.      THE ALLEGATIONS OF THE COMPLAINT. ................................................................2

II.     PROCEDURAL BACKGROUND. ..................................................................................4

ARGUMENT ....................................................................................................................5

I.      THE FACTORS FOR DETERMINING WHETHER THE REFERENCE SHOULD
        BE WITHDRAWN UNIFORMLY SUPPORT WITHDRAWAL HERE. .........................5

        A.      LEHMAN'S SOLE REMAINING CLAIM IS NON-CORE. ...............................6

        B.      CONSIDERATIONS OF EFFICIENCY FAVOR LITIGATING IN THIS
                COURT IN THE FIRST INSTANCE. ....................................................................7

        C.      LEHMAN'S SOLE CLAIM IS A LEGAL ONE. ................................................11

        D.      LITIGATING IN THE FIRST INSTANCE IN THIS COURT WILL END
                LEHMAN'S FORUM SHOPPING. ......................................................................11

        E.      NOTHING IN THIS CASE AFFECTS UNIFORMITY IN THE
                ADMINISTRATION OF BANKRUPTCY LAW. ..............................................12

CONCLUSION....................................................................................................................12

# TABLE OF AUTHORITIES

## FEDERAL CASES

*Dev. Specialists, Inc. v. Akin Gump Strauss Hauer & Feld LLP*, 462 B.R. 457 (S.D.N.Y. 2011) ................................................................................................7

*Dynegy Danskammer, LLC v. Peabody COALTRADE Int'l Ltd.*, 905 F. Supp. 2d 526 (S.D.N.Y. 2012) ............................................................................7, 8, 11, 12

*Exec. Benefits Ins. Agency v. Arkison*, 133 S. Ct. 2880 (2013) ......................................9

*In re EMS Fin. Servs., LLC*, 491 B.R. 196 (E.D.N.Y. 2013)...................................8, 11

*In re Lehman Bros. Holding Inc.*, No. 13-Civ-07481 (LGS), 2013 WL 6633431 (S.D.N.Y. Dec. 17, 2013).................................................................................10

*In re Lehman Bros. Holding Inc.*, Adv. Proc. No. 13-01340(JMP), 2013 WL 6671557 (Bankr. S.D.N.Y. Dec. 19, 2013) ("Mem. on MTD") ..................... passim

*In re Lenders Abstract & Settlement Serv., Inc.*, 493 B.R. 385 (E.D.N.Y. 2013) ....................8, 11

*In re Murphy*, 482 F. App'x 624 (2d Cir. 2012) ......................................................5, 11

*In re Orion Pictures Corp.*, 4 F.3d 1095 (2d Cir. 1993)......................................... passim

*N. Pipeline Constr. Co. v. Marathon Pipe Line Co.*, 458 U.S. 50 (1982) ......................................6

*SIPC v. Bernard L. Madoff Inv. Sec. LLC*, 486 B.R. 579 (S.D.N.Y. 2013) ....................................7

*Stern v. Marshall*, 131 S. Ct. 2594 (2011) ......................................................................6

## OTHER AUTHORITIES

28 U.S.C § 157................................................................................................... 5, 6

Intel Corporation, by and through undersigned counsel, respectfully submits this memorandum of law in support of its motion for withdrawal of the reference of this matter to the bankruptcy court.

In a recent order, the bankruptcy court dismissed the two bankruptcy-law counts of the complaint in this case for failure to state a claim and found that the remaining count was, in the court's words, "simply a claim for breach of contract" under New York law. Because that claim is unquestionably a "non-core" claim, the bankruptcy court cannot enter a final judgment in this case; only this Court can.

For that reason, and others, the reference to the bankruptcy court should be withdrawn. Any proposed findings of fact or conclusions of law by the bankruptcy court would be subject to *de novo* review in this Court. Requiring that the parties first litigate before the bankruptcy court would be grossly inefficient, would saddle them with another layer of expense, would needlessly consume scarce judicial resources at two levels, and would result in duplication of effort and undue delay. Moreover, the bankruptcy court has no special or unique expertise to bring to bear in resolving the underlying contract dispute. In the wake of the dismissal of the two bankruptcy-law counts, no bankruptcy issues remain in the case. The remaining count is for breach of contract and, as the bankruptcy court itself recognized, that count is based entirely on state law. The interpretation of commercial contracts, and the rendering of final judgments on breach-of-contract claims, is the particular province of this Court, not the bankruptcy court. Nor is the bankruptcy court's familiarity with the Lehman bankruptcy a relevant consideration, both because this case presents a freestanding issue of contract interpretation and because the bankruptcy judge who possesses that familiarity is retiring at the end of the month.

In this case, the familiar factors for determining whether the reference should be withdrawn all point in one direction. There is no reason to require the parties to proceed with needlessly duplicative litigation in bankruptcy court on a garden-variety breach-of-contract claim. The Court therefore should withdraw the reference.

## BACKGROUND

## I.    THE ALLEGATIONS OF THE COMPLAINT.

In August 2008, as part of a corporate share repurchase program, Intel entered into a contract with Plaintiff Lehman OTC Derivatives, Inc. ("LOTC"). Adversary Complaint ("Compl.," attached as Exhibit A) ¶ 15 & Exs. 1-4.[1] Intel's objective was to buy back and retire $1 billion worth of its shares during a "blackout period" in which Intel legally was prohibited from trading in its own securities. *See id.* ¶ 45.

The contract is governed by New York law. Compl. Ex. 3 (Confirmation) at 13. Generally, the contract provided that Intel would prepay $1 billion to LOTC; LOTC would post $1 billion in cash as collateral with Intel; and, by September 29, 2008, LOTC would deliver to Intel a combination of Intel shares and cash such that the shares (valued at a slight discount off their volume-weighted average price during a specified calculation period), plus any cash needed to cover a shortfall, would total $1 billion. Compl. ¶¶ 16-17, 22-23 & Ex. 3 at 3-4, 10. It also provided that, in the event of an early termination of the transaction, the "Agreed Value" of any shares delivered by LOTC would be based on the discounted volume-weighted average price of those shares during the calculation period. Compl. Ex. 3 at 9.

---

[1]    The contract consists of several documents, including the four attached to the complaint as Exhibits 1 to 4. Certain of those documents are standardized forms used by the International Swaps and Derivatives Association ("ISDA"), while others—notably including the "Confirmation" attached to the complaint as Exhibit 3—are customized and negotiated.

Intel made its $1 billion prepayment as required; LOTC posted the required $1 billion collateral; and LOTC began purchasing shares. Compl. ¶¶ 16, 21-22. On September 15, 2008, the other plaintiff in this case, Lehman Brothers Holdings Inc. ("LBHI"), filed for bankruptcy. *Id.* ¶¶ 21, 30.[2] Critically, because LBHI was LOTC's credit support provider, LBHI's bankruptcy filing constituted an event of default under the contract and entitled Intel to terminate the transaction at any time then or thereafter. *Id.* ¶ 30-31 & Ex. 1 (Master Agreement) § 6(a). When LOTC failed to deliver any shares on the due date of September 29, Intel ended the transaction by designating an "Early Termination Date." *Id.* ¶ 37 & Ex. 6 (9/29/08 letter).

Intel's termination of the transaction entitled Intel to determine its "Loss," as defined by the contract; if LOTC failed to compensate Intel for that amount, Intel was entitled to set off its Loss against the collateral that LOTC had posted. Compl. ¶¶ 24-25, 44 & Ex. 1 §§ 6(e)(i)(4), 14. The contract defined the "Loss" of a non-defaulting party as "an amount that party reasonably determines in good faith to be its total losses and costs . . . in connection with th[e] Agreement." *Id.* Ex. 1 § 14. That amount is to be determined "as of the relevant Early Termination Date" if "reasonably practicable." *Id.* Intel calculated its Loss as (1) $1 billion, which was "equal to the value, measured as specified in the Confirmation, of deliveries that were to be made by Lehman on or before the Early Termination Date [and] which were not made," plus (2) the interest that Intel had been unable to earn on its $1 billion prepayment. Compl. ¶ 40 & Ex. 6. When LOTC failed to pay Intel that amount, Intel set off its Loss against the $1 billion in posted collateral and the interest that had accrued thereon. *Id.* ¶ 41 & Ex. 7. LOTC filed a petition for bankruptcy a few days later. *Id.* ¶ 12.

---

[2]    LBHI is a plaintiff in this case by virtue of its authority to prosecute claims for LOTC's estate; it possesses no claims of its own. *See* Compl. ¶ 13.

## II.    PROCEDURAL BACKGROUND.

Plaintiffs LOTC and LBHI (hereafter collectively "Lehman") initiated an adversary proceeding on May 1, 2013.  The gist of the complaint is that, because Intel was allegedly obligated by the contract to determine its Loss "based on the market value of the undelivered shares," Intel's determination of Loss, which was not based on spot market prices for Intel shares, could not have been made "reasonably" or "in good faith," as the contract required.  *In re Lehman Bros. Holdings Inc.*, Adv. Proc. No. 13-01340(JMP), --- B.R. ---, 2013 WL 6671557, at *1-2 (Bankr. S.D.N.Y. Dec. 19, 2013) ("Mem. on MTD").  The first count of the complaint, therefore, is a straightforward breach-of-contract claim.  *Id.* at *5-6.  Precisely with the "intention[]" of "invok[ing] the jurisdiction of" the bankruptcy court, however, Lehman added two bankruptcy-law counts:  a count for "turnover" under the Bankruptcy Code and a count seeking a declaratory judgment that Intel had violated the automatic stay in bankruptcy.  *Id.* at *2-3.  Lehman also argued that the breach-of-contract count was a "core" bankruptcy matter because it was "inextricably tied to the bankruptcy context."  *Id.* at *5.

Intel moved to dismiss the two bankruptcy-law counts for failure to state a claim and sought a determination that the breach-of-contract claim "is a non-core count that may not be finally adjudicated by the bankruptcy court."  Mem. on MTD at *1.  The bankruptcy court agreed with Intel in both respects and granted the motion.

First, as to the bankruptcy-law counts, the court reasoned that "[t]he undisputed prepetition setoff by Intel conclusively forecloses all property interests of LOTC in the collateral," and any claim by LOTC with respect to whether the correct amount of collateral was set off "is simply a claim for breach of contract."  *Id.* at *2.  The court rejected Lehman's "flawed premise" that it still retained any property interest in the collateral that had been set off, and it noted "[t]he inescapable problem" that Lehman's own allegations of a prepetition setoff

- 4 -

were incompatible with its bankruptcy-law claims.  *Id.* at *3-4.  Because "Intel has not violated the automatic stay and holds no property to turn over to Lehman," the court dismissed both bankruptcy-law counts for failure to state a claim.  *Id.* at *5.

Second, the bankruptcy court agreed that the breach-of-contract claim necessarily is "non-core."  The court determined that "the consequences of [LOTC's] default—[Intel's] allegedly unreasonable loss calculations . . . —have no direct connection to the bankruptcy of either LBHI or LOTC other than as a possible claim to augment the estates with cash now held by Intel."  Mem. on MTD at *6.  The bankruptcy court found it "unmistakably clear" that Lehman's breach-of-contract claim against Intel "does not arise in any bankruptcy case."  *Id.*

The bankruptcy court's decision was entered as an order on January 13, 2014.  Exhibit B.

## ARGUMENT

### I.    THE FACTORS FOR DETERMINING WHETHER THE REFERENCE SHOULD BE WITHDRAWN UNIFORMLY SUPPORT WITHDRAWAL HERE.

Even where (as here) a matter is referred to the bankruptcy court automatically, a district court is empowered to withdraw a case or proceeding referred to the bankruptcy court "for cause shown." 28 U.S.C. § 157(d).  The Second Circuit has identified five factors, known as the *Orion* factors, for evaluating whether cause exists for withdrawal of the reference:

> [W]hether the claim or proceeding is core or non-core, whether it is legal or equitable, and considerations of efficiency, prevention of forum shopping, and uniformity in the administration of bankruptcy law.

*In re Orion Pictures Corp.,* 4 F.3d 1095, 1101 (2d Cir. 1993); *see also In re Murphy*, 482 F. App'x 624, 628 (2d Cir. 2012) (same).  In the present case, all of those factors strongly weigh in favor of withdrawal.

### A.    LEHMAN'S SOLE REMAINING CLAIM IS NON-CORE.

"A district court considering whether to withdraw the reference should first evaluate whether the claim is core or non-core." *Orion*, 4 F.3d at 1101.  It is upon this "threshold" issue that "questions of efficiency and uniformity will turn." *Id.*  Although a bankruptcy court may hear and enter final judgment on certain "core proceedings," it is precluded—both by statute and under the Constitution—from doing so where a claim is "non-core." *Stern v. Marshall*, 131 S. Ct. 2594, 2602, 2610 (2011).  Rather, in a non-core proceeding, a bankruptcy court is limited to "submit[ting] proposed findings of fact and conclusions of law to the district court" for *de novo* review.  28 U.S.C § 157(c)(1).

It is well established that "[a] breach-of-contract action by a debtor against a party to a pre-petition contract[] who has filed no claim with the bankruptcy court" is paradigmatically non-core. *Orion*, 4 F.3d at 1102; *see also N. Pipeline Constr. Co. v. Marathon Pipe Line Co.*, 458 U.S. 50, 53, 87 n.40 (1982) (noting that a bankruptcy court could not constitutionally decide a state-law contract claim).  In *Orion*, the district court had initially (and erroneously) held that a state-law, prepetition contract claim was core because it "concern[ed] the administration of the estate."  4 F.3d at 1102.  On appeal, however, the Second Circuit rejected that reasoning because it "would swallow the rule," in that "*[a]ny* contract action that the debtor would pursue against a defendant presumably would be expected to inure to the benefit of the debtor estate and thus 'concern[s]' its 'administration.'" *Id.* (emphasis added).  Lehman tried a similar approach here, arguing that its contract claim was core because it is "inextricably tied to the bankruptcy context."  Mem. on MTD at *5.  But the bankruptcy court squarely rejected that argument, reasoning that Lehman's breach-of-contract claim "ha[s] no direct connection to the bankruptcy of either LBHI or LOTC other than as a possible claim to augment the estates with cash now held by Intel." *Id.* at *6.  Moreover, all alleged "material liability-creating conduct actually took

- 6 -

place a number of days before the bankruptcy filing of LOTC." *Id.*  For these reasons, the

bankruptcy court found that the claim was non-core.  *Id.*  Because this is a case in which the

bankruptcy court *cannot* validly render a final judgment, this "threshold" *Orion* factor

indisputably supports withdrawal of the reference.

###    B.    CONSIDERATIONS OF EFFICIENCY FAVOR LITIGATING IN THIS COURT IN THE FIRST INSTANCE.

"[C]onsiderations of efficiency," *Orion*, 4 F.3d at 1101, also strongly favor withdrawal of

the reference.  Because Lehman's sole claim is non-core, the role of the bankruptcy court would

be limited to submitting proposed findings of fact and conclusions of law, all of which would be

subject to *de novo* review by this Court.  It would plainly be inefficient and costly to require the

parties to engage in duplicative evidentiary submissions and legal arguments in proceedings

before both the bankruptcy court and this Court.  Nor does it make sense to have two judges

sequentially review and rule on the same factual and legal questions, particularly with all the

attendant delay that this would entail.

The fact that the bankruptcy court cannot issue a final judgment in this case is "pivotal"

to the question of withdrawal of the reference, *Orion*, 4 F.3d at 1102, "because if a district court

must review recommendations *de novo*, 'it would be inefficient to allow the[] proceedings to go

forward, knowing that they will have to be substantially repeated.'"  *Dynegy Danskammer, LLC*

*v. Peabody COALTRADE Int'l Ltd.*, 905 F. Supp. 2d 526, 533 (S.D.N.Y. 2012) (quoting *Dev.*

*Specialists, Inc. v. Akin Gump Strauss Hauer & Feld LLP*, 462 B.R. 457, 472 (S.D.N.Y. 2011)).

Indeed, "whether or not a bankruptcy court has constitutional authority to enter a final decision

. . . may be the most important factor in determining the permissive withdrawal of the

bankruptcy reference."  *SIPC v. Bernard L. Madoff Inv. Sec. LLC*, 486 B.R. 579, 584 (S.D.N.Y.

2013).  In this case, "withdrawal of the reference is necessary in order to adjudicate the

proceedings in a single court," *Dynegy*, 905 F. Supp. 2d at 533, and the efficiency factor of *Orion* cuts decisively in favor of withdrawal. *See also In re EMS Fin. Servs., LLC*, 491 B.R. 196, 205 (E.D.N.Y. 2013) (stating that, because *de novo* review would be required of any bankruptcy court findings, "judicial resources will be better served" by withdrawal of the reference); *In re Lenders Abstract & Settlement Serv., Inc.*, 493 B.R. 385, 397 (E.D.N.Y. 2013) (same).

At the end of its opinion, the bankruptcy court, while finding that the sole remaining claim was non-core, proposed in passing that Intel consent to adjudication in the bankruptcy court because "it is most efficient and eminently sensible for all disputes involving swap agreements where Lehman and its affiliates are counterparties to be handled in" that court. Mem. on MTD at *6. As a preliminary matter, the issue of whether the reference should be withdrawn, or whether it would be better for "all disputes involving swap agreements" to be handled by the bankruptcy court, *id.*, was not before that court and had not been briefed or argued by the parties. The court's statement therefore constituted *dictum* of the truest sort. To the extent the bankruptcy court was suggesting that there would be benefits from litigating the state-law contract claim at issue here in that court, however, Intel respectfully submits that such suggestion was mistaken.

To begin with, whether litigants can consent to the exercise of the judicial power of the United States by a non-Article III bankruptcy judge, in the form of a final, enforceable judgment, has been called into question and is presently the subject of a pending case before the United

States Supreme Court.  *See Exec. Benefits Ins. Agency v. Arkison*, 133 S. Ct. 2880 (2013).[3]   The bankruptcy court did not address that constitutional question.  Even assuming that Intel could confer such jurisdiction via consent, Intel respectfully declines to do so.  Intel is entitled, both as a statutory matter and as a matter of constitutional right, to have this case heard and decided in an Article III court.

Beyond the question of consent, however, it would not be "most efficient and eminently sensible" for the bankruptcy court to handle this matter simply because it involves a "swap agreement[]."  Mem. on MTD at *6.  Resolving disputes over the meaning of swap agreements is not within the special expertise of bankruptcy judges.  Such agreements are routinely interpreted by federal district courts in the same manner as other disputes involving commercial contracts.  No bankruptcy-law issues remain in this case; all that is left is a contract dispute between Intel and LOTC involving the interpretation of a customized Confirmation incorporating ISDA provisions and the application of New York law.  Nor is knowledge of the Lehman bankruptcy a relevant consideration: as the bankruptcy court has already acknowledged, the contract claim has "no direct connection" to the Lehman bankruptcy "other than as a possible claim to augment the estates."  *Id.*  That alone is an insufficient reason to keep this case in the bankruptcy court, as the Second Circuit held in *Orion*.  Moreover, the bankruptcy court's familiarity with the Lehman bankruptcy soon will be lost, because Judge James Peck is retiring effective January 31, 2014.  At that point, all Lehman matters will be assigned to a new judge who has not previously overseen the Lehman bankruptcy.

---

[3]      *See* Question Presented, *available at* http://www.supremecourt.gov/qp/12-01200qp.pdf (certiorari granted on the question of "[w]hether Article III permits the exercise of the judicial power of the United States by bankruptcy courts on the basis of litigant consent").

In any event, absent Intel's consent to final adjudication by the bankruptcy court, there is no efficiency to be achieved by letting the case remain in the bankruptcy court because any proposed findings or conclusions by that court will be subject to *de novo* review in this Court. Intel should not be forced to litigate the breach-of-contract claim twice, with double the expense.

The only case cited by the bankruptcy court, *In re Lehman Bros. Holding Inc.*, No. 13-Civ-07481 (LGS), 2013 WL 6633431 (S.D.N.Y. Dec. 17, 2013), *see* Mem. on MTD at *6, did not involve swap agreements and is readily distinguishable.  In that case, the district court granted a motion to withdraw the reference by petitioner Federal Housing Finance Agency ("FHFA") but nevertheless referred the matter under consideration to the bankruptcy court for a report and recommendation. *Lehman Bros.*, 2013 WL 6633431, at *1.  Under the facts presented in the FHFA case, withdrawal of the reference was mandatory, but the district court concluded that "the issue of claim priority is squarely among the issues bankruptcy courts were created to handle, and that avoidance claims are almost exclusively adjudicated by bankruptcy judges." *Id.* at *3.  Here, in contrast, the only issue in the case is the interpretation and application of a state-law contract, which has nothing at all to do with bankruptcy.  Unlike with respect to FHFA, this case does not involve the "complex . . . claims procedure in the LBHI bankruptcy" and does not implicate in any way "the expertise of bankruptcy judges generally with avoidance actions and challenges to priority." *Id.*  Moreover, the district court specifically identified Judge Peck's familiarity with the FHFA matter as a basis to support referring the matter back to him for disposition (with the "hope[] to get his invaluable input *before he leaves his post*"). *Id.* at *3 & n.2 (emphasis added).  Given Judge Peck's imminent departure from the bench, that consideration is irrelevant here.

- 10 -

C.    **LEHMAN'S SOLE CLAIM IS A LEGAL ONE.**

Another *Orion* factor is whether the proceeding is legal or equitable. *Murphy*, 482 F.

App'x at 628 (citing *Orion*, 4 F.3d at 1101). A determination that the claims are legal (rather

than equitable) favors withdrawal of the reference. Here, Lehman's sole surviving claim

indisputably seeks money damages. *See* Compl. ¶ 58. "Where a claim for breach of contract

seeks monetary damages, such a claim is a legal, rather than an equitable, claim." *In re Lenders*,

493 B.R. at 396. Lehman's sole claim is therefore a legal one.[4] This *Orion* factor again supports

withdrawal of the reference.

D.    **LITIGATING IN THE FIRST INSTANCE IN THIS COURT WILL END
       LEHMAN'S FORUM SHOPPING.**

A third *Orion* factor, the "prevention of forum shopping," 4 F.3d at 1101, also supports

withdrawing the reference. As the bankruptcy court expressly recognized, Lehman drafted a

complaint with untenable bankruptcy-law claims that were "intentional[ly] designed to invoke

the jurisdiction of" the bankruptcy court. Mem. on MTD at *2. Lehman's complaint even

attempted to characterize its breach-of-contract claim as a "core" bankruptcy claim. The

bankruptcy court sustained all of Intel's objections to Lehman's complaint, dismissed the two

bankruptcy-law counts, and held that the remaining contract claim was "non-core." By contrast,

"[t]here is no indication that forum shopping" is the motivation behind Intel's motion to

withdraw the reference, "as opposed to a genuine desire for more efficient adjudication."

*Dynegy*, 905 F. Supp. 2d at 533. This factor, too, supports withdrawal of the reference.

---

[4]    That the parties agreed to a jury waiver, Compl. Ex. 2 § 5(k), does not alter this fact. In
*In re EMS*, for example, although no jury trial demand had been made, the court nevertheless
determined that "because the underlying nature of the claim[] is legal, not equitable, . . .
Federal's motion to withdraw the reference should be granted." 491 B.R. at 205.

### E.    NOTHING IN THIS CASE AFFECTS UNIFORMITY IN THE ADMINISTRATION OF BANKRUPTCY LAW.

The last *Orion* factor for the Court to consider is "uniformity in the administration of bankruptcy law." *Orion*, 4 F.3d at 1101. This factor, too, cuts in favor of withdrawal of the reference, because, as a result of the bankruptcy court's decision, the sole claim remaining in this case does not turn in any way on bankruptcy law. Even before LOTC filed for bankruptcy, Intel and LOTC entered into a contract; LOTC defaulted; and Intel terminated and set off its Loss. In view of the bankruptcy court's rejection of Lehman's attempt to manufacture bankruptcy claims, all that is left of this case is a contract claim arising under New York law. "Courts routinely have found no benefit [to uniform administration] where claims are based on state law." *Dynegy*, 905 F. Supp. 2d at 533. So too here. This case "ha[s] no direct connection to the bankruptcy of either LBHI or LOTC other than as a possible claim to augment the estates with cash now held by Intel." Mem. on MTD at *6. That is not a basis for leaving the case in the bankruptcy court.

## CONCLUSION

For the foregoing reasons, Intel respectfully requests that the Court grant the motion to withdraw the reference.

Dated: January 14, 2014                    By:

                                         /s/ John J. Buckley, Jr.
                                         John J. Buckley, Jr. (*pro hac vice*)
                                         WILLIAMS & CONNOLLY LLP
                                         725 Twelfth Street NW
                                         Washington, DC 20005
                                         Tel:    (202) 434-5000
                                         Fax:    (202) 434-5029

                                         *Attorney for Defendant Intel Corporation*

- 12 -

# **<u>EXHIBIT A</u>**

JONES DAY
222 East 41st Street
New York, New York 10017
Telephone: (212) 326-3939
Facsimile: (212) 755-7306
Robert W. Gaffey
Jayant W. Tambe
Mahesh Venkatakrishnan

*Attorneys for Plaintiffs*
*Lehman Brothers Holdings Inc.*
*and Lehman Brothers OTC Derivatives Inc.*

## UNITED STATES BANKRUPTCY COURT
## SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------------------X
: 
In re:                                            :    Chapter 11
                                                  :
LEHMAN BROTHERS HOLDINGS INC., *et al.,*  :    Case No. 08-13555 (JMP)
                                                  :
                    Debtors.                      :    (Jointly Administered)
                                                  :
-------------------------------------------------------------X
                                                  :
LEHMAN BROTHERS HOLDINGS INC. and    :
LEHMAN BROTHERS OTC DERIVATIVES INC.:
                                                  :
                    Plaintiffs,                   :    Adv. Proc. No. 13-_____ (JMP)
                                                  :
v.                                                :
                                                  :
INTEL CORP.,                                      :
                                                  :
                    Defendant.                    :
-------------------------------------------------------------X

## ADVERSARY COMPLAINT

     Lehman Brothers Holdings Inc. ("LBHI"), on behalf of itself and as Plan

Administrator under the Modified Third Amended Joint Chapter 11 Plan of Lehman Brothers

Holdings Inc. and Its Affiliated Debtors (the "Plan"), and Lehman Brothers OTC Derivatives

Inc. ("LOTC") (and together with LBHI's affiliated debtors in the above referenced chapter 11

case, the "Debtors"), as and for their Adversary Complaint against defendant Intel Corporation

("Intel") allege as follows:

**INTRODUCTION**

1.     This is an action to recover collateral that was unlawfully seized by Intel

in breach of a swap agreement between LOTC and Intel.

2.     Under the swap agreement, Intel was required to deliver $1 billion to

LOTC on August 29, 2008, and LOTC was to deliver to Intel, on September 29, 2008 (the

"Settlement Date"), shares of Intel stock, with the number of shares determined by a formula

based on the fluctuation in the price of Intel stock.  As turned out to be the case, the swap

agreement required LOTC to deliver to Intel approximately 50.5 million shares of Intel stock on

the Settlement Date.  Additionally, on August 29, 2008, LOTC was required to post, and it did

so post, $1 billion of cash collateral to Intel.

3.     On September 15, 2008, LBHI filed for bankruptcy protection pursuant to

chapter 11 of title 11 of the United States Code (the "Bankruptcy Code").  Because the swap

agreement designated LBHI as LOTC's Credit Support Provider, LBHI's bankruptcy filing

constituted an "Event of Default."  This Event of Default triggered Intel's right to terminate the

swap agreement by declaring an "Early Termination Date."

4.     Intel did not terminate the swap agreement on September 15, 2008,

although it could have chosen to do so.   Ultimately, it chose to ride out the market for two

weeks.  On September 29, 2008, which was also the Settlement Date for the Transaction, Intel

declared an Early Termination Date and terminated the swap agreement due to LBHI's

bankruptcy filing.

5.      Intel's designation of the Early Termination Date gave rise to a specific, agreed-upon procedure for determining what amounts were due upon termination.  Specifically, the swap agreement required only that Intel be compensated for its losses as a result of the termination, as reasonably determined by Intel in good faith.

6.      Intel did not reasonably, or in good faith, determine its losses in accordance with the swap agreement.

7.      Upon information and belief, Intel's reasonable losses as a result of terminating the swap agreement were far less than $1 billion.  Nonetheless, on September 29, 2008, Intel unlawfully seized, and has refused to return any portion of, the $1 billion cash collateral posted by LOTC under the swap agreement, and the nearly $2 million in interest that had accrued thereon as of the Settlement Date.

8.      By seizing LOTC's collateral in its entirety and by failing to return the portion of LOTC's collateral that is beyond Intel's reasonable losses, Intel breached the swap agreement and the automatic stay of the Bankruptcy Code.  Accordingly, LOTC brings this action to require Intel to repay to LOTC an amount to be determined at trial, plus interest, that Intel wrongfully seized from LOTC's posted collateral.

## <u>JURISDICTION AND VENUE</u>

9.      This is an adversary proceeding brought pursuant to Sections 362, 541, and 542 of the Bankruptcy Code, Rules 7001 and 7003 of the Federal Rules of Bankruptcy Procedure (the "<u>Bankruptcy Rules</u>"), and 28 U.S.C. § 2201, to recover amounts due to LOTC by Intel.

10.     This Court has subject matter jurisdiction to consider and determine this matter pursuant to 28 U.S.C. §§ 157 and 1334.  This is a core proceeding pursuant to 28 U.S.C.

§ 157(b).  The Court has retained jurisdiction over this matter pursuant to Section 14.1 of the

Plan and paragraphs RR and 77 of the order confirming the Plan.

11.     Venue is proper in this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

## **PARTIES**

12.     On September 15, 2008 and October 3, 2008, LBHI and LOTC,

respectively, commenced with this Court voluntary cases under chapter 11 of the Bankruptcy

Code.  LOTC's chapter 11 case has been consolidated with LBHI's chapter 11 case for

procedural purposes only, and those cases are being jointly administered pursuant to

Bankruptcy Rule 1015(b).  Plaintiffs LBHI and LOTC are both Delaware corporations with

their principal places of business at 1271 Sixth Avenue, New York, New York 10020.

13.     On December 6, 2011, the Court approved and entered an order

confirming the Plan.  The Plan became effective on March 6, 2012.  Pursuant to the Plan, LBHI,

as Plan Administrator, is authorized to prosecute litigation claims on behalf of its estate and

LOTC's estate.

14.     Defendant Intel is a Delaware corporation with its principal place of

business in Santa Clara, California.

## **STATEMENT OF FACTS**

### **A.  The Swap Agreement**

15.     LOTC and Intel entered into the swap agreement at issue in this action on

August 1, 2008.  The swap agreement consists of four documents:  (i) the 1992 ISDA Master

Agreement, Multicurrency—Cross Border, dated as of February 1, 2008 (the "Master

Agreement"); (ii) a Schedule to the Master Agreement, also dated as of February 1, 2008 (the

"Schedule"); (iii) a Confirmation dated as of August 1, 2008 (the "Confirmation"); and (iv)

- 4 -

paragraphs 1-12 of the 1994 standard form ISDA Credit Support Annex (the "<u>Credit Support</u>

<u>Annex</u>" and together with the Master Agreement, the Schedule and the Confirmation, the

"<u>Swap Agreement</u>"), which the Confirmation incorporates by reference.  Copies of the Master

Agreement, the Schedule, the Confirmation and the Credit Support Annex are attached as

Exhibits 1-4.

      16.      Section 1 of the Confirmation required Intel to deliver a $1 billion

prepayment to LOTC on August 29, 2008 (the "<u>Prepayment</u>").  Intel wired the Prepayment to

LOTC on August 29 in four installments of $250 million.

      17.      In exchange for the Prepayment, the Confirmation required LOTC to

deliver to Intel on the Settlement Date:  (i) a number of shares of Intel common stock,

calculated based upon, among other things, a volume-weighted average price of Intel shares

from September 2, 2008 through September 26, 2008 (the "<u>Calculation Period</u>"), determined in

accordance with restrictions imposed upon an issuer's acquisition of its own shares by SEC

Rule 10b-18; and (ii) a potential cash payment that increased along with the increase of the

average price of Intel stock over the Calculation Period.

      18.      The Swap Agreement thus allowed Intel to reduce its outstanding shares

while LOTC was exposed to the risk of price movement in Intel shares.  Essentially, the Swap

Agreement required LOTC to deliver a certain number of shares (or shares and cash, depending

upon the average price of Intel shares during the period of the trade), in exchange for Intel's

prepayment to LOTC of $1 billion.

      19.      Pursuant to the Swap Agreement, Intel had agreed to take more of its

shares—and less cash—in satisfaction of LOTC's obligation as the volume weighted average

price of those shares over the Calculation Period (the "<u>10b-18 VWAP</u>") declined.  Here,

because the 10b-18 VWAP was less than $21, the Swap Agreement required LOTC to deliver to Intel approximately 50.5 million shares, and no cash, on the Settlement Date.

20.     Although the Swap Agreement imposed no restrictions on LOTC as to when it had to acquire any of the shares to be delivered on the Settlement Date, LOTC had to bear certain risks, such as execution risk, volatility risk, and delivery risk, in connection with acquiring Intel's shares.

21.     Starting on or about August 29, 2008, LOTC began purchasing Intel shares.  Following the LBHI bankruptcy on September 15, 2008, LOTC continued to purchase Intel shares.  As of September 29, 2008, LOTC had purchased approximately 39.7 million Intel shares at a cost of approximately $803 million.  On September 29, 2008, the value of these shares was approximately $686 million.

**B.  LOTC's Collateral**

22.     The Confirmation required LOTC to post, and LOTC did indeed post, $1 billion of collateral to Intel on August 29, 2008.  The Swap Agreement required Intel to invest this collateral only in certain "Permitted Investments," and to provide LOTC an accounting of such investments and their earnings.  *See* Confirmation § 6(i).

23.     The principal amount of the posted collateral did not fluctuate in any manner and remained at $1 billion throughout the life of the Swap Agreement.  Specifically, it did not rise or fall with the price of Intel's shares or the value or number of shares acquired by LOTC during Calculation Period.  If the Swap Agreement went to maturity, the collateral was to be returned to LOTC in its entirety, with interest, on the Settlement Date upon delivery by LOTC of the shares required by the Swap Agreement.  *See* Confirmation § 6(d)(C).

24.     Pursuant to the Credit Support Annex, Intel had the right to set-off against the collateral posted by LOTC, but only to recover any amounts actually payable by LOTC to Intel pursuant to the Swap Agreement.  *See* Credit Support Annex ¶ 8(a)(iii).

25.     Specifically, the Schedule provided that "upon an Early Termination Date resulting from an Event of Default," a non-defaulting party may "reduce any amount or obligation due" to the defaulting party "by setting off against such amount or obligation any amounts" owed to it by the defaulting party.  If the amount the non-defaulting party owes to the defaulting party "exceeds the amount or obligation to be setoff against," the non-defaulting party is obligated to pay the defaulting party "the excess … over such amount or obligation." Schedule § 5(g)

26.     In addition, the Credit Support Annex made clear that, after exercising this set-off right, Intel was required to transfer to LOTC "any proceeds . . . remaining after . . . satisfaction in full of amounts payable by [LOTC]" pursuant to the Swap Agreement.  *See* Credit Support Annex ¶ 8(c).

27.     Intel therefore was not entitled to simply keep all of the $1 billion in collateral upon the non-delivery by LOTC of the requisite number of shares on the Settlement Date.  Instead, it was necessary to determine the "amounts payable" to Intel, and the remainder of the collateral was to be returned to LOTC.

28.     The Confirmation also required Intel to invest LOTC's collateral in designated interest-bearing investments and to deliver the interest on these investments to LOTC upon return of the collateral, which, as set forth in more detail below, Intel failed to do. *See* Confirmation § 6(i)(iii) & 6(j).

### C.  Event of Default And Early Termination Date

       29.    Section 5(a) of the Master Agreement sets forth the occurrences which constitute an Event of Default under the Swap Agreement.  In relevant part, the Master Agreement provides:

> **5. Events of Default and Termination Events**
>
> (a) *Events of Default*.  The occurrence at any time with respect to a party or . . . any Credit Support Provider of such party . . . of any of the following events constitutes an event of default (an "<u>Event of Default</u>") with respect to such party:
>
> * * *
>
> > (vii) *Bankruptcy.*  The party, any Credit Support Provider of such party or any applicable Specified Entity of such party [. . .] (4) institutes or has instituted against it a proceeding seeking a judgment of insolvency or bankruptcy or any other relief under any bankruptcy or insolvency law or other similar law affecting creditors' rights, or a petition is presented for its winding-up or liquidation [. . . ].

       30.    On September 15, 2008, LBHI filed for bankruptcy.  Section 4(g)(i) of the Schedule designated LBHI as LOTC's "Credit Support Provider."  So this was an Event of Default.  By letter dated September 26, 2008, Intel declared that an Event of Default had occurred on September 15, 2008 as a result of LBHI's bankruptcy.  In the same letter, Intel demanded LOTC to deliver 50,552,943 Intel shares by the Settlement Date in satisfaction of LOTC's obligations under the Swap Agreement.  A copy of the letter from Intel to LOTC, dated September 26, 2008 ("<u>September 26 Letter</u>"), is attached as Exhibit 5.

       31.    Following Intel's declaration of an Event of Default as a result of LBHI's bankruptcy, Intel had the right to designate an "Early Termination Date."  *See* Master Agreement § 6(a).  However, Intel did not designate an Early Termination Date in its September 26 Letter.

- 8 -

32.     Unless and until Intel designated an Early Termination Date, both parties were required to continue to perform under the Swap Agreement.  Upon designation of an Early Termination Date, Section 6(c)(ii) of the Master Agreement relieved both parties of any further obligation to make "payments or deliveries."  In that event, the Swap Agreement provided that "[t]he amount, if any, payable in respect of an Early Termination Date shall be determined pursuant to Section 6(e)" of the Master Agreement.  *See* Master Agreement § 6(c)(ii).

**D.  Loss Upon Termination Of The Swap Agreement**

33.     In the Confirmation, the parties elected that "Loss and Second Method," as defined in Section 6(e) of the Master Agreement, would apply to determine a loss calculation and payment method in the event that an Early Termination Date was designated.  The Second Method provides, in relevant part, that upon the designation of an Early Termination Date resulting from an Event of Default

> an amount will be payable equal to the Non-defaulting Party's Loss in respect of this Agreement.  If that amount is a positive number, the Defaulting Party will pay it to the Non-defaulting Party; if it is a negative number, the Non-defaulting Party will pay the absolute value of that amount to the Defaulting Party.

Master Agreement § 6(e)(i)(4).

34.     Section 14 of the Master Agreement defines "Loss" to mean, in pertinent part, the

> amount that [the Non-defaulting party] reasonably determines in good faith to be its total losses and costs (or gain, in which case expressed as a negative number) in connection with this Agreement . . . including any loss of bargain, cost of funding or, at the election of [the non-defaulting] party but without duplication, loss or cost incurred as a result of its terminating, liquidating, obtaining or reestablishing any hedge or related trading position (or any gain resulting from them).  Loss includes losses and costs (or gains) in respect of any payment or delivery required to have been made . . . on or before the relevant Early Termination Date

- 9 -

and not made . . . .   A party will determine its Loss *as of the
relevant Early Termination Date, or, if that is not reasonably
practicable, as of the earliest date thereafter as is reasonably
practicable.*  A party may (but need not) determine its Loss by
reference to quotations of relevant rates or prices from one or more
leading dealers in the relevant markets.

Master Agreement § 14 (emphasis added).

### E.   Intel's Termination Of The Swap Agreement And Seizure Of The Collateral

35.     As explained above, Intel chose not to exercise its right to designate an

Early Termination Date immediately upon LBHI's bankruptcy on September 15, 2008.  Instead,

it adopted a "wait and see" attitude for the remaining two weeks of the trade.  In doing so, Intel

apparently sought to create an argument to seize the entire $1 billion collateral posted by LOTC.

36.     A downward movement in the 10b-18 VWAP of Intel shares—from

$19.82 on September 15 to $18.71 on September 26—increased the number of shares that

LOTC was to deliver to Intel.  Specifically, as Intel stated in the September 26 Letter,

50,552,943 Intel shares were to be delivered by LOTC to Intel on September 29, 2008, the

Settlement Date.  In the same letter, Intel informed LOTC that LBHI's bankruptcy constituted

an "Event of Default under Section 5(a)(vii)" of the Master Agreement.  As noted above,

however, Intel did not either on September 15 or on September 26 elect to declare an Early

Termination Date due to LBHI's bankruptcy filing.

37.     After the close of the markets on September 29, 2008, Intel sent a letter to

LOTC in which Intel reiterated that LBHI's bankruptcy constituted an Event of Default under

the Master Agreement.  This time, however, Intel "designate[d] September 29, 2008 as the

Early Termination Date in respect of the Transaction."  Intel acknowledged in its letter that the

parties had elected "Second Method and Loss" to determine payments owed on an Event of

Default.  A copy of the letter from Intel to LOTC, dated September 29, 2008 ("September 29

Letter"), is attached as Exhibit 6.  LOTC did not deliver any shares to Intel on September 29.

       38.     Intel's September 29 Letter purported to set forth Intel's "Calculation of

Loss."  This "calculation" misstated that Lehman's obligation pursuant to the swap agreement

was to deliver "US $1 billion in Intel common stock."

       39.     As set out above, LOTC was not obligated under the Swap Agreement to

deliver "$1 billion in Intel common stock."  The Swap Agreement did not require LOTC to

deliver stock in a particular dollar amount.  It required a calculated number of shares to be

delivered.  As Intel itself had acknowledged in its September 26 Letter, precisely 50,552,943

shares of Intel common stock were to be delivered on the Settlement Date September 29, 2008

(which was also the Early Termination Date).  The price of Intel common stock as of the close

of markets on September 29, 2008 was $17.27 per share.  Thus, the value of 50,552,943 shares

of Intel common stock on September 29, 2008 was approximately $873 million, not $1 billion.

       40.     Intel's September 29 Letter also purported to state Intel's "Loss" as

consisting of:  (i) "US $1 billion, equal to the price Intel paid on the Prepayment Date . . . and

equal to the value, measured as specified in the Confirmation, of deliveries that were to be made

by Lehman on or before the Early Termination Date"; and (ii) $1,966,256 interest on the $1

billion that Intel paid to LOTC.  However, as noted above, $1 billion was not the "value . . . of

deliveries that were to be made by Lehman," nor was interest on that amount a proper

component of Intel's "Loss."

       41.     On September 30, 2008, Intel sent a third letter to LOTC indicating that

Intel had on that day "set-off and applied the Posted Collateral held by us under the

Confirmation and the Agreement, consisting of Cash, in the amount of US $1,001,966,256.00,

against the amount of US $1,001,966,256.00 payable by you under the Confirmation and the

Agreement as specified in the Termination Letter."  A copy of the letter from Intel to LOTC,

dated September 30, 2008, is attached as Exhibit 7.

      42.    Hence, Intel had seized the entire amount of LOTC's $1 billion collateral,

and interest due to LOTC on that collateral, in the guise of Intel's "Loss," when all Intel was

entitled to was 50,552,943 shares of Intel stock as the value of the number of shares.

### F.  Intel Did Not Make A Reasonable Determination Of Its "Loss"

      43.    Intel did not make a reasonable determination of its "Loss," choosing

instead to seize the $1 billion in collateral that LOTC posted in connection with the Swap

Agreement, which it had no right to do.  As Intel itself acknowledged in its September 26

Letter, LOTC would have satisfied its entire obligation to Intel under the Swap Agreement if

LOTC had delivered 50,552,943 shares of Intel common stock on September 29, 2008.

      44.    By designating an Early Termination Date on September 29, 2008, Intel

did not rescind or cancel the Swap Agreement and was bound by "Second Method and Loss," as

set forth in the Master Agreement, as the *exclusive means* for calculation of amounts owing

pursuant to the Swap Agreement.  Under the "Second Method," as chosen by the parties, "an

amount will be payable equal to the Non-defaulting Party's Loss in respect of this Agreement."

Master Agreement § 6(e)(i)(4).  The Master Agreement, in turn, provides that "Loss" is "an

amount that [the Non-defaulting] party reasonably determines in good faith to be its total losses

and costs . . . in connection with this Agreement . . . including any loss of bargain, [or] cost of

funding," but the Master Agreement expressly states that this amount shall be determined "as of

the relevant Early Termination Date, or, if that is not reasonably practicable, as of the earliest

date thereafter as is reasonably practicable."  Master Agreement § 14 (emphasis added).

45.     Furthermore, Intel is subject to securities regulations in connection with purchases of its own stock and in accordance with Section 10(b) of the Securities Exchange Act of 1934 and Rule 10b-5 promulgated thereunder, cannot trade in its securities while in the possession of material non-public information.  Accordingly, Intel could not have purchased its shares from the open market on September 29, 2008 and for a certain "blackout period" thereafter while it was in the possession of material non-public information.  On information and belief, this "blackout period" ended on November 4, 2008.  Upon information and belief, Intel could have acquired 50,552,943 shares of its own common stock in a related trade over the period from November 5, 2008 through December 1, 2008, for approximately $688 million, far less than the $1 billion it seized.

46.     The Swap Agreement does not provide for the self-help measure that Intel employed, *i.e.*, seizure of the $1 billion that LOTC posted as collateral.  That was neither a reasonable nor a good faith determination of Intel's Loss for this transaction.  Intel made an express election under this agreement that, in the event of an Early Termination Date, it would determine its Loss "as of the relevant Early Termination Date," not that it would be entitled to recover Intel's full purchase price and restore itself to a position as if the Swap Agreement had never existed.  A reasonable and good faith determination of loss seeks to quantify the non-defaulting party's position as if the transaction contemplated by the agreement had taken place, not by assuming that the parties had never entered into the transaction.  Nowhere in Intel's "Calculation of Loss" in its September 29 Letter did it attempt to value in any detail the Intel shares that were to be delivered on the Settlement Date.  Thus, Intel's determination of Loss was neither reasonable, nor in good faith, under the Swap Agreement.

47.     Under the Swap Agreement, Intel only had a right to set-off its actual Loss

against the $1 billion of LOTC's collateral and return to LOTC any remaining amounts plus

interest, not to seize the entire amount.  Instead, Intel unlawfully seized the entire amount of the

collateral, plus interest.  Despite demands by LOTC, to date, Intel has refused to return any of

the amounts owed to LOTC.

### G.   Interest On LOTC's Collateral Improperly Seized By Intel

48.     The Swap Agreement also requires Intel to pay interest to LOTC on the

posted collateral.

49.     First, Intel is required to pay LOTC interest on the collateral that Intel has

unlawfully retained since September 29, 2008, which was the Early Termination Date as

declared by Intel.  The Credit Support Annex expressly provides that Intel is required to pay

interest on any collateral that it fails to transfer to LOTC when due:

> A Secured Party [here, Intel] that fails to make, when due, any
> Transfer of Posted Collateral . . . will be obligated to pay the
> Pledgor [*i.e.*, LOTC] . . . an amount equal to interest at the Default
> Rate multiplied by the [the amount of posted collateral failed to be
> transferred], from (and including) the date that Posted Collateral . .
> . was required to be Transferred to (but excluding) the date of
> Transfer of that Posted Collateral [ . . .].

Credit Support Annex ¶ 11 (a).

50.     The "Default Rate" is defined in the Swap Agreement as "a rate per

annum equal to the cost (without proof or evidence of any actual cost) to the relevant payee (as

certified by it) if it were to fund or of funding the relevant amount plus 1% per annum."  Master

Agreement § 14.

51.     Intel has wrongfully retained LOTC's collateral since September 29,

2008.  Accordingly, pursuant to paragraph 8(c) of the Credit Support Annex, Intel is required to

- 14 -

pay to LOTC interest accrued on this amount at the Default Rate, compounded daily from

September 29, 2008 until the business day prior to the day on which Intel finally transfers this

excess collateral and accompanying interest back to LOTC.

52.    LOTC is also entitled to the interest accrued on the $1 billion collateral

from the date that LOTC posted this collateral until the Early Termination Date.  The Swap

Agreement required Intel to invest LOTC's collateral in designated interest-bearing investments

and to deliver the interest from these investments to LOTC on the Settlement Date.  *See*

Confirmation § 6.  As Intel has acknowledged in its September 29 Letter in connection with

purporting to calculate its own Loss by reference to LOTC's collateral, the interest on these

investments made with LOTC's collateral was $1,966,256.  LOTC is therefore entitled to this

amount as well.

## FIRST CAUSE OF ACTION
### (Breach of Contract)

53.    Plaintiffs repeat and incorporate the allegations contained in the

preceding paragraphs as if set forth fully herein.

54.    The Swap Agreement constituted a valid contract between LOTC and

Intel.

55.    LOTC has performed its obligations under the Swap Agreement.  The

Swap Agreement did not require LOTC to deliver any shares upon Intel's declaration of an

Early Termination Date due to the bankruptcy filing of LBHI.

56.    Intel breached the Swap Agreement by failing to return to LOTC its

unlawfully seized collateral, plus interest thereon since the Early Termination Date.

- 15 -

57.     Intel also breached the Swap Agreement by failing to pay LOTC the

interest that was or should have been earned on LOTC's collateral pursuant to the Swap

Agreement from the time LOTC posted the collateral through the Early Termination Date.

58.     As a direct and proximate result of Intel's breaches of the Swap

Agreement, LOTC has been deprived of a substantial sum of money in an amount to be

determined at trial.

**SECOND CAUSE OF ACTION**
**(Turnover Under Section 542(a) of the Bankruptcy Code)**

59.     Plaintiffs repeat and incorporate the allegations contained in the

preceding paragraphs as if set forth fully herein.

60.     Section 542(a) of the Bankruptcy Code provides that a debtor may

recover property in an action for turnover.  Specifically:

> [A]n entity … in possession, custody, or control, during the case, of property that
> the trustee may use, sell, or lease under section 363 of this title … shall deliver to
> the trustee, and account for, such property or the value of such property, unless
> such property is of inconsequential value or benefit to the estate. 11 U.S.C. §
> 542(a).

61.     Money owed to a debtor is property of such debtor's estate pursuant to

section 541(a) of the Bankruptcy Code because the definition of estate property includes all

legal and equitable interests of a debtor in property as of commencement of the case and any

interest in property that the estate acquires after commencement of the case.  11 U.S.C. §

541(a).

62.     The collateral Intel unlawfully seized constitutes property of the LOTC

estate because LOTC has a legal interest in these funds consistent with section 541(a) of the

Bankruptcy Code.

63.      The interest amounts earned on LOTC's collateral from the time it was

posted through the Early Termination Date are property of the LOTC estate because LOTC has

a legal interest in these funds consistent with section 541(a) of the Bankruptcy Code.

64.      Intel has no security interest in or other claim to the unlawfully seized

collateral following the Early Termination Date.

65.      The amounts Intel owes to LOTC are easily identifiable.

66.      These amounts are neither of inconsequential value nor inconsequential

benefit to the LOTC estate.

67.      As described above, LOTC has demanded repayment of these amounts

from Intel.  To date, although Intel is in possession, custody, or control of such funds, Intel has

refused to return them to LOTC.

68.      Accordingly, pursuant to section 542(a) of the Bankruptcy Code, LOTC

is entitled to immediate payment from Intel to the LOTC estate of those funds.

### THIRD CAUSE OF ACTION
**(Declaratory Judgment – Violation of the Automatic Stay Pursuant to 362(a)
of the Bankruptcy Code)**

69.      Plaintiffs repeat and incorporate the allegations contained in the

preceding paragraphs as if set forth fully herein.

70.      Section 362(a) of the Bankruptcy Code provides, in relevant part, that the

filing of a petition under Title 11 of the Bankruptcy Code "operates as a stay, applicable to all

entities, of – . . . (3) any act . . . to exercise control over property of the estate . . . ." 11 U.S.C.

§ 362(a)(3).

71.    At the time LOTC filed its petition for protection under the Bankruptcy

Code, the portion of LOTC's collateral that Intel unlawfully withheld constituted a substantial

asset of LOTC's estate.

72.    Intel's exercise of control over this portion of LOTC's collateral,

including its refusal to return the funds owed to LOTC is a violation of the automatic stay under

section 362(a) of the Bankruptcy Code.  *See* 11 U.S.C. § 362(a)(3).

73.    There is an actual controversy between the parties regarding whether the

Swap Agreement requires Intel to return to LOTC the unlawfully withheld collateral.

74.     Accordingly, pursuant to 28 U.S.C. § 2201 and Bankruptcy Rule 7001,

LOTC requests that this Court enter a declaratory judgment that Intel's continuing failure to

return the unlawfully withheld collateral constitutes a willful violation of the automatic stay

under section 362(a)(3) of the Bankruptcy Code.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for judgment against Intel and an order:

(1)    awarding Plaintiffs damages and interest in an amount to be determined at

trial;

(2)     requiring Intel to turn over to LOTC the amounts of collateral that it

wrongfully seized;

(3)    requiring Intel to turn over to LOTC interest on the collateral that Intel

wrongfully seized as calculated in accordance with the Swap Agreement and since the Early

Termination Date;

(4)     requiring Intel to turn over to LOTC interest amounts earned or that

should have been earned on LOTC's collateral in accordance with the Swap Agreement from the

time LOTC posted the collateral with Intel through the Early Termination Date;

(5)     declaring that Intel's withholding of amounts due to LOTC violates the

automatic stay pursuant to section 362(a) of the Bankruptcy Code;

(6)     awarding post-judgment and pre-judgment interest on the above-

referenced amounts;

(7)     requiring Intel to pay Plaintiffs' attorneys' fees and other costs and

expenses incurred in prosecuting the causes of action described herein; and

(8)     such further relief as the Court deems just and proper.


Dated:  May 1, 2013                          JONES DAY
        New York, New York


                                             /s/ Robert W. Gaffey
                                             Robert W. Gaffey
                                             Jayant W. Tambe
                                             Mahesh Venkatakrishnan

                                             222 East 41st Street
                                             New York, New York  10017
                                             Telephone:  (212) 326-3939
                                             Facsimile:  (212) 755-7306

                                             *Attorneys for Plaintiffs Lehman Brothers
                                             Holdings Inc. and Lehman Brothers OTC
                                             Derivatives Inc.*

# EXHIBIT

# 1

(Multicurrency-Cross Border)



International Swap Dealers Association, Inc.

# MASTER AGREEMENT

dated as of **February 1, 2008**

**LEHMAN BROTHERS OTC**     and     **INTEL CORPORATION**
**DERIVATIVES INC.**

have entered and/or anticipate entering into one or more transactions (each a "Transaction") that are or will
be governed by this Master Agreement, which includes the schedule (the "Schedule"), and the documents
and other confirming evidence (each a "Confirmation") exchanged between the parties confirming those
Transactions.

Accordingly, the parties agree as follows:—

1.       **Interpretation**

(a)       **Definitions.**  The terms defined in Section 14 and in the Schedule will have the meanings therein
specified for the purpose of this Master Agreement.

(b)       **Inconsistency.**  In the event of any inconsistency between the provisions of the Schedule and the
other provisions of this Master Agreement, the Schedule will prevail.  In the event of any inconsistency
between the provisions of any Confirmation and this Master Agreement (including the Schedule), such
Confirmation will prevail for the purposes of the relevant Transaction.

(c)       **Single Agreement.**  All Transactions are entered into in reliance on the fact that this Master
Agreement and all Confirmations form a single agreement between the parties (collectively referred to as
this "Agreement"), and the parties would not otherwise enter into any Transactions.

2.       **Obligations**

(a)       **General Conditions.**

(i)  Each party will make each payment or delivery specified in each Confirmation to be made by
it, subject to the other provisions of this Agreement.

(ii)  Payments under this Agreement will be made on the due date for value on that date in the
place of the account specified in the relevant Confirmation or otherwise pursuant to this
Agreement, in freely transferable funds and in the manner customary for payments in the required
currency.  Where settlement is by delivery (that is, other than by payment), such delivery will be
made for receipt on the due date in the manner customary for the relevant obligation unless
otherwise specified in the relevant Confirmation or elsewhere in this Agreement.

(iii)  Each obligation of each party under Section 2(a)(i) is subject to  (1) the condition precedent
that no Event of Default or Potential Event of Default with respect to the other party has occurred
and is continuing, (2) the condition precedent that no Early Termination Date in respect of the
relevant Transaction has occurred or been effectively designated and (3) each other applicable
condition precedent specified in this Agreement.

(b)     *Change of Account*. Either party may change its account for receiving a payment or delivery by giving notice to the other party at least five Local Business Days prior to the scheduled date for the payment or delivery to which such change applies unless such other party gives timely notice of a reasonable objection to such change.

(c)     *Netting*. If on any date amounts would otherwise be payable:—

    (i)     in the same currency; and

    (ii)    in respect of the same Transaction,

by each party to the other, then, on such date, each party's obligation to make payment of any such amount will be automatically satisfied and discharged and, if the aggregate amount that would otherwise have been payable by one party exceeds the aggregate amount that would otherwise have been payable by the other party, replaced by an obligation upon the party by whom the larger aggregate amount would have been payable to pay to the other party the excess of the larger aggregate amount over the smaller aggregate amount.

The parties may elect in respect of two or more Transactions that a net amount will be determined in respect of all amounts payable on the same date in the same currency in respect of such Transactions, regardless of whether such amounts are payable in respect of the same Transaction. The election may be made in the Schedule or a Confirmation by specifying that subparagraph (ii) above will not apply to the Transactions identified as being subject to the election, together with the starting date (in which case subparagraph (ii) above will not, or will cease to, apply to such Transactions from such date). This election may be made separately for different groups of Transactions and will apply separately to each pairing of Offices through which the parties make and receive payments or deliveries.

(d)     *Deduction or Withholding for Tax.*

    (i)     *Gross-Up*. All payments under this Agreement will be made without any deduction or withholding for or on account of any Tax unless such deduction or withholding is required by any applicable law, as modified by the practice of any relevant governmental revenue authority, then in effect. If a party is so required to deduct or withhold, then that party ("X") will:—

        (1)     promptly notify the other party ("Y") of such requirement;

        (2)     pay to the relevant authorities the full amount required to be deducted or withheld (including the full amount required to be deducted or withheld from any additional amount paid by X to Y under this Section 2(d)) promptly upon the earlier of determining that such deduction or withholding is required or receiving notice that such amount has been assessed against Y;

        (3)     promptly forward to Y an official receipt (or a certified copy), or other documentation reasonably acceptable to Y, evidencing such payment to such authorities; and

        (4)     if such Tax is an Indemnifiable Tax, pay to Y, in addition to the payment to which Y is otherwise entitled under this Agreement, such additional amount as is necessary to ensure that the net amount actually received by Y (free and clear of Indemnifiable Taxes, whether assessed against X or Y) will equal the full amount Y would have received had no such deduction or withholding been required. However, X will not be required to pay any additional amount to Y to the extent that it would not be required to be paid but for:—

            (A)     the failure by Y to comply with or perform any agreement contained in Section 4(a)(i), 4(a)(iii) or 4(d); or

            (B)     the failure of a representation made by Y pursuant to Section 3(f) to be accurate and true unless such failure would not have occurred but for (I) any action taken by a taxing authority, or brought in a court of competent jurisdiction, on or after the date on which a Transaction is entered into (regardless of whether such action is taken or brought with respect to a party to this Agreement) or (II) a Change in Tax Law.

2

(ii) *Liability.* If: —

(1) X is required by any applicable law, as modified by the practice of any relevant governmental revenue authority, to make any deduction or withholding in respect of which X would not be required to pay an additional amount to Y under Section 2(d)(i)(4);

(2) X does not so deduct or withhold; and

(3) a liability resulting from such Tax is assessed directly against X,

then, except to the extent Y has satisfied or then satisfies the liability resulting from such Tax, Y will promptly pay to X the amount of such liability (including any related liability for interest, but including any related liability for penalties only if Y has failed to comply with or perform any agreement contained in Section 4(a)(i), 4(a)(iii) or 4(d)).

(e) *Default Interest; Other Amounts.* Prior to the occurrence or effective designation of an Early Termination Date in respect of the relevant Transaction, a party that defaults in the performance of any payment obligation will, to the extent permitted by law and subject to Section 6(c), be required to pay interest (before as well as after judgment) on the overdue amount to the other party on demand in the same currency as such overdue amount, for the period from (and including) the original due date for payment to (but excluding) the date of actual payment, at the Default Rate. Such interest will be calculated on the basis of daily compounding and the actual number of days elapsed. If, prior to the occurrence or effective designation of an Early Termination Date in respect of the relevant Transaction, a party defaults in the performance of any obligation required to be settled by delivery, it will compensate the other party on demand if and to the extent provided for in the relevant Confirmation or elsewhere in this Agreement.

## 3. Representations

Each party represents to the other party (which representations will be deemed to be repeated by each party on each date on which a Transaction is entered into and, in the case of the representations in Section 3(f), at all times until the termination of this Agreement) that:—

(a) *Basic Representations.*

(i) *Status.* It is duly organised and validly existing under the laws of the jurisdiction of its organisation or incorporation and, if relevant under such laws, in good standing;

(ii) *Powers.* It has the power to execute this Agreement and any other documentation relating to this Agreement to which it is a party, to deliver this Agreement and any other documentation relating to this Agreement that it is required by this Agreement to deliver and to perform its obligations under this Agreement and any obligations it has under any Credit Support Document to which it is a party and has taken all necessary action to authorise such execution, delivery and performance;

(iii) *No Violation or Conflict.* Such execution, delivery and performance do not violate or conflict with any law applicable to it, any provision of its constitutional documents, any order or judgment of any court or other agency of government applicable to it or any of its assets or any contractual restriction binding on or affecting it or any of its assets;

(iv) *Consents.* All governmental and other consents that are required to have been obtained by it with respect to this Agreement or any Credit Support Document to which it is a party have been obtained and are in full force and effect and all conditions of any such consents have been complied with; and

(v) *Obligations Binding.* Its obligations under this Agreement and any Credit Support Document to which it is a party constitute its legal, valid and binding obligations, enforceable in accordance with their respective terms (subject to applicable bankruptcy, reorganisation, insolvency, moratorium or similar laws affecting creditors' rights generally and subject, as to enforceability, to equitable principles of general application (regardless of whether enforcement is sought in a proceeding in equity or at law)).

ISDA® 1992

(b)     *Absence of Certain Events*. No Event of Default or Potential Event of Default or, to its knowledge, Termination Event with respect to it has occurred and is continuing and no such event or circumstance would occur as a result of its entering into or performing its obligations under this Agreement or any Credit Support Document to which it is a party.

(c)     *Absence of Litigation*. There is not pending or, to its knowledge, threatened against it or any of its Affiliates any action, suit or proceeding at law or in equity or before any court, tribunal, governmental body, agency or official or any arbitrator that is likely to affect the legality, validity or enforceability against it of this Agreement or any Credit Support Document to which it is a party or its ability to perform its obligations under this Agreement or such Credit Support Document.

(d)     *Accuracy of Specified Information*. All applicable information that is furnished in writing by or on behalf of it to the other party and is identified for the purpose of this Section 3(d) in the Schedule is, as of the date of the information, true, accurate and complete in every material respect.

(e)     *Payer Tax Representation*. Each representation specified in the Schedule as being made by it for the purpose of this Section 3(e) is accurate and true.

(f)     *Payee Tax Representations*. Each representation specified in the Schedule as being made by it for the purpose of this Section 3(f) is accurate and true.

**4.     Agreements**

Each party agrees with the other that, so long as either party has or may have any obligation under this Agreement or under any Credit Support Document to which it is a party:—

(a)     *Furnish Specified Information*. It will deliver to the other party or, in certain cases under subparagraph (iii) below, to such government or taxing authority as the other party reasonably directs:—

(i)     any forms, documents or certificates relating to taxation specified in the Schedule or any Confirmation;

(ii)     any other documents specified in the Schedule or any Confirmation; and

(iii)     upon reasonable demand by such other party, any form or document that may be required or reasonably requested in writing in order to allow such other party or its Credit Support Provider to make a payment under this Agreement or any applicable Credit Support Document without any deduction or withholding for or on account of any Tax or with such deduction or withholding at a reduced rate (so long as the completion, execution or submission of such form or document would not materially prejudice the legal or commercial position of the party in receipt of such demand), with any such form or document to be accurate and completed in a manner reasonably satisfactory to such other party and to be executed and to be delivered with any reasonably required certification,

in each case by the date specified in the Schedule or such Confirmation or, if none is specified, as soon as reasonably practicable.

(b)     *Maintain Authorisations*. It will use all reasonable efforts to maintain in full force and effect all consents of any governmental or other authority that are required to be obtained by it with respect to this Agreement or any Credit Support Document to which it is a party and will use all reasonable efforts to obtain any that may become necessary in the future.

(c)     *Comply with Laws*. It will comply in all material respects with all applicable laws and orders to which it may be subject if failure so to comply would materially impair its ability to perform its obligations under this Agreement or any Credit Support Document to which it is a party.

(d)     *Tax Agreement*. It will give notice of any failure of a representation made by it under Section 3(f) to be accurate and true promptly upon learning of such failure.

(e)     *Payment of Stamp Tax*. Subject to Section 11, it will pay any Stamp Tax levied or imposed upon it or in respect of its execution or performance of this Agreement by a jurisdiction in which it is incorporated,

4                                                                                              **ISDA® 1992**

organised, managed and controlled, or considered to have its seat, or in which a branch or office through which it is acting for the purpose of this Agreement is located ("Stamp Tax Jurisdiction") and will indemnify the other party against any Stamp Tax levied or imposed upon the other party or in respect of the other party's execution or performance of this Agreement by any such Stamp Tax Jurisdiction which is not also a Stamp Tax Jurisdiction with respect to the other party.

## 5.      Events of Default and Termination Events

(a)      *Events of Default*. The occurrence at any time with respect to a party or, if applicable, any Credit Support Provider of such party or any Specified Entity of such party of any of the following events constitutes an event of default (an "Event of Default") with respect to such party:—

(i)      *Failure to Pay or Deliver*. Failure by the party to make, when due, any payment under this Agreement or delivery under Section 2(a)(i) or 2(e) required to be made by it if such failure is not remedied on or before the third Local Business Day after notice of such failure is given to the party;

(ii)      *Breach of Agreement*. Failure by the party to comply with or perform any agreement or obligation (other than an obligation to make any payment under this Agreement or delivery under Section 2(a)(i) or 2(e) or to give notice of a Termination Event or any agreement or obligation under Section 4(a)(i), 4(a)(iii) or 4(d)) to be complied with or performed by the party in accordance with this Agreement if such failure is not remedied on or before the thirtieth day after notice of such failure is given to the party;

(iii)      *Credit Support Default*.

(1)      Failure by the party or any Credit Support Provider of such party to comply with or perform any agreement or obligation to be complied with or performed by it in accordance with any Credit Support Document if such failure is continuing after any applicable grace period has elapsed;

(2)      the expiration or termination of such Credit Support Document or the failing or ceasing of such Credit Support Document to be in full force and effect for the purpose of this Agreement (in either case other than in accordance with its terms) prior to the satisfaction of all obligations of such party under each Transaction to which such Credit Support Document relates without the written consent of the other party; or

(3)      the party or such Credit Support Provider disaffirms, disclaims, repudiates or rejects, in whole or in part, or challenges the validity of, such Credit Support Document;

(iv)      *Misrepresentation*. A representation (other than a representation under Section 3(e) or (f)) made or repeated or deemed to have been made or repeated by the party or any Credit Support Provider of such party in this Agreement or any Credit Support Document proves to have been incorrect or misleading in any material respect when made or repeated or deemed to have been made or repeated;

(v)      *Default under Specified Transaction*. The party, any Credit Support Provider of such party or any applicable Specified Entity of such party (1) defaults under a Specified Transaction and, after giving effect to any applicable notice requirement or grace period, there occurs a liquidation of, an acceleration of obligations under, or an early termination of, that Specified Transaction, (2) defaults, after giving effect to any applicable notice requirement or grace period, in making any payment or delivery due on the last payment, delivery or exchange date of, or any payment on early termination of, a Specified Transaction (or such default continues for at least three Local Business Days if there is no applicable notice requirement or grace period) or (3) disaffirms, disclaims, repudiates or rejects, in whole or in part, a Specified Transaction (or such action is taken by any person or entity appointed or empowered to operate it or act on its behalf);

(vi)      *Cross Default*. If "Cross Default" is specified in the Schedule as applying to the party, the occurrence or existence of (1) a default, event of default or other similar condition or event (however

described) in respect of such party, any Credit Support Provider of such party or any applicable Specified Entity of such party under one or more agreements or instruments relating to Specified Indebtedness of any of them (individually or collectively) in an aggregate amount of not less than the applicable Threshold Amount (as specified in the Schedule) which has resulted in such Specified Indebtedness becoming, or becoming capable at such time of being declared, due and payable under such agreements or instruments, before it would otherwise have been due and payable or (2) a default by such party, such Credit Support Provider or such Specified Entity (individually or collectively) in making one or more payments on the due date thereof in an aggregate amount of not less than the applicable Threshold Amount under such agreements or instruments (after giving effect to any applicable notice requirement or grace period);

(vii) *Bankruptcy*. The party, any Credit Support Provider of such party or any applicable Specified Entity of such party: —

(1) is dissolved (other than pursuant to a consolidation, amalgamation or merger); (2) becomes insolvent or is unable to pay its debts or fails or admits in writing its inability generally to pay its debts as they become due; (3) makes a general assignment, arrangement or composition with or for the benefit of its creditors; (4) institutes or has instituted against it a proceeding seeking a judgment of insolvency or bankruptcy or any other relief under any bankruptcy or insolvency law or other similar law affecting creditors' rights, or a petition is presented for its winding-up or liquidation, and, in the case of any such proceeding or petition instituted or presented against it, such proceeding or petition (A) results in a judgment of insolvency or bankruptcy or the entry of an order for relief or the making of an order for its winding-up or liquidation or (B) is not dismissed, discharged, stayed or restrained in each case within 30 days of the institution or presentation thereof; (5) has a resolution passed for its winding-up, official management or liquidation (other than pursuant to a consolidation, amalgamation or merger); (6) seeks or becomes subject to the appointment of an administrator, provisional liquidator, conservator, receiver, trustee, custodian or other similar official for it or for all or substantially all its assets; (7) has a secured party take possession of all or substantially all its assets or has a distress, execution, attachment, sequestration or other legal process levied, enforced or sued on or against all or substantially all its assets and such secured party maintains possession, or any such process is not dismissed, discharged, stayed or restrained, in each case within 30 days thereafter; (8) causes or is subject to any event with respect to it which, under the applicable laws of any jurisdiction, has an analogous effect to any of the events specified in clauses (1) to (7) (inclusive); or (9) takes any action in furtherance of, or indicating its consent to, approval of, or acquiescence in, any of the foregoing acts; or

(viii) *Merger Without Assumption*. The party or any Credit Support Provider of such party consolidates or amalgamates with, or merges with or into, or transfers all or substantially all its assets to, another entity and, at the time of such consolidation, amalgamation, merger or transfer: —

(1) the resulting, surviving or transferee entity fails to assume all the obligations of such party or such Credit Support Provider under this Agreement or any Credit Support Document to which it or its predecessor was a party by operation of law or pursuant to an agreement reasonably satisfactory to the other party to this Agreement; or

(2) the benefits of any Credit Support Document fail to extend (without the consent of the other party) to the performance by such resulting, surviving or transferee entity of its obligations under this Agreement.

(b)    *Termination Events*. The occurrence at any time with respect to a party or, if applicable, any Credit Support Provider of such party or any Specified Entity of such party of any event specified below constitutes an Illegality if the event is specified in (i) below, a Tax Event if the event is specified in (ii) below or a Tax Event Upon Merger if the event is specified in (iii) below, and, if specified to be applicable, a Credit Event

6                                                          **ISDA® 1992**

Upon Merger if the event is specified pursuant to (iv) below or an Additional Termination Event if the event is specified pursuant to (v) below:—

    (i)    ***Illegality***. Due to the adoption of, or any change in, any applicable law after the date on which a Transaction is entered into, or due to the promulgation of, or any change in, the interpretation by any court, tribunal or regulatory authority with competent jurisdiction of any applicable law after such date, it becomes unlawful (other than as a result of a breach by the party of Section 4(b)) for such party (which will be the Affected Party):

        (1) to perform any absolute or contingent obligation to make a payment or delivery or to receive a payment or delivery in respect of such Transaction or to comply with any other material provision of this Agreement relating to such Transaction; or

        (2) to perform, or for any Credit Support Provider of such party to perform, any contingent or other obligation which the party (or such Credit Support Provider) has under any Credit Support Document relating to such Transaction;

    (ii)    ***Tax Event***. Due to (x) any action taken by a taxing authority, or brought in a court of competent jurisdiction, on or after the date on which a Transaction is entered into (regardless of whether such action is taken or brought with respect to a party to this Agreement) or (y) a Change in Tax Law, the party (which will be the Affected Party) will, or there is a substantial likelihood that it will, on the next succeeding Scheduled Payment Date (1) be required to pay to the other party an additional amount in respect of an Indemnifiable Tax under Section 2(d)(i)(4) (except in respect of interest under Section 2(e), 6(d)(ii) or 6(e)) or (2) receive a payment from which an amount is required to be deducted or withheld for or on account of a Tax (except in respect of interest under Section 2(e), 6(d)(ii) or 6(e)) and no additional amount is required to be paid in respect of such Tax under Section 2(d)(i)(4) (other than by reason of Section 2(d)(i)(4)(A) or (B));

    (iii)    ***Tax Event Upon Merger***. The party (the "Burdened Party") on the next succeeding Scheduled Payment Date will either (1) be required to pay an additional amount in respect of an Indemnifiable Tax under Section 2(d)(i)(4) (except in respect of interest under Section 2(e), 6(d)(ii) or 6(e)) or (2) receive a payment from which an amount has been deducted or withheld for or on account of any Indemnifiable Tax in respect of which the other party is not required to pay an additional amount (other than by reason of Section 2(d)(i)(4)(A) or (B)), in either case as a result of a party consolidating or amalgamating with, or merging with or into, or transferring all or substantially all its assets to, another entity (which will be the Affected Party) where such action does not constitute an event described in Section 5(a)(viii);

    (iv)    ***Credit Event Upon Merger***. If "Credit Event Upon Merger" is specified in the Schedule as applying to the party, such party ("X"), any Credit Support Provider of X or any applicable Specified Entity of X consolidates or amalgamates with, or merges with or into, or transfers all or substantially all its assets to, another entity and such action does not constitute an event described in Section 5(a)(viii) but the creditworthiness of the resulting, surviving or transferee entity is materially weaker than that of X, such Credit Support Provider or such Specified Entity, as the case may be, immediately prior to such action (and, in such event, X or its successor or transferee, as appropriate, will be the Affected Party); or

    (v)    ***Additional Termination Event***. If any "Additional Termination Event" is specified in the Schedule or any Confirmation as applying, the occurrence of such event (and, in such event, the Affected Party or Affected Parties shall be as specified for such Additional Termination Event in the Schedule or such Confirmation).

(c)    ***Event of Default and Illegality***. If an event or circumstance which would otherwise constitute or give rise to an Event of Default also constitutes an Illegality, it will be treated as an Illegality and will not constitute an Event of Default.

ISDA® 1992

**6.     Early Termination**

(a)     ***Right to Terminate Following Event of Default***. If at any time an Event of Default with respect to a party (the "Defaulting Party") has occurred and is then continuing, the other party (the "Non-defaulting Party") may, by not more than 20 days notice to the Defaulting Party specifying the relevant Event of Default, designate a day not earlier than the day such notice is effective as an Early Termination Date in respect of all outstanding Transactions. If, however, "Automatic Early Termination" is specified in the Schedule as applying to a party, then an Early Termination Date in respect of all outstanding Transactions will occur immediately upon the occurrence with respect to such party of an Event of Default specified in Section 5(a)(vii)(1), (3), (5), (6) or, to the extent analogous thereto, (8), and as of the time immediately preceding the institution of the relevant proceeding or the presentation of the relevant petition upon the occurrence with respect to such party of an Event of Default specified in Section 5(a)(vii)(4) or, to the extent analogous thereto, (8).

(b)     ***Right to Terminate Following Termination Event***.

(i)     ***Notice***. If a Termination Event occurs, an Affected Party will, promptly upon becoming aware of it, notify the other party, specifying the nature of that Termination Event and each Affected Transaction and will also give such other information about that Termination Event as the other party may reasonably require.

(ii)     ***Transfer to Avoid Termination Event***. If either an Illegality under Section 5(b)(i)(1) or a Tax Event occurs and there is only one Affected Party, or if a Tax Event Upon Merger occurs and the Burdened Party is the Affected Party, the Affected Party will, as a condition to its right to designate an Early Termination Date under Section 6(b)(iv), use all reasonable efforts (which will not require such party to incur a loss, excluding immaterial, incidental expenses) to transfer within 20 days after it gives notice under Section 6(b)(i) all its rights and obligations under this Agreement in respect of the Affected Transactions to another of its Offices or Affiliates so that such Termination Event ceases to exist.

If the Affected Party is not able to make such a transfer it will give notice to the other party to that effect within such 20 day period, whereupon the other party may effect such a transfer within 30 days after the notice is given under Section 6(b)(i).

Any such transfer by a party under this Section 6(b)(ii) will be subject to and conditional upon the prior written consent of the other party, which consent will not be withheld if such other party's policies in effect at such time would permit it to enter into transactions with the transferee on the terms proposed.

(iii)     ***Two Affected Parties***. If an Illegality under Section 5(b)(i)(1) or a Tax Event occurs and there are two Affected Parties, each party will use all reasonable efforts to reach agreement within 30 days after notice thereof is given under Section 6(b)(i) on action to avoid that Termination Event.

(iv)     ***Right to Terminate***. If:

(1)     a transfer under Section 6(b)(ii) or an agreement under Section 6(b)(iii), as the case may be, has not been effected with respect to all Affected Transactions within 30 days after an Affected Party gives notice under Section 6(b)(i); or

(2)     an Illegality under Section 5(b)(i)(2), a Credit Event Upon Merger or an Additional Termination Event occurs, or a Tax Event Upon Merger occurs and the Burdened Party is not the Affected Party,

either party in the case of an Illegality, the Burdened Party in the case of a Tax Event Upon Merger, any Affected Party in the case of a Tax Event or an Additional Termination Event if there is more than one Affected Party, or the party which is not the Affected Party in the case of a Credit Event Upon Merger or an Additional Termination Event if there is only one Affected Party may, by not more than 20 days notice to the other party and provided that the relevant Termination Event is then

**ISDA® 1992**

continuing, designate a day not earlier than the day such notice is effective as an Early Termination Date in respect of all Affected Transactions.

(c)   *Effect of Designation.*

(i)   If notice designating an Early Termination Date is given under Section 6(a) or (b), the Early Termination Date will occur on the date so designated, whether or not the relevant Event of Default or Termination Event is then continuing.

(ii)   Upon the occurrence or effective designation of an Early Termination Date, no further payments or deliveries under Section 2(a)(i) or 2(e) in respect of the Terminated Transactions will be required to be made, but without prejudice to the other provisions of this Agreement. The amount, if any, payable in respect of an Early Termination Date shall be determined pursuant to Section 6(e).

(d)   *Calculations.*

(i)   *Statement*. On or as soon as reasonably practicable following the occurrence of an Early Termination Date, each party will make the calculations on its part, if any, contemplated by Section 6(e) and will provide to the other party a statement (1) showing, in reasonable detail, such calculations (including all relevant quotations and specifying any amount payable under Section 6(e)) and (2) giving details of the relevant account to which any amount payable to it is to be paid. In the absence of written confirmation from the source of a quotation obtained in determining a Market Quotation, the records of the party obtaining such quotation will be conclusive evidence of the existence and accuracy of such quotation.

(ii)   *Payment Date*. An amount calculated as being due in respect of any Early Termination Date under Section 6(e) will be payable on the day that notice of the amount payable is effective (in the case of an Early Termination Date which is designated or occurs as a result of an Event of Default) and on the day which is two Local Business Days after the day on which notice of the amount payable is effective (in the case of an Early Termination Date which is designated as a result of a Termination Event). Such amount will be paid together with (to the extent permitted under applicable law) interest thereon (before as well as after judgment) in the Termination Currency, from (and including) the relevant Early Termination Date to (but excluding) the date such amount is paid, at the Applicable Rate. Such interest will be calculated on the basis of daily compounding and the actual number of days elapsed.

(e)   *Payments on Early Termination*. If an Early Termination Date occurs, the following provisions shall apply based on the parties' election in the Schedule of a payment measure, either "Market Quotation" or "Loss", and a payment method, either the "First Method" or the "Second Method". If the parties fail to designate a payment measure or payment method in the Schedule, it will be deemed that "Market Quotation" or the "Second Method", as the case may be, shall apply. The amount, if any, payable in respect of an Early Termination Date and determined pursuant to this Section will be subject to any Set-off.

(i)   *Events of Default*. If the Early Termination Date results from an Event of Default: —

(1) *First Method and Market Quotation*. If the First Method and Market Quotation apply, the Defaulting Party will pay to the Non-defaulting Party the excess, if a positive number, of (A) the sum of the Settlement Amount (determined by the Non-defaulting Party) in respect of the Terminated Transactions and the Termination Currency Equivalent of the Unpaid Amounts owing to the Non-defaulting Party over (B) the Termination Currency Equivalent of the Unpaid Amounts owing to the Defaulting Party.

(2) *First Method and Loss*. If the First Method and Loss apply, the Defaulting Party will pay to the Non-defaulting Party, if a positive number, the Non-defaulting Party's Loss in respect of this Agreement.

(3) *Second Method and Market Quotation*. If the Second Method and Market Quotation apply, an amount will be payable equal to (A) the sum of the Settlement Amount (determined by the

Non-defaulting Party) in respect of the Terminated Transactions and the Termination Currency Equivalent of the Unpaid Amounts owing to the Non-defaulting Party less (B) the Termination Currency Equivalent of the Unpaid Amounts owing to the Defaulting Party. If that amount is a positive number, the Defaulting Party will pay it to the Non-defaulting Party; if it is a negative number, the Non-defaulting Party will pay the absolute value of that amount to the Defaulting Party.

(4) *Second Method and Loss*. If the Second Method and Loss apply, an amount will be payable equal to the Non-defaulting Party's Loss in respect of this Agreement. If that amount is a positive number, the Defaulting Party will pay it to the Non-defaulting Party; if it is a negative number, the Non-defaulting Party will pay the absolute value of that amount to the Defaulting Party.

(ii) **Termination Events**. If the Early Termination Date results from a Termination Event: —

(1) *One Affected Party*. If there is one Affected Party, the amount payable will be determined in accordance with Section 6(e)(i)(3), if Market Quotation applies, or Section 6(e)(i)(4), if Loss applies, except that, in either case, references to the Defaulting Party and to the Non-defaulting Party will be deemed to be references to the Affected Party and the party which is not the Affected Party, respectively, and, if Loss applies and fewer than all the Transactions are being terminated, Loss shall be calculated in respect of all Terminated Transactions.

(2) *Two Affected Parties*. If there are two Affected Parties: —

(A) if Market Quotation applies, each party will determine a Settlement Amount in respect of the Terminated Transactions, and an amount will be payable equal to (I) the sum of (a) one-half of the difference between the Settlement Amount of the party with the higher Settlement Amount ("X") and the Settlement Amount of the party with the lower Settlement Amount ("Y") and (b) the Termination Currency Equivalent of the Unpaid Amounts owing to X less (II) the Termination Currency Equivalent of the Unpaid Amounts owing to Y; and

(B) if Loss applies, each party will determine its Loss in respect of this Agreement (or, if fewer than all the Transactions are being terminated, in respect of all Terminated Transactions) and an amount will be payable equal to one-half of the difference between the Loss of the party with the higher Loss ("X") and the Loss of the party with the lower Loss ("Y").

If the amount payable is a positive number, Y will pay it to X; if it is a negative number, X will pay the absolute value of that amount to Y.

(iii) **Adjustment for Bankruptcy**. In circumstances where an Early Termination Date occurs because "Automatic Early Termination" applies in respect of a party, the amount determined under this Section 6(e) will be subject to such adjustments as are appropriate and permitted by law to reflect any payments or deliveries made by one party to the other under this Agreement (and retained by such other party) during the period from the relevant Early Termination Date to the date for payment determined under Section 6(d)(ii).

(iv) **Pre-Estimate**. The parties agree that if Market Quotation applies an amount recoverable under this Section 6(e) is a reasonable pre-estimate of loss and not a penalty. Such amount is payable for the loss of bargain and the loss of protection against future risks and except as otherwise provided in this Agreement neither party will be entitled to recover any additional damages as a consequence of such losses.

ISDA® 1992

## 7.    Transfer

Subject to Section 6(b)(ii), neither this Agreement nor any interest or obligation in or under this Agreement may be transferred (whether by way of security or otherwise) by either party without the prior written consent of the other party, except that: —

(a)    a party may make such a transfer of this Agreement pursuant to a consolidation or amalgamation with, or merger with or into, or transfer of all or substantially all its assets to, another entity (but without prejudice to any other right or remedy under this Agreement); and

(b)    a party may make such a transfer of all or any part of its interest in any amount payable to it from a Defaulting Party under Section 6(e).

Any purported transfer that is not in compliance with this Section will be void.

## 8.    Contractual Currency

(a)    *Payment in the Contractual Currency*. Each payment under this Agreement will be made in the relevant currency specified in this Agreement for that payment (the "Contractual Currency"). To the extent permitted by applicable law, any obligation to make payments under this Agreement in the Contractual Currency will not be discharged or satisfied by any tender in any currency other than the Contractual Currency, except to the extent such tender results in the actual receipt by the party to which payment is owed, acting in a reasonable manner and in good faith in converting the currency so tendered into the Contractual Currency, of the full amount in the Contractual Currency of all amounts payable in respect of this Agreement. If for any reason the amount in the Contractual Currency so received falls short of the amount in the Contractual Currency payable in respect of this Agreement, the party required to make the payment will, to the extent permitted by applicable law, immediately pay such additional amount in the Contractual Currency as may be necessary to compensate for the shortfall. If for any reason the amount in the Contractual Currency so received exceeds the amount in the Contractual Currency payable in respect of this Agreement, the party receiving the payment will refund promptly the amount of such excess.

(b)    *Judgments*. To the extent permitted by applicable law, if any judgment or order expressed in a currency other than the Contractual Currency is rendered (i) for the payment of any amount owing in respect of this Agreement, (ii) for the payment of any amount relating to any early termination in respect of this Agreement or (iii) in respect of a judgment or order of another court for the payment of any amount described in (i) or (ii) above, the party seeking recovery, after recovery in full of the aggregate amount to which such party is entitled pursuant to the judgment or order, will be entitled to receive immediately from the other party the amount of any shortfall of the Contractual Currency received by such party as a consequence of sums paid in such other currency and will refund promptly to the other party any excess of the Contractual Currency received by such party as a consequence of sums paid in such other currency if such shortfall or such excess arises or results from any variation between the rate of exchange at which the Contractual Currency is converted into the currency of the judgment or order for the purposes of such judgment or order and the rate of exchange at which such party is able, acting in a reasonable manner and in good faith in converting the currency received into the Contractual Currency, to purchase the Contractual Currency with the amount of the currency of the judgment or order actually received by such party. The term "rate of exchange" includes, without limitation, any premiums and costs of exchange payable in connection with the purchase of or conversion into the Contractual Currency.

(c)    *Separate Indemnities*. To the extent permitted by applicable law, these indemnities constitute separate and independent obligations from the other obligations in this Agreement, will be enforceable as separate and independent causes of action, will apply notwithstanding any indulgence granted by the party to which any payment is owed and will not be affected by judgment being obtained or claim or proof being made for any other sums payable in respect of this Agreement.

(d)    *Evidence of Loss*. For the purpose of this Section 8, it will be sufficient for a party to demonstrate that it would have suffered a loss had an actual exchange or purchase been made.

ISDA® 1992

## 9. Miscellaneous

(a)    *Entire Agreement*. This Agreement constitutes the entire agreement and understanding of the parties with respect to its subject matter and supersedes all oral communication and prior writings with respect thereto.

(b)    *Amendments*. No amendment, modification or waiver in respect of this Agreement will be effective unless in writing (including a writing evidenced by a facsimile transmission) and executed by each of the parties or confirmed by an exchange of telexes or electronic messages on an electronic messaging system.

(c)    *Survival of Obligations*. Without prejudice to Sections 2(a)(iii) and 6(c)(ii), the obligations of the parties under this Agreement will survive the termination of any Transaction.

(d)    *Remedies Cumulative*. Except as provided in this Agreement, the rights, powers, remedies and privileges provided in this Agreement are cumulative and not exclusive of any rights, powers, remedies and privileges provided by law.

(e)    *Counterparts and Confirmations*.

(i) This Agreement (and each amendment, modification and waiver in respect of it) may be executed and delivered in counterparts (including by facsimile transmission), each of which will be deemed an original.

(ii) The parties intend that they are legally bound by the terms of each Transaction from the moment they agree to those terms (whether orally or otherwise). A Confirmation shall be entered into as soon as practicable and may be executed and delivered in counterparts (including by facsimile transmission) or be created by an exchange of telexes or by an exchange of electronic messages on an electronic messaging system, which in each case will be sufficient for all purposes to evidence a binding supplement to this Agreement. The parties will specify therein or through another effective means that any such counterpart, telex or electronic message constitutes a Confirmation.

(f)    *No Waiver of Rights*. A failure or delay in exercising any right, power or privilege in respect of this Agreement will not be presumed to operate as a waiver, and a single or partial exercise of any right, power or privilege will not be presumed to preclude any subsequent or further exercise, of that right, power or privilege or the exercise of any other right, power or privilege.

(g)    *Headings*. The headings used in this Agreement are for convenience of reference only and are not to affect the construction of or to be taken into consideration in interpreting this Agreement.

## 10. Offices; Multibranch Parties

(a)    If Section 10(a) is specified in the Schedule as applying, each party that enters into a Transaction through an Office other than its head or home office represents to the other party that, notwithstanding the place of booking office or jurisdiction of incorporation or organisation of such party, the obligations of such party are the same as if it had entered into the Transaction through its head or home office. This representation will be deemed to be repeated by such party on each date on which a Transaction is entered into.

(b)    Neither party may change the Office through which it makes and receives payments or deliveries for the purpose of a Transaction without the prior written consent of the other party.

(c)    If a party is specified as a Multibranch Party in the Schedule, such Multibranch Party may make and receive payments or deliveries under any Transaction through any Office listed in the Schedule, and the Office through which it makes and receives payments or deliveries with respect to a Transaction will be specified in the relevant Confirmation.

## 11. Expenses

A Defaulting Party will, on demand, indemnify and hold harmless the other party for and against all reasonable out-of-pocket expenses, including legal fees and Stamp Tax, incurred by such other party by reason of the enforcement and protection of its rights under this Agreement or any Credit Support Document

**ISDA® 1992**

to which the Defaulting Party is a party or by reason of the early termination of any Transaction, including, but not limited to, costs of collection.

## 12. Notices

(a)    *Effectiveness*. Any notice or other communication in respect of this Agreement may be given in any manner set forth below (except that a notice or other communication under Section 5 or 6 may not be given by facsimile transmission or electronic messaging system) to the address or number or in accordance with the electronic messaging system details provided (see the Schedule) and will be deemed effective as indicated:—

    (i)    if in writing and delivered in person or by courier, on the date it is delivered;

    (ii)    if sent by telex, on the date the recipient's answerback is received;

    (iii)    if sent by facsimile transmission, on the date that transmission is received by a responsible employee of the recipient in legible form (it being agreed that the burden of proving receipt will be on the sender and will not be met by a transmission report generated by the sender's facsimile machine);

    (iv)    if sent by certified or registered mail (airmail, if overseas) or the equivalent (return receipt requested), on the date that mail is delivered or its delivery is attempted; or

    (v)    if sent by electronic messaging system, on the date that electronic message is received,

unless the date of that delivery (or attempted delivery) or that receipt, as applicable, is not a Local Business Day or that communication is delivered (or attempted) or received, as applicable, after the close of business on a Local Business Day, in which case that communication shall be deemed given and effective on the first following day that is a Local Business Day.

(b)    *Change of Addresses*. Either party may by notice to the other change the address, telex or facsimile number or electronic messaging system details at which notices or other communications are to be given to it.

## 13. Governing Law and Jurisdiction

(a)    *Governing Law*. This Agreement will be governed by and construed in accordance with the law specified in the Schedule.

(b)    *Jurisdiction*. With respect to any suit, action or proceedings relating to this Agreement ("Proceedings"), each party irrevocably:

    (i)    submits to the jurisdiction of the English courts, if this Agreement is expressed to be governed by English law, or to the non-exclusive jurisdiction of the courts of the State of New York and the United States District Court located in the Borough of Manhattan in New York City, if this Agreement is expressed to be governed by the laws of the State of New York; and

    (ii)    waives any objection which it may have at any time to the laying of venue of any Proceedings brought in any such court, waives any claim that such Proceedings have been brought in an inconvenient forum and further waives the right to object, with respect to such Proceedings, that such court does not have any jurisdiction over such party.

Nothing in this Agreement precludes either party from bringing Proceedings in any other jurisdiction (outside, if this Agreement is expressed to be governed by English law, the Contracting States, as defined in Section 1(3) of the Civil Jurisdiction and Judgments Act 1982 or any modification, extension or re-enactment thereof for the time being in force) nor will the bringing of Proceedings in any one or more jurisdictions preclude the bringing of Proceedings in any other jurisdiction.

(c)    *Service of Process*. Each party irrevocably appoints the Process Agent (if any) specified opposite its name in the Schedule to receive, for it and on its behalf, service of process in any Proceedings. If for any

ISDA® 1992

reason any party's Process Agent is unable to act as such, such party will promptly notify the other party and within 30 days appoint a substitute process agent acceptable to the other party. The parties irrevocably consent to service of process given in the manner provided for notices in Section 12. Nothing in this Agreement will affect the right of either party to serve process in any other manner permitted by law.

(d)     *Waiver of Immunities*. Each party irrevocably waives, to the fullest extent permitted by applicable law, with respect to itself and its revenues and assets (irrespective of their use or intended use), all immunity on the grounds of sovereignty or other similar grounds from (i) suit, (ii) jurisdiction of any court, (iii) relief by way of injunction, order for specific performance or for recovery of property, (iv) attachment of its assets (whether before or after judgment) and (v) execution or enforcement of any judgment to which it or its revenues or assets might otherwise be entitled in any Proceedings in the courts of any jurisdiction and irrevocably agrees, to the extent permitted by applicable law, that it will not claim any such immunity in any Proceedings.

## 14.     Definitions

As used in this Agreement:—

*"Additional Termination Event"* has the meaning specified in Section 5(b).

*"Affected Party"* has the meaning specified in Section 5(b).

*"Affected Transactions"* means (a) with respect to any Termination Event consisting of an Illegality, Tax Event or Tax Event Upon Merger, all Transactions affected by the occurrence of such Termination Event and (b) with respect to any other Termination Event, all Transactions.

*"Affiliate"* means, subject to the Schedule, in relation to any person, any entity controlled, directly or indirectly, by the person, any entity that controls, directly or indirectly, the person or any entity directly or indirectly under common control with the person. For this purpose, "control" of any entity or person means ownership of a majority of the voting power of the entity or person.

*"Applicable Rate"* means:—

(a)     in respect of obligations payable or deliverable (or which would have been but for Section 2(a)(iii)) by a Defaulting Party, the Default Rate;

(b)     in respect of an obligation to pay an amount under Section 6(e) of either party from and after the date (determined in accordance with Section 6(d)(ii)) on which that amount is payable, the Default Rate;

(c)     in respect of all other obligations payable or deliverable (or which would have been but for Section 2(a)(iii)) by a Non-defaulting Party, the Non-default Rate; and

(d)     in all other cases, the Termination Rate.

*"Burdened Party"* has the meaning specified in Section 5(b).

*"Change in Tax Law"* means the enactment, promulgation, execution or ratification of, or any change in or amendment to, any law (or in the application or official interpretation of any law) that occurs on or after the date on which the relevant Transaction is entered into.

*"consent"* includes a consent, approval, action, authorisation, exemption, notice, filing, registration or exchange control consent.

*"Credit Event Upon Merger"* has the meaning specified in Section 5(b).

*"Credit Support Document"* means any agreement or instrument that is specified as such in this Agreement.

*"Credit Support Provider"* has the meaning specified in the Schedule.

*"Default Rate"* means a rate per annum equal to the cost (without proof or evidence of any actual cost) to the relevant payee (as certified by it) if it were to fund or of funding the relevant amount plus 1% per annum.

14                                                      ISDA® 1992

*"Defaulting Party"* has the meaning specified in Section 6(a).

*"Early Termination Date"* means the date determined in accordance with Section 6(a) or 6(b)(iv).

*"Event of Default"* has the meaning specified in Section 5(a) and, if applicable, in the Schedule.

*"Illegality"* has the meaning specified in Section 5(b).

*"Indemnifiable Tax"* means any Tax other than a Tax that would not be imposed in respect of a payment under this Agreement but for a present or former connection between the jurisdiction of the government or taxation authority imposing such Tax and the recipient of such payment or a person related to such recipient (including, without limitation, a connection arising from such recipient or related person being or having been a citizen or resident of such jurisdiction, or being or having been organised, present or engaged in a trade or business in such jurisdiction, or having or having had a permanent establishment or fixed place of business in such jurisdiction, but excluding a connection arising solely from such recipient or related person having executed, delivered, performed its obligations or received a payment under, or enforced, this Agreement or a Credit Support Document).

*"law"* includes any treaty, law, rule or regulation (as modified, in the case of tax matters, by the practice of any relevant governmental revenue authority) and *"lawful"* and *"unlawful"* will be construed accordingly.

*"Local Business Day"* means, subject to the Schedule, a day on which commercial banks are open for business (including dealings in foreign exchange and foreign currency deposits) (a) in relation to any obligation under Section 2(a)(i), in the place(s) specified in the relevant Confirmation or, if not so specified, as otherwise agreed by the parties in writing or determined pursuant to provisions contained, or incorporated by reference, in this Agreement, (b) in relation to any other payment, in the place where the relevant account is located and, if different, in the principal financial centre, if any, of the currency of such payment, (c) in relation to any notice or other communication, including notice contemplated under Section 5(a)(i), in the city specified in the address for notice provided by the recipient and, in the case of a notice contemplated by Section 2(b), in the place where the relevant new account is to be located and (d) in relation to Section 5(a)(v)(2), in the relevant locations for performance with respect to such Specified Transaction.

*"Loss"* means, with respect to this Agreement or one or more Terminated Transactions, as the case may be, and a party, the Termination Currency Equivalent of an amount that party reasonably determines in good faith to be its total losses and costs (or gain, in which case expressed as a negative number) in connection with this Agreement or that Terminated Transaction or group of Terminated Transactions, as the case may be, including any loss of bargain, cost of funding or, at the election of such party but without duplication, loss or cost incurred as a result of its terminating, liquidating, obtaining or reestablishing any hedge or related trading position (or any gain resulting from any of them). Loss includes losses and costs (or gains) in respect of any payment or delivery required to have been made (assuming satisfaction of each applicable condition precedent) on or before the relevant Early Termination Date and not made, except, so as to avoid duplication, if Section 6(e)(i)(1) or (3) or 6(e)(ii)(2)(A) applies. Loss does not include a party's legal fees and out-of-pocket expenses referred to under Section 11. A party will determine its Loss as of the relevant Early Termination Date, or, if that is not reasonably practicable, as of the earliest date thereafter as is reasonably practicable. A party may (but need not) determine its Loss by reference to quotations of relevant rates or prices from one or more leading dealers in the relevant markets.

*"Market Quotation"* means, with respect to one or more Terminated Transactions and a party making the determination, an amount determined on the basis of quotations from Reference Market-makers. Each quotation will be for an amount, if any, that would be paid to such party (expressed as a negative number) or by such party (expressed as a positive number) in consideration of an agreement between such party (taking into account any existing Credit Support Document with respect to the obligations of such party) and the quoting Reference Market-maker to enter into a transaction (the "Replacement Transaction") that would have the effect of preserving for such party the economic equivalent of any payment or delivery (whether the underlying obligation was absolute or contingent and assuming the satisfaction of each applicable condition precedent) by the parties under Section 2(a)(i) in respect of such Terminated Transaction or group of Terminated Transactions that would, but for the occurrence of the relevant Early Termination Date, have

**ISDA® 1992**

been required after that date. For this purpose, Unpaid Amounts in respect of the Terminated Transaction or group of Terminated Transactions are to be excluded but, without limitation, any payment or delivery that would, but for the relevant Early Termination Date, have been required (assuming satisfaction of each applicable condition precedent) after that Early Termination Date is to be included. The Replacement Transaction would be subject to such documentation as such party and the Reference Market-maker may, in good faith, agree. The party making the determination (or its agent) will request each Reference Market-maker to provide its quotation to the extent reasonably practicable as of the same day and time (without regard to different time zones) on or as soon as reasonably practicable after the relevant Early Termination Date. The day and time as of which those quotations are to be obtained will be selected in good faith by the party obliged to make a determination under Section 6(e), and, if each party is so obliged, after consultation with the other. If more than three quotations are provided, the Market Quotation will be the arithmetic mean of the quotations, without regard to the quotations having the highest and lowest values. If exactly three such quotations are provided, the Market Quotation will be the quotation remaining after disregarding the highest and lowest quotations. For this purpose, if more than one quotation has the same highest value or lowest value, then one of such quotations shall be disregarded. If fewer than three quotations are provided, it will be deemed that the Market Quotation in respect of such Terminated Transaction or group of Terminated Transactions cannot be determined.

*"Non-default Rate"* means a rate per annum equal to the cost (without proof or evidence of any actual cost) to the Non-defaulting Party (as certified by it) if it were to fund the relevant amount.

*"Non-defaulting Party"* has the meaning specified in Section 6(a).

*"Office"* means a branch or office of a party, which may be such party's head or home office.

*"Potential Event of Default"* means any event which, with the giving of notice or the lapse of time or both, would constitute an Event of Default.

*"Reference Market-makers"* means four leading dealers in the relevant market selected by the party determining a Market Quotation in good faith (a) from among dealers of the highest credit standing which satisfy all the criteria that such party applies generally at the time in deciding whether to offer or to make an extension of credit and (b) to the extent practicable, from among such dealers having an office in the same city.

*"Relevant Jurisdiction"* means, with respect to a party, the jurisdictions (a) in which the party is incorporated, organised, managed and controlled or considered to have its seat, (b) where an Office through which the party is acting for purposes of this Agreement is located, (c) in which the party executes this Agreement and (d) in relation to any payment, from or through which such payment is made.

*"Scheduled Payment Date"* means a date on which a payment or delivery is to be made under Section 2(a)(i) with respect to a Transaction.

*"Set-off"* means set-off, offset, combination of accounts, right of retention or withholding or similar right or requirement to which the payer of an amount under Section 6 is entitled or subject (whether arising under this Agreement, another contract, applicable law or otherwise) that is exercised by, or imposed on, such payer.

*"Settlement Amount"* means, with respect to a party and any Early Termination Date, the sum of: —

(a) the Termination Currency Equivalent of the Market Quotations (whether positive or negative) for each Terminated Transaction or group of Terminated Transactions for which a Market Quotation is determined; and

(b) such party's Loss (whether positive or negative and without reference to any Unpaid Amounts) for each Terminated Transaction or group of Terminated Transactions for which a Market Quotation cannot be determined or would not (in the reasonable belief of the party making the determination) produce a commercially reasonable result.

*"Specified Entity"* has the meanings specified in the Schedule.

ISDA® 1992

*"Specified Indebtedness"* means, subject to the Schedule, any obligation (whether present or future, contingent or otherwise, as principal or surety or otherwise) in respect of borrowed money.

*"Specified Transaction"* means, subject to the Schedule, (a) any transaction (including an agreement with respect thereto) now existing or hereafter entered into between one party to this Agreement (or any Credit Support Provider of such party or any applicable Specified Entity of such party) and the other party to this Agreement (or any Credit Support Provider of such other party or any applicable Specified Entity of such other party) which is a rate swap transaction, basis swap, forward rate transaction, commodity swap, commodity option, equity or equity index swap, equity or equity index option, bond option, interest rate option, foreign exchange transaction, cap transaction, floor transaction, collar transaction, currency swap transaction, cross-currency rate swap transaction, currency option or any other similar transaction (including any option with respect to any of these transactions), (b) any combination of these transactions and (c) any other transaction identified as a Specified Transaction in this Agreement or the relevant confirmation.

*"Stamp Tax"* means any stamp, registration, documentation or similar tax.

*"Tax"* means any present or future tax, levy, impost, duty, charge, assessment or fee of any nature (including interest, penalties and additions thereto) that is imposed by any government or other taxing authority in respect of any payment under this Agreement other than a stamp, registration, documentation or similar tax.

*"Tax Event"* has the meaning specified in Section 5(b).

*"Tax Event Upon Merger"* has the meaning specified in Section 5(b).

*"Terminated Transactions"* means with respect to any Early Termination Date (a) if resulting from a Termination Event, all Affected Transactions and (b) if resulting from an Event of Default, all Transactions (in either case) in effect immediately before the effectiveness of the notice designating that Early Termination Date (or, if "Automatic Early Termination" applies, immediately before that Early Termination Date).

*"Termination Currency"* has the meaning specified in the Schedule.

*"Termination Currency Equivalent"* means, in respect of any amount denominated in the Termination Currency, such Termination Currency amount and, in respect of any amount denominated in a currency other than the Termination Currency (the "Other Currency"), the amount in the Termination Currency determined by the party making the relevant determination as being required to purchase such amount of such Other Currency as at the relevant Early Termination Date, or, if the relevant Market Quotation or Loss (as the case may be), is determined as of a later date, with the Termination Currency at the rate equal to the spot exchange rate of the foreign exchange agent (selected as provided below) for the purchase of such Other Currency with the Termination Currency at or about 11:00 a.m. (in the city in which such foreign exchange agent is located) on such date as would be customary for the determination of such a rate for the purchase of such Other Currency for value on the relevant Early Termination Date or that later date. The foreign exchange agent will, if only one party is obliged to make a determination under Section 6(e), be selected in good faith by that party and otherwise will be agreed by the parties.

*"Termination Event"* means an Illegality, a Tax Event or a Tax Event Upon Merger or, if specified to be applicable, a Credit Event Upon Merger or an Additional Termination Event.

*"Termination Rate"* means a rate per annum equal to the arithmetic mean of the cost (without proof or evidence of any actual cost) to each party (as certified by such party) if it were to fund or of funding such amounts.

*"Unpaid Amounts"* owing to any party means, with respect to an Early Termination Date, the aggregate of (a) in respect of all Terminated Transactions, the amounts that became payable (or that would have become payable but for Section 2(a)(iii)) to such party under Section 2(a)(i) on or prior to such Early Termination Date and which remain unpaid as at such Early Termination Date and (b) in respect of each Terminated Transaction, for each obligation under Section 2(a)(i) which was (or would have been but for Section 2(a)(iii)) required to be settled by delivery to such party on or prior to such Early Termination Date and which has not been so settled as at such Early Termination Date, an amount equal to the fair market

ISDA® 1992

Execution Copy

value of that which was (or would have been) required to be delivered as of the originally scheduled date for delivery, in each case together with (to the extent permitted under applicable law) interest, in the currency of such amounts, from (and including) the date such amounts or obligations were or would have been required to have been paid or performed to (but excluding) such Early Termination Date, at the Applicable Rate. Such amounts of interest will be calculated on the basis of daily compounding and the actual number of days elapsed. The fair market value of any obligation referred to in clause (b) above shall be reasonably determined by the party obliged to make the determination under Section 6(e) or, if each party is so obliged, it shall be the average of the Termination Currency Equivalents of the fair market values reasonably determined by both parties.

IN WITNESS WHEREOF the parties have executed this document on the respective dates specified below with effect from the date specified on the first page of this document.


**LEHMAN BROTHERS OTC DERIVATIVES INC.**
*(Name of Party)*

By: _____

Name:

Title:   Allyson M. Carine
         Authorized Signatory

Date:


**INTEL CORPORATION**
*(Name of Party)*

By: _____

Name:   Douglas M. Lusk

Title:   Assistant Treasurer and
         Authorized Signatory

Date:

LEGAL OK   2/27

# EXHIBIT
# 2

Execution Copy

# SCHEDULE
## to the
## Amended and Restated
## Master Agreement
## dated as of February 1, 2008

| | | | |
|---|---|---|---|
| between | Lehman Brothers OTC Derivatives Inc., a corporation organized under the laws of the State of Delaware("Party A") | and | Intel Corporation, a company organized under the laws of the State of Delaware ("Party B") |

## PART 1. TERMINATION PROVISIONS

(a)    "Specified Entity" means in relation to Party A for the purpose of:-

Section 5(a)(v), Lehman Brothers Commercial Corporation,
Section 5(a)(vi), Lehman Brothers Commercial Corporation,
Section 5(a)(vii), Lehman Brothers Commercial Corporation,
Section 5(b)(iv), none,

and in relation to Party B for the purpose of:-

Section 5(a)(v), none,
Section 5(a)(vi), none,
Section 5(a)(vii), none,
Section 5(b)(iv), none.

(b)    Except as otherwise indicated herein, "Specified Transaction" will have the meaning specified in Section 14 of the Agreement.

(c)    The "Cross Default" provisions of Section 5(a)(vi) will apply to Party A and to Party B.

"Specified Indebtedness" means any obligation (whether present or future, contingent or otherwise, as principal or surety or otherwise) in respect of (i) borrowed money, or (ii) any Specified Transaction (except that, for this purpose only, the words "and any other entity" shall be substituted for the words "and the other party to this Agreement (or any Credit Support Provider of such other party or any applicable Specified Entity of such other party)" where they appear in the definition of "Specified Transaction"); provided, that the foregoing shall not apply to Specified Indebtedness in respect of a Specified Transaction unless the relevant counterparty has made demand for payment of such indebtedness and Party A is not contesting in good faith its obligation to pay such amount by appropriate proceedings or other appropriate actions (which may include entering into negotiations in good faith with the relevant counterparty).

"Threshold Amount" means US$100,000,000 or the equivalent in any other currency at spot rates of exchange prevailing from time to time.

(d)    The "Credit Event Upon Merger" provisions of Section 5(b)(iv) WILL apply to Party A and to Party B, restated as follows:

"Credit Event Upon Merger" shall mean that a Designated Event (as defined below) occurs with respect to a party, any Credit Support Provider of such party or any applicable Specified Entity of such party (in each case, "X"), and such Designated Event does not constitute an event described in Section 5(a)(viii) of this Agreement, but the creditworthiness of X or, if applicable, the successor, surviving or transferee entity of X, is materially weaker than that of X immediately prior to such action (and, in such event, such party or its successor or transferee, as appropriate, will be the Affected Party).   For purposes hereof, a Designated Event with respect to X means that, after the execution date hereof, X consolidates or amalgamates with or merges with or into, or transfers all or substantially all its assets (or any substantial part of the assets comprising the business conducted by X as of the execution date hereof) to, or receives all or substantially all the assets or obligations of, another entity.

(e)    The "Automatic Early Termination" provision of Section 6(a) will not apply to Party A and will not apply to Party B; provided, however, that where the Event of Default specified in Section 5(a)(vii)(1), (3), (4), (5), (6) or, to the extent analogous thereto, (8), is governed by a system of law which does not permit termination to take place after the occurrence of the relevant Event of Default, then the Automatic Early Termination provision of Section 6(a) will apply to Party A and Party B for purposes of such Event of Default.

(f)    Payments on Early Termination.   For the purpose of Section 6(e) of this Agreement, Market Quotation and the Second Method will apply.

(g)    "Termination Currency" means United States Dollars.

(h)    Additional Termination Event will not apply.


**PART 2. TAX REPRESENTATIONS**

(a)    <u>Payer Representations</u>.  For the purpose of Section 3(e) of this Agreement, Party A and Party B each make the following representation:

It is not required by any applicable law, as modified by the practice of any relevant governmental revenue authority, of any Relevant Jurisdiction to make any deduction or withholding for or on account of any Tax from any payment (other than interest under Section 2(e), 6(d)(ii) or 6(e) of this Agreement) to be made by it to the other party under this Agreement.  In making this representation, it may rely on (i) the accuracy of any representations made by the other party pursuant to Section 3(f) of this Agreement, (ii) the satisfaction of the agreement contained in Section 4(a)(i) or 4(a)(iii) of this Agreement and the accuracy and effectiveness of any document provided by the other party pursuant to Section

4(a)(i) or 4(a)(iii) of this Agreement and (iii) the satisfaction of the agreement of the other party contained in Section 4(d) of this Agreement; provided that it shall not be a breach of this representation where reliance is placed on clause (ii) and the other party does not deliver a form or document under Section 4(a)(iii) by reason of material prejudice to its legal or commercial position.

(b)   <u>Payee Representations</u>.  For the purpose of Section 3(f) of this Agreement, Party A and Party B make the representations specified below, if any:

   (i)   The following representation will apply to Party A:

   Party A represents it is a U.S. person, and treated as a corporation, for United States federal income tax purposes.

   (ii)   The following representation will apply to Party B:

   Party B represents that it is a U.S. person, and treated as a corporation, for United States federal income tax purposes.


## PART 3.  AGREEMENT TO DELIVER DOCUMENTS

For the purpose of Sections 4(a)(i) and 4(a)(ii) of this Agreement, each party agrees to deliver the following documents, as applicable:

(a)   Tax forms, documents or certificates to be delivered are: as provided in Section 4(a)(iii).

(b)   Other documents to be delivered are:

| Party Required to Deliver Document | Form, Document, Certificate | Date by which delivered | Covered by Section 3(d) Representation |
|---|---|---|---|
| Party A and Party B | Evidence of the incumbency and specimen signature of each person executing this Agreement or any other document on its behalf in connection with this Agreement. | Upon execution of this Agreement and, if requested, each Confirmation. | Yes |
| Party A and Party B | Copy of the resolutions of the Board of Directors of such party, certified by the Secretary or an | Upon execution of this Agreement. | Yes |

|  |  |  |  |
|---|---|---|---|
|  | Assistant Secretary of such party, authorizing the execution and delivery of this Agreement and each Confirmation. |  |  |
| Party A and Party B | Copy of annual audited, consolidated financial statements of Lehman Brothers Holdings Inc., in the case of Party A, and Intel Corporation, in the case of Party B, prepared in accordance with generally accepted accounting principles applied on a consistent basis, duly certified by independent certified public accountants of recognized standing selected by the party providing such statements. | Promptly upon request by the other party, after such financial statements become publicly available. | Yes |
| Party A | A duly executed Credit Support Document | Upon execution of this Agreement. | No |

# PART 4. MISCELLANEOUS

(a) <u>Addresses for Notices</u>. For the purpose of Section 12(a) of this Agreement:

    (i) Addresses for notices or communications to Party A:

        Address:    Lehman Brothers OTC Derivatives Inc.
                    c/o Lehman Brothers Inc.
                    Legal Compliance and Audit Group
                    Capital Markets Contracts - Legal
                    745 Seventh Avenue, $19^h$ Floor
                    New York, New York 10019

        Attention:    Documentation Manager

        Telephone No.:212-526-7187

        Facsimile No.: 212-526-7672

        For all purposes.

    (ii) Addresses for notices or communications to Party B:

        Address:    2200 Mission College Boulevard, Treasury Dept., M/S
                    RN6-47, Santa Clara, California, 95054
        Attention:    Cash Manager
        Telex No.    N/A    Answerback:  N/A
        Fax No.     408-765-1611

        With a copy of notices and communications pursuant to Sections 5 or 6 to:

        Address:    Intel Corporation, 2200 Mission College Boulevard, Legal
                    Dept., M/S SC4-203, Santa Clara, California 95054
        Attention:    Director of Corporate Affairs
        Facsimile:    408-765-7636

(b) <u>Process Agent</u>. For the purpose of Section 13(c) of this Agreement:

    (i) Party A appoints as its Process Agent: None.

    (ii) Party B appoints as its Process Agent: None.

(c) <u>Offices</u>. The provisions of Section 10(a) will apply to this Agreement.

Execution Copy

(d) <u>Multibranch Party</u>. For the purpose of Section 10(c) of this Agreement:

    (i)    Party A is not a Multibranch Party.

    (ii)    Party B is not a Multibranch Party.

(e) <u>Calculation Agent</u>. The Calculation Agent is Party A, unless otherwise specified in a Confirmation in relation to the relevant Transaction.

(f) <u>Credit Support Document</u>. Details of any Credit Support Document:

    (i)    Credit Support Document means in relation to Party A: Guarantee of Lehman Brothers Holding Inc. in the form attached hereto.

    (ii)    Credit Support Document means in relation to Party B: Not applicable.

(g) <u>Credit Support Provider</u>.

    (i)    Credit Support Provider means in relation to Party A: Lehman Brothers Holding Inc.

    (ii)    Credit Support Provider means in relation to Party B: Not applicable.

(h) <u>Governing Law</u>. This Agreement will be governed by and construed in accordance with the laws of the State of New York (without reference to choice of law doctrine).

(i) <u>Netting of Payments</u>. Subparagraph (ii) of Section 2(c) of this Agreement will not apply to any Transactions.

(j) "Affiliate" will have the meaning specified in Section 14 of this Agreement; provided, however, that Party A acknowledges and agrees that the Intel Corporation Profit-Sharing Retirement Plan, the Intel Corporation Defined Benefit Pension Plan, the Intel Puerto Rico Profit-Sharing Retirement Plan and the Intel Puerto Rico Defined Benefit Pension Plan are not Affiliates of Party B.

## PART 5. OTHER PROVISIONS

(a) <u>Definitions</u>. Unless otherwise specified in a Confirmation, this Agreement, each Confirmation and each Transaction between the parties are subject to the 2000 ISDA Definitions as amended, supplemented, updated, restated, and superseded from time to time (the "2000 Definitions"), as published by the International Swaps and Derivatives Association, Inc. (formerly known as the International Swap Dealers Association, Inc.) ("ISDA"), and will be governed in all respects by the 2000 Definitions. Any reference to a "Swap Transaction" in the 2000 Definitions is deemed to be a reference to a "Transaction" for the purpose of

interpreting this Agreement or any Confirmation, and any reference to a "Transaction" in this Agreement or any Confirmation is deemed to be a reference to a "Swap Transaction" for the purpose of interpreting the 2000 Definitions.

(b)  Inconsistency.  In the event of any inconsistency between any of the following documents, the relevant document first listed shall govern with respect to a particular Transaction: (i) the Confirmation of the Transaction, (ii) this Schedule, (iii) the definitions incorporated by reference in a Confirmation or in this Agreement, and (iv) the printed form of ISDA Master Agreement.

(c)  Principles and Practices for Wholesale Financial Market Transactions.  The parties to this Agreement hereby agree that the Principles and Practices for Wholesale Financial Market Transactions, released by the Federal Reserve Bank of New York and the International Swaps and Derivatives Association, Inc. on August 17, 1995, shall not apply to the relationship between the parties, this Agreement or any Transaction entered into hereunder; provided that in no event shall the inclusion of this subparagraph 5(c) affect the enforceability of the Agreement against either Party A or Party B.

(d)  Accuracy of Specified Information.  Section 3(d) is hereby amended by adding in the third line thereof after the word "respect" and before the period the words "or, in the case of audited or unaudited financial statements, fairly presents the financial condition of the entity for which such statements are provided."

(e)  Change of Account.  Section 2(b) is hereby amended by adding the following at the end thereof:

"and provided that, unless the other party consents (which consent shall not be unreasonably withheld), such new account shall be in the same tax jurisdiction as the original account."

(f)  Additional Representations.  Section 3 is hereby amended by adding at the end thereof the following subsections:

(g)  Party A and Party B each represent to the other that on the date hereof and on each date on which a Transaction is entered into between them that:  (a) each Party is an "eligible contract participant" within the meaning of section 1a(12) of the Commodity Exchange Act, as amended; (b) this Agreement and each Transaction is subject to individual negotiation by each Party; and (c) neither this Agreement nor any Transaction will be executed or traded on a "trading facility" within the meaning of section 1a(33) of the Commodity Exchange Act, as amended.

(h)  Intention to Enter Into a "Swap Agreement." Each of Party A and Party B hereby acknowledges and agrees that this Agreement and each Transaction hereunder is intended to be a "swap agreement" as that term is defined in the U.S. Bankruptcy Code (as amended from time to time) and that the rights granted to each party under Section 6 include a contractual

Execution Copy

right to terminate a "swap agreement" and to offset and net out termination values and payments in conjunction therewith.

(g)    <u>Set-Off</u>. Each party to this Agreement ("X") agrees that, upon an Early Termination Date resulting from an Event of Default with respect to X, the other party hereto ("Y") may, without prior notice to X, reduce any amount or obligation due and owing (whether or not arising under this Agreement and whether matured or unmatured regardless of the currency, place of payment or booking office of the obligation) to X (the "Original Obligation") by setting off against such amount or obligation any amounts due and owing (whether or not arising under this Agreement and whether matured or unmatured regardless of the currency, place of payment or booking office of the obligation) to Y (or any Affiliate of Y) by X and, for this purpose, may convert one currency into another at the applicable market exchange rate selected by Y on the relevant date. Any such setoff shall automatically satisfy and discharge the Original Obligation to X and, if the Original Obligation exceeds the amount or obligation to be setoff against, the Original Obligation shall be novated and replaced by an obligation to pay X only the excess of the Original Obligation over such amount or obligation.

Any obligation of Y to make payment or delivery to X hereunder shall in any event be conditioned upon and subject to the condition precedent that and shall arise only upon the date that all indebtedness and payment and delivery obligations, whether matured or unmatured, contingent or absolute, of X to Y shall have been fully and finally performed or satisfied.

If an amount or obligation is unascertained, Y may in good faith estimate that amount or obligation and set-off in respect of such estimate, subject to the relevant party accounting to the other when the amount or obligation is ascertained.

Nothing in this provision shall be effective to create a charge or other security interest. This provision shall be in addition to and not in limitation of any other right or remedy (including any right to setoff, counterclaim or otherwise withhold payment) to which any party is at any time otherwise entitled (whether by operation of law, contract or otherwise).

(h)    <u>No Fiduciary Relationship</u>. The other party is not acting as a fiduciary for it in respect of this Agreement or any Transaction entered into hereunder and this Agreement reflects an arm's length agreement that was reached between the parties.

(i)    <u>Recording of Communications</u>. Each party hereby notifies the other that telephone conversations between the parties may be recorded, and each party hereby consents to such recording and to such recording being adduced in evidence in court proceedings.

(j)     Severability.  If any term, provision, covenant or condition of this Agreement, or the application thereof to any party or circumstance, shall be held to be illegal, invalid or unenforceable (in whole or in part) for any reason, the remaining terms, provisions, covenants and conditions hereof shall continue in full force and effect as if this Agreement had been executed with the illegal, invalid or unenforceable portion eliminated, so long as this Agreement as so modified continues to express, without material change, the original intentions of the parties as to the subject matter of this Agreement and the deletion of such portion of this Agreement will not substantially impair the respective benefits or expectations of the parties hereto; provided, however, that this severability provision will not be applicable if any provision of Section 2, 5, 6 or 13 (or any definition or provision in Section 14 to the extent it relates to, or is used in or in connection with, any such section) is held to be illegal, invalid or unenforceable.

(k)     Waiver of Trial by Jury.  Each party waives, to the fullest extent permitted by applicable law, any right it may have to a trial by jury in respect of any Proceedings relating to this Agreement, any Transaction or any Credit Support Document.

(l)     Transfer. Notwithstanding Section 7 of this Agreement, Party A may assign its rights and obligations under this Agreement, in whole and not in part, to any affiliate of Holdings effective upon delivery to Party B of the full unconditional guarantee by Holdings, in favor of Party B, of the obligations of such Affiliate.

(m)     Transactions.  With respect to each Option Transaction, Party B represents to Party A (at all times until termination of this Agreement) that Party B:

   (i)     understands that the Option Transactions have not been registered under the Securities Act of 1933, as amended (the "Securities Act") and are being offered and sold in reliance on the exemption to the registration requirements of the Securities Act provided under Section 4(2) thereof:

   (ii)    understands and acknowledges that Party A has no obligation to register the Option Transactions under the Securities Act or any other United States federal or state securities law, and that the Option Transactions must be held indefinitely by the purchaser thereof unless subsequently registered under such securities laws or an exemption from such registration is available;

   (iii)   agrees that in the event that at some future time it wishes to dispose of the Option Transactions in whole or in part (such disposition currently not being foreseen or contemplated), it will not transfer the same except in a transaction exempt from or not subject to the registration requirements of the Securities Act; and

   (iv)    understands that each Confirmation may bear a legend to substantially the following effect:

          **THE SECURITIES REPRESENTED BY THE CONFIRMATION HAVE BEEN ACQUIRED FOR INVESTMENT AND HAVE NOT**

**BEEN REGISTERED UNDER THE UNITED STATES SECURITIES ACT OF 1933, AS AMENDED, OR ANY OTHER UNITED STATES FEDERAL OR STATE SECURITIES LAWS; AND SUCH SECURITIES MAY NOT BE SOLD OR OTHERWISE TRANSFERRED IN THE ABSENCE OF APPROPRIATE REGISTRATION UNDER SUCH SECURITIES LAWS OR EXCEPT IN A TRANSACTION EXEMPT FROM OR NOT SUBJECT TO THE REGISTRATION REQUIREMENTS OF SUCH SECURITIES LAWS.**

(n)   <u>Disclosure Statement.</u>  Party B represents to Party A that it has received and read and understands the Notice of Regulatory Treatment and the OTC Option Risk Disclosure Statement delivered by Party B to Party A.

(o)   <u>Outstanding Specified Transactions</u>.  Upon the effectiveness of this Agreement, unless otherwise agreed to in writing by the parties to this Agreement with respect to enumerated Specified Transactions, all Specified Transactions then outstanding between the parties shall be subject to the terms hereof.

(p)   <u>Disclosure of Details</u>.  The parties hereby irrevocably agree that each party may disclose details with respect to this Agreement and the Transactions documented hereunder to, and share information concerning this Agreement and the Transactions documented hereunder with, their respective branches and Affiliates.

(q)   <u>Swap Agreement</u>.  Without limiting any other protections under the Bankruptcy Code (Title 11 of the United States Code) (the "Bankruptcy Code"), the parties hereto intend for:

This Agreement and each Transaction to be a "swap agreement" as defined in the Bankruptcy Code, and the parties hereto to be entitled to the protections afforded by, among other Sections, Section 560 of the Bankruptcy Code.

A party's right to liquidate this Agreement or any Transaction and to exercise any other remedies upon the occurrence of any Event of Default or Termination Event under this Agreement or any Transaction to constitute a "contractual right" as described in Section 560 of the Bankruptcy Code.

Any cash, securities or other property provided as performance assurance, credit support of collateral with respect to this Agreement or any Transaction to constitute "transfers" under "swap agreement" as defined in the Bankruptcy Code.

All payments for, under or in connection with this Agreement or any Transaction, all payments for any securities or other assets and the transfer of such securities or other assets to constitute "transfers" under a "swap agreement" as defined in the Bankruptcy Code.

Execution Copy

## PART 6: ADDITIONAL TERMS FOR FX TRANSACTIONS AND CURRENCY OPTIONS

(a)     **Incorporation and Amendment of 1998 FX and Currency Option Definitions**

    (i)     <u>Incorporation of 1998 FX and Currency Option Definitions</u>. The 1998 FX and Currency Option Definitions, as amended or supplemented from time to time (the "1998 Definitions"), published by the International Swaps and Derivatives Association, Inc., the Emerging Markets Traders Association and The Foreign Exchange Committee, are hereby incorporated by reference with respect to any "Currency Option Transactions" and "FX Transactions" as defined by the 1998 Definitions, except as otherwise specifically provided herein or in the Confirmation.

    (ii)     <u>Amendment of 1998 FX and Currency Option Definitions</u>. The following amendments are made to the 1998 Definitions:

        Section 2.1 of the 1998 Definitions is amended by adding the following as Section 2.1(b):

        **Currency Obligation.** "Currency Obligation" means the undertaking of a party hereunder to receive or deliver an amount of currency, including a netted Currency Obligation, and including any Currency Obligation previously entered into by the parties.

(b)     **Confirmations**. Any confirmation (whether provided by mail, facsimile or other electronic means) in respect of any FX Transaction or Currency Option Transaction into which the parties may enter, or may have entered into prior to the date hereof, that fails by its terms to expressly exclude the application of this Agreement shall (to the extent not otherwise provided for in this Agreement) (i) constitute a "Confirmation" as referred to in this Agreement, even where not so specified in such confirmation; and (ii) supplement, form a part of, and be subject to this Agreement, and all provisions in this Agreement will govern such Confirmation except as expressly modified therein.

(c)     **Netting and Related Provisions**. Section 2(c) shall not apply to FX Transactions or Currency Option Transactions. In lieu thereof, the following shall apply:

    (i)     <u>Netting, Discharge and Termination of FX Transactions</u>. The following provisions shall apply to FX Transactions:

        Unless otherwise agreed by the parties, whenever an FX Transaction is entered into between the parties which creates a Currency Obligation in the same currency and for the same Settlement Date as an existing Currency Obligation between the parties, such Currency Obligations shall

automatically and without further action be netted, individually canceled and simultaneously replaced through novation by a new Currency Obligation under which the party having the obligation to deliver the greater aggregate amount of currency shall be obligated to deliver the excess of such greater aggregate currency amount over such lesser aggregate currency amount. Such new Currency Obligation shall be considered a "Currency Obligation" under this Agreement.

(ii) <u>Netting, Discharge and Termination with Respect to Currency Option Transactions</u>. The following provisions shall apply to Currency Option Transactions:

Unless otherwise agreed by the parties, any Call or Put written by a party will automatically be terminated and discharged, in whole or in part, as applicable, against a Call or a Put, respectively, having the same identical terms, written by the other party; and, upon the occurrence of such termination or discharge, neither party shall have any further obligation to the other party in respect of the parts so terminated and discharged (except for the obligation of either party to pay any Premium due, but not paid, thereunder); and the remaining portion of any Currency Option Transaction, which is partially discharged and terminated, shall continue to be a Currency Option Transaction under this Agreement.

(d) **Inconsistencies**. In the event of any conflict between:

(i) the terms of a Deliverable FX Transaction Confirmation and this Agreement, the terms of this Agreement shall supersede;

(ii) the terms of a Deliverable FX Transaction Confirmation, where the Confirmation explicitly states that it shall so prevail and has been signed by both parties, its terms shall supersede the terms of this Agreement;

(iii) the terms of a Currency Option Transaction or a Non-Deliverable FX Transaction Confirmation and this Agreement, the terms of the Confirmation shall supersede.

(e) **Definitions.** <u>Section 14</u> is hereby amended as follows:

The definition of "Terminated Transactions" shall be deemed to include Currency Obligations.

IN WITNESS WHEREOF, Party A and Party B have caused this Schedule to be duly executed to be effective as of the date first written above.

**LEHMAN BROTHERS OTC DERIVATIVES INC.**                      **INTEL CORPORATION**

*Party A*                                                    *Party B*

Name:                                                        Name: Douglas M. Lusk

    Allyson M. Carine

Title:   Authorized Signatory                 Title:  Authorized Signatory

Date:                                                        Date:

LEGAL OK

# EXHIBIT
# 3

# LEHMAN BROTHERS

**Transaction**

Date:           August 1, 2008

To:            Intel Corporation
                 c/o Doug M. Lusk
                 Facsimile: (408) 765-1611
                 Telephone: (408) 765-1679

From:         Lehman Brothers, Inc acting as Agent
                 Lehman Brothers OTC Derivatives Inc., acting as Principal
                 Andrew Yare - Transaction Management Group
                 Facsimile:        646-885-9546 (United States of America)
                 Telephone:     212-526-9986

Global Id:      3990242

Dear Sir or Madam:

      This confirmation ("**Confirmation**"), dated as of August 1, 2008, is intended to represent the terms and provisions of the VWAP Prepaid Share Forward Transaction (the "**Transaction**") entered into between Lehman Brothers OTC Derivatives Inc. ("**Lehman**" or "**Party A**") and Intel Corporation ("**Counterparty**" or "**Party B**"). This Confirmation shall constitute a "Confirmation" as referred to in the Agreement specified below. This confirmation is sent on behalf of both Lehman and Counterparty. **Lehman Brothers OTC Derivatives Inc. is not a member of the Securities Investor Protection Corporation.**

      The definitions and provisions contained in the 2002 ISDA Equity Derivatives Definitions (the "**Equity Definitions**"), as published by the International Swaps and Derivatives Association, Inc., are incorporated into this Confirmation. This Confirmation evidences a complete binding agreement between the Counterparty and Lehman as to the terms of the Transaction.

      This Confirmation evidences a complete and binding agreement between Party A and Party B as to the terms of the Transaction to which this Confirmation relates. This Confirmation shall supplement, form a part of, and be subject to an agreement in the form of the 1992 ISDA Master Agreement (Multicurrency-Cross Border) (the "**Agreement**") executed on February 1, 2008 between Party A and Party B; *provided* that Loss and Second Method shall apply with respect to this Transaction for purposes of Section 6(e) of the Agreement. In the event of any inconsistency between the provisions of that Agreement, and this Confirmation, this Confirmation will prevail for the purpose of this Transaction. The parties hereto agree to use all reasonable efforts promptly (and in all events prior to the Prepayment Date (as defined in Section 1)) to negotiate execute and deliver an agreement in the same form as the Agreement referred to in the preceding sentence, at which point such new agreement shall supersede and become the "Agreement" for purposes of this Confirmation.

      All provisions contained in the Agreement shall govern this Confirmation except as expressly modified below. The Agreement and this Confirmation shall represent the entire agreement and understanding of the parties with respect to the subject matter and terms of the Transaction and shall supersede all prior or contemporaneous written or oral communications with respect thereto.

      If there is any inconsistency between the Agreement, this Confirmation, and the Equity Definitions, the following shall prevail for purposes of the Transaction in the order of precedence indicated: (i) this Confirmation; (ii) the Agreement; and (iii) the Equity Definitions.

1.      The Transaction shall constitute a Share Forward Transaction for purposes of the Equity Definitions. Set forth below are the terms and conditions which shall govern the Transaction.

General Terms:

| | |
|---|---|
| Agent: | Lehman Brothers Inc. ("**LBI**") is acting as agent on behalf of Lehman and Counterparty for this Transaction. LBI has no obligations, by guarantee, endorsement or otherwise, with respect to the performance of this Transaction by either party. |
| Trade Date: | August 1, 2008 |
| Buyer: | Counterparty |
| Seller: | Lehman |
| Shares: | Common Stock, $0.001 par value of Counterparty (Ticker: INTC) |
| Forward Price: | The arithmetic average of the 10b-18 VWAP for each Exchange Business Day in the Calculation Period |
| 10b-18 VWAP: | The 10b-18 volume-weighted average price per share of the Shares, as published by Bloomberg (by reference to Bloomberg INTC.Q <Equity> AQR SEC (or any successor thereto)) at 4:15 p.m., New York Time, absent manifest error. For any Exchange Business Day on which a manifest error occurs with respect to the Bloomberg Page specified above, an amount determined in good faith and in a commercially reasonable manner by the Calculation Agent as 10b-18 VWAP. |
| Forward Price Adjustment Amount: | The Table Amount. The Calculation Agent shall provide written or electronic notice to the Counterparty of the Forward Price Adjustment Amount promptly upon determination thereof; *provided* that failure by Calculation Agent to give such notice or notices shall not constitute a default under or breach of the Transaction. |
| Table Amount: | An amount determined with respect to the Reference Spot and the Reference Implied Volatility by the Calculation Agent and derived from the table (the "**Table**") set forth in Schedule A hereto. The Reference Spot will be measured along the horizontal axis. The Reference Implied Volatility (together with the Reference Spot, the "**Table Reference**") will be measured along the vertical axis. The figures appearing in the Table are the Table Amounts for the Table References that tie exactly to the data points included as axis labels on the Table. For Table References falling between amounts set forth on the vertical and horizontal axes of the Table, the Table Amount will be calculated by the Calculation Agent using bilinear interpolation. If a Table Amount is otherwise not determinable pursuant to the foregoing on the Prepayment Date because one or more relevant Table References falls outside the Table, unless the parties otherwise agree, the Transaction shall automatically terminate (the "**Nullification**"), on the Prepayment Date and the Transaction and all of the respective rights and obligations of Party A and Party B hereunder shall be cancelled and terminated. Following such termination, each party shall be released and discharged by the other party from and agrees not to make any claim against the other party with respect to any obligations or liabilities of either party arising out of and to be performed in connection with the Transaction either prior to or after the Prepayment Date. Party A and Party B |

Global Deal ID: 3624221

2

represent and acknowledge to the other that upon Nullification, all obligations with respect to the Transaction shall be deemed fully and finally discharged and any amounts previously transferred from one party to the other with respect to the Transaction shall promptly be returned.

Reference Spot:                     The 10b-18 VWAP on the Prepayment Date starting at 11:30 a.m. New York Time on such date.

Reference Implied Volatility:       The arithmetic average of the volatilities for the Reference Options at each Reference Time on the Prepayment Date resulting from the arithmetic average for call option and put option volatilities obtained by linearly interpolating (across Strike Prices based on the Spot Price) the arithmetic averages of the volatilities at such time opposite the captions "real-time implied volatility bid" and "real-time implied volatility ask", as such volatilities are displayed on the page "INTC <Equity> OMON <GO>", on the BLOOMBERG Professional Service, or any successor page, absent manifest error.

Reference Times:                    11:00 a.m., 2:00 p.m. New York Time

Reference Options:                  The listed call and put options expiring on September 20, 2008 with a strike price equal to the then-current price per Share (the "**Spot Price**") or if the Spot Price does not match any of the listed options' strike prices, the two listed options expiring on September 20, 2008 with strike prices (the "**Strike Prices**") that are closest to and exceeding and closest to and less than the Spot Price.

Calculation Period:                 Each Exchange Business Day from and including the Exchange Business Day immediately following the Prepayment Date to and including the Termination Date.

Termination Date:                   September 26, 2008; *provided* that Lehman may, in its absolute discretion, accelerate the Termination Date to any Scheduled Trading Day on or after September 22, 2008 upon written notice to the Counterparty (it being understood that such notice shall be given to the Counterparty on or prior to the date that Lehman so accelerates).

Exchange:                           NASDAQ Global Select Market

Market Disruption Event:            The definition of "Market Disruption Event" in Section 6.3(a) of the Equity Definitions is hereby amended by deleting the words "at any time during the one-hour period that ends at the relevant Valuation Time, Latest Exercise Time, Knock-in Valuation Time or Knock-out Valuation Time, as the case may be" and inserting the words "at any time on any Scheduled Trading Day during the Calculation Period or" after the word "material," in the third line thereof.

Notwithstanding anything to the contrary in the Equity Definitions, to the extent that any Scheduled Trading Day in the Calculation Period is a Disrupted Day, the Termination Date shall be postponed and the Calculation Agent in its commercially reasonable and good faith discretion shall extend the Calculation Period and make adjustments to the weighting of each Rule 10b-18 eligible transaction in the Shares on the relevant Exchange Business Days during the Calculation Period for purposes of determining the Forward Price, with such adjustments based on, among other factors, the duration of any Market Disruption Event and the volume, historical trading patterns and price of the Shares.

Global Deal ID: 3624221

To the extent that there are 5 consecutive Disrupted Days during the Calculation Period, then notwithstanding the occurrence of a Disrupted Day, Lehman shall have the option in its commercially reasonable and good faith discretion to either determine the weighting of each Rule 10b-18 eligible transaction in the Shares on the relevant Exchange Business Days during the Calculation Period, as applicable, using its good faith estimate of the value for the Share on such 5 consecutive days or elect to further extend the Calculation Period as it deems necessary. All determinations by Lehman to modify the Calculation Period or make any other adjustment as specified herein shall be communicated to Counterparty within one Scheduled Trading Day of the event giving Lehman the right to make such modification or adjustment, and Counterparty shall have the right to object and submit the matter to a review of the Substitute Calculation Agents as described in Section 3(h) herein.

| | |
|---|---|
| Prepayment Amount: | US $1 billion |
| Prepayment Date: | August 29, 2008 |

Settlement Terms:

Physical Settlement:     Applicable

Delivery of Shares and Cash:     On the Settlement Date, Lehman will deliver to Counterparty, at or prior to 4:30 p.m. New York Time, the Number of Shares to be Delivered, *plus* an amount in cash equal to the amount (the "**Cash Delivery Amount**") by which the Prepayment Amount exceeds the Final Notional Amount (collectively, the "**Final Delivery Amount**").

If the Number of Shares to be Delivered is a negative number, Counterparty will not be obligated to purchase from Lehman such negative number of Shares.

Under no circumstances will Counterparty be required to return to Lehman any Shares previously delivered.

Number of Shares
to be Delivered:     A number of Shares equal to the difference between (a) the quotient of (i) the Final Notional Amount *divided by* (ii) the Forward Price *minus* the Forward Price Adjustment Amount; *provided* that a number of Shares less than a whole number shall be rounded upward and (b) the number of Shares delivered, if any, pursuant to "Early Share Delivery" on the Early Delivery Date.

Final Notional Amount:     An amount determined by the Calculation Agent pursuant to the following formula:

$$\$750\text{mm} * \frac{\text{Max}(0,\text{Min}(\$25.00 - \text{Forward Price},\$4.00))}{\$4.00} + \$250\text{mm}$$

Settlement Date:     One (1) Exchange Business Day following the Termination Date.

Early Share Delivery:     In the event that Party A has not exercised its right to accelerate the Termination Date on or prior to September 25, 2008 pursuant to the "Termination Date" provision above, on the Early Delivery Date, Party A shall have the right to deliver a number of Shares (the "**Early Delivery Amount**") determined in its sole discretion.

| | |
|---|---|
| Early Delivery Date: | September 26, 2008. |
| Settlement Currency: | USD (all amounts shall be converted to the Settlement Currency by the Calculation Agent) |
| Net Share Settlement: | The terms of "Delivery of Shares and Cash" above notwithstanding Party B may, by a separate instruction given to Party A on or prior to the Termination Date, elect that Net Share Settlement shall apply to the Cash Delivery Amount. If Net Share Settlement is applicable, on the day that is three Scheduled Trading Days after the completion of the Net Share Settlement Period (the "**Net Share Settlement Date**") Party A shall deliver (in addition to the Number of Shares to be Delivered previously delivered on the Settlement Date) a number of Shares to Party B (the "**Net Delivery Shares**") equal to the Cash Delivery Amount *divided* by the volume weighted average price at which Party A purchased the Net Delivery Shares. No fractional Shares shall be delivered in connection with Net Share Settlement by Party A, and the value of any fractional Share otherwise deliverable shall be paid in cash to Party B on the Net Share Settlement Date (such value to be determined by multiplying such fractional Share by the volume weighted average price at which Party A purchased the Refund Shares). |
| Net Share Settlement Period: | The period during which Party A makes purchases of the Net Delivery Shares, commencing on the Scheduled Trading Day immediately following the Termination Date and ending on the Scheduled Trading Day on which Party A completes its purchases of the Net Delivery Shares. |
| | All purchases of Net Delivery Shares by Party A shall comply with the terms of Rule 10b-18. |
| Potential Adjustment Events: | |
| Method of Adjustment: | Calculation Agent Adjustment; *provided, however*, that all determinations by the Calculation Agent with respect to the Method of Adjustment shall be communicated to Counterparty within one Scheduled Trading Day of the Potential Adjustment Event giving Lehman the right to make such adjustment, and Counterparty shall have the right to object and submit the matter to a review of the Substitute Calculation Agents as described in Section 3(h) herein. |
| Merger Events/Tender Offers: | |
| Share for Share: | Modified Calculation Agent Adjustment; *provided, however*, that all determinations by the Calculation Agent to make an adjustment as described herein shall be communicated to Counterparty within one Scheduled Trading Day of the Merger Event giving Lehman the right to make such adjustment, and Counterparty shall have the right to object and submit the matter to a review of the Substitute Calculation Agents as described in Section 3(h) herein. |
| Share for Other: | Cancellation and Payment |
| Share for Combined: | Cancellation and Payment |
| Nationalization, Insolvency or Delisting: | Cancellation and Payment |

| Determining Party: | Lehman, *provided, however,* that with respect to the Cancellation Amount determined by the Determining Party, Counterparty shall have the right to object and submit the matter to a review of the Substitute Calculation Agents as described in Section 3(h) herein. |
|---|---|

| Lehman Payment Instructions: | JPMORGAN CHASE BANK<br>ABA # 021000021<br>Swift # CHASUS33XXX<br>A/C # 066626277<br>A/C Name: Lehman Brothers OTC Derivatives |
|---|---|

| Intel Payment Instructions: | Citibank, NY<br>ABA # 021000089<br>Swift # CITIUS33<br>A/C # 40667555<br>A/C Name: Intel Corporation |
|---|---|

| Intel Delivery Instructions: | DTC# 908<br>Agent Bank# 27603<br>Institution ID# 29424<br>A/C# 848386<br>A/C Name: Intel Corporation |
|---|---|

2.      Calculation Agent.       LBI

3.      <u>Additional Mutual Representations, Warranties and Covenants</u>.  In addition to the representations and warranties in the Agreement, each party represents, warrants and covenants to the other party that:

(a) <u>Eligible Contract Participant</u>.  Each party represents that it is: (i) an "eligible contract participant", as defined in the U.S. Commodity Exchange Act (as amended), and (ii) entering into this Transaction as principal and not for the benefit of any third party.

(b) <u>Accredited Investor</u>.  Each party acknowledges that the offer and sale of securities under this Transaction is intended to be exempt from registration under the Securities Act of 1933, as amended (the "**Securities Act**"), by virtue of Section 4(2) thereof and the provisions of Regulation D thereunder ("**Regulation D**").  Accordingly, each party represents and warrants to the other that (i) it has the financial ability to bear the economic risk of its investment and is able to bear a total loss of its investment, (ii) it is an "accredited investor" as that term is defined under Regulation D, (iii) it will purchase for investment and not with a view to the distribution or resale thereof, and (iv) the disposition is restricted under this Confirmation, the Securities Act and state securities laws.

(c) <u>Registered Broker-Dealer</u>.  As a broker-dealer registered with the U.S. Securities and Exchange Commission, LBI, as agent of Lehman and Counterparty, will be responsible for (i) effecting the Transaction, (ii) issuing all required confirmations and statements to Lehman and Counterparty, (iii) maintaining books and records relating to the Transaction as required by SEC regulations, and (iv) receiving, delivering and safeguarding Counterparty's funds and any securities in connection with the Transaction in compliance with SEC regulations.

(d) LBI hereby represents, warrants and covenants to Counterparty that during the Calculation Period and during any Net Share Settlement Period or Early Termination Net Share Settlement Period it will be the sole purchaser of Shares in the market with respect to this Transaction and will comply with the provisions of Rule 10b-18(b)(1),(2),(3) and (4) of the Securities Exchange Act of 1934, as amended (the "**Exchange Act**"), to the extent that it purchases or hedges any Shares with respect to this Transaction as if it were Counterparty's agent and LBI (or any "affiliated purchaser" as defined in Rule 10b-18 under the Exchange Act ("**Rule 10b-18**")) will not purchase or hedge any Shares with respect to this Transaction beginning on the date hereof and through, and (subject to the following exception) including, the Prepayment Date, except that Counterparty acknowledges and agrees that

Global Deal ID: 3624221

6

Lehman or LBI may, directly or indirectly, purchase Shares on the Prepayment Date; *provided* that the aggregate number of Shares purchased in such transactions on the Prepayment Date shall not exceed 12.5 percent of the ADTV (as defined in Rule 10b-18) limit for that day. Lehman acknowledges and agrees that Counterparty (or any "affiliated purchaser" as defined in Rule 10b-18 under the Exchange Act) may, directly or indirectly, purchase Shares outside of the Transaction during the Calculation Period and during any Net Share Settlement Period or Early Termination Net Share Settlement Period, *provided* that (i) Counterparty or such "affiliated purchaser" effects such purchases in unsolicited transactions or privately negotiated (off-market) transactions that are not "Rule 10b-18 purchases" (as defined in Rule 10b-18) or (ii) with the prior agreement of Lehman, Counterparty or such "affiliated purchaser" effects such purchases in unsolicited transactions that are not privately negotiated (off-market) and (x) Counterparty receives the agreement of Lehman at least one Scheduled Trading Day before making any such purchases, (y) the aggregate number of Shares Counterparty purchases in such transactions on any day shall not exceed 12.5 percent of the ADTV (as defined in Rule 10b-18) limit for that day and (z) a public announcement (as defined in Rule 165(f) under the Securities Act) of a Merger Transaction shall not have occurred and be continuing on such day or (iii) such purchases are made by Deutsche Bank Securities Inc. or its affiliates in respect of the issuer collar transaction relating to the Shares entered into by Counterparty and Deutsche Bank Securities Inc. on April 17, 2003, as amended (the "**Deutsche Bank Transaction**"). Lehman acknowledges and agrees that Counterparty or any "affiliated purchaser" may, directly or indirectly, purchase Shares outside of the Transaction on the Prepayment Date, *provided* that (i) Counterparty or such "affiliated purchaser" effects such purchases in unsolicited transactions or privately negotiated (off-market) transactions that are not "Rule 10b-18 purchases" (as defined in Rule 10b-18) or (ii) Counterparty or such "affiliated purchaser" effects such purchases in unsolicited transactions that are not privately negotiated (off-market) and (x) the aggregate number of Shares Counterparty purchases in such transactions on the Prepayment Date shall not exceed 12.5 percent of the ADTV (as defined in Rule 10b-18) limit for that day and (y) a public announcement (as defined in Rule 165(f) under the Securities Act) of a Merger Transaction shall not have occurred and be continuing on such day or (iii) such purchases are made by Deutsche Bank Securities Inc. or its affiliates in respect of the Deutsche Bank Transaction.

(e)   Lehman and Counterparty each hereby acknowledges that any transactions by Lehman in any Shares during the life of the Transaction will be undertaken by Lehman as principal for its own account, and not as agent for Counterparty.

(f)   All of the actions to be taken by Lehman and LBI in connection with this Agreement shall be taken by Lehman independently and without any advance or subsequent consultation with Counterparty.

(g)   Each party acknowledges that it is entering into this Confirmation and the Transaction hereunder in good faith and not as part of a plan or scheme to evade the prohibitions of Rule 10b5-1. It is the intent of the parties that the Transaction comply with the requirements of Rule 10b5-1(c)(1) and (2) and shall be interpreted to comply with such requirements. Counterparty intends any instruction providing that Net Share Settlement shall apply and any instruction under Section 5(d) to receive Shares or Alternative Termination Delivery Units to be made at a time and in a manner to comply with the requirements of Rule 10b5-1(c)(1) and (2).

(h)   If within one Scheduled Trading Day of receipt of notice of an adjustment or modification made to this Transaction by Lehman Counterparty reasonably objects to such adjustment or modification, Lehman and Counterparty shall agree to three leading independent dealers to act as a substitute Calculation Agent in place of Lehman ("**Substitute Calculation Agents**") for that determination. If Lehman and Counterparty do not agree to the three Substitute Calculation Agents, they must each appoint a third party in order for the third parties to together agree to three Substitute Calculation Agents. The Substitute Calculation Agents cannot be affiliates of Lehman or Counterparty and must make a determination as to the disputed matter within two Scheduled Trading Days of such appointment. For any determination, the median determination (after discarding the low and the high determinations) provided by the three Substitute Calculation Agents shall be deemed the final determination. Unless there is clear error, the determinations of the Substitute Calculation Agents are binding and conclusive. Each Lehman and Counterparty must pay any costs of the Substitute Calculation Agents equally. Lehman and Counterparty waive any claim they might otherwise have against the Substitute Calculation Agents for errors or omissions made in good faith in making any determination in connection with the Transaction. For the avoidance of doubt, any dispute regarding any Lehman Payment Amount shall not delay any delivery or payment otherwise due.

4.   Additional Representations, Warranties and Covenants of Counterparty.  In addition to the representations, warranties and covenants in the Agreement and those contained herein, as of the Trade Date Counterparty represents, warrants and covenants to Lehman that:

(a)   it is not aware of any third party tender offer for its Shares and is not entering into the Transaction as part of a self tender offer for its Shares;

(b)   it is not entering into the Transaction on the basis of, and is not aware of, any material non-public information with respect to the Shares or in anticipation of, in connection with, or to facilitate, a distribution of its securities;

(c)   it is entering into the Transaction pursuant to a publicly disclosed Share buy-back program; and

(d)   to the extent Counterparty (or any "affiliated purchaser" as defined in Rule 10b-18 under the Exchange Act) intends to purchase any Shares outside of this Transaction during the Calculation Period, such purchases shall be conducted as described in Section 3(d) with respect to Counterparty and any affiliated purchaser of Counterparty.

5.   Suspension of Calculation Period and Termination.

(a)   If Counterparty concludes that it will be engaged in a distribution of the Shares for purposes of Regulation M, Counterparty agrees that it will, on one Scheduled Trading Day's written notice, direct Lehman not to purchase Shares in connection with hedging any Transaction during the "restricted period" (as defined in Regulation M).  If on any Scheduled Trading Day Counterparty delivers written notice (and confirms by telephone) by 8:30 a.m. New York Time (the "**Notification Time**") then such notice shall be effective to suspend the Calculation Period, as the case may be, as of such Notification Time.  In the event that Counterparty delivers notice and/or confirms by telephone after the Notification Time, then the Calculation Period, as the case may be, shall be suspended effective as of 8:30 a.m. New York Time on the following Scheduled Trading Day or as otherwise required by law or agreed between Counterparty and Lehman. The Calculation Period shall be suspended and the Termination Date extended for each Scheduled Trading Day in such restricted period and Lehman agrees that upon receipt of notice from Counterparty, Lehman will not effect any transactions in Shares that would give rise to a violation of Regulation M.

(b)   In the event the Calculation Period is suspended pursuant to Section 5 (a) above during the regular trading session on the Exchange, the Calculation Agent, in its commercially reasonable and good faith discretion shall, in calculating the Forward Price, extend the Calculation Period and make adjustments to the weighting of each Rule 10b-18 eligible transaction in the Shares on the relevant Exchange Business Days during the Calculation Period for purposes of determining the Forward Price, with such adjustments based on, among other factors, the duration of any such suspension and the volume, historical trading patterns and price of the Shares, but in no event shall the Calculation Period be extended by more than five (5) Exchange Business Days in the aggregate.  If the Calculation Period is extended by more than five (5) Exchange Business Days, then Counterparty shall have the right to terminate this Agreement with settlement of this Transaction subject to Cancellation and Payment.  All determinations by Lehman to suspend or extend the Calculation Period shall be communicated to Counterparty within one Scheduled Trading Day of the event giving Lehman the right to suspend or extend the Calculation Period, and Counterparty shall have the right to object and submit the matter to a review of the Substitute Calculation Agents as described in Section 3(h) herein.

(c)   Counterparty shall have the right to terminate the Transaction at any time from the date hereof and through, and including, 11:30 a.m. New York Time on the Prepayment Date without any cost or financial consequence to Counterparty.  During the period after 11:30 a.m. New York Time on the Prepayment Date and during the Calculation Period, Counterparty shall have the right to terminate the Transaction, but settlement of the Transaction will be subject to Cancellation and Payment (except in the case of a Nullification as provided above); *provided* that with respect to the determination of Cancellation Amount, Party A shall be the Determining Party and Section 3(h) hereof shall not apply.  With respect to such determination, the Determining Party shall act in good

faith and use commercially reasonable procedures in order to produce a commercially reasonable result in accordance with Section 12.8(b) of the Equity Definitions.

(d)    Early Termination.  In the event that (i) an Early Termination Date (whether as a result of an Event of Default or a Termination Event) occurs or is designated with respect to the Transaction, (ii) the Transaction is cancelled or terminated upon the occurrence of an Extraordinary Event (other than a Merger Event or Nationalization in which the consideration or proceeds to be paid to holders of Shares consists solely of cash) or (iii) the Transaction is cancelled pursuant to Section 5(b) or 5(c) of this Confirmation, if Lehman would owe any amount to Counterparty pursuant to Section 6(d)(ii) of the Agreement or any Cancellation Amount pursuant to Article 12 of the Equity Definitions (any such amount, a "**Lehman Payment Amount**"), then on the date on which any Lehman Payment Amount is due, in lieu of any payment of such Lehman Payment Amount, Lehman shall (x) deliver to Counterparty a number of Shares (or, in the case of a Merger Event, a number of units, each comprising the number of amount of the securities or property that a hypothetical holder of one Share would receive in such Merger Event (each such unit, an "**Alternative Termination Delivery Unit**")) comprising Lehman's Hedge Positions in respect of the Transaction as of the relevant Early Termination Date or the date on which the Transaction is otherwise terminated or cancelled; *provided* that in no event will the number of Shares delivered be in excess of an amount equal to (a) the Final Notional Amount (calculated based upon the Calculation Period ending on the relevant Early Termination Date) *divided by* (b) the Agreed Value and (y) pay to Counterparty an amount in cash equal to any excess of the Lehman Payment Amount over the aggregate Agreed Value of such Shares or Alternative Termination Delivery Units so delivered; *provided* that in determining the composition of any Alternative Delivery Unit, if the relevant Merger Event involves a choice of consideration to be received by holders, such holder shall be deemed to have elected to receive the maximum possible amount of cash.  "**Agreed Value**" means a price per share equal to the Forward Price (calculated based upon the Calculation Period ending on the relevant Early Termination Date) minus the Forward Price Adjustment Amount.  Clause (y) of this paragraph (d) notwithstanding, Party B may, by a separate instruction given to Lehman on or prior to the relevant termination date (howsoever called), elect to receive the portion of the Lehman Payment Amount consisting of cash (the "**ET Cash Amount**") in Shares or Alternative Termination Delivery Units; *provided* that Shares or Alternative Termination Delivery Units, as the case may be, remain outstanding and continue to be freely tradable on the relevant Exchange.  If Party B gives such instruction to Lehman on or prior to the relevant termination date (howsoever called), Lehman shall be under no obligation to deliver the ET Cash Amount or any value with respect thereto on the day that the Lehman Payment Amount is otherwise due.  If Party B gives such instruction, then on the day that is three Scheduled Trading Days after the completion of the Early Termination Net Share Settlement Period (the "**ETNS Settlement Date**") Party A shall deliver a number of Shares or Alternative Termination Delivery Units to Party B (in either case, the "**ETNS Shares**") equal to the ET Cash Amount *divided by* the volume weighted average price at which Party A purchased the ETNS Shares.  No fractional Shares or fractional Alternative Termination Delivery Units shall be delivered in connection with this provision by Party A, and the value of any fractional Share or Alternative Termination Delivery Unit otherwise deliverable shall be paid in cash to Party B on the ETNS Settlement Date (such value to be determined by multiplying such fractional Share by the volume weighted average price at which Party A purchased the Refund Shares).  For purposes hereof, "**Early Termination Net Share Settlement Period**" means the period during which Party A makes purchases of the ETNS Shares, commencing on the Scheduled Trading Day immediately following the date on which any Lehman Payment Amount is otherwise due and ending on the Scheduled Trading Day on which Party A completes its purchases of the Net Delivery Shares.

6.    **Collateral.**  Party A and Party B agree that the provisions of this Section 6 will apply with respect to the Transaction to the same extent as if the Parties had executed a 1994 standard form ISDA Credit Support Annex (ISDA Agreements Subject to New York Law Only) to the Schedule to the Agreement (the "CSA").  Paragraphs 1 through 12 of the CSA are incorporated herein by reference, and terms defined in the CSA shall have the meanings accorded them therein, subject in each case to the elections and modifications set out below and with references to paragraph 13 in the CSA referring instead to this Section 6.  Subject to the foregoing, the following CSA elections and variables shall apply to the Transaction:

(a)  **Security Interest for "Obligations".**  The term "Obligations" as used in the CSA includes no additional obligations with respect to either Party.

(b)  Credit Support Obligations.

        (i)      Delivery Amount, Return Amount and Credit Support Amount.

            (A)   "Delivery Amount" has the meaning specified in Paragraph 3(a).

            (B)   "Return Amount" has the meaning specified in Paragraph 3(b).

        (ii)     Eligible Collateral. The following items will qualify as "Eligible Collateral":

| ELIGIBLE COLLATERAL | REMAINING MATURITY FROM THE VALUATION DATE | VALUATION PERCENTAGE |
|---|---|---|
| USD Cash | Not applicable | 100% |

    (c)    Other Eligible Support. There shall be no "Other Eligible Support" for either party for purposes of the CSA, unless agreed in writing between the Parties.

    (d)    Credit Support Amount.

            (A)     "Independent Amount" shall not apply for purposes of the CSA

            (B)     "Threshold" means, with respect to Party A, USD 0.

            (C)     "Secured Party's Exposure" means USD 1 billion, (a) reduced on the Early Delivery Amount by an amount equal to (i) the Forward Price that would be determined as if the Exchange Business day prior to the Early Delivery Date were the Termination Date *minus* the Forward Price Adjustment Amount *multiplied by* (ii) the number of Shares delivered on such date and (b) reduced to zero on the Settlement Date upon the delivery by Party A to Party B of the Final Delivery Amount; *provided* that if Party B has elected Net Share Settlement to apply, on the Settlement Date, the Secured Party's Exposure shall be deemed reduced by an amount equal to (x) the Forward Price minus the Forward Price Adjustment *multiplied by* (y) the Number of Shares to be Delivered and on the Net Share Settlement Date the Secured Party's Exposure shall be deemed reduced to zero. Paragraph 4(b) notwithstanding, Party B shall be deemed to have made a demand for Eligible Credit Support on the Trade Date and the Transfer of Eligible Credit Support by Party A with respect to such demand shall occur at or prior to 3:00 p.m. New York Time on the Prepayment Date (*provided* that Party B shall have paid the Prepayment Amount as provided above in this Confirmation at or prior to 11:30 a.m. New York Time on such date). The foregoing notwithstanding, until satisfaction of Party B's obligation to pay the Prepayment Amount to Party A on the Prepayment Date, the Secured Party's Exposure shall be deemed to be zero. Party A shall be deemed to make demand for the relevant Return Amount on the New York Business Days immediately preceding each of the Early Delivery Date, if any, the Settlement Date and the Net Share Settlement Date, if any, in each case, prior to the Notification Time, *provided* that the Secured Party shall have no obligation to return any Posted Credit Support until such time as the Early Delivery Amount or Final Delivery Amount or portion thereof consisting of the Number of Shares to be Delivered, as the case may be, shall have been delivered to Party B. Paragraph 4(b) notwithstanding, the Transfer of the Return Amount with respect to each of the Early Delivery Date, Settlement Date and Net Share Settlement Date shall be made by Party B on each such date, *provided* that the Early Delivery Amount, Final Delivery Amount or portion thereof consisting of the Number of Shares to be Delivered, as the case may be, shall have been received by Party B at or prior to 3:00 p.m. New York Time on such date; otherwise, such Transfers shall occur on the next Local Business Day (and the Interest Rate for the periods after such earlier date shall be as provided in clause (i) of the definition of Interest Rate).

(D)     "Minimum Transfer Amount" means, with respect to Party A, USD 0.

(E)     Rounding. The Delivery Amount and the Return Amount will be rounded up and down to the nearest integral multiple of USD 10,000, respectively.

(e)   Valuation and Timing.

(i)     "Valuation Agent" means Party B.

(ii)    "Valuation Date" means each Local Business Day.

(iii)   "Valuation Time" means the close of business in the city of the Valuation Agent on the Local Business Day immediately preceding each Valuation Date or date of calculation, as applicable.

(iv)    "Notification Time" means by 12:00 noon, New York time, on a Local Business Day.

(f)   Conditions Precedent. With respect to Party A, any Additional Termination Event (if Party A is the Affected Party with respect to such Termination Event) will be a "Specified Condition".

(g)   Substitution.

(i)     "Substitution Date" has the meaning specified in Paragraph 4(d)(ii).

(ii)    Consent.  Inapplicable.

(h)   Dispute Resolution.

(i)     "Resolution Time" means 12:00 noon, New York time, on the Local Business Day following the date on which notice is given that gives rise to a dispute under Paragraph 5.

(ii)    Value.  For the purpose of Paragraphs 5(i)(C) and 5(ii), the Value of Posted Credit Support other than Cash will be calculated as the sum of (I) (x) the mean of the high bid and low asked prices quoted on such date by any principal market maker for such Eligible Collateral chosen by the Disputing Party, or (y) if no quotations are available from a principal market maker for such date, the mean of such high bid and low asked prices as of the first day prior to such date on which such quotations were available, plus (II) the accrued interest on such Eligible Collateral (except to the extent Transferred to a party pursuant to any applicable provision of this Agreement or included in the applicable price referred to in (I) of this clause (A)) as of such date; multiplied by the Valuation Percentage.

(iii)   The provisions of Paragraph 5 will apply.

(i)   Holding and Using Posted Collateral.

(i)     Eligibility to Hold Posted Collateral; Custodians.

Party B will not hold Posted Collateral through a Custodian pursuant to Paragraph 6(b).

(ii)    Use of Posted Collateral. The provisions of Paragraph 6(c) will apply to Party B.

(iii)   Notwithstanding the foregoing, Party B hereby agrees to invest the initial Eligible Collateral in one or more of the following (each of which, a "Permitted Investment"):

(A) demand deposit accounts or money market accounts, including those accounts managed by any commercial bank or trust company which is organized under the laws of the United States or of any State thereof the credit of which is rated not less than A or the equivalent rating by Standard and Poor's Corporation or Moody's Investors Services, Inc.;

(B) securities (i) which are commonly known as "commercial paper," (ii) which are due and payable within thirty (30) days from the date of issue, (iii) which have been issued by any corporation organized under the laws of the United States or of any State thereof and (iv) the ratings for which, at the time of the acquisition thereof by Counterparty, are not less than "P-l" if rated by Moody's Investors Services, Inc., and not less than "A-1" if rated by Standard and Poor's Corporation; and

(C) United States Treasury obligations maturing in 30 days or less from the date of issue.

The amounts so invested, and earnings thereon, shall remain invested in such Permitted Investments until the exercise of remedies with respect to the Posted Credit Support pursuant to Paragraph 8 of the CSA or until the Posted Credit Support is Transferred by Party B to Party A as provided above. If such funds are commingled with funds of Party B, Party B shall identify Permitted Investments of the Eligible Collateral made on behalf of Party A using separate notional accounts comprised of entries in its treasury recordkeeping system. Such entries shall include the invested amount of Eligible Collateral, all earnings thereon and all other additions thereto and withdrawals therefrom in accordance with this Agreement. No later than January 31, 2009, Party B shall provide a statement to Party A setting forth the amount of earnings on the Eligible Collateral that Party A is required to include in its income for U.S. federal income tax purposes in accordance with Paragraph 10(c) (provided that under no circumstances shall Party B be liable for Party A's income or other taxes).

(j) Distributions and Interest Amount.

(i) Interest Rate. The Interest Rate for any day means the greater of (i) a rate per annum at which any Posted Collateral is actually invested by Party B and (ii) a rate per annum equal to the Federal Funds Rate as of that date, as published by Bloomberg (by reference to Bloomberg FOMC <GO> screen) for the most recent date.

(ii) Transfer of Interest Amount. The Transfer of the Interest Amount will be made on the Settlement Date, and on any Local Business Day when Posted Collateral in the form of Cash is Transferred to the Pledgor pursuant to Paragraph 3(b).

(iii) Alternative to Interest Amount. The provisions of Paragraph 6(d)(ii) will apply.

(k) Additional Representations. None.

(l) Other Eligible Support and Other Posted Support.

(i) "Value" shall have no meaning with respect to either party with respect to Other Eligible Support and Other Posted Support.

(ii) "Transfer" shall have no meaning with respect to either party with respect to Other Eligible Support and Other Posted Support.

(m) Agreement as to Single Secured Party and Pledgor. Party A and Party B agree that (a) the term "Secured Party" as used in the CSA means only Party B, (b) the term "Pledgor" as used in the CSA means only

Party A, (c) only Party A makes the pledge and grant in Paragraph 2, the acknowledgment in the final sentence of Paragraph 8(a) and the representations in Paragraph 9 and (d) only Party A will be required to make Transfers of Eligible Credit Support hereunder.

7.      Governing Law.   The Agreement, this Confirmation and all matters arising in connection with the Agreement and this Confirmation shall be governed by, and construed and enforced in accordance with, the laws of the State of New York (without reference to its choice of laws doctrine).

8.      Counterparty hereby agrees (a) to check this Confirmation carefully and immediately upon receipt so that errors or discrepancies can be promptly identified and rectified and (b) to confirm that the foregoing (in the exact form provided by Lehman) correctly sets forth the terms of the agreement between Lehman and Counterparty with respect to the Transaction to which this Confirmation relates, by manually signing this Confirmation or this page hereof as evidence of agreement to such terms and providing the other information requested herein and immediately returning an executed copy to Lehman, Facsimile No. 646-885-9546.

9.      Regulatory Provisions.     (a) Party B represents and warrants that it has received and read and understands the Notice of Regulatory Treatment and the OTC Option Risk Disclosure Statement.

        (b) The Agent will furnish Party B upon written request a statement as to the source and amount of any remuneration received or to be received by the Agent in connection with this Transaction evidenced hereby.

*[Remainder of page intentionally left blank.  Signature page to follow]*

Yours faithfully,

**LEHMAN BROTHERS OTC DERIVATIVES INC.**

By: _____

Authorized Signatory

Anatoly Kozlov
Authorized Signatory

Agreed and Accepted By:

**LEHMAN BROTHERS INC.**

By: _____
Name: Anatoly Kozlov
Title: Authorized Signatory

**INTEL CORPORATION**

By: _____
Name:
Title: Doug M. Lusk
Assistant Treasurer

## SCHEDULE A

### TABLE

| | Reference Spot | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | $16.00 | $17.00 | $18.00 | $19.00 | $20.00 | $21.00 | $22.00 | $23.00 | $24.00 | $25.00 | $26.00 | $27.00 |
| 14.00% | $0.000 | $0.000 | $0.000 | $0.000 | $0.000 | $0.000 | $0.000 | $0.000 | $0.000 | $0.000 | $0.000 | $0.000 |
| 16.00% | $0.000 | $0.000 | $0.000 | $0.000 | $0.000 | $0.000 | $0.000 | $0.000 | $0.000 | $0.000 | $0.000 | $0.000 |
| 18.00% | $0.000 | $0.000 | $0.000 | $0.000 | $0.000 | $0.000 | $0.011 | $0.015 | $0.007 | $0.000 | $0.000 | $0.000 |
| 20.00% | $0.000 | $0.000 | $0.000 | $0.000 | $0.000 | $0.008 | $0.023 | $0.033 | $0.039 | $0.000 | $0.000 | $0.000 |
| 22.00% | $0.000 | $0.000 | $0.000 | $0.000 | $0.000 | $0.016 | $0.035 | $0.051 | $0.066 | $0.029 | $0.000 | $0.000 |
| 24.00% | $0.008 | $0.008 | $0.008 | $0.009 | $0.010 | $0.025 | $0.048 | $0.071 | $0.093 | $0.060 | $0.000 | $0.000 |
| 26.00% | $0.022 | $0.023 | $0.024 | $0.020 | $0.021 | $0.034 | $0.062 | $0.092 | $0.120 | $0.093 | $0.000 | $0.000 |
| 28.00% | $0.026 | $0.028 | $0.030 | $0.026 | $0.029 | $0.044 | $0.077 | $0.113 | $0.149 | $0.125 | $0.044 | $0.000 |
| 30.00% | $0.031 | $0.033 | $0.035 | $0.032 | $0.035 | $0.055 | $0.092 | $0.136 | $0.178 | $0.158 | $0.081 | $0.000 |
| 32.00% | $0.036 | $0.038 | $0.041 | $0.037 | $0.043 | $0.065 | $0.108 | $0.159 | $0.206 | $0.193 | $0.117 | $0.038 |
| 34.00% | $0.042 | $0.045 | $0.048 | $0.045 | $0.051 | $0.078 | $0.125 | $0.182 | $0.235 | $0.225 | $0.153 | $0.070 |
| 36.00% | $0.047 | $0.050 | $0.053 | $0.051 | $0.061 | $0.090 | $0.141 | $0.205 | $0.264 | $0.260 | $0.192 | $0.108 |
| 38.00% | $0.052 | $0.055 | $0.059 | $0.058 | $0.069 | $0.103 | $0.158 | $0.230 | $0.293 | $0.295 | $0.231 | $0.149 |
| 40.00% | $0.050 | $0.053 | $0.056 | $0.059 | $0.074 | $0.116 | $0.178 | $0.256 | $0.322 | $0.328 | $0.272 | $0.188 |
| 42.00% | $0.056 | $0.059 | $0.063 | $0.067 | $0.084 | $0.130 | $0.197 | $0.281 | $0.351 | $0.362 | $0.311 | $0.229 |
| 44.00% | $0.062 | $0.066 | $0.069 | $0.074 | $0.095 | $0.144 | $0.217 | $0.307 | $0.380 | $0.395 | $0.351 | $0.272 |
| 46.00% | $0.068 | $0.072 | $0.076 | $0.082 | $0.106 | $0.159 | $0.238 | $0.333 | $0.409 | $0.429 | $0.390 | $0.315 |
| 48.00% | $0.074 | $0.079 | $0.083 | $0.091 | $0.118 | $0.175 | $0.259 | $0.359 | $0.438 | $0.462 | $0.429 | $0.358 |
| 50.00% | $0.081 | $0.086 | $0.091 | $0.099 | $0.130 | $0.191 | $0.280 | $0.385 | $0.468 | $0.496 | $0.468 | $0.401 |

Volatility

# EXHIBIT
# 4

**(Bilateral Form)**                                   **(ISDA Agreements Subject to New York Law Only)**



# ISDA®

International Swaps and Derivatives Association, Inc.

# CREDIT SUPPORT ANNEX

to the Schedule to the

………………………………………………………………………….

dated as of ……………………….

between

………………………………………………….  and   ………………………………………………

("Party A")                                                                ("Party B")

This Annex supplements, forms part of, and is subject to, the above-referenced Agreement, is part of its Schedule and is a Credit Support Document under this Agreement with respect to each party.

Accordingly, the parties agree as follows:—

**Paragraph 1.  Interpretation**

(a)   ***Definitions and Inconsistency.***   Capitalized terms not otherwise defined herein or elsewhere in this Agreement have the meanings specified pursuant to Paragraph 12, and all references in this Annex to Paragraphs are to Paragraphs of this Annex. In the event of any inconsistency between this Annex and the other provisions of this Schedule, this Annex will prevail, and in the event of any inconsistency between Paragraph 13 and the other provisions of this Annex, Paragraph 13 will prevail.

(b)   ***Secured Party and Pledgor.***   All references in this Annex to the "Secured Party" will be to either party when acting in that capacity and all corresponding references to the "Pledgor" will be to the other party when acting in that capacity; *provided, however*, that if Other Posted Support is held by a party to this Annex, all references herein to that party as the Secured Party with respect to that Other Posted Support will be to that party as the beneficiary thereof and will not subject that support or that party as the beneficiary thereof to provisions of law generally relating to security interests and secured parties.

**Paragraph 2.  Security Interest**

Each party, as the Pledgor, hereby pledges to the other party, as the Secured Party, as security for its Obligations, and grants to the Secured Party a first priority continuing security interest in, lien on and right of Set-off against all Posted Collateral Transferred to or received by the Secured Party hereunder. Upon the Transfer by the Secured Party to the Pledgor of Posted Collateral, the security interest and lien granted hereunder on that Posted Collateral will be released immediately and, to the extent possible, without any further action by either party.

Copyright © 1994 by International Swaps and Derivatives Association, Inc.

## Paragraph 3.  Credit Support Obligations

(a)  ***Delivery Amount.***  Subject to Paragraphs 4 and 5, upon a demand made by the Secured Party on or promptly following a Valuation Date, if the Delivery Amount for that Valuation Date equals or exceeds the Pledgor's Minimum Transfer Amount, then the Pledgor will Transfer to the Secured Party Eligible Credit Support having a Value as of the date of Transfer at least equal to the applicable Delivery Amount (rounded pursuant to Paragraph 13). Unless otherwise specified in Paragraph 13, the ***"Delivery Amount"*** applicable to the Pledgor for any Valuation Date will equal the amount by which:

>   (i) the Credit Support Amount
>
>   exceeds
>
>   (ii) the Value as of that Valuation Date of all Posted Credit Support held by the Secured Party.

(b)  ***Return Amount.***  Subject to Paragraphs 4 and 5, upon a demand made by the Pledgor on or promptly following a Valuation Date, if the Return Amount for that Valuation Date equals or exceeds the Secured Party's Minimum Transfer Amount, then the Secured Party will Transfer to the Pledgor Posted Credit Support specified by the Pledgor in that demand having a Value as of the date of Transfer as close as practicable to the applicable Return Amount (rounded pursuant to Paragraph 13). Unless otherwise specified in Paragraph 13, the ***"Return Amount"*** applicable to the Secured Party for any Valuation Date will equal the amount by which:

>   (i) the Value as of that Valuation Date of all Posted Credit Support held by the Secured Party
>
>   exceeds
>
>   (ii) the Credit Support Amount.

***"Credit Support Amount"***  means, unless otherwise specified in Paragraph 13, for any Valuation Date (i) the Secured Party's Exposure for that Valuation Date plus (ii) the aggregate of all Independent Amounts applicable to the Pledgor, if any, minus (iii) all Independent Amounts applicable to the Secured Party, if any, minus (iv) the Pledgor's Threshold; *provided, however*, that the Credit Support Amount will be deemed to be zero whenever the calculation of Credit Support Amount yields a number less than zero.

## Paragraph 4.  Conditions Precedent, Transfer Timing, Calculations and Substitutions

(a)  ***Conditions Precedent.***  Each Transfer obligation of the Pledgor under Paragraphs 3 and 5 and of the Secured Party under Paragraphs 3, 4(d)(ii), 5 and 6(d) is subject to the conditions precedent that:

>   (i) no Event of Default, Potential Event of Default or Specified Condition has occurred and is continuing with respect to the other party; and
>
>   (ii) no Early Termination Date for which any unsatisfied payment obligations exist has occurred or been designated as the result of an Event of Default or Specified Condition with respect to the other party.

(b)  ***Transfer Timing.***  Subject to Paragraphs 4(a) and 5 and unless otherwise specified, if a demand for the Transfer of Eligible Credit Support or Posted Credit Support is made by the Notification Time, then the relevant Transfer will be made not later than the close of business on the next Local Business Day; if a demand is made after the Notification Time, then the relevant Transfer will be made not later than the close of business on the second Local Business Day thereafter.

(c)  ***Calculations.***  All calculations of Value and Exposure for purposes of Paragraphs 3 and 6(d) will be made by the Valuation Agent as of the Valuation Time. The Valuation Agent will notify each party (or the other party, if the Valuation Agent is a party) of its calculations not later than the Notification Time on the Local Business Day following the applicable Valuation Date (or in the case of Paragraph 6(d), following the date of calculation).

**(d)** *Substitutions.*

(i) Unless otherwise specified in Paragraph 13, upon notice to the Secured Party specifying the items of Posted Credit Support to be exchanged, the Pledgor may, on any Local Business Day, Transfer to the Secured Party substitute Eligible Credit Support (the "Substitute Credit Support"); and

(ii) subject to Paragraph 4(a), the Secured Party will Transfer to the Pledgor the items of Posted Credit Support specified by the Pledgor in its notice not later than the Local Business Day following the date on which the Secured Party receives the Substitute Credit Support, unless otherwise specified in Paragraph 13 (the "Substitution Date"); *provided* that the Secured Party will only be obligated to Transfer Posted Credit Support with a Value as of the date of Transfer of that Posted Credit Support equal to the Value as of that date of the Substitute Credit Support.

**Paragraph 5. Dispute Resolution**

If a party (a "Disputing Party") disputes (I) the Valuation Agent's calculation of a Delivery Amount or a Return Amount or (II) the Value of any Transfer of Eligible Credit Support or Posted Credit Support, then (1) the Disputing Party will notify the other party and the Valuation Agent (if the Valuation Agent is not the other party) not later than the close of business on the Local Business Day following (X) the date that the demand is made under Paragraph 3 in the case of (I) above or (Y) the date of Transfer in the case of (II) above, (2) subject to Paragraph 4(a), the appropriate party will Transfer the undisputed amount to the other party not later than the close of business on the Local Business Day following (X) the date that the demand is made under Paragraph 3 in the case of (I) above or (Y) the date of Transfer in the case of (II) above, (3) the parties will consult with each other in an attempt to resolve the dispute and (4) if they fail to resolve the dispute by the Resolution Time, then:

(i) In the case of a dispute involving a Delivery Amount or Return Amount, unless otherwise specified in Paragraph 13, the Valuation Agent will recalculate the Exposure and the Value as of the Recalculation Date by:

(A) utilizing any calculations of Exposure for the Transactions (or Swap Transactions) that the parties have agreed are not in dispute;

(B) calculating the Exposure for the Transactions (or Swap Transactions) in dispute by seeking four actual quotations at mid-market from Reference Market-makers for purposes of calculating Market Quotation, and taking the arithmetic average of those obtained; *provided* that if four quotations are not available for a particular Transaction (or Swap Transaction), then fewer than four quotations may be used for that Transaction (or Swap Transaction); and if no quotations are available for a particular Transaction (or Swap Transaction), then the Valuation Agent's original calculations will be used for that Transaction (or Swap Transaction); and

(C) utilizing the procedures specified in Paragraph 13 for calculating the Value, if disputed, of Posted Credit Support.

(ii) In the case of a dispute involving the Value of any Transfer of Eligible Credit Support or Posted Credit Support, the Valuation Agent will recalculate the Value as of the date of Transfer pursuant to Paragraph 13.

Following a recalculation pursuant to this Paragraph, the Valuation Agent will notify each party (or the other party, if the Valuation Agent is a party) not later than the Notification Time on the Local Business Day following the Resolution Time. The appropriate party will, upon demand following that notice by the Valuation Agent or a resolution pursuant to (3) above and subject to Paragraphs 4(a) and 4(b), make the appropriate Transfer.

ISDA®1994

**Paragraph 6. Holding and Using Posted Collateral**

(a)    *Care of Posted Collateral.* Without limiting the Secured Party's rights under Paragraph 6(c), the  Secured Party will exercise reasonable care to assure the safe custody of all Posted Collateral to the extent required by applicable law, and in any event the Secured Party will be deemed to have exercised reasonable care if it exercises at least the same degree of care as it would exercise with respect to its own property. Except  as specified in the preceding sentence, the Secured Party will have no duty with respect to Posted Collateral, including, without limitation, any duty to collect any Distributions, or enforce or preserve any rights pertaining thereto.

(b)    *Eligibility to Hold Posted Collateral; Custodians.*

(i) *General.* Subject to the satisfaction of any conditions specified in Paragraph 13 for holding Posted Collateral, the Secured Party will be entitled to hold Posted Collateral or to appoint an agent (a "Custodian") to hold Posted Collateral for the Secured Party. Upon notice by the Secured Party to the Pledgor of the appointment of a Custodian, the Pledgor's obligations to make any Transfer will be discharged by making the Transfer to that Custodian. The holding of Posted Collateral by a  Custodian will be deemed to be the holding of that Posted Collateral by the Secured Party for which the Custodian is acting.

(ii) *Failure to Satisfy Conditions.* If the Secured Party or its Custodian fails to satisfy any  conditions for holding Posted Collateral, then upon a demand made by the Pledgor, the Secured Party will, not later than five Local Business Days after the demand, Transfer or cause its Custodian to Transfer all Posted Collateral held by it to a Custodian that satisfies those conditions or to the Secured Party if it satisfies those conditions.

(iii) *Liability.* The Secured Party will be liable for the acts or omissions of its Custodian to the  same extent that the Secured Party would be liable hereunder for its own acts or omissions.

(c)    *Use of Posted Collateral.* Unless otherwise specified in Paragraph 13 and without limiting the rights and obligations of the parties under Paragraphs 3, 4(d)(ii), 5, 6(d) and 8, if the Secured Party is not a Defaulting Party or an Affected Party with respect to a Specified Condition and no Early Termination Date has occurred or been designated as the result of an Event of Default or Specified Condition with respect to the Secured Party, then the Secured Party will, notwithstanding Section 9-207 of the New York Uniform Commercial Code, have the right to:

(i) sell, pledge, rehypothecate, assign, invest, use, commingle or otherwise dispose of, or otherwise use in its business any Posted Collateral it holds, free from any claim or right of any nature whatsoever of the Pledgor, including any equity or right of redemption by the Pledgor; and

(ii) register any Posted Collateral in the name of the Secured Party, its Custodian or a nominee for either.

For purposes of the obligation to Transfer Eligible Credit Support or Posted Credit Support pursuant  to Paragraphs 3 and 5 and any rights or remedies authorized under this Agreement, the Secured Party will be deemed to continue to hold all Posted Collateral and to receive Distributions made thereon, regardless of whether the Secured Party has exercised any rights with respect to any Posted Collateral pursuant to (i) or (ii) above.

(d)    *Distributions and Interest Amount.*

(i) *Distributions.*   Subject to Paragraph 4(a), if the Secured Party receives or is deemed to  receive Distributions on a Local Business Day, it will Transfer to the Pledgor not later than the following Local Business Day any Distributions it receives or is deemed to receive to the extent that a Delivery Amount would not be created or increased by that Transfer, as calculated by the Valuation Agent (and the date of calculation will be deemed to be a Valuation Date for this purpose).

(ii) *Interest Amount.* Unless otherwise specified in Paragraph 13 and subject to Paragraph 4(a), in lieu of any interest, dividends or other amounts paid or deemed to have been paid with respect to Posted Collateral in the form of Cash (all of which may be retained by the Secured Party), the Secured Party will Transfer to the Pledgor at the times specified in Paragraph 13 the Interest Amount to the extent that a Delivery Amount would not be created or increased by that Transfer, as calculated by the Valuation Agent (and the date of calculation will be deemed to be a Valuation Date for this purpose). The Interest Amount or portion thereof not Transferred pursuant to this Paragraph will constitute Posted Collateral in the form of Cash and will be subject to the security interest granted under Paragraph 2.

## Paragraph 7. Events of Default

For purposes of Section 5(a)(iii)(1) of this Agreement, an Event of Default will exist with respect to a party if:

(i) that party fails (or fails to cause its Custodian) to make, when due, any Transfer of Eligible Collateral, Posted Collateral or the Interest Amount, as applicable, required to be made by it and that failure continues for two Local Business Days after notice of that failure is given to that party;

(ii) that party fails to comply with any restriction or prohibition specified in this Annex with respect to any of the rights specified in Paragraph 6(c) and that failure continues for five Local Business Days after notice of that failure is given to that party; or

(iii) that party fails to comply with or perform any agreement or obligation other than those specified in Paragraphs 7(i) and 7(ii) and that failure continues for 30 days after notice of that failure is given to that party.

## Paragraph 8. Certain Rights and Remedies

(a)  *Secured Party's Rights and Remedies.* If at any time (1) an Event of Default or Specified Condition with respect to the Pledgor has occurred and is continuing or (2) an Early Termination Date has occurred or been designated as the result of an Event of Default or Specified Condition with respect to the Pledgor, then, unless the Pledgor has paid in full all of its Obligations that are then due, the Secured Party may exercise one or more of the following rights and remedies:

(i) all rights and remedies available to a secured party under applicable law with respect to Posted Collateral held by the Secured Party;

(ii) any other rights and remedies available to the Secured Party under the terms of Other Posted Support, if any;

(iii) the right to Set-off any amounts payable by the Pledgor with respect to any Obligations against any Posted Collateral or the Cash equivalent of any Posted Collateral held by the Secured Party (or any obligation of the Secured Party to Transfer that Posted Collateral); and

(iv) the right to liquidate any Posted Collateral held by the Secured Party through one or more public or private sales or other dispositions with such notice, if any, as may be required under applicable law, free from any claim or right of any nature whatsoever of the Pledgor, including any equity or right of redemption by the Pledgor (with the Secured Party having the right to purchase any or all of the Posted Collateral to be sold) and to apply the proceeds (or the Cash equivalent thereof) from the liquidation of the Posted Collateral to any amounts payable by the Pledgor with respect to any Obligations in that order as the Secured Party may elect.

Each party acknowledges and agrees that Posted Collateral in the form of securities may decline speedily in value and is of a type customarily sold on a recognized market, and, accordingly, the Pledgor is not entitled to prior notice of any sale of that Posted Collateral by the Secured Party, except any notice that is required under applicable law and cannot be waived.

(b)    *Pledgor's Rights and Remedies.* If at any time an Early Termination Date has occurred or been designated as the result of an Event of Default or Specified Condition with respect to the Secured Party, then (except in the case of an Early Termination Date relating to less than all Transactions (or Swap Transactions) where the Secured Party has paid in full all of its obligations that are then due under Section 6(e) of this Agreement):

(i) the Pledgor may exercise all rights and remedies available to a pledgor under applicable law with respect to Posted Collateral held by the Secured Party;

(ii) the Pledgor may exercise any other rights and remedies available to the Pledgor under the terms of Other Posted Support, if any;

(iii) the Secured Party will be obligated immediately to Transfer all Posted Collateral and the Interest Amount to the Pledgor; and

(iv) to the extent that Posted Collateral or the Interest Amount is not so Transferred pursuant to (iii) above, the Pledgor may:

(A) Set-off any amounts payable by the Pledgor with respect to any Obligations against any Posted Collateral or the Cash equivalent of any Posted Collateral held by the Secured Party (or any obligation of the Secured Party to Transfer that Posted Collateral); and

(B) to the extent that the Pledgor does not Set-off under (iv)(A) above, withhold payment of any remaining amounts payable by the Pledgor with respect to any Obligations, up to the Value of any remaining Posted Collateral held by the Secured Party, until that Posted Collateral is Transferred to the Pledgor.

(c)    *Deficiencies and Excess Proceeds.* The Secured Party will Transfer to the Pledgor any proceeds and Posted Credit Support remaining after liquidation, Set-off and/or application under Paragraphs 8(a) and 8(b) after satisfaction in full of all amounts payable by the Pledgor with respect to any Obligations; the Pledgor in all events will remain liable for any amounts remaining unpaid after any liquidation, Set-off and/or application under Paragraphs 8(a) and 8(b).

(d)    *Final Returns.* When no amounts are or thereafter may become payable by the Pledgor with respect to any Obligations (except for any potential liability under Section 2(d) of this Agreement), the Secured Party will Transfer to the Pledgor all Posted Credit Support and the Interest Amount, if any.

## Paragraph 9. Representations

Each party represents to the other party (which representations will be deemed to be repeated as of each date on which it, as the Pledgor, Transfers Eligible Collateral) that:

(i) it has the power to grant a security interest in and lien on any Eligible Collateral it Transfers as the Pledgor and has taken all necessary actions to authorize the granting of that security interest and lien;

(ii) it is the sole owner of or otherwise has the right to Transfer all Eligible Collateral it Transfers to the Secured Party hereunder, free and clear of any security interest, lien, encumbrance or other restrictions other than the security interest and lien granted under Paragraph 2;

(iii) upon the Transfer of any Eligible Collateral to the Secured Party under the terms of this Annex, the Secured Party will have a valid and perfected first priority security interest therein (assuming that any central clearing corporation or any third-party financial intermediary or other entity not within the control of the Pledgor involved in the Transfer of that Eligible Collateral gives the notices and takes the action required of it under applicable law for perfection of that interest); and

(iv) the performance by it of its obligations under this Annex will not result in the creation of any security interest, lien or other encumbrance on any Posted Collateral other than the security interest and lien granted under Paragraph 2.

ISDA®1994

## Paragraph 10. Expenses

(a) ***General.*** Except as otherwise provided in Paragraphs 10(b) and 10(c), each party will pay its own costs and expenses in connection with performing its obligations under this Annex and neither party will be liable for any costs and expenses incurred by the other party in connection herewith.

(b) ***Posted Credit Support.*** The Pledgor will promptly pay when due all taxes, assessments or charges of any nature that are imposed with respect to Posted Credit Support held by the Secured Party upon becoming aware of the same, regardless of whether any portion of that Posted Credit Support is subsequently disposed of under Paragraph 6(c), except for those taxes, assessments and charges that result from the exercise of the Secured Party's rights under Paragraph 6(c).

(c) ***Liquidation/Application of Posted Credit Support.*** All reasonable costs and expenses incurred by or on behalf of the Secured Party or the Pledgor in connection with the liquidation and/or application of any Posted Credit Support under Paragraph 8 will be payable, on demand and pursuant to the Expenses Section of this Agreement, by the Defaulting Party or, if there is no Defaulting Party, equally by the parties.

## Paragraph 11. Miscellaneous

(a) ***Default Interest.*** A Secured Party that fails to make, when due, any Transfer of Posted Collateral or the Interest Amount will be obligated to pay the Pledgor (to the extent permitted under applicable law) an amount equal to interest at the Default Rate multiplied by the Value of the items of property that were required to be Transferred, from (and including) the date that Posted Collateral or Interest Amount was required to be Transferred to (but excluding) the date of Transfer of that Posted Collateral or Interest Amount. This interest will be calculated on the basis of daily compounding and the actual number of days elapsed.

(b) ***Further Assurances.*** Promptly following a demand made by a party, the other party will execute, deliver, file and record any financing statement, specific assignment or other document and take any other action that may be necessary or desirable and reasonably requested by that party to create, preserve, perfect or validate any security interest or lien granted under Paragraph 2, to enable that party to exercise or enforce its rights under this Annex with respect to Posted Credit Support or an Interest Amount or to effect or document a release of a security interest in Posted Collateral or an Interest Amount.

(c) ***Further Protection.*** The Pledgor will promptly give notice to the Secured Party of, and defend against, any suit, action, proceeding or lien that involves Posted Credit Support Transferred by the Pledgor or that could adversely affect the security interest and lien granted by it under Paragraph 2, unless that suit, action, proceeding or lien results from the exercise of the Secured Party's rights under Paragraph 6(c).

(d) ***Good Faith and Commercially Reasonable Manner.*** Performance of all obligations under this Annex, including, but not limited to, all calculations, valuations and determinations made by either party, will be made in good faith and in a commercially reasonable manner.

(e) ***Demands and Notices.*** All demands and notices made by a party under this Annex will be made as specified in the Notices Section of this Agreement, except as otherwise provided in Paragraph 13.

(f) ***Specifications of Certain Matters.*** Anything referred to in this Annex as being specified in Paragraph 13 also may be specified in one or more Confirmations or other documents and this Annex will be construed accordingly.

**ISDA®1994**

**Paragraph 12. Definitions**

As used in this Annex:—

*"Cash"* means the lawful currency of the United States of America.

*"Credit Support Amount"* has the meaning specified in Paragraph 3.

*"Custodian"* has the meaning specified in Paragraphs 6(b)(i) and 13.

*"Delivery Amount"* has the meaning specified in Paragraph 3(a).

*"Disputing Party"* has the meaning specified in Paragraph 5.

*"Distributions"* means with respect to Posted Collateral other than Cash, all principal, interest and other payments and distributions of cash or other property with respect thereto, regardless of whether the Secured Party has disposed of that Posted Collateral under Paragraph 6(c). Distributions will not include any item of property acquired by the Secured Party upon any disposition or liquidation of Posted Collateral or, with respect to any Posted Collateral in the form of Cash, any distributions on that collateral, unless otherwise specified herein.

*"Eligible Collateral"* means, with respect to a party, the items, if any, specified as such for that party in Paragraph 13.

*"Eligible Credit Support"* means Eligible Collateral and Other Eligible Support.

*"Exposure"* means for any Valuation Date or other date for which Exposure is calculated and subject to Paragraph 5 in the case of a dispute, the amount, if any, that would be payable to a party that is the Secured Party by the other party (expressed as a positive number) or by a party that is the Secured Party to the other party (expressed as a negative number) pursuant to Section 6(e)(ii)(2)(A) of this Agreement as if all Transactions (or Swap Transactions) were being terminated as of the relevant Valuation Time; *provided* that Market Quotation will be determined by the Valuation Agent using its estimates at mid-market of the amounts that would be paid for Replacement Transactions (as that term is defined in the definition of "Market Quotation").

*"Independent Amount"* means, with respect to a party, the amount specified as such for that party in Paragraph 13; if no amount is specified, zero.

*"Interest Amount"* means, with respect to an Interest Period, the aggregate sum of the amounts of interest calculated for each day in that Interest Period on the principal amount of Posted Collateral in the form of Cash held by the Secured Party on that day, determined by the Secured Party for each such day as follows:

      (x) the amount of that Cash on that day; multiplied by

      (y) the Interest Rate in effect for that day; divided by

      (z) 360.

*"Interest Period"* means the period from (and including) the last Local Business Day on which an Interest Amount was Transferred (or, if no Interest Amount has yet been Transferred, the Local Business Day on which Posted Collateral in the form of Cash was Transferred to or received by the Secured Party) to (but excluding) the Local Business Day on which the current Interest Amount is to be Transferred.

*"Interest Rate"* means the rate specified in Paragraph 13.

*"Local Business Day",* unless otherwise specified in Paragraph 13, has the meaning specified in the Definitions Section of this Agreement, except that references to a payment in clause (b) thereof will be deemed to include a Transfer under this Annex.

*"**Minimum Transfer Amount**"* means, with respect to a party, the amount specified as such for that party in Paragraph 13; if no amount is specified, zero.

*"**Notification Time**"* has the meaning specified in Paragraph 13.

*"**Obligations**"* means, with respect to a party, all present and future obligations of that party under this Agreement and any additional obligations specified for that party in Paragraph 13.

*"**Other Eligible Support**"* means, with respect to a party, the items, if any, specified as such for that party in Paragraph 13.

*"**Other Posted Support**"* means all Other Eligible Support Transferred to the Secured Party that remains in effect for the benefit of that Secured Party.

*"**Pledgor**"* means either party, when that party (i) receives a demand for or is required to Transfer Eligible Credit Support under Paragraph 3(a) or (ii) has Transferred Eligible Credit Support under Paragraph 3(a).

*"**Posted Collateral**"* means all Eligible Collateral, other property, Distributions, and all proceeds thereof that have been Transferred to or received by the Secured Party under this Annex and not Transferred to the Pledgor pursuant to Paragraph 3(b), 4(d)(ii) or 6(d)(i) or released by the Secured Party under Paragraph 8. Any Interest Amount or portion thereof not Transferred pursuant to Paragraph 6(d)(ii) will constitute Posted Collateral in the form of Cash.

*"**Posted Credit Support**"* means Posted Collateral and Other Posted Support.

*"**Recalculation Date**"* means the Valuation Date that gives rise to the dispute under Paragraph 5; *provided*, *however*, that if a subsequent Valuation Date occurs under Paragraph 3 prior to the resolution of the dispute, then the "Recalculation Date" means the most recent Valuation Date under Paragraph 3.

*"**Resolution Time**"* has the meaning specified in Paragraph 13.

*"**Return Amount**"* has the meaning specified in Paragraph 3(b).

*"**Secured Party**"* means either party, when that party (i) makes a demand for or is entitled to receive Eligible Credit Support under Paragraph 3(a) or (ii) holds or is deemed to hold Posted Credit Support.

*"**Specified Condition**"* means, with respect to a party, any event specified as such for that party in Paragraph 13.

*"**Substitute Credit Support**"* has the meaning specified in Paragraph 4(d)(i).

*"**Substitution Date**"* has the meaning specified in Paragraph 4(d)(ii).

*"**Threshold**"* means, with respect to a party, the amount specified as such for that party in Paragraph 13; if no amount is specified, zero.

*"**Transfer**"* means, with respect to any Eligible Credit Support, Posted Credit Support or Interest Amount, and in accordance with the instructions of the Secured Party, Pledgor or Custodian, as applicable:

> (i) in the case of Cash, payment or delivery by wire transfer into one or more bank accounts specified by the recipient;

> (ii) in the case of certificated securities that cannot be paid or delivered by book-entry, payment or delivery in appropriate physical form to the recipient or its account accompanied by any duly executed instruments of transfer, assignments in blank, transfer tax stamps and any other documents necessary to constitute a legally valid transfer to the recipient;

> (iii) in the case of securities that can be paid or delivered by book-entry, the giving of written instructions to the relevant depository institution or other entity specified by the recipient, together with a written copy thereof to the recipient, sufficient if complied with to result in a legally effective transfer of the relevant interest to the recipient; and

> (iv) in the case of Other Eligible Support or Other Posted Support, as specified in Paragraph 13.

*"**Valuation Agent**"* has the meaning specified in Paragraph 13.

*"**Valuation Date**"* means each date specified in or otherwise determined pursuant to Paragraph 13.

*"**Valuation Percentage**"* means, for any item of Eligible Collateral, the percentage specified in Paragraph 13.

*"**Valuation Time**"* has the meaning specified in Paragraph 13.

*"**Value**"* means for any Valuation Date or other date for which Value is calculated and subject to Paragraph 5 in the case of a dispute, with respect to:

    (i) Eligible Collateral or Posted Collateral that is:

        (A) Cash, the amount thereof; and

        (B) a security, the bid price obtained by the Valuation Agent multiplied by the applicable Valuation Percentage, if any;

    (ii) Posted Collateral that consists of items that are not specified as Eligible Collateral, zero; and

    (iii) Other Eligible Support and Other Posted Support, as specified in Paragraph 13.

ISDA®1994

**Paragraph 13. Elections and Variables**

(a)   *Security Interest for "Obligations"*. The term ***"Obligations"*** as used in this Annex includes the following additional obligations:

With respect to Party A:  ....................................................................................................................

With respect to Party B: .....................................................................................................................

(b)   *Credit Support Obligations*.

(i) *Delivery Amount, Return Amount and Credit Support Amount.*

(A) ***"Delivery Amount"***  has the meaning specified in Paragraph 3(a), unless otherwise specified here: .......................................................................................................................................

(B) ***"Return Amount"***  has the meaning specified in Paragraph 3(b), unless otherwise specified here: .......................................................................................................................................

(C) ***"Credit Support Amount"***  has the meaning specified in Paragraph 3, unless otherwise specified here: .......................................................................................................................................

(ii) *Eligible Collateral.* The following items will qualify as ***"Eligible Collateral"*** for the party specified:

|  |  | Party A | Party B | Valuation Percentage |
|---|---|---|---|---|
| (A) | Cash | [  ] | [  ] | [  ] % |
| (B) | negotiable debt obligations issued by the U.S. Treasury Department having an original maturity at issuance of not more than one year ("Treasury Bills") | [  ] | [  ] | [  ] % |
| (c) | negotiable debt obligations issued by the U.S. Treasury Department having an original maturity at issuance of more than one year but not more than 10 years ("Treasury Notes") | [  ] | [  ] | [  ] % |
| (D) | negotiable debt obligations issued by the U.S. Treasury Department having an original maturity at issuance of more than 10 years ("Treasury Bonds") | [  ] | [  ] | [  ] % |
| (E) | other:  ............................................................... | [  ] | [  ] | [  ] % |

(iii) *Other Eligible Support.* The following items will qualify as ***"Other Eligible Support"*** for the party specified:

|  |  | Party A | Party B |
|---|---|---|---|
| (A) | ............................................................... | [  ] | [  ] |
| (B) | ............................................................... | [  ] | [  ] |

**ISDA®1994**

(iv) ***Thresholds.***

(A)    ***"Independent Amount"*** means with respect to Party A: $ ...................................................................

       ***"Independent Amount"*** means with respect to Party B: $ ...................................................................

(B)    ***"Threshold"*** means with respect to Party A: $ ...................................................................

       ***"Threshold"*** means with respect to Party B: $ ...................................................................

(C)    ***"Minimum Transfer Amount"*** means with respect to Party A: $ ...................................................

       ***"Minimum Transfer Amount"*** means with respect to Party B: $ ...................................................

(D)    ***Rounding.*** The Delivery Amount and the Return Amount will be rounded [down to the nearest integral multiple of $. . . . /up and down to the nearest integral multiple of $. . . ., respectively*].

(c)    ***Valuation and Timing.***

(i) ***"Valuation Agent"*** means, for purposes of Paragraphs 3 and 5, the party making the demand under Paragraph 3, and, for purposes of Paragraph 6(d), the Secured Party receiving or deemed to receive the Distributions or the Interest Amount, as applicable, unless otherwise specified here: .........................................

(ii)    ***"Valuation Date"*** means: ...............................................................................................................

(iii)    ***"Valuation Time"*** means:

      [ ]   the close of business in the city of the Valuation Agent on the Valuation Date or date of calculation, as applicable;

      [ ]   the close of business on the Local Business Day before the Valuation Date or date of calculation, as applicable;

*provided* that the calculations of Value and Exposure will be made as of approximately the same time on the same date.

(iv) ***"Notification Time"*** means 1:00 p.m., New York time, on a Local Business Day, unless otherwise specified here: .........................................................................................................................................

(d)    ***Conditions Precedent and Secured Party's Rights and Remedies.*** The following Termination Event(s) will be a ***"Specified Condition"*** for the party specified (that party being the Affected Party if the Termination Event occurs with respect to that party):

|  | Party A | Party B |
|---|---|---|
| Illegality | [  ] | [  ] |
| Tax Event | [  ] | [  ] |
| Tax Event Upon Merger | [  ] | [  ] |
| Credit Event Upon Merger | [  ] | [  ] |
| Additional Termination Event(s):[1] |  |  |
| ............................................................... | [  ] | [  ] |
| ............................................................... | [  ] | [  ] |

---

\*    Delete as applicable.

[1]    If the parties elect to designate an Additional Termination Event as a "Specified Condition", then they should only designate one or more Additional Termination Events that are designated as such in their Schedule.

**ISDA®1994**

(e) *Substitution.*

(i) *"Substitution Date"* has the meaning specified in Paragraph 4(d)(ii), unless otherwise specified here: ......................................................................................................................................................................

(ii) *Consent.* If specified here as applicable, then the Pledgor must obtain the Secured Party's consent for any substitution pursuant to Paragraph 4(d): [applicable/inapplicable *][2]

(f) *Dispute Resolution.*

(i) *"Resolution Time"* means 1:00 p.m., New York time, on the Local Business Day following the  date on which the notice is given that gives rise to a dispute under Paragraph 5, unless otherwise specified here: ......................................................................................................................................................................

(ii) *Value.* For the purpose of Paragraphs 5(i)(C) and 5(ii), the Value of Posted Credit Support will be calculated as follows: ...................................................................................................................................

(iii) *Alternative.* The provisions of Paragraph 5 will apply, unless an alternative dispute resolution procedure is specified here: ..........................................................................................................................

(g) *Holding and Using Posted Collateral.*

(i) *Eligibility to Hold Posted Collateral; Custodians.* Party A and its Custodian will be entitled to hold Posted Collateral pursuant to Paragraph 6(b); *provided* that the following conditions applicable to it are satisfied:

(1) Party A is not a Defaulting Party.

(2) Posted Collateral may be held only in the following jurisdictions: ........................................................

(3) ...........................................................................................................................................................

Initially, the **Custodian** for Party A is  ........................................................................................................

Party B and its Custodian will be entitled to hold Posted Collateral pursuant to Paragraph 6(b); *provided* that the following conditions applicable to it are satisfied:

(1) Party B is not a Defaulting Party.

(2) Posted Collateral may be held only in the following jurisdictions: ........................................................

(3) ...........................................................................................................................................................

Initially, the **Custodian** for Party B is ..........................................................................................................

(ii) *Use of Posted Collateral.* The provisions of Paragraph 6(c) will not apply to the [party/parties *] specified here:

[ ] Party A

[ ] Party B

and [that party/those parties *] will not be permitted to:  ..............................................................................

---

* Delete as applicable.

[2] Parties should consider selecting "applicable" where substitution without consent could give rise to a registration requirement to perfect properly the security interest in Posted Collateral (*e.g.,* where a party to the Annex is the New York branch of an English bank).

**ISDA®1994**

(h)　　*Distributions and Interest Amount.*

　　　(i) *Interest Rate*. The *"Interest Rate"* will be:　.......................................................................................

　　　(ii) *Transfer of Interest Amount.* The Transfer of the Interest Amount will be made on the last Local Business Day of each calendar month and on any Local Business Day that Posted Collateral in the form of Cash is Transferred to the Pledgor pursuant to Paragraph 3 (b), unless otherwise specified here: …
.................................................................................................................................................................

　　　(iii) *Alternative to Interest Amount.* The provisions of Paragraph 6(d)(ii) will apply, unless otherwise specified here: .............................................................................................................................

(i)　　*Additional Representation(s).*

[Party A/Party B*] represents to the other party (which representation(s) will be deemed to be repeated as of each date on which it, as the Pledgor, Transfers Eligible Collateral) that:

　　　(i) ..........................................................................................................................................................

　　　(ii) .........................................................................................................................................................

(j)　　*Other Eligible Support and Other Posted Support.*

　　　(i) *"Value"* with respect to Other Eligible Support and Other Posted Support means:.......................................

　　　(ii) *"Transfer"* with respect to Other Eligible Support and Other Posted Support means:................................

(k)　　*Demands and Notices*.

All demands, specifications and notices under this Annex will be made pursuant to the Notices Section of this Agreement, unless otherwise specified here:

　　　Party A: .................................................................................................................................................

　　　　　.....................................................................................................................................................

　　　Party B: .................................................................................................................................................

　　　　　.....................................................................................................................................................

(l)　　*Addresses for Transfers.*

　　　Party A: .................................................................................................................................................

　　　　　.....................................................................................................................................................

　　　Party B: .................................................................................................................................................

　　　　　.....................................................................................................................................................

(m)　　*Other Provisions.*

---

*　　Delete as applicable.

　　　　　　　　　　　　　　　　　　　　　　　　　　　　　　　ISDA®1994

# EXHIBIT
# 5



September 26, 2008

VIA FACSIMILE AND COURIER

Lehman Brothers OTC Derivatives Inc.
c/o Lehman Brothers Inc.
Legal Compliance and Audit Group
Capital Markets Contracts - Legal
745 Seventh Avenue, 19th Floor
New York, New York 10019
Attention:       Documentation Manager
Telephone No.:  212-526-7187
Facsimile No.:   212-526-7672

Lehman Brothers OTC Derivatives Inc.
745 Seventh Avenue
New York, New York 10019
Attention:   Marcus Weickel
Facsimile:   646-834-2928
Telephone:   212-526-0042

Re:   *VWAP Prepaid Share Forward Transaction – Your Global ID 3990242*

Dear Sir or Madam:

Reference is made to the confirmation ("**Confirmation**"), dated as of August 1, 2008, representing the terms and provisions of the VWAP Prepaid Share Forward Transaction (the "**Transaction**") entered into between Lehman Brothers OTC Derivatives Inc. ("**Lehman**," "**Party A**" or "**you**") and Intel Corporation ("**Counterparty,**" "**Party B,**" "**we**" or "**us**"), Lehman's Global ID number 3990242, which Confirmation supplements, forms a part of, and is subject to an agreement in the form of the 1992 ISDA Master Agreement (Multicurrency-Cross Border) (the "**Agreement**") dated February 1, 2008 between Party A and Party B (as modified with respect to the Transaction as provided in the Confirmation). All capitalized terms not defined herein shall have the meaning set forth in the Confirmation or the Agreement, as applicable.

The Calculation Period under the Confirmation ended today, and in accordance with the terms of the Confirmation, we calculate that the Forward Price is $19.8872 and the Final Notional Amount is US $1 billion. As previously agreed, the Forward Price Adjustment Amount is $0.106. Therefore, pursuant to the terms of the Confirmation, the Number of Shares to be Delivered is 50,552,943 Shares and the Cash Delivery Amount is zero ($0.00). We note that Lehman is required to deliver the Number of Shares to be Delivered at or prior to 4:30 p.m. New York time on Monday, September 29, 2008. In light of recent events with respect to Lehman

**Intel Corporation**
2200 Mission College Blvd.
Santa Clara, CA 95054

Lehman Brothers OTC Derivatives Inc.
September 26, 2008
Page 2
Brothers Holdings Inc. and its subsidiaries, and given the absence of communications from our
contacts at Lehman, please let us know as soon as possible if Lehman will be performing under
the terms of the Confirmation.

We also note that an Event of Default under Section 5(a)(vii) of the Agreement occurred
on September 15, 2008, and remains continuing, as a result of Lehman Brothers Holdings Inc., a
Credit Support Provider under the terms of the Agreement, filing a case under chapter 11 of the
Bankruptcy Code.  We reserve all our rights in respect of such Event of Default and any other
Event of Default.

[Remainder of page intentionally blank]

**Intel Corporation**
2200 Mission College Blvd.
Santa Clara, CA  95054

Lehman Brothers OTC Derivatives Inc.
September 26, 2008
Page 3

Kind regards,

INTEL CORPORATION

By: _____
Name: Douglas M. Lusk
Title: Assistant Treasurer

# EXHIBIT
# 6



September 29, 2008

VIA HAND DELIVERY (WITH COPY BY FACSIMILE)

Lehman Brothers OTC Derivatives Inc.
    c/o Lehman Brothers Inc.
    Legal Compliance and Audit Group
    Capital Markets Contracts - Legal
745 Seventh Avenue, 19th Floor
New York, New York 10019

Attention:    Documentation Manager

Telephone No.:212-526-7187

Facsimile No.:212-526-7672


    Re:    *VWAP Prepaid Share Forward Transaction – Your Global ID 3990242*

Dear Sir or Madam:

    Reference is made to the confirmation ("**Confirmation**"), dated as of August 1, 2008, representing the terms and provisions of the VWAP Prepaid Share Forward Transaction (the "**Transaction**") entered into between Lehman Brothers OTC Derivatives Inc. ("**Lehman**" or "**Party A**") and Intel Corporation ("**Intel**" or "**Party B**"), Lehman's Global ID number 3990242, which Confirmation supplements, forms a part of, and is subject to an agreement in the form of the 1992 ISDA Master Agreement (Multicurrency-Cross Border) (the "**Agreement**") dated February 1, 2008 between Party A and Party B (as modified with respect to the Transaction as provided in the Confirmation). All capitalized terms not defined herein shall have the meaning set forth in the Confirmation or the Agreement, as applicable.

    Lehman failed to deliver at or before 4:30 p.m. (New York City time) today, September 29, 2008, the Number of Shares to be Delivered in accordance with the terms of the Confirmation and Section 2(a)(i) of the Agreement (the "**Failed Delivery**"). In addition, on September 15, 2008, Lehman Brothers Holdings Inc. ("**LBHI**"), a Credit Support Provider under the terms of the Agreement, filed a case under chapter 11 of the U.S. Bankruptcy Code with the United States Bankruptcy Court for the Southern District of New York, which event constitutes an Event of Default under Section 5(a)(vii) of the Agreement, which is continuing on the date hereof (the "**Existing Event of Default**").

**Intel Corporation**
2200 Mission College Blvd.
Santa Clara, CA 95054

Lehman Brothers OTC Derivatives Inc.
September 29, 2008
Page 2


Based upon the Existing Event of Default and in light of the Failed Delivery, pursuant to Section 6(a) of the Agreement, Intel hereby designates September 29, 2008 as the Early Termination Date in respect of the Transaction, which is the only outstanding Transaction under the Agreement.

Pursuant to the terms of the Confirmation, Second Method and Loss apply to the Transaction for purposes of Section 6(e) of the Agreement. Pursuant to Section 6(d)(i) of the Agreement, we notify you that our Loss in respect of the Transaction, including as a result of the Failed Delivery, is US $1,001,966,256.00 (US $ one billion one million nine hundred sixty six thousand two hundred fifty six). Exhibit A to this letter is a statement showing our calculation of the Loss. This amount is due to us on the Early Termination Date in accordance with Section 6(d)(ii) of the Agreement and shall be delivered in accordance with Section 5(d) of the Confirmation.

Intel hereby certifies that the amount of our Loss as set forth in the immediately preceding paragraph and further detailed on Exhibit A to this letter also constitutes the amount of Intel's "costs, losses or expenses" resulting from the Failed Delivery for purposes of Section 9.12 of the Equity Definitions, and Intel hereby demands indemnification for such amounts in accordance with the terms of such Section 9.12 (without duplication of amounts demanded in the immediately preceding paragraph).

Please deliver the Shares and cash required to be delivered in accordance with Section 5(d) of the Confirmation to the following accounts of Intel.

Payment instructions for cash payments:

Citibank, NY
ABA # 021000089
Swift # CITIUS33
A/C # 40667555
A/C Name: Intel Corporation


Delivery instructions for delivery of Shares:

DTC# 908
Agent Bank# 27603
Institution ID# 29424
A/C# 848386
A/C Name: Intel Corporation

Intel reserves its right to claim indemnification for the out-of-pocket expenses of enforcement and protection of Intel's rights under the Agreement pursuant to Section 11 of the Agreement.

**Intel Corporation**
2200 Mission College Blvd.
Santa Clara, CA 95054

Lehman Brothers OTC Derivatives Inc.
September 29, 2008
Page 3

Kind regards,

**INTEL CORPORATION**

By: _____
Name: Douglas M. Lusk
Title: Assistant Treasurer

copy to:

Lehman Brothers Inc., acting as Agent
Lehman Brothers OTC Derivatives Inc., acting as Principal
Attention: Andrew Yare - Transaction Management Group
745 Seventh Avenue
New York, New York 10019

Facsimile:    646-885-9546 (United States of America)
Telephone:    212-526-9986

**Intel Corporation**
2200 Mission College Blvd.
Santa Clara, CA 95054

Lehman Brothers OTC Derivatives Inc.
September 29, 2008
Page 4

## EXHIBIT A – CALCULATION OF LOSS

<u>Loss</u>:

Intel's Loss is US $1,001,966,256.00 (US $ one billion one million nine hundred sixty six thousand two hundred fifty six), representing, in accordance with the definition of Loss in the Agreement, Intel's "total losses and costs . . . in connection with . . . [the] Terminated Transaction . . . , including any loss of bargain [or] cost of funding" and including "losses and costs . . . in respect of any . . . delivery required to have been made . . . on or before the relevant Early Termination Date and not made".

<u>Calculation</u>:

Lehman delivery obligation under the Transaction:  US $1 billion in Intel common stock, $0.001 par value, which stock was to be purchased  during the Calculation Period in compliance with certain provisions of and rules under the Securities Exchange Act of 1934, as amended, as specified in the Confirmation, and valued as specified in the Confirmation, to be delivered on or prior to September 29, 2008.

Lehman deliveries have occurred to date:  none.

Intel's total losses and costs (including without limitation losses and costs as a result of the Failed Delivery) pursuant to the definition of Loss are US $ 1,001,966,256.00, an amount equal to the sum of

> (i) US $1 billion, equal to the price Intel paid on the Prepayment Date for the deliveries required to be made by Lehman under the Confirmation (the **"Prepayment Amount"**), and equal to the value, measured as specified in the Confirmation, of deliveries that were to be made by Lehman on or before the Early Termination Date which were not made; and

> (ii) US $ 1,966,256.00, representing interest Intel was unable to earn on the Prepayment Amount from the Prepayment Date through the Early Termination Date as a result of entering into the Transaction, which lost interest amount has been determined by reference to the actual amount of interest earned during such period on the cash collateral held by Intel in accordance with the terms of the Confirmation.

100520062_7.DOC

**Intel Corporation**
2200 Mission College Blvd.
Santa Clara, CA  95054

# EXHIBIT
# 7



September 30, 2008

VIA HAND DELIVERY (WITH COPY BY FACSIMILE)

Lehman Brothers OTC Derivatives Inc.
    c/o Lehman Brothers Inc.
    Legal Compliance and Audit Group
    Capital Markets Contracts - Legal
745 Seventh Avenue, 19th Floor
New York, New York 10019

Attention:    Documentation Manager

Telephone No.: 212-526-7187

Facsimile No.: 212-526-7672

Re:    *VWAP Prepaid Share Forward Transaction – Your Global ID 3990242*

Dear Sir or Madam:

    Reference is made to the confirmation ("**Confirmation**"), dated as of August 1, 2008, representing the terms and provisions of the VWAP Prepaid Share Forward Transaction (the "**Transaction**") entered into between Lehman Brothers OTC Derivatives Inc. ("**Lehman**" or "**you**") and Intel Corporation ("**Counterparty**", "**we**" or "**us**"), Lehman's Global ID number 3990242, which Confirmation supplements, forms a part of, and is subject to an agreement in the form of the 1992 ISDA Master Agreement (Multicurrency-Cross Border) (the "**Agreement**") dated February 1, 2008 between Party A and Party B (as modified with respect to the Transaction as provided in the Confirmation). All capitalized terms not defined herein shall have the meaning set forth in the Confirmation or the Agreement, as applicable.

    Reference is also made to the letter delivered from us to you yesterday, September 29, 2008 (the "**Termination Letter**"), which, among other things, designated such date as the Early Termination Date in respect of the Transaction, as a result of an Event of Default with respect to Lehman and demanded certain payments and deliveries required by the Confirmation and the Agreement in connection with such designation.

    We have not received any portion of the required payments and deliveries from you that were due yesterday as specified under the Termination Letter and in accordance with the terms of the Confirmation and the Agreement. We hereby notify you that, accordingly, we today have set-off and applied the Posted Collateral held by us under the Confirmation and the Agreement,

Lehman Brothers OTC Derivatives Inc.
September 30, 2008
Page 2

consisting of Cash, in the amount of US $1,001,966,256.00, against the amount of US $1,001,966,256.00 payable by you under the Confirmation and the Agreement as specified in the Termination Letter.

We reserve our right to claim indemnification for the out-of-pocket expenses of enforcement and protection of our rights under the Agreement pursuant to Section 11 of the Agreement.

[Remainder of page intentionally blank]

**Intel Corporation**
2200 Mission College Blvd.
Santa Clara, CA 95054

Lehman Brothers OTC Derivatives Inc.
September 30, 2008
Page 3


                          Kind regards,


                          INTEL CORPORATION

                          By: _____
                          Name:   Douglas M. Lusk
                          Title:     Assistant Treasurer


copy to:

Lehman Brothers Inc., acting as Agent
Lehman Brothers OTC Derivatives Inc., acting as Principal
Attention:  Andrew Yare - Transaction Management Group
745 Seventh Avenue
New York, New York 10019

Facsimile:     646-885-9546 (United States of America)
Telephone:     212-526-9986


**Intel Corporation**
2200 Mission College Blvd.
Santa Clara, CA  95054

# EXHIBIT B

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| In re:<br>LEHMAN BROTHERS HOLDINGS INC., *et al.*,<br>        Debtors. | Chapter 11<br>Case No. 08-13555 (JMP)<br>(Jointly Administered) |
| LEHMAN BROTHERS HOLDINGS INC. and<br>LEHMAN BROTHERS OTC DERIVATIVES INC.,<br>        Plaintiffs,<br>v.<br>INTEL CORP.,<br>        Defendant. | Adv. Proc. No. 13-01340 (JMP) |

## ORDER ON MOTION TO DISMISS AND
## FOR A DETERMINATION THAT CONTRACT CLAIM IS NON-CORE

Upon the motion of Defendant Intel Corporation to dismiss Counts II and III of the Adversary
Complaint in this action for failure to state a claim and for a determination that Count I is
non-core, and for the reasons set forth in the Court's December 19, 2013 Memorandum Decision
(ECF No. 29):

1. It is hereby ORDERED that Counts II and III of the Adversary Complaint are
   dismissed for failure to state a claim upon which relief may be granted; and

2. It is hereby DECLARED that Count I of the Adversary Complaint is a non-core
   proceeding.

Dated: New York, New York
     January 13, 2014



/s/ James M. Peck

_____
Honorable James M. Peck
United States Bankruptcy Judge