JONES DAY
222 East 41st Street
New York, New York 10017
Telephone:  (212) 326-3939
Facsimile:  (212) 755-7306
Robert W. Gaffey
Jayant W. Tambe
Todd R. Geremia
Mahesh Venkatakrishnan

*Attorneys for Plaintiffs*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

------------------------------------------------------------X
                                                            :
In re:                                                      :  Chapter 11
                                                            :
LEHMAN BROTHERS HOLDINGS INC., *et al.,*    :  Case No. 08-13555 (SCC)
                                                            :
                          Debtors.                   :  (Jointly Administered)
                                                            :
------------------------------------------------------------X
                                                            :
LEHMAN BROTHERS HOLDINGS INC. and     :
LEHMAN BROTHERS OTC DERIVATIVES INC.:
                                                            :
                                                            :  Adv. Proc. No. 13-01340 (SCC)
                          Plaintiffs,              :
                                                            :
v.                                                          :
                                                            :
INTEL CORP.,                                      :
                                                            :
                          Defendant.              X
------------------------------------------------------------

**PLAINTIFFS' MEMORANDUM OF LAW IN SUPPORT OF THEIR**
**MOTION FOR SUMMARY JUDGMENT**

## TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ................................................................................................ ii

INTRODUCTION ............................................................................................................... 1

    A.    The Derivative Agreement and Lehman's Collateral ................................. 5

    B.    The Lehman Bankruptcy-Related Event of Default .................................. 6

    C.    Intel Declares An "Early Termination" on the Settlement Date ............... 7

    D.    Intel Seizes Lehman's Collateral ............................................................. 8

ARGUMENT ....................................................................................................................... 8

    I.    INTEL'S LOSS WAS $873 MILLION, NOT THE FULL PRE-
        PAYMENT AMOUNT AND THE INTEREST ACCRUED ON IT ................... 9

    A.    The Master Agreement Governs How to Determine the Type of
        Loss at Issue Here ................................................................................. 10

    B.    The Structure of the Parties' Agreement Points to the Same Result
        as the Loss Provision and New York Law ............................................... 13

    C.    New York Law Provides for the Identical Determination of Loss as
        the ISDA Master .................................................................................... 17

        1.    Under New York Law, Loss for Non-Delivery of Shares Is
            the Fair Market Value of the Shares on the Date They Were
            to Be Delivered ............................................................................. 17

        2.    Intel May Not Use Restitution or Rescission as a Substitute
            for Determining Its "Loss" in Accordance with the
            Agreement ..................................................................................... 19

    II.    EVEN UNDER AN APPROACH ADVOCATED BY INTEL, LEHMAN
        IS ENTITLED TO A JUDGMENT HERE ....................................................... 21

CONCLUSION ................................................................................................................. 25

i

# TABLE OF AUTHORITIES

Page

CASES

*Abdul v. Subbiah*,
    289 A.D.2d 105, 735 N.Y.S.2d 29 (1st Dep't 2001) ...........................................19

*Am. Express Travel Related Servs. Co. v. Accu-Weather, Inc.*,
    849 F. Supp. 233 (S.D.N.Y. 1994)..................................................................................8

*Anderson v. Liberty Lobby, Inc.*,
    477 U.S. 242 (1986)...................................................................................................8, 9

*Anthracite Rated Investments (Jersey) Ltd. v. Lehman Bros. Fin. S.A.*,
    [2011] EWHC 1822 (CH).........................................................................................3, 14

*Britannia Bulk plc (in liquidation) v. Bulk Trading S.A.*,
    [2011] EWHC 692 (Comm)....................................................................................12, 13

*Chevron TCI, Inc. v. Talleyrand Assocs., LLC*,
    No. 03 Civ. 4043 (AJP), 2003 U.S. Dist. LEXIS 22795 (S.D.N.Y. Dec. 23,
    2003) ...............................................................................................................................8

*Clarex Ltd. v. Natixis Sec. Am. LLC*,
    No. 12 Civ. 7908, 2013 U.S. Dist. LEXIS 82632 (S.D.N.Y. June 11, 2013)..........18

*Freishtat v. LivePerson, Inc.*,
    871 F Supp 2d 293 (S.D.N.Y. 2012)..........................................................................18

*In re Lehman Bros. Holdings Inc.*,
    492 B.R. 191 (Bankr. S.D.N.Y. May 10, 2013) (Peck, J.).......................................18

*Int'l Fid. Ins. Co. v. Aulson Co.*,
    No. 11 Civ. 9240 (DLC), 2012 U.S. Dist. LEXIS 171982 (S.D.N.Y. Dec. 4,
    2012) ...............................................................................................................................9

*Rosenbaum v. DataCom Sys.*,
    No. 13 Civ. 5484 (PKC), 2014 U.S. Dist. LEXIS 18730 (S.D.N.Y. Feb. 13,
    2014) ...............................................................................................................................9

*Rudman v. Cowles Commc'ns., Inc.*
    30 N.Y.2d 1 (1972) .....................................................................................................19

*Sharma v. Skaarup Shipping Mgmt. Corp.*,
    916 F.2d 820 (2d Cir. 1990) ..........................................................................4, 5, 18

*Simon v. Electrospace Corp.*,
    28 N.Y.2d 136 (1971) ...................................................................................17, 18

*State St. Bank & Trust Co. v. Salovaara*,
    326 F.3d 130 (2d Cir. 2003) ................................................................................8

*Tech. Exp. Inc. v. FTF Bus. Sys. Corp.*,
    No. 99 Civ. 11692, 2000 U.S. Dist. LEXIS 18518 (S.D.N.Y. Dec. 26, 2000).......................19

*Waxman v. Envipco Pick Up & Processing Servs., Inc.*,
    No. 02 Civ. 10132 (GEL), 2006 U.S. Dist. LEXIS 3883 (S.D.N.Y. Jan. 17,
    2006) ...........................................................................................................19, 21

*Waxman v. Envipco Pick Up & Processing Servs.*,
    Inc., No. 02 Civ. 10132 (GEL), 2006 U.S. Dist. LEXIS 44006 (S.D.N.Y. June
    28, 2006) ......................................................................................................17

**OTHER AUTHORITIES**

*Corbin on Contracts* § 55.13 (2005) ...........................................................................20

Fed. R. Bankr. P. 7056 .............................................................................................1

Fed. R. Civ. P. 56 ..................................................................................................1

Fed. R. Civ. P. 56(a) ..............................................................................................8

Restatement (Second) of Contracts § 373(2), cmt. b. .................................................20

Pursuant to Rule 56 of the Federal Rules of Civil Procedure, as made applicable to this adversary proceeding by Rule 7056 of the Federal Rules of Bankruptcy Procedure, Plaintiffs Lehman Brothers Holdings Inc. ("LBHI") and Lehman Brothers OTC Derivatives Inc. ("LOTC," and together with LBHI, "Lehman") respectfully submit this memorandum of law in support of their motion for summary judgment on Lehman's claim for breach of contract against Defendant Intel Corporation ("Intel").[1]  *See* Adversary Complaint, dated May 1, 2013 ("Complaint") [Dkt. No. 1].

## INTRODUCTION

In August 2008, LOTC and Intel entered into a derivative contract that provided for LOTC to purchase shares of Intel's common stock and then to deliver those shares to Intel on September 29, 2008, which was the "Settlement Date" for this trade.  The precise number of shares to be delivered was to be determined, by a formula in the contract, on September 26, 2008, the last day of the "Calculation Period."  On the September 29, 2008 Settlement Date, Intel declared an "Early Termination Date" for the trade.  By that time, the number of shares to be delivered had been set at 50,552,943 shares.  Under the contract and New York law, Intel was then supposed to close out this trade by determining its "Loss" at the value of the shares it was to receive, on the date it was to receive them.  That amount was $873 million, based on the undisputed fair market value of the 50.5 million shares Intel was to receive on September 29, 2008.

Apparently unhappy with the outcome of the trade to which it had agreed, Intel sought to make the trade disappear at the expense of Lehman and its creditors.  Intel invented a rescission

---

[1] The breach of contract claim is the first cause of action in the Complaint.  The second and third causes of action have been dismissed by Order dated January 13, 2014 [Dkt. No. 31].

remedy not provided for in the contract by essentially taking a full refund for itself.  Intel declared its Loss was the $1 billion contractual payment it made to LOTC at the outset of the trade plus interest, *i.e.*, the exact amount of LOTC's collateral Intel had held on that date.   On this unlawful premise, Intel seized the entirety of LOTC's collateral.  There are no disputed material factual issues here, and Plaintiffs are entitled to damages in a principal amount of at least $129 million—the difference between the $1.002 billion of LOTC collateral that Intel improperly seized and Intel's true Loss of $873 million, *i.e.* the fair market value of the undelivered shares on the day they were supposed to be delivered.

The "Loss" payment measure that governs close-out payments for an early termination of this transaction provides that Intel must "reasonably determine[] in good faith" what its "total losses and costs" were in connection with the trade.  Because Intel waited until September 29, 2008, the Settlement Date, to "early terminate" its trade with LOTC, the precise number of shares to be delivered was already established, as was their fair market value.  Hence, there was no uncertainty about what Intel was to receive (50.5 million shares) and what those shares were worth ($873 million) when Intel was to receive them (September 29, 2008).

The close-out payment measure to which the parties agreed expressly addresses this circumstance.  It provides that "Loss includes losses and costs (or gains) in respect of any payment or delivery required to have been made . . . on or before the relevant Early Termination Date and not made."  ISDA itself—in the User's Guide for the 1992 Master Agreement and in a recent *amicus* brief discussing the issue—has also confirmed that this sort of loss, for an obligation that has already become due, is an "unpaid amount."  Courts addressing the Loss provision in the 1992 Master have held likewise.  And Unpaid Amounts, as expressly set forth in

the Master, must be valued at "an amount equal to the fair market value of that which was (or would have been) required to be delivered as of the originally scheduled date for delivery."

Intel's Loss in connection with its early termination of this trade was thus the fair market value of the 50.5 million shares that it was supposed to receive on the "originally scheduled date for delivery" of September 29, 2008. Because that amount of shares and the closing price for Intel common shares on September 29, 2008 ($17.27) are undisputed, Intel's Loss, under any reasonable view and as a matter of law, was not the amount Intel originally invested in this derivative or the entirety of the $1 billion in LOTC's collateral that Intel opportunistically seized in an attempt to achieve *de facto* rescission. Intel's Loss was instead $873 million, the established fair market value of the shares on the delivery date. Plaintiffs are therefore entitled to a principal amount of at least $129 million—the difference between the $1.002 billion collateral Intel improperly seized and the $873 million that was Intel's actual Loss—and also interest on that amount.

The correctness of this result is underscored by the other close-out payment measure in the 1992 ISDA Master, *i.e.* "Market Quotation." Although Loss and Market Quotation are alternatives, they are each designed to arrive at a close-out payment that preserves the economic equivalent of any delivery that was to be made if the agreement had not been terminated early. For this reason, courts that have examined this issue have held that "outcomes derived from one [close-out payment measure] may be usefully tested by way of cross-check by reference to the other," and, indeed, this "sensible notion" has "hardened into hornbook law." *See, e.g., Anthracite Rated Investments (Jersey) Ltd. v. Lehman Bros. Fin. S.A.*, [2011] EWHC 1822 (CH), [116(1)], attached as Ex. 13 to the Declaration of Mahesh Venkatakrishnan ("Venkatakrishnan Decl."), submitted herewith. Here, this cross check shows that Market Quotation would lead to

3

the *exact same* close-out payment as Loss, properly applied.  As with Loss, Market Quotation would value LOTC's fully-ripened obligation to deliver a fixed number of shares to Intel as an Unpaid Amount, which, again, is the fair-market value of those shares as of the date that they were to be delivered, September 29, 2008.[2]

The result is the same under established New York law, which governs this contract. New York law also measures a party's loss for undelivered shares as the fair market value of the shares on the date they were to be delivered.  As the Second Circuit has noted, there is not "any New York authority that even remotely undercuts" this rule.  *Sharma v. Skaarup Shipping Mgmt. Corp.*, 916 F.2d 820, 825 (2d Cir. 1990).  Courts applying New York law have made clear that a non-defaulting party may not seek equitable remedies, like restitution or rescission, in connection with a contract to purchase shares where, as here, the value of the shares to be delivered on the date they were to be delivered is known.  The sole available remedy is a legal one:  the fair market value of the shares that the party was to receive on the date it was to receive them.  Intel's attempt to fashion its own form of rescission or restitution, by taking back its full initial purchase price through a seizure of LOTC's collateral, thus fails.

In sum, (i) under the Loss payment measure, (ii) as confirmed by applying the Market Quotation measure as a cross check, and (iii) under settled New York law, Intel's recoverable loss here is the fair market value of the 50.5 million undelivered shares on the date Intel was to receive them.  That loss was indisputably $873 million, not the $1 billion of LOTC's collateral

---

[2] As described below, in Part I.B of the Argument section, this is the only relevant step in applying the Market Quotation payment measure here.  Because there were no future deliveries to be made, the other steps in Market Quotation—i.e., obtaining quotations to estimate the value of future obligations, not yet ripened—would not apply.

that Intel improperly seized.  Plaintiffs are therefore entitled to summary judgment in the

principal amount of no less than $129 million, plus interest.

## BACKGROUND

The undisputed, material facts on which this motion is based are set forth in Lehman's

accompanying statement of undisputed material facts.  They are summarized here.

### A.    The Derivative Agreement and Lehman's Collateral

LOTC and Intel entered into this derivative Agreement on August 1, 2008.[3]  Plaintiffs'

Statement of Undisputed Material Facts ("SOF") ¶ 1.  The Agreement is governed by New York

law.  SOF ¶ 3.  Pursuant to the Agreement, Intel paid $1 billion to LOTC as a "Pre Payment" on

August 29, 2008.  SOF ¶¶ 4-5.  LOTC was then required to deliver to Intel a fixed number of

shares of Intel common stock on the September 29, 2008 "Settlement Date" for this trade.  SOF ¶

13.  The number of shares LOTC was obligated to deliver on September 29, 2008 was

indeterminate when the parties entered into the Agreement on August 1, 2008.  *See id*.  That

number was to be determined as of September 26, 2008, by application of a formula (based on a

volume-weighted average price of Intel common stock) set forth in the Confirmation to the

Agreement.  Confirmation § 1 ("Number of Shares to be Delivered"); SOF ¶¶ 13-14.

The Agreement also required LOTC to post $1 billion of collateral to Intel on August 29,

2008.  SOF ¶ 7.  The principal amount of LOTC's posted collateral remained at the fixed amount

---

[3] The Agreement consists of: (i) the 1992 ISDA Master Agreement, Multicurrency—Cross Border, dated as of February 1, 2008 (the "Master Agreement"); (ii) a Schedule to the Master Agreement, also dated as of February 1, 2008 (the "Schedule"); (iii) a Confirmation dated as of August 1, 2008 (the "Confirmation"); (iv) paragraphs 1-12 of the 1994 standard form ISDA Credit Support Annex (the "Credit Support Annex"), which the Confirmation incorporates by reference; and (v) the definitions and provisions contained in the 2002 ISDA Equity Derivatives Definitions (the "Equity Definitions"), which the Confirmation incorporates by reference.  SOF ¶ 2.  The Master Agreement, Schedule, Confirmation, and Credit Support Annex are attached as Exhibits 1-4 to the Adversary Complaint in this matter and to the accompanying Declaration of Mahesh Venkatakrishnan ("Venkatakrishnan Decl.").  The Equity Definitions are attached as Venkatakrishnan Decl. Ex. 15.

of $1 billion throughout the trade.  SOF ¶ 8.  When the trade went to maturity, the collateral,

including any interest earned on it, was to be returned to LOTC on the Settlement Date upon

delivery by LOTC of the shares called for by the Agreement.  SOF ¶ 9.  Intel had the right to set

off against the collateral, but this right was limited to amounts payable by LOTC to Intel

pursuant to the Agreement.  SOF ¶¶ 10-11.  The remainder of the collateral had to be returned to

LOTC.  SOF ¶ 11.

Starting on or about August 29, 2008, LOTC began purchasing Intel shares.  SOF ¶ 6.  As

of September 29, 2008, LOTC had purchased approximately 39.7 million Intel shares at a cost to

LOTC of approximately $803 million.  SOF ¶ 16.

### B.    The Lehman Bankruptcy-Related Event of Default

The Agreement designated LBHI as LOTC's Credit Support Provider, which meant,

among other things, that LBHI's bankruptcy filing on September 15, 2008 was a defined "Event

of Default" under the Agreement.  SOF ¶¶ 18, 20.  Although Intel had a right to declare a so-

called "Early Termination Date" due to LBHI's bankruptcy filing on September 15, 2008, Intel

did not do so on that day.  SOF ¶ 23.  Intel "note[d]" the Event of Default in a September 26,

2008 letter to LOTC, but did not declare an Early Termination on that date, either.  SOF ¶¶ 21,

23.

The Calculation Period under the parties' Agreement—that is, the period used in the

formula for determining the number of shares LOTC would be obligated to deliver to Intel on

September 29—was September 2, 2008 through September 26, 2008.  SOF ¶ 14.  When Intel

sent its letter to LOTC on September 26, 2008, the last day of the Calculation Period, the number

of shares LOTC was to deliver had therefore become fixed.  Intel's September 26 letter to LOTC

acknowledged this.  It plainly stated, "[P]ursuant to the terms of the Confirmation, the Number

of Shares to be delivered is 50,552,943 Shares and the Cash Delivery Amount is zero ($0.00)."

SOF ¶ 21.  The parties, accordingly, do not dispute that the Agreement called for LOTC to deliver to Intel 50,552,943 shares on the Settlement Date.  SOF ¶ 15.

### C.    Intel Declares An "Early Termination" on the Settlement Date

Intel waited a full two weeks after the September 15, 2008 LBHI bankruptcy filing before declaring an Early Termination Date.  It did this by a letter to LOTC dated September 29, 2008.  SOF ¶ 25.  As noted, this was also the Settlement Date under the Agreement.  SOF ¶ 12.

In its September 29 letter declaring the Early Termination Date, Intel acknowledged that the parties had elected "Second Method and Loss" to determine payments owed on an Event of Default.  SOF ¶ 27.  However, in disregard of the requirements for calculating "Loss" set forth in the Master Agreement (*see* Master Agreement § 14), Intel, in effect, declared the parties' Agreement to be nullified.  Intel summarily asserted in a "Calculation of Loss," attached to its September 29 letter, that its "Loss" was $1,001,966,256.00.  SOF ¶¶ 28-29.  That is, Intel asserted its "Loss" for this transaction in an amount that was exactly equal to the principal amount of LOTC's posted collateral plus interest earned on that collateral; and Intel made no attempt to actually value the 50.5 million shares of Intel common stock that were to be delivered on the Settlement Date.  Then, having previously acknowledged on September 26 that LOTC's obligation was to deliver 50.5 million shares, Intel shifted on September 29 when it asserted that LOTC's obligation under the Agreement was to deliver $1 billion in Intel common stock.  SOF ¶¶ 25, 29.

That is not what the Agreement states.  LOTC's obligation was to deliver a specific number of shares, determined pursuant to the formula in the Confirmation at the end of the Calculation Period.  SOF ¶ 13.  Indeed, only three days before it changed its mind and strategically demanded *de facto* rescission of the Agreement, Intel expressly acknowledged in its September 26 letter that "the Number of Shares to be Delivered is 50,552,943 Shares [.]"  SOF ¶

7

21.  That number is undisputed, and it is also undisputed that the fair market value of the

50,552,943 shares of Intel common stock that LOTC was to deliver on the Settlement Date was

$873 million, not $1 billion.  *See* SOF ¶ 17.

### D.    Intel Seizes Lehman's Collateral

On September 30, 2008, the day after Intel designated an Early Termination Date for this

trade and declared a *de facto* nullification of the contract, Intel took matters into its own hands,

notifying Lehman that it had seized all of Lehman's collateral and all of the interest accrued on

it.  SOF ¶ 30.  Intel—unilaterally and without basis—rescinded this transaction and gave itself a

remedy the Agreement does not provide for:  a full refund of its $1 billion Prepayment Amount,

and the interest accrued on it, all as if the parties had never entered into this derivative trade.

### ARGUMENT

Summary judgment is appropriate where, as here, "there is no genuine dispute as to any

material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a);

*see also State St. Bank & Trust Co. v. Salovaara*, 326 F.3d 130, 135-36 (2d Cir. 2003).  A fact is

material if it "might affect the outcome of the suit under the governing law," and a dispute as to a

material fact is genuine "if the evidence is such that a reasonable [finder of fact] could return a

verdict for the nonmoving party."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

The "construction of an unambiguous contract is a matter of law, appropriate for summary

judgment resolution."  *Chevron TCI, Inc. v. Talleyrand Assocs., LLC*, No. 03 Civ. 4043 (AJP),

2003 U.S. Dist. LEXIS 22795, at *14 (S.D.N.Y. Dec. 23, 2003); *see also Am. Express Travel

Related Servs. Co. v. Accu-Weather, Inc.*, 849 F. Supp. 233, 239 (S.D.N.Y. 1994) ("[I]f a

contract is unambiguous, its proper interpretation is a question of law that may be resolved by

the Court on summary judgment.").  Once the moving party has carried its burden of showing

that no material fact is in dispute, "the nonmovant 'may not rest upon the mere allegations or

denials in his pleadings, but must set forth specific facts showing there is a genuine issue for trial.'" *Rosenbaum v. DataCom Sys.*, No. 13 Civ. 5484 (PKC), 2014 U.S. Dist. LEXIS 18730, at *13 (S.D.N.Y. Feb. 13, 2014) (quoting *Liberty Lobby, Inc.*, 477 U.S. at 248); *see also Int'l Fid. Ins. Co. v. Aulson Co.*, No. 11 Civ. 9240 (DLC), 2012 U.S. Dist. LEXIS 171982, at *9 (S.D.N.Y. Dec. 4, 2012).

There is no disputed issue of material fact here under a proper construction of the Loss provision in the Master Agreement and under New York law.  If LOTC had delivered 50.5 million shares on September 29, 2008, Intel would have received $873 million in value.  Because it did not receive those shares, Intel lost that $873 million in value.  Intel, however, wrongfully inflated its purported "Loss" to much more, $1,001,966,256, and seized LOTC's $1 billion in collateral.  There was no basis for Intel to do that in the contract or as a matter of law.  Intel's Loss, properly measured under the contract and New York law, was no more than the fair market value of what would have been delivered to it:  the 50.5 million shares on the Settlement Date.  Because that Loss was $873 million, Intel should have returned to LOTC the difference between that $1.002 billion in collateral and its $873 million Loss, or $129 million.  Lehman is therefore entitled to a judgment here in the principal amount of no less than $129 million, plus interest.

## I.      INTEL'S LOSS WAS $873 MILLION, NOT THE FULL PRE-PAYMENT AMOUNT AND THE INTEREST ACCRUED ON IT

The definition of Loss, a parallel close-out measure for early termination of this Agreement ("Market Quotation"), and New York law all compel the same result in this case: Intel's Loss was $873 million—the fair market value of the shares to be delivered on the date they were to be delivered (September 29, 2008)—not the $1 billion plus interest that it seized from LOTC.

### A.    The Master Agreement Governs How to Determine the Type of Loss at Issue Here

The parties chose "Loss" and "Second Method" to determine how to make close-out payments in the event of an Early Termination.  SOF ¶ 27.

Loss is defined in Section 14 of the 1992 ISDA Master.  The full definition is set out below, and the part of it that addresses the specific type of loss suffered by Intel here—arising from failure to deliver on a ripened obligation to deliver shares—is in bold type:

> **"Loss"** means, with respect to this Agreement or one or more Terminated Transactions, as the case may be, and a party, the Termination Currency Equivalent of an amount that party reasonably determines in good faith to be its total losses and costs (or gain, in  which case expressed as a negative number) in connection with this Agreement or that Terminated Transaction or group of Terminated Transactions, as the case may be, including any loss of bargain, cost of funding or, at the election of such party but without duplication, loss or cost incurred as a result of its terminating, liquidating, obtaining or reestablishing any hedge or related trading position (or any gain resulting from any of them). **Loss includes losses and costs (or gains) in respect of any payment or delivery required to have been made (assuming satisfaction of each applicable condition precedent) on or before the relevant Early Termination Date and not made, except, so as to avoid duplication, if Section 6(e)(i)(1) or (3) or 6(e)(ii)(2)(A) applies.**  Loss does not include a party's legal fees and out-of-pocket expenses referred to under Section 11.  A party will determine its Loss as of the relevant Early Termination Date, or, if that is not reasonably practicable, as of the earliest date thereafter as is reasonably practicable.  A party may (but need not) determine its Loss by reference to quotations of relevant rates or prices from one or more leading dealers in the relevant markets.

While the definition generally defines Loss as that which a party "reasonably determines in good faith to be its total losses and costs," it also *expressly* spells out what Loss is in the factual scenario here, *i.e.* a fully determined deliverable—a fixed number of publicly traded

10

shares—that was required to be made on or before the Early Termination Date.[4]  Specifically,

Loss "includes" losses and costs "in respect of any payment [or] delivery required to have been

made . . . on or before the relevant Early Termination Date and not made, except, so as to avoid

duplication, if Section 6(e)(i)(1) or (3) or 6(e)(ii)(2)(A) applies."  1992 ISDA Master § 14

(definition of "Loss").  This type of Loss is referred to as an "unpaid amount," for which the

ISDA Master sets out a particular methodology to calculate.

This concept of an unpaid amount is incorporated into the Loss definition.  ISDA's

User's Guide for the 1992 Master expressly provides that "amounts included in the definition of

'Unpaid Amounts' are now encompassed in the definition of 'Loss' . . . ."  SOF ¶ 35; *see also id.*

¶ 36 (where User's Guide also states that "obligations which became . . . deliverable but which

were not . . . delivered prior to the Early Termination Date" are "included in the definition of

'Unpaid Amounts'" and "encompassed within the definition of 'Loss'").[5]  ISDA has also

recently confirmed this position in an *amicus* brief it submitted in connection with a dispute

under a 1992 ISDA Master Agreement.  In its brief, ISDA made clear that an obligation that has

already become due is referred to in *both* the definition of Unpaid Amounts *and* the definition of

Loss.  SOF ¶ 33 ("[O]bligations that would have accrued but for Section 2(a)(iii) are expressly

referred to in the definition of Unpaid Amounts . . . *and the definition of Loss*.") (emphasis

---

[4] Intel designated September 29, 2008 as the "Early Termination Date" for this transaction.  SOF ¶ 25. That was (i) after the Calculation Period, and so the number of shares to be delivered by LOTC was fixed; and (ii) also the Settlement Date for this trade, when delivery of that fixed number of shares was to have been made. *See* SOF ¶¶ 12, 14, 23, 25.  As such, it was known by the Early Termination Date declared by Intel that the parties' agreement called for Lehman to deliver to Intel a precise number of Intel shares, 50,552,943, on September 29, 2008.

[5] *See also* SOF ¶ 36 (User's Guide:  "In the case of Loss, Unpaid Amounts are no longer separately determined under the 1992 Agreements but are part of the calculation by a party of its Loss (unless Loss is being determined in the case where a Market Quotation cannot be determined or would not produce a commercially reasonable result).").

added.). [6] Courts in England, which have significant experience in these matters, have followed

this course, ruling that "the words in the second sentence of the Loss definition [*i.e.*, a loss 'in

respect of any payment [or] delivery required to have been made . . . and not made'] are a

reference to Unpaid Amounts." *Britannia Bulk plc (in liquidation) v. Bulk Trading S.A.*, [2011]

EWHC 692 (Comm) [41-43] (Venkatakrishnan Decl. Ex. 14).

The 1992 ISDA Master Agreement addresses how Loss is to be determined for an unpaid

amount, *i.e.*, a delivery that was required to have been made as of the Early Termination Date but

not made. Specifically, the Master provides that an Unpaid Amount is "equal to the *fair market*

*value* of that which was (or would have been) required to be delivered as of the originally

scheduled date for delivery" in respect of an "obligation under Section 2(a)(i) [requiring the

'delivery specified in each Confirmation to be made,' *i.e.*, the 50.5 million shares of Intel

common stock here] which was (or would have been but for Section 2(a)(iii) [which imposes a

condition precedent that, *inter alia*, no Early Termination Date has occurred or been designated])

required to be settled by delivery to such party on or prior to such Early Termination Date and

---

[6] The definition of Loss itself further underscores that it deliberately incorporates the concept of an "unpaid amount," by stating that losses "in respect of any payment or delivery required to have been made . . . on or before the relevant Early Termination Date and not made" are recoverable, but not, "*so as to avoid duplication*," if certain other sections apply. Each one of those other sections requires a determination of an Unpaid Amount. *See* 1992 ISDA Master § 14 (emphasis added) (definition of Loss; other sections are Section 6(e)(i)(1) or (3) and Section 6(e)(ii)(2)(A), all of which call for application of Market Quotation, which in turn calls for application of Unpaid Amounts). Once again, ISDA's recent *amicus* brief confirms that this sort of Loss recovery is excluded as "duplicative" of the recoveries provided for by the listed section because it is the *same* as the recovery allowed upon application of Unpaid Amounts. That is, both the part of Loss providing for recovery "in respect of any payment or delivery required to have been made on or before the relevant Early Termination Date and not made" and the listed provisions that follow all provide for recovery of "unpaid amounts" pursuant to the 1992 ISDA Master. *See* SOF ¶ 34 (ISDA *amicus* brief: "Because Market Quotation already takes into account [losses and costs (or gains) in respect of any payment or delivery required to have been made . . . on or before the relevant Early Termination Date and not made] as Unpaid Amounts, they are excluded from the fall-back Loss calculation to prevent double counting.").

which has not been so settled as at such Early Termination Date." 1992 ISDA Master § 14 (definition of "Unpaid Amounts") (emphasis added).

Applying this definition in the ISDA Master, it is indisputable that the 50.5 million shares of Intel common stock, fixed as of September 26, 2008, was an Unpaid Amount and therefore required to be measured at fair market value. This obligation "was required to be settled by delivery to [Intel] on or prior to [the] Early Termination Date", *i.e.* September 29 (also the Settlement Date). It is also indisputable that the "fair market value" of those shares was $873 million "as of the originally scheduled date for delivery," that is, on September 29, 2008. Intel designated the Early Termination Date after the close of the markets on September 29, 2008, and the closing price for Intel common stock on the NASDAQ exchange on September 29, 2008 was $17.27. SOF ¶¶ 17, 25. The fair market value of the 50.5 million shares that were to be delivered pursuant to this agreement was, therefore, $17.27 multiplied by 50,552,943, or $873 million, as of the September 29, 2008 Settlement Date / Early Termination Date.

In the face of these clear requirements in the ISDA Master—and as supported by the User's Guide, ISDA's *amicus* briefs, and the only court to have squarely addressed the issue (*Britannia Bulk plc (in liquidation) v. Bulk Trading S.A.*, [2011] EWHC 692 (Comm) [41-43])— Intel's Loss was the fair market value of the 50,552,943 shares that the Agreement called for LOTC to deliver on September 29, 2008. That fair market value was $873 million, not the $1 billion collateral plus interest that Intel improperly seized from Lehman.

### B.     The Structure of the Parties' Agreement Points to the Same Result as the Loss Provision and New York Law

Other close-out provisions in the Master Agreement underscore that the Loss here is measured by the fair market value of the specific number of shares to be delivered on the Settlement Date, not, as Intel would have it, by an approach that would completely unwind the

transaction, retroactively eliminate all risk that Intel took in this derivative trade, and treat it as though it never existed.

Market Quotation and Loss are two close-out payment measures set out in the 1992 ISDA Master. They are not identical for all purposes, and parties may elect between them, but *both* measures are designed to arrive at a close-out that preserves the economic equivalent of any payment or delivery that was to be made if the agreement had not been terminated early. Hence, cases addressing the two close-out measures have recognized that "Loss and Market Quotation are, although different formulae, aimed at achieving broadly the same result, so that outcomes derived from one may be usefully tested by way of cross-check by reference to the other." *Anthracite Rated Investments (Jersey) Ltd. v. Lehman Bros. Fin. S.A.*, [2011] EWHC 1822 (CH) [116(1)]. This "sensible" notion "has hardened into hornbook law." *Id.* And, under either the Market Quotation or Loss close-out measure, "the loss of bargain must be valued on an assumption that, but for termination, the transaction would have proceeded to a conclusion, and that all conditions to its full performance by both sides would have been satisfied, however improbable that assumption may be in the real world." *Id.* at [116(2)].

This interpretive authority is well-grounded in the 1992 ISDA Master. As discussed in Part I.A above, both Market Quotation and Loss call for a calculation of fair-market value of obligations that have become due, on the date they came due.[7] As ISDA has explained, the determination of amounts that have become due "*whether under the Market Quotation method or Loss method*, involves . . . calculation of amounts due historically under the Transaction (or that

---

[7] As to amounts that have not yet become due, the Market Quotation calls for a determining party to solicit market quotes to ascertain what amount would have to be paid to enter into a so-called "Replacement Transaction," which, as under the Loss definition, would "have the effect of preserving for such [determining party] the economic equivalent of any payment or delivery . . . that would, but for the occurrence of the relevant Early Termination Date, have been required after that date." 1992 ISDA Master § 14 (definition of "Market Quotation").

would have been due but for Section 2(a)(iii)) but not paid (that is, the 'Unpaid Amounts' . . . .)." SOF ¶ 32 (emphasis added).[8]

In accordance with this authority, a "cross-check" under the Market Quotation measure leads to the *exact same result* as application of the Loss measure (as set out above, in Part I.A) and also under New York law (as set out below, in Part I.C). That is because application of Market Quotation to this trade would, as with Loss, result in a close-out payment equal to the Unpaid Amounts in connection with the shares to be delivered on September 29, 2008.

As its name implies, one step in the Market Quotation payment measure calls for obtaining quotations from so-called "Reference Market Makers." But that step is pertinent only to approximate values for *future* deliveries, which are not at issue here. The determining party is not to seek market quotes for deliveries that were to have been made on or before the Early Termination Date. *See* 1992 ISDA Master § 14 (definition of Market Quotation; providing that "Unpaid Amounts" are excluded from solicitations for Market Quotations). This is because the deliveries in such instances are already known quantities, for which quotations estimating their future value are unnecessary (even nonsensical) because their *actual*, fair market value is currently determined.

_____

[8] Further demonstrating that Market Quotation and Loss ought to produce essentially the same result, the ISDA Master provides that, for purposes of determining a Settlement Amount (*i.e.*, the close-out amount under the Market Quotation method), Loss is a fallback to Market Quotation if a Market Quotation cannot be determined or would, in the reasonable belief of the determining party, not produce a commercially reasonable result. *See* 1992 ISDA Master § 14 (definition of "Settlement Amount"). The Loss methodology also specifically calls for the determining party to make its determination "as of the relevant Early Termination Date, or, if that is not reasonably practicable, as of the earliest date thereafter as is reasonably practicable." 1992 ISDA Master § 14 (definition of "Loss"). The Loss measure thus calls for the determining party to evaluate its losses as of the date the contract was terminated. It does not point backward in time to when the parties entered into the contract, and authorize a determination of Loss that would effectively rescind the transaction, as Intel did here, by equating Loss to a prepaid purchase price.

Here, when Intel declared an Early Termination Date the only obligation owing by LOTC was already due, *i.e.*, the 50.5 million shares due to Intel on September 29, the very date that Intel terminated this trade after the market closed.  Accordingly, upon application of Market Quotation to "cross check," there would be no quote from dealers to seek or provide.  The only determination to be made here was of the Unpaid Amounts, *i.e.*, the amounts in connection with the obligation that had already become due on September 29, 2008.  *See* 1992 ISDA Master § 6(e)(i)(3) (providing for payment equal to the sum of, *inter alia*, the Settlement Amount, which requires a determination of a Market Quotation, if necessary, and, separately, Unpaid Amounts).

The Unpaid Amounts here—all that would be due to Intel even under the Market Quotation method—are determined in the same manner as Intel's Loss should have been, namely, the "fair market value of that which was (or would have been) required to be delivered as of the originally scheduled date for delivery."  *Id.* § 14 (definition of "Unpaid Amounts").  That is the methodology for valuing an obligation, such as LOTC's obligation to deliver approximately 50.5 million shares, "which was (or would have been . . .) required to be settled by delivery to such party on or prior to such Early Termination Date and which has not been so settled as at such Early Termination Date . . . ."  *Id.*

In sum, in this transaction Market Quotation and Loss lead to the *exact same close-out amount*:  $873 million, for 50.5 million shares "which was (or would have been . . .) required to be settled by delivery" to Intel, multiplied by the fair market value of those shares on September 29, 2008 (the "originally scheduled date for delivery").  That is Intel's Loss and also the amount that would have been recoverable here when Loss is "cross checked" under the Market Quotation close-out measure.  This cross-check, in accordance with guidance from authorities interpreting

16

the 1992 ISDA Master, confirms that Intel's Loss was not $1 billion plus interest—as Intel

claimed upon closing out this trade—but $873 million.

### C.   New York Law Provides for the Identical Determination of Loss as the ISDA Master

The result is the same under New York law.  The parties elected in Part 4(h) of the

Schedule that their Agreement was to be governed by, and construed in accordance with, New

York law.  New York law, like the Master Agreement itself, is quite specific on how the

particular losses at issue in this case—losses due to a failure to deliver shares of stock—are to be

determined.

### 1.   Under New York Law, Loss for Non-Delivery of Shares Is the Fair Market Value of the Shares on the Date They Were to Be Delivered

As Judge Lynch has pointed out, New York law is "settled" that "'[t]he proper measure

of damages for breach of contract is determined by the loss sustained or gain prevented at the

time and place of breach . . . .  The rule is precisely the same when the breach of contract is

nondelivery of shares of stock.'"  *Waxman v. Envipco Pick Up & Processing Servs., Inc.,* No. 02

Civ. 10132 (GEL), 2006 U.S. Dist. LEXIS 44006, at *7 (S.D.N.Y. June 28, 2006) (quoting

*Simon v. Electrospace Corp.*, 28 N.Y.2d 136, 145 (1971)).  "The rule is not only well settled; it

is also well reasoned.  Valuing the [shares] as of the date when [the defendant] failed to deliver

them reflects the true loss to plaintiffs at the time of breach, and eliminates any speculation

concerning how long plaintiffs would have held on to the securities if they had been delivered as

promised."  *Id.*

Under this rule for determining losses for failure to deliver shares called for by a contract,

the non-defaulting party's losses are measured by the fair market value of the shares that were

supposed to be delivered *on the date that they were supposed to be delivered*.  "The damage

award resulting from a breach of an agreement to purchase securities is the difference between

17

the contract price and the fair market value of the asset at the time of breach . . . ." *Sharma*, 916 F.2d at 825 (2d Cir. 1990).  In *Sharma*, the Second Circuit noted the absence of "any New York authority that even remotely undercuts" this rule.  *Id.*[9]

The manner of determining losses under New York law in connection with a failure to deliver shares is thus the same for this transaction as under both Loss and Market Quotation. The $1 billion prepayment by Intel to LOTC, *i.e.*, the "contract price" here, is not the "fair market value of the (undelivered) asset" on the Early Termination Date of September 29, 2008. The fair market value of that undelivered asset was $873 million (50.5 million shares multiplied by the $17.27 closing price on September 29, 2008).  Intel's recoverable loss under New York law was thus $873 million, just as it is under the defined term "Loss" in the ISDA Master and under the "cross-check" of applying the Market Quotation payment measure.

---

[9] *See also id.* (affirming district court's holding that lost future earnings were not recoverable as a matter of law because "[i]t is a fundamental proposition of contract law, including that of New York, that the loss caused by a breach is determined as of the time of the breach.  It is also fundamental that, where the breach involves deprivation of an item with a determinable market value, the market value at the time of the breach is the measure of damages"); *Clarex Ltd. v. Natixis Sec. Am. LLC*, No. 12 Civ. 7908, 2013 U.S. Dist. LEXIS 82632, at *26, *28 (S.D.N.Y. June 11, 2013) (finding that plaintiffs' claim for damages equal to the current market value of the warrants was unavailable as a matter of law because it was "in excess of the value of the Warrants at the time of the alleged breach"); *Simon*, 28 N.Y.2d at 145-46 (holding that the "loss" due to breach of a contract to deliver shares "was fixed and determined" as of the date the shares were to be delivered; "[i]t was then that plaintiff was to be made whole and not at some future time . . . . That was, therefore also the time when the value to [plaintiff] of defendant's performance was to be measured" and the value of the shares at issue "was precisely determinable on the public market" on the date of non-delivery); *Freishtat v. LivePerson, Inc.*, 871 F Supp 2d 293, 316 (S.D.N.Y. 2012) (when "the breach of contract is the failure to deliver the correct number of shares of stock, the proper measure of damages is to determine the loss sustained or gain prevented at the time and place of the breach" and relying on the "closing price for LivePerson stock" on the delivery date to determine damages); *In re Lehman Bros. Holdings Inc.*, 492 B.R. 191, 200-201 (Bankr. S.D.N.Y. May 10, 2013) (Peck, J.) (finding that if the plaintiff would have filed a proof of claim for breach of contract for the defendant's failure to return securities under a swap agreement, "damages presumably would be calculated in an amount equal to the market value of these securities" since "in an action for breach of contract general damages seek to compensate the plaintiff for the value of the very performance promised, often determined by the market value of the good or service to be provided") (internal quotation marks and citations omitted).

### 2. Intel May Not Use Restitution or Rescission as a Substitute for Determining Its "Loss" in Accordance with the Agreement

New York law is just as clear that a party in Intel's position for this transaction is not permitted to treat the contract as though it did not exist and seek rescission or restitution through self-help. Those equitable remedies are available only when there is no remedy at law for the non-defaulting party. *See Rudman v. Cowles Commc'ns., Inc*. 30 N.Y.2d 1, 13-14 (1972) (restitution may be invoked "only when there is lacking a complete and adequate remedy at law"); *Tech. Exp. Inc. v. FTF Bus. Sys. Corp.*, No. 99 Civ. 11692, 2000 U.S. Dist. LEXIS 18518, at *15 (S.D.N.Y. Dec. 26, 2000) (noting that to recover in restitution plaintiff must show "that the circumstances were such that equity and good conscience require the defendant make restitution"). That is patently not the case here. The parties' agreement *provides* a specific methodology to determine Intel's losses and allowed for Intel to set off its loss against the collateral posted by Lehman. And that contractual methodology is fully in accord with settled New York law.

Intel may contend that restitution is appropriate because there was a "total breach" by Lehman in this case. *See, e.g.*, *Abdul v. Subbiah*, 289 A.D.2d 105, 735 N.Y.S.2d 29, 30 (1st Dep't 2001). But courts have made clear that, in the context of an agreement to deliver shares whose value is known on the date of breach, this equitable theory of recovery is not cognizable as a matter of law. *See Waxman v. Envipco Pick Up & Processing Servs., Inc.*, No. 02 Civ. 10132 (GEL), 2006 U.S. Dist. LEXIS 3883, at * 19-20 (S.D.N.Y. Jan. 17, 2006) (granting partial summary judgment to the defendant on the question of plaintiffs' entitlement to restitution damages for the defendant's failure to deliver securities even assuming that defendant's failure to

deliver constituted a "total breach," because "all that remained was for [the defendant] to transfer a fixed sum of securities whose value on any particularly date is easily determined").[10]

In any event, there was no "total breach" here.  The event that triggered the Early Termination Date here was the bankruptcy filing by the Credit Support Provider under the parties' agreement, not LOTC's failure to deliver the shares at issue.  Indeed, LOTC's failure to deliver the shares called for by the agreement could not have been the triggering Event of Default on September 29, 2008—the date Intel designated as the Early Termination Date— because that failure to deliver would not have ripened into an Event of Default until the end of a three-day cure period granted by the Agreement.  *See* 1992 ISDA Master Agreement § 5(a)(i).

Moreover, neither the occurrence of a Bankruptcy Event nor even a Failure to Deliver was a "breach" of the agreement, let alone a "total breach."  "Failure to Deliver" and a "Bankruptcy Event" are prescribed Events of Default in the ISDA Master.  Upon designation of an Early Termination Date on the basis of the occurrence of these or other defined Events of Default, the parties' contract specified close-out payment measures and particular procedures for applying those measures to determine a close-out amount.  Neither Event constituted a "breach" of the Agreement.  Intel therefore may not now claim a right to restitution, which is what its seizure of the collateral really was.  The contract at issue simply does not allow for nullifying the contract as a consequence of an Event of Default.

It would have been a straightforward task for the parties to provide for an outright return of the $1 billion prepayment with interest in the event of an Early Termination Date—or to

---

[10] *See also* Restatement (Second) of Contracts § 373(2), cmt. b. ("If, after one party has fully performed his part of the contract, the other party then refuses to pay a definite sum of money that has been fixed as the price for that performance, the injured party is barred from recovery of a greater sum as restitution."); 11 Joseph M. Perillo, *Corbin on Contracts* § 55.13 (2005) ("In the process of determining values, market prices will always be used if such prices are available.").

simply agree that Intel's Loss would be $1 billion in the event of an Early Termination Date—if

that is what they intended to do to compensate Intel for any Loss.  In fact, they provided for

similar remedies in other specific contexts.  For example, the Confirmation provided for a so-

called "Nullification" prior to August 29, 2008 in situations where the volatility of Intel's stock

exceeded certain levels.  In such cases, the Agreement would "automatically terminate" and "all

of the respective rights and obligations of [the parties would] be cancelled and terminated."

Confirmation § 1 (definition of "Table Amount").  Were this to occur, "any amounts previously

transferred from one party to the other with respect to the Transaction shall promptly be

returned."  *Id.*  *That* is a restitutionary remedy, expressly provided for in the parties' contract.

However, although the parties knew how to agree to unwind the contract and provide for

a refund upon the occurrence of certain defined events, they provided for no such restitutionary

remedy here.  Undeterred by the lack of a contractual provision allowing it to do so, that is

exactly what Intel did, by seizing the full collateral amount.  Intel effectively nullified the

contract and took back its pre-payment, with interest, all under the guise of declaring its "Loss."

## II.   EVEN UNDER AN APPROACH ADVOCATED BY INTEL, LEHMAN IS ENTITLED TO A JUDGMENT HERE

As discussed above, the determination of Intel's Loss is controlled by the definition of

Loss and the provisions for recovery of unpaid amounts in the ISDA Master.  Despite this, Intel

has taken the position during discovery that, in closing out this trade, the 50.5 million shares to

be delivered by LOTC were to be valued pursuant to Section 5(d) of the parties' Confirmation of

this trade at their "Agreed Value."  SOF ¶ 31.  Intel is wrong.  Section 5(d) and the defined term

"Agreed Value" in that provision apply only *after* Loss has already been determined.  In any

event, even assuming, as Intel has asserted, that Section 5(d) were to apply to quantify Loss, that

21

provision would still obligate Intel to return to Lehman approximately $100 million (and, indeed, as much as $228 million) of LOTC's collateral.

Section 5(d) of the Confirmation does not provide a methodology for *quantifying* Intel's Loss, as Intel has asserted. It only provides a mechanism for how Intel's Loss is *to be compensated*, in terms of physical shares and cash. Indeed, the provision requires that Loss be determined *before* the steps set forth in Section 5(d) of the Confirmation can be applied.[11] Application of Section 5(d) here would show only that, had Intel adhered to this provision in closing out its trade with LOTC, Intel would have been entitled to set off even less than $873 million of LOTC's collateral (*i.e.*, the proper measure of Loss here).

As discussed in Part I above, Intel's Loss is $873 million, the fair market value of the undelivered shares. That is the "Lehman Payment Amount" as it is referred to in Section 5(d) of the Confirmation, and the analysis starts there. Section 5(d) of the Confirmation next calls for physical delivery of those shares that had, up until the designation of the Early Termination Date, been acquired by LOTC in connection with this trade. Those shares are defined as the "Hedge Positions," and, in this analysis, they were the 39.7 million shares of Intel common stock LOTC had acquired prior to the Early Termination Date. SOF ¶ 16.

Section 5(d) next calls for a calculation of the "amount in cash," if any, to accompany the Hedge Positions in order to fully compensate Intel for its Loss. The "Agreed Value" of the Hedge Positions is used *solely* for this purpose. And it is determined by subtracting a defined

---

[11] In any event, Section 5(d) is inapplicable here because Intel never closed out this trade by seeking shares. Rather than seeking to enforce its rights to delivery of the Hedge Positions under Section 5(d) of the Confirmation, on September 30, 2008, a day after having demanded delivery of the "Shares and cash required to be delivered in accordance with Section 5(d)," Intel summarily seized Lehman's $1 billion cash-collateral plus interest. SOF ¶¶ 25, 30. That is, Intel took all cash and did not close-out this trade with a mix of shares and cash, as would have been called for had Intel applied Section 5(d).

discount, called the "Forward Price Adjustment Amount," from the "Forward Price" as those

terms are defined in Section 1 of the Confirmation.  In its September 26, 2008 letter, Intel agreed

"that the Forward Price is $19.8872" and that "the Forward Price Adjustment Amount is

$0.106."  SOF ¶ 22.  The Agreed Value for purposes of making the allocations of Loss called for

by Section 5(d) is therefore $19.7812.  And the "amount in cash" to be delivered to Intel as

compensation for its Loss under Section 5(d)(y) of the Confirmation would be approximately

$87.6 million, determined as follows:  $873 million (Loss or "Lehman Payment Amount") minus

$785.4 million (39.7 million Hedge Positions x $19.7812) .

The fair market value of LOTC's approximately 39.7 million Hedge Positions on

September 29, 2008 was approximately $685.7 million, based on the price of Intel's stock at the

close of markets on that date. *See supra* Part I.B.1 (explaining that shares to be delivered are to

be valued at their fair market value on the date that they were to be delivered).  That is the value

of what Intel would have received pursuant to Section 5(d), and there is no basis in Section 5(d)

or under New York law for valuing the shares it would have received at anything other than their

fair market value.  "Agreed Value" is a defined term used only to determine the "amount in

cash" to deliver to Intel.  Adding the fair market value of LOTC's Hedge Positions on September

29, 2008 to the "amount in cash" of approximately $87.6 million under Section 5(d)(y) of the

Confirmation, the total value to Intel of shares and cash that it would have received pursuant to

Section 5(d) of the Confirmation is $773.3 million.  This means that, if LOTC had compensated

Intel for its Loss in shares and cash pursuant to Section 5(d) of the Confirmation, Intel would

have been obligated to return to Lehman approximately $228.6 million of collateral.

Alternatively, even assuming, as Intel improperly claims, that Intel's Loss—and therefore

the "Lehman Payment Amount" under Section 5(d)—is $1,001,966,256, Intel would still have

had to return approximately $99.7 million of the collateral to Lehman pursuant to Section 5(d) of

the Confirmation.  Making this assumption, for the sake of argument, would mean that Lehman

would have had to deliver the 39.7 million shares of Intel stock (*i.e.*, the Hedge Positions) and

approximately $216.5 million in cash to Intel under Section 5(d)(y) of the Confirmation.  That

"amount in cash" would be determined by taking the Lehman Payment Amount, as Intel would

calculate it (*i.e.*, $1,001,966,256) and subtracting from it the aggregate Agreed Value of the 39.7

million Hedge Positions held by LOTC (*i.e.*, $785,451,495, derived by multiplying the 39.7

million Hedge Positions by the "Agreed Value" of $19.7812).

For the Court's convenience the steps to each of these alternative damage scenarios,

assuming that Section 5(d) of the Confirmation were to apply in determining Plaintiffs' damages,

is set out in the table below:

|  | Formula | $873 M Loss | $1 B "Loss" |
|---|---|---|---|
| Lehman Payment Amount | Loss | **$873,049,326** | **$1,001,966,256** |
| Agreed Value | Forward Price – Forward Price Adjustment Amount | $19.8872 - 0.106 = **$19.7812** | $19.8872 - 0.106 = **$19.7812** |
| Aggregate Agreed Value of LOTC's Hedge Positions | Hedge Positions x Agreed Value | 39,706,969 x $19.7812 = **$785,451,495** | 39,706,969 x $19.7812 = **$785,451,495** |
| Cash Payment Under Section 5(d)(y) | Lehman Payment Amount – Aggregate Agreed Value of LOTC's Hedge Positions | $873,049,326 - $785,451,495 = **$87,597,831** | $1,001,966,256 - $785,451,495 = **$216,514,761** |
| Aggregate Spot Price of Hedge Positions on September 29, 2008 | Hedge Positions x Closing Price of Intel Shares on September 29, 2008 | 39,706,969 x $17.27 = **$685,739,355** | 39,706,969 x $17.27 = **$685,739,355** |
| Value Subject to Set-off | Cash Payment Under Section 5(d)(y) + Aggregate Spot Price of Hedge Positions on September 29, 2008 | $87,597,831 + $685,739,355 = **$773,337,186** | $216,514,761 + $685,739,355 = **$902,254,116** |
| Due to LOTC | Value of Collateral – Value Subject to Set-off | $1,001,966,256 - $773,337,186 = **$228,629,070** | $1,001,966,256 - $902,254,116 = **$99,712,140** |

**CONCLUSION**

Lehman respectfully requests that the Court grant its motion for summary judgment on its breach of contract cause of action and enter judgment for Lehman against Intel in the amount of no less than the principal amount of $129 million, plus interest.

Dated:  January 20, 2015
        New York, New York

Respectfully submitted,

JONES DAY

By:

_____
Robert W. Gaffey
Jayant W. Tambe
Todd R. Geremia
Mahesh Venkatakrishnan
JONES DAY
222 East 41st Street
New York, New York 10017
Telephone: (212) 326-3939
Facsimile:  (212) 755-7306

*Attorneys for Plaintiffs,*
*Lehman Brothers Holdings Inc. and*
*Lehman Brothers OTC Derivatives Inc.*

## CERTIFICATE OF SERVICE

I, Mahesh Venkatakrishnan, hereby certify that on January 20, 2015, a true and correct copy of the foregoing document was served upon all counsel of record via the Court's CM/ECF system.

Dated:  January 20, 2015             */s/* Mahesh Venkatakrishnan
        New York, New York

Mahesh Venkatakrishnan
JONES DAY
222 East 41st Street
New York, New York 10017
Telephone: (212) 326-3939
Facsimile: (212) 755-7306

*Attorney for Plaintiffs,*
*Lehman Brothers Holdings Inc. and*
*Lehman Brothers OTC Derivatives Inc.*