John J. Buckley, Jr.
Daniel F. Katz
Edward C. Barnidge
WILLIAMS & CONNOLLY LLP
725 Twelfth Street, N.W.
Washington, DC 20005
Tel: (202) 434-5000
Fax: (202) 434-5029

Craig T. Goldblatt
Isley M. Gostin
WILMER CUTLER PICKERING
HALE & DORR LLP
1875 Pennsylvania Avenue, N.W.
Washington, DC 20006
Tel: (202) 663-6000
Fax: (202) 663-6363

*Attorneys for Defendant Intel Corporation*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re:<br><br>LEHMAN BROTHERS HOLDINGS INC., *et al.*,<br>　　　　　　　　　　　　　Debtors. | Chapter 11<br>Case No. 08-13555 (SCC)<br>(Jointly Administered) |
| LEHMAN BROTHERS HOLDINGS INC. and<br>LEHMAN BROTHERS OTC DERIVATIVES INC.,<br>　　　　　　　　　　　Plaintiffs,<br>v.<br>INTEL CORPORATION,<br>　　　　　　　　　　　Defendant. | Adv. Proc. No. 13-01340 (SCC) |

**DEFENDANT INTEL CORPORATION'S REVISED MEMORANDUM OF
LAW IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT**

## TABLE OF CONTENTS

TABLE OF CONTENTS................................................................................................... i

TABLE OF AUTHORITIES ......................................................................................... iii

INTRODUCTION .............................................................................................................1

BACKGROUND ................................................................................................................4

I.      INTEL'S SHARE BUYBACK PROGRAM AND LOTC'S ROLE IN IT ......................4

        A.      Intel's Share Buyback Program ...................................................................4

        B.      Intel Does Not Realize a Gain or Loss on Its Share Repurchases .........................5

        C.      LOTC Expected a $3 Million Profit from the 3Q08 Transaction..........................6

II.     THE 3Q08 TRANSACTION............................................................................................6

        A.      Prepayment in Full, Followed by Physical Settlement ............................................7

        B.      Volume-Weighted Average Price or VWAP ...........................................................7

                1.      The VWAP Would Be Used To Determine the Number of Shares
                        LOTC Was Required To Deliver..................................................................7

                2.      Shares on Early Termination Would Be Valued at VWAP.........................8

        C.      "Loss" and "Market Quotation" Are Different Payment Measures, and the
                Parties Here Chose "Loss"...........................................................................................9

        D.      The Fixed Exposure Provision.................................................................................11

        E.      The Equity Derivatives Definitions ........................................................................11

III.    LOTC DELIVERS ZERO SHARES ............................................................................12

        A.      LOTC Stops Buying Shares, Realizes It Cannot Deliver Any Shares, and
                Prepares To Lose the $1 Billion Collateral.............................................................12

        B.      LOTC Delivers Zero Shares on the Delivery Date.................................................13

        C.      Intel's Loss Determination.......................................................................................14

        D.      Intel's Set-off Against the Collateral ......................................................................14

IV.     THE LAWSUIT.............................................................................................................15

SUMMARY JUDGMENT STANDARD.......................................................................................16

ARGUMENT .........................................................................................................................16

    A.    Intel's Upfront Cost for Entering into This Transaction Was $1 Billion ..............18

    B.    The "Agreed Value" of the Shares Due on Early Termination Was $1 Billion .................................................................................................................19

    C.    The Value to Intel of the Undelivered Shares Was $1 Billion .............................20

    D.    Intel's Exposure Was Fixed at $1 Billion .............................................................21

    E.    Intel's Restitution Interest Was $1 Billion............................................................22

    F.    ███████████████████████████████ ...................................................23

    G.    Intel's Costs, Losses, or Expenses under Section 9.12 of the Equity Derivatives Definitions Were $1 Billion .............................................................24

CONCLUSION......................................................................................................................25

## TABLE OF AUTHORITIES

### FEDERAL CASES

*Barbara v. MarineMax, Inc.*, No. 12-CV-0368, 2013 WL 4507068
(E.D.N.Y. Aug. 22, 2013), *aff'd*, 577 F. App'x 49 (2d Cir. 2014) ................................ 16, 17

*CDO Plus Master Fund Ltd. v. Wachovia Bank, N.A.*, No. 07 Civ. 11078,
2010 WL 3239416 (S.D.N.Y. Aug. 16, 2010)..........................................................................17

*Celotex Corp. v. Catrett*, 477 U.S. 317 (1986) ............................................................................16

*Green v. Fund Asset Mgmt., L.P.*, 147 F. Supp. 2d 318 (D.N.J. 2001),
*aff'd*, 286 F.3d 682 (3d Cir. 2002) .......................................................................................18

*Men's Sportswear, Inc. v. Sasson Jeans, Inc. (In re Men's Sportswear, Inc.)*,
834 F.2d 1134 (2d Cir. 1987) ...............................................................................................22

*Seabury Constr. Corp. v. Jeffrey Chain Corp.*, 289 F.3d 63 (2d Cir. 2002)................................18

*Tech. Express, Inc. v. FTF Bus. Sys. Corp.*, No. 99 Civ. 11692, 2000 WL 1877020
(S.D.N.Y. Dec. 26, 2000) .....................................................................................................23

*Toledo Fund, LLC v. HSBC Bank USA*, No. 11 Civ. 7686, 2012 WL 2850997
(S.D.N.Y. July 9, 2012) ........................................................................................................17

*VCG Special Opportunities Master Fund Ltd. v. Citibank, N.A.*, 594 F. Supp. 2d
334 (S.D.N.Y. 2008), *aff'd*, 355 F. App'x 507 (2d Cir. 2009) ...............................................21

### STATE CASES

*Amalgamated Hous. Corp. v. Kelly*, 82 N.Y.S.2d 577 (Sup. Ct. 1948)........................................25

### OTHER AUTHORITIES

17 C.F.R. § 240.10b-18..................................................................................................................5

17 C.F.R. § 240.10b5-1 .................................................................................................................. 4

Black's Law Dictionary (10th ed. 2014)............................................................................ *passim*

Statement of FAS No. 133: *Accounting for Derivative Instruments and Hedging
Activities* (1998), ¶ 11(a)...............................................................................................5, 20

## INTRODUCTION

Plaintiff Lehman Brothers OTC Derivatives Inc. ("LOTC") accepted a $1 billion prepayment from defendant Intel Corporation to acquire and physically deliver shares of Intel stock to Intel so that Intel could retire the shares and benefit its remaining shareholders.  LOTC failed, however, to perform the contract and delivered no shares while retaining Intel's $1 billion prepayment.  Intel reasonably and in good faith determined its loss to be $1 billion and set off that loss against $1 billion that LOTC had posted as collateral to secure its performance.  Now, more than six years later, LOTC and its parent, Lehman Brothers Holdings Inc. ("LBHI"), seek to recover damages from Intel notwithstanding LOTC's complete non-performance.  As a matter of law, Intel is entitled to summary judgment in its favor.

On August 29, 2008, Intel prepaid LOTC $1 billion to acquire and physically deliver shares of Intel common stock to Intel on or before September 29, 2008.  The transaction allowed Intel to repurchase its shares while in a "quiet period" during which securities regulations precluded the company from repurchasing its shares directly.  LOTC was required to deliver a number of shares determined by dividing Intel's $1 billion prepayment by the volume-weighted average price ("VWAP") of Intel stock over a 19-day calculation period.  Upon physical receipt of the shares, Intel would retire them and in doing so benefit its remaining shareholders with a larger claim on the company's future cash flows.  To secure its performance, LOTC posted $1 billion cash collateral, which would not be returned by Intel unless and until LOTC delivered the required shares.

After receiving Intel's $1 billion prepayment, LOTC acquired Intel shares steadily on each business day.  The acquisitions abruptly stopped on September 18, 2008, three days after LBHI, LOTC's parent, filed for bankruptcy protection.  By then, LOTC had acquired 39.7 million Intel shares, which it was contractually required to deliver to Intel whether or not it

1

performed in full.  LOTC, however, determined that it would be unable to deliver the acquired

shares because they were being held by other Lehman entities that were embroiled in liquidation

and foreign bankruptcy proceedings.  ██████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████

██████████████████████████████████████████, Intel was unaware

of the inner workings of LOTC, and remained hopeful that LOTC, which had not filed for

bankruptcy, might fulfill its contractual obligations.  After the calculation period ended on

September 26, 2008, Intel notified LOTC that, based on the VWAP of Intel stock over the

calculation period, LOTC was required to deliver approximately 50.5 million shares on

September 29.  But LOTC delivered no shares on that day or any time thereafter.  Nor did LOTC

return the $1 billion prepayment.  The contract provided that in an event of default the non-

defaulting party (here, Intel) had the right to make a reasonable, good faith determination of its

total losses and costs—its "Loss" in the language of the contract.  That is exactly what Intel did.

Intel informed LOTC that its Loss was $1 billion, equal to the amount of Intel's prepayment and

the contractually agreed-upon value of the shares, plus a small amount of interest.  Intel then set

off its Loss against the $1 billion collateral that LOTC had posted for the express purpose of

securing Intel against a default.

---

[1] Relevant excerpted portions of the exhibits cited herein are attached to the accompanying
Declaration of Edward C. Barnidge.  Pursuant to Bankruptcy Local Rule 7056-1, Intel also is
separately submitting a Statement of Undisputed Material Facts in support of its Motion.

████████████████████████████████████████████████████

███████████████████████████████████ plaintiffs filed this lawsuit over five years later,

making the astonishing claim that Intel's Loss determination for that very same amount was

unreasonable and in bad faith.  In a complete about-face, plaintiffs assert that the **only** reasonable

and good faith calculation of Intel's Loss was $873 million—which they now calculate based on

the September 29 spot price of the approximately 50.5 million shares that LOTC was

contractually required to deliver.  Plaintiffs thus argue that they should be rewarded for LOTC's

complete failure to perform by receiving at least $127 million (the difference between Intel's

supposed $873 million Loss and the $1 billion collateral)—even though, by its own estimates,

LOTC would have made a profit of only $3 million had it performed in full.

Plaintiffs' *post hoc* claim ignores both the undisputed material facts and the unambiguous

language of the parties' contract.  Plaintiffs bear the burden of establishing that Intel's

determination of its Loss was unreasonable and not in good faith.  Plaintiffs cannot meet that

burden as a matter of law because the reasonableness of Intel's Loss determination is supported

by multiple, independent considerations, any one of which would alone justify entry of judgment

in Intel's favor.  Intel's determination of its total losses and costs is reasonable because it reflects

its $1 billion prepaid costs, the $1 billion agreed value of the shares that LOTC was required to

deliver, the $1 billion book value of the transaction to Intel, the $1 billion fixed exposure to Intel

specially agreed to by the parties, the $1 billion recovery provided under restitution principles,

████████████████████████████████████████████████ Intel prepaid in

full and received nothing in return.  Its objective in entering the transaction was defeated

entirely.  Accordingly, the Court should grant summary judgment to Intel.

# BACKGROUND

## I. INTEL'S SHARE BUYBACK PROGRAM AND LOTC'S ROLE IN IT

### A. Intel's Share Buyback Program

Intel has a longstanding program of repurchasing and retiring its shares. When repurchased shares are retired, Intel reduces shareholders' equity on its balance sheet by the acquisition cost of the shares. Ex. S (Stevens Dep. 35–36, 134); Ex. Q (Shymkiw Dep. 64–65, 176). Intel's share repurchases benefit Intel's remaining (non-selling) shareholders by giving them a larger claim on the future cash flows of the company. Ex. R (Smith Dep. 21–22, 139); Ex. M (Jacob Dep. 33–35).

For years, Intel repurchased its shares entirely through its in-house traders. Ex. N (Lusk Dep. 14–15); Ex. M (Jacob Dep. 14–15). This approach required that Intel refrain from share repurchases during its quarterly "quiet periods" when management often would possess material, nonpublic information. Ex. M (Jacob Dep. 15–17). Intel's quarterly quiet period, which is published by the company, typically runs from several weeks before the end of the fiscal quarter through Intel's quarterly earnings announcement. Ex. N (Lusk Dep. 24–25, 29).

To spread its repurchases more evenly throughout the entire year, Intel began entering into transactions pursuant to SEC Rule 10b5-1, which permits a purchaser to acquire its shares while in possession of material, nonpublic information if the acquisitions are made pursuant to a plan entered into before the purchaser became aware of such information. Ex. M (Jacob Dep. 15–16); Ex. N (Lusk Dep. 14); *see* 17 C.F.R. § 240.10b5-1(c)(1)(i)(B)(2). Starting in the fourth quarter of 2007, Intel entered into and executed several share repurchase transactions pursuant to Rule 10b5-1, contracting each quarter with a counterparty bank to purchase and deliver the

number of shares determined by the VWAP of Intel stock over a specified calculation period within Intel's quiet period.[2] *Id.*

In the third quarter of 2008 ("3Q08"), Intel and LOTC entered into the transaction at issue in this case. LOTC accepted Intel's prepayment but never delivered any shares. *See* Adversary Compl., Dkt. No. 1 ("Compl.") ¶¶ 16, 37; Ex. G (Intel 9/29/08 Letter). Following LOTC's complete failure to perform, Intel set off its $1 billion cost and loss on the transaction (plus interest) against the $1 billion in collateral (plus interest) that Intel had required LOTC to post to secure performance. Ex. H (Intel 9/30/08 Letter); Ex. N (Lusk Dep. 56–57). LOTC's non-performance prevented Intel from retiring shares and reducing shareholders' equity by $1 billion in 3Q08, and so it could not benefit remaining shareholders by giving them a larger claim on Intel's future cash flows.

### B.    Intel Does Not Realize a Gain or Loss on Its Share Repurchases

Share repurchases do not generate profits or losses for Intel. Ex. S (Stevens Dep. 35–36, 134). Whereas derivatives are typically "marked to market" on a company's financial statements, meaning gains and losses based on current market values are recognized, *see* Ex. S (Stevens Dep. 67–68), Generally Accepted Accounting Principles (GAAP) specifically permit *equity* accounting for share repurchase transactions, *see* FASB, Statement of FAS No. 133: *Accounting for Derivative Instruments and Hedging Activities* (1998), ¶ 11(a). Under FAS 133, Intel reduces shareholders' equity on its balance sheet by the actual price it pays for repurchased shares—*not* the market spot price of the shares on the delivery date. *See* Ex. S (Stevens Dep.

---

[2] To be more precise, Intel's contracts used the "10b-18 VWAP," which is the volume-weighted average price per share of only those trades that comply with the quantity, timing, and other conditions for share repurchases set forth in SEC Rule 10b-18. Ex. A (Confirmation § 1) (defining "10b-18 VWAP"); 17 C.F.R. § 240.10b-18.

35–36, 134); Ex. Q (Shymkiw Dep. 64–65, 176).  Intel's share repurchase transactions, therefore, do not generate profits or losses for Intel.  In short, on its own books, Intel would measure the value of the 3Q08 transaction by Intel's $1 billion purchase price for the shares. ████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

████████ .

### C.    LOTC Expected a $3 Million Profit from the 3Q08 Transaction



LOTC expected to make its projected $3 million profit on the 3Q08 transaction by purchasing small amounts of Intel shares each day, guided by a computer model. ████████

██████████████████████████    Ex. T (Weickel Dep. 75–78).  Thus, the 3Q08 transaction did not involve LOTC speculatively betting on the direction of Intel's stock price.  *See id.*  The spot price of Intel's shares on the specified delivery date was as irrelevant to LOTC as it was to Intel.  *See* ████████████    Ex. T (Weickel Dep. 132–33); Ex. O (Murphy Dep. 122–23).

## II.    THE 3Q08 TRANSACTION

The 3Q08 contract between Intel and LOTC, which the parties referred to as the "VWAP Prepaid Share Forward Transaction," Ex. A (Confirmation at 1), was highly customized and

included a 13-page, single-spaced Confirmation that captured the many negotiated, customized

features of the contract. *See* Ex. A (Confirmation); Ex. O (Murphy Dep. 92–93). The

Confirmation incorporated by reference several ISDA form agreements, including the 1992

ISDA Master Agreement between Intel and LOTC ("ISDA Master") and Schedule thereto (the

"Schedule"), the 2002 ISDA Equity Derivatives Definitions (the "Equity Definitions"), and

Paragraphs 1 through 12 of the 1994 ISDA Credit Support Annex (the "CSA"). Ex. A

(Confirmation at 1); *see* Exs. B–E. The Confirmation expressly provided that it would stand at

the top of the interpretive hierarchy, with its terms controlling any inconsistencies between

documents. Ex. A (Confirmation at 1). The contract specified that New York law would govern

its interpretation. Ex. C (Schedule Part 4(h)).

### A.      Prepayment in Full, Followed by Physical Settlement

The Confirmation obligated Intel to prepay $1 billion to LOTC on August 29, 2008, and

obligated LOTC to physically deliver the required shares on or before September 29, 2008. *See*

Ex. A (Confirmation § 1) (defining "Prepayment Amount," "Prepayment Date," and "Settlement

Date"; and designating "Physical Settlement" as "Applicable"). Physical delivery was essential

to fulfilling the purpose of the contract because Intel needed the shares to retire them and thereby

benefit the remaining shareholders with a larger proportion of Intel's future cash flows. Ex. T

(Weickel Dep. 67–68); Ex. R (Smith Dep. 21–22); Ex. M (Jacob Dep. 33–35).

### B.      Volume-Weighted Average Price or VWAP

#### 1.      The VWAP Would Be Used To Determine the Number of Shares LOTC Was Required To Deliver

The number of shares that LOTC was required to deliver to Intel was derived from the

volume-weighted average price or VWAP of Intel stock over the contractually defined

calculation period, which ran from September 2 to 26, 2008. LOTC was required to deliver the

7

number of shares determined by dividing $1 billion by the VWAP[3] over the calculation period.
Ex. A (Confirmation § 1) (defining "Number of Shares to be Delivered").  The VWAP over the
calculation period was ultimately $19.7812, and LOTC consequently was required to deliver
50,552,943 ($1 billion/$19.7812) shares of Intel stock on September 29, 2008.  Ex. F (Intel
9/26/08 Letter).  Hence, by the formula's very design, the value of those shares equaled exactly
$1 billion.  ████████████████████████████████████████

████████████████████████████████████████████

████████████

### 2.        Shares on Early Termination Would Be Valued at VWAP

By the terms of the contract, the Intel shares that LOTC was required to deliver following
a default also were to be valued at VWAP.  The parties' customized Confirmation specified the
consequences of an Event of Default by LOTC.  Ex. A (Confirmation § 5(d)) (entitled "Early
Termination").  Following an Event of Default, such as the bankruptcy of LBHI (LOTC's credit
support provider in the contract), Intel could declare an Early Termination Date, Ex. B (ISDA
Master § 6(a)) ("Right to Termination Following Event of Default"), and that would trigger the
customized "Early Termination" provision set forth in Section 5(d) of the Confirmation.  Ex. A
(Confirmation § 5(d)).

This Early Termination provision specified that if Intel determined that LOTC owed it a
payment under the ISDA payment measure chosen by the parties, resulting in a "Lehman
Payment Amount," then:

---

[3] By agreement of the parties, the VWAP used for this calculation included a slight discount.
*See* Ex. A (Confirmation §§ 1 & 5(d)) (defining "Forward Price" and "Forward Price Adjustment
Amount").

> Lehman shall (x) deliver to [Intel] a number of Shares . . .
> comprising Lehman's Hedge Positions in respect of the
> Transaction . . . and (y) pay to [Intel] an amount in cash equal to
> any excess of the Lehman Payment Amount over the aggregate
> Agreed Value of such Shares . . . .

Ex. A (Confirmation § 5(d)).

The parties selected "Loss" from the 1992 ISDA Master Agreement as the payment measure for determining the "Lehman Payment Amount." Ex. A (Confirmation at 1); Compl. ¶ 33. The "Hedge Positions" that LOTC was required to deliver were any Intel shares that LOTC had acquired prior to the declaration of the Early Termination Date. *See, e.g.*, Ex. I (Pls.' Interrog. Resps. No. 16) (defining LOTC's Hedge Positions as the total number of shares LOTC acquired for purposes of this transaction). And the "Agreed Value" of the Hedge Positions was the VWAP over the calculation period. Ex. A (Confirmation §§ 1 & 5(d)) (defining "Forward Price," "Forward Price Adjustment Amount," and "Agreed Value").

In short, under Section 5(d) of the Confirmation, once Intel declared an Early Termination Date and determined its Loss, *i.e.*, its total losses and costs, LOTC was required to deliver the shares it had acquired to date and to pay cash equal to the difference between Intel's Loss and the total VWAP value of those shares. The contract thus specified that any shares LOTC was obligated to deliver in the event of a default should be valued by the VWAP over the calculation period and not the market spot price on the delivery date.

### C.    "Loss" and "Market Quotation" Are Different Payment Measures, and the Parties Here Chose "Loss"

Intel and LOTC's choice of "Loss" as the payment measure in their bespoke Early Termination provision was deliberate and significant. Previously, they had designated "Market Quotation," the alternative payment measure provided by the 1992 ISDA Master, as the default measure when they entered into their ISDA Master Agreement on February 1, 2008. Ex. C

(Schedule Part 1(f)) ("Payments on Early Termination"). But the parties specifically overrode

that election for the 3Q08 transaction. Ex. A (Confirmation at 1).

Market Quotation and Loss are very different, as evidenced by the plain language of the

two provisions. Unlike Loss, the Market Quotation measure imposes specific requirements for

valuing both future and past-due deliverables upon Early Termination. Under Market Quotation,

the value of any delivery that would have been due after the Early Termination Date must be

measured by the cost of entering into an economically-equivalent replacement transaction. Ex. B

(ISDA Master § 14, at 15–16) (defining "Market Quotation"). The non-defaulting party must

make that measurement by obtaining a certain number of market quotations from leading dealers

in the relevant market. *Id.* And for a delivery that was due but not made on or prior to the Early

Termination Date, Market Quotation requires the non-defaulting party to determine the "fair

market value" of the deliverable as of the originally scheduled delivery date. *Id.* (ISDA Master

§§ 14, at 15–18 (defining "Unpaid Amounts") & 6(e)(i)(3) (defining "Second Method and

Market Quotation")).

The Loss payment measure is much more flexible than Market Quotation. By its terms,

the Loss measure requires neither the pricing of a replacement transaction for a future deliverable

nor the determination of the fair market value for a past-due deliverable. Instead, Loss is a

general indemnification provision entitling the non-defaulting party to recover its "total losses

and costs." It is defined in relevant part as:

> [A]n amount that party reasonably determines in good faith to be
> its total losses and costs (or gain, in which case expressed as a
> negative number) in connection with [the terminated transaction],
> including any loss of bargain, cost of funding or, at the election of
> such party but without duplication, loss or cost incurred as a result
> of its terminating, liquidating, obtaining or reestablishing any
> hedge or related trading position (or any gain resulting from any of
> them). Loss includes losses and costs (or gains) in respect of any

10

> payment or delivery required to have been made (assuming
> satisfaction of each applicable condition precedent) on or before
> the relevant Early Termination Date and not made[.] . . . A party
> may (but need not) determine its Loss by reference to quotations of
> relevant rates or prices from one or more leading dealers in the
> relevant markets.

Ex. B (ISDA Master § 14, at 15).  In determining "its total losses and costs," the only

requirements are that the non-defaulting party do so "reasonably" and "in good faith."  *Id.*  The

non-defaulting party is not required to use any particular method in measuring "its total losses

and costs."  It "may" determine its Loss "by reference to quotations of relevant rates or prices,"

but it "need not" do so.  *Id.*  The non-defaulting party is required to determine its Loss "as of the

relevant Early Termination Date, or, if that is not reasonably practicable, as of the earliest date

thereafter as is reasonably practicable."  *Id.*

### D.    The Fixed Exposure Provision

In another customized term in the Confirmation, LOTC agreed to post $1 billion in cash

collateral, *see* Compl. ¶¶ 2, 22; Ex. A (Confirmation § 6(d)), and the parties agreed to fix Intel's

"Exposure" at $1 billion, Ex. A (Confirmation § 6(d)(C)) (defining "Secured Party's Exposure").

This meant that the collateral was not to be adjusted unless, and until, LOTC delivered shares.

*Id.*  Exposure is "the amount . . . that would be payable to a party that is the Secured Party by the

other party . . . ***as if [the] Transaction[] were being terminated*** as of the relevant Valuation

Time."  Ex. D (CSA ¶ 12, at 8) (emphasis added) (defining "Exposure").

### E.    The Equity Derivatives Definitions

The parties also incorporated the 2002 ISDA Equity Derivatives Definitions into their

contract.  Ex. A (Confirmation at 1).  Those definitions provide terms tailored for transactions

that were to be settled by physical delivery, like the transaction here.  The definitions provide

that in the event of a share delivery failure, the party failing to make the required delivery "will

indemnify the other party on demand for any costs, losses, or expenses . . . resulting from such failure." Ex. E (Equity Definitions § 9.12) (defining "Indemnification for Failure to Deliver"). The definitions specify that "[a] certificate signed by the deliveree setting out such costs, losses or expenses in reasonable detail will be conclusive evidence that they have been incurred." *Id.*

## III.   LOTC DELIVERS ZERO SHARES

### A.   LOTC Stops Buying Shares, Realizes It Cannot Deliver Any Shares, and Prepares To Lose the $1 Billion Collateral

After Intel prepaid $1 billion, LOTC began acquiring shares steadily each day in the calculation period using an account with its broker-dealer and affiliate, Lehman Brothers Inc. ("LBI"). *See* Ex. K (LBHI/LOTC Dep. 55–56); ███████████████████████ Pursuant to the terms of the Confirmation, to which LBI was a signatory, LBI was to receive, deliver and safeguard any Intel shares acquired in connection with the transaction in compliance with SEC regulations. Ex. A (Confirmation § 3(c)). By September 18, LBI had acquired approximately 39.7 million shares—more than 75% of LOTC's ultimate delivery obligation. *See* Ex. I (Pls.' Interrog. Resps. No. 11); Compl. ¶ 21.

Following the bankruptcy of its parent, LBHI, on September 15, 2008, LOTC advised Intel that it was continuing to buy Intel shares under the contract, Ex. M (Jacob Dep. 58), and, in fact, LOTC continued to acquire shares through LBI for several days following LBHI's bankruptcy filing, Ex. I (Pls.' Interrog. Resps. No. 11); Compl. ¶ 21. (LOTC did not file for bankruptcy until October 3, 2008. *See* Compl. ¶ 12). Intel did not declare an early termination immediately upon LBHI's bankruptcy, and hoped that LOTC would deliver shares as LOTC had agreed. *See* Ex. R (Smith Dep. 69–70); Ex. N (Lusk Dep. 91); Ex. Y (9/16/08 e-mail from Intel CFO Smith, "[h]opefully they are buying like crazy").

During the week of September 15, the parties discussed an early delivery of the shares

LOTC had acquired to date. Ex. L (Hora Dep. 63–64). But LOTC informed Intel that it had lost

access to all shares in London, which accounted for approximately half of its Hedge Positions.

Ex. M (Jacob Dep. 49–50). LBI had rehypothecated approximately 15 million of its acquired

Intel shares to Lehman Brothers International (Europe) ("LBIE"), Lehman's European affiliate.

Ex. I (Pls.' Interrog. Resps. No. 13); Ex. K (LBHI/LOTC Dep. 56–58). Plaintiffs assert that the

shares were trapped when LBIE entered into bankruptcy administration in the United Kingdom

on September 15, 2008. *See* Ex. I (Pls.' Interrog. Resps. No. 13). Also according to plaintiffs,

by September 19, 2008, the remaining approximately 20 to 25 million shares in the U.S. became

inaccessible to LOTC when liquidation proceedings against LBI commenced. *Id.*; Ex. K

(LBHI/LOTC Dep. 71).

On September 18, ███████████████████████████████████████████

███████████████████████ LOTC told Intel that it was experiencing difficulty settling

the transaction and no longer would communicate with Intel about it. Ex. M (Jacob Dep. 49–50).

████████████████████████

█████████████████████████████████

███████████████████

## B.    LOTC Delivers Zero Shares on the Delivery Date

Following the close of markets on September 26, 2008, the last day of the calculation

period, Intel notified LOTC that it was required to deliver 50,552,943 shares by 4:30 p.m. on

Monday, September 29. *See* Ex. F (9/26/08 Intel Letter). Intel management directed staff to

monitor Intel's securities accounts for any share delivery. *See* Ex. AA (9/26/08 e-mail from

Assistant Treasurer Doug Lusk asking several Intel employees to "be on high alert about possible

delivery by Lehman of shares into our DTC account"). LOTC did not deliver any shares on

September 29. Compl. ¶ 37; Ex. G (9/29/08 Intel Letter, at 1).

### C.    Intel's Loss Determination

Following LOTC's failure to deliver shares by the required time on September 29, Intel

designated that day as the Early Termination Date. *See* Ex. G (9/29/08 Intel Letter, at 2). Intel

determined its Loss to be $1,001,966,256.00. *Id.* at 2, 4. Intel continued to seek shares from

LOTC, providing delivery instructions and demanding that any shares that had been acquired be

delivered in accordance with Section 5(d) of the Confirmation. *Id.* at 2.

Intel set forth its detailed Loss determination in an attachment to its September 29 letter.

*See id.* at 4. Intel's Loss consisted of: (i) $1 billion, which equaled the amount of its prepayment,

as well as the value of the shares to be delivered by LOTC, as measured by the Confirmation

(*i.e.*, the VWAP value), and (ii) $1,966,256, which equaled the interest that Intel had foregone on

its prepayment (as determined by reference to the interest earned on the cash collateral). *See id.*

Pursuant to Section 9.12 of the Equity Derivatives Definitions, Intel also certified

$1,001,966,256.00 as the amount of Intel's costs, losses, or expenses resulting from the failed

delivery and, without duplication, sought indemnification for that amount. *See id.* at 2.

### D.    Intel's Set-off Against the Collateral

LOTC delivered nothing—neither shares nor cash—in response to Intel's Early

Termination notice. The Credit Support Annex, therefore, entitled Intel to set off its Loss against

the collateral. Ex. D (CSA ¶ 8(a)(iii)); Compl. ¶ 24. On September 30, Intel notified LOTC that

it had exercised its right to set off its Loss against the full collateral held by Intel. Ex. H (9/30/08

Intel Letter). LOTC did not object, offer an alternative calculation, or otherwise respond to any

of Intel's letters.

## IV.    THE LAWSUIT

Plaintiffs filed this suit on May 1, 2013, and included claims for breach of contract, turnover, and a declaratory judgment that Intel had violated the Bankruptcy Code's automatic stay provisions. *See* Compl. ¶¶ 53–74. On Intel's motion, this Court dismissed the turnover and declaratory judgment claims for failure to state a claim and determined that the breach of contract claim is non-core. *See* Order (Jan. 13, 2014), Dkt. No. 31; Memorandum Decision, Dkt. No. 29.

In their Complaint, plaintiffs falsely allege that "LOTC has performed its obligations under the Swap Agreement," Compl. ¶ 55—in fact, LOTC delivered zero shares and defeated the purpose of the contract. Plaintiffs admit that Intel suffered a positive Loss because it prepaid $1 billion and received nothing in return. *See id.* ¶ 24. Plaintiffs allege, however, that Intel could not reasonably and in good faith have valued its Loss on September 29 as $1 billion, and that a reasonable and good faith Loss determination must have been $873 million or some lower amount. *Id.* ¶¶ 39–40.[4] Plaintiffs base this claim on "[t]he price of Intel common stock as of the close of markets on September 29, 2008," *id.* ¶ 39, despite the fact that under the contract shares were to be valued at the VWAP over the calculation period and, further, despite its concession that "Intel could not have purchased its shares" that day because it was in possession of material nonpublic information, *id.* ¶ 45. Strikingly, plaintiffs' Complaint omits any mention of Section 5(d) of the Confirmation, the parties' bespoke early termination provision.

---

[4] Plaintiffs have claimed alternatively that Intel owes $127 million, $227 million, or $312 million (plus interest). *See* Ex. J (Pls.' Initial Disclosures at 5–6) & Ex. I (Pls.' Interrog. Resps. No. 16). Thus, plaintiffs' own calculation of reasonable Loss determinations spans a range of nearly $200 million.

## SUMMARY JUDGMENT STANDARD

On its sole remaining claim for breach of contract, plaintiffs bear the burden of

demonstrating (1) the existence of a valid contract; (2) performance by LOTC; (3) breach by

Intel; and (4) damage to LOTC caused by the breach. *Barbara v. MarineMax, Inc.*, No. 12-CV-

0368, 2013 WL 4507068, at *7 (E.D.N.Y. Aug. 22, 2013) (applying New York contract law),

*aff'd*, 577 F. App'x 49 (2d Cir. 2014). To obtain summary judgment, Intel must make an initial

showing that there is no genuine issue of material fact on at least one of these elements such that

Intel is entitled to judgment as a matter of law. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322–

23 (1986). Once Intel has carried its initial burden, entry of summary judgment is required

unless plaintiffs "come forward with specific facts showing that there is a genuine issue for

trial." *Barbara*, 2013 WL 4507068, at *7 (internal quotation marks omitted).

## ARGUMENT

"Loss" is a general indemnification provision that entitled Intel as the non-defaulting

party to recover "its total losses and costs." Ex. B (ISDA Master § 14, at 15). The language is

all-encompassing—Intel was entitled to recover ***all*** of its losses and costs. And as the non-

defaulting party, Intel was entitled to determine ***its own*** losses and costs. In doing so, it "need

not" be guided "by reference to quotations of relevant rates or prices." *Id.* Intel's sole obligation

was to determine its total losses and costs "reasonably"[5] and "in good faith." *Id.*

---

[5] "Reasonable" is not the same as "commercially reasonable," although Intel's determination
easily satisfies either standard. Where commercial reasonableness is the test, the ISDA Master
Agreement expressly states as much. *See, e.g.*, Ex. B (ISDA Master § 14, at 16) (definition of
"Settlement Amount") (addressing where Market Quotation—not Loss—fails to produce a
"commercially reasonable result"). By contrast, the definition of Loss uses the term
"reasonable," which means "[f]air, proper, or moderate under the circumstances." Black's Law
Dictionary 1456 (10th ed. 2014).

Plaintiffs have the burden of demonstrating that Intel's Loss determination was

unreasonable or not in good faith.  Courts examining breach of contract claims under New York

law—including in ISDA contexts—have not hesitated to enter judgment in favor of the

defendant because of the plaintiff's failure to put forward facts supporting the plaintiff's claim

that the defendant's exercise of discretion was improper.  *See, e.g.*, *Barbara*, 2013 WL 4507068,

at *21 (plaintiffs failed to adduce any evidence of defendant's bad faith to substantiate breach of

contractual duty); *CDO Plus Master Fund Ltd. v. Wachovia Bank, N.A.*, No. 07 Civ. 11078, 2010

WL 3239416, at *4–5 (S.D.N.Y. Aug. 16, 2010) (plaintiff failed to proffer evidence that—as

contended—defendant had performed calculations unreasonably under ISDA agreement).[6]

Because plaintiffs in this case cannot demonstrate that Intel's Loss determination was

unreasonable or made in bad faith, the Court similarly should enter judgment in favor of Intel

here.

The undisputed material facts demonstrate that Intel acted reasonably and in good faith

when it determined that its "total losses and costs" equaled $1 billion plus interest.  Intel did not

inflate its losses or costs in any way.  It did not make an arbitrary or bad faith calculation.

Numerous, independent bases—any one of which would suffice—support the reasonableness of

Intel's determination.  First, under the contract, Intel was explicitly entitled to recover its "costs."

Having prepaid $1 billion (and having received nothing in return), it was reasonable for Intel to

determine that its "total losses and costs" included its prepayment.  Second, LOTC's default

deprived Intel of the right to receive approximately 50.5 million shares.  It was reasonable for

---

[6] *See generally Toledo Fund, LLC v. HSBC Bank USA*, No. 11 Civ. 7686, 2012 WL 2850997, at
*6, 8 (S.D.N.Y. July 9, 2012) (plaintiff "failed to raise a triable issue" that defendant's
methodology under ISDA agreement "was arbitrary or irrational," especially "[i]n light of the
amount of discretion ceded to [defendant]").

Intel to value that lost delivery in the same way the contract expressly valued delivered shares—

at their VWAP price, totaling $1 billion.  Third, Intel's determination matched exactly how Intel,

in accordance with GAAP, accounted for successful share repurchase transactions.  Fourth,

LOTC agreed at the outset that Intel's Exposure to an LOTC event of default equaled a fixed $1

billion.  Fifth, Intel's determination matches the result provided by the principle of restitution

when a party fails to make a required delivery after receiving a prepayment in full.  Sixth, LOTC

itself recognized, prior to initiating this litigation, that the result was reasonable.  Because there

can be no genuine dispute that Intel made a reasonable Loss determination in good faith, Intel is

entitled to entry of judgment as a matter of law.

### A.    Intel's Upfront Cost for Entering into This Transaction Was $1 Billion

Under Loss, Intel was entitled as the non-defaulting party to recover its "total losses and

costs" incurred "in connection with" the transaction.  Ex. B (ISDA Master § 14, at 15).  These

unambiguous terms should be afforded their ordinary meaning.  *See Seabury Constr. Corp. v.

Jeffrey Chain Corp.*, 289 F.3d 63, 68 (2d Cir. 2002).  "Total" means all losses and costs, without

limit.  *See* Black's Law Dictionary 1719 ("total" means "1. Whole; not divided; full; complete");

*see also Green v. Fund Asset Mgmt., L.P.*, 147 F. Supp. 2d 318, 329 (D.N.J. 2001) (holding that

meaning of "total" assets is "nose-face plain" and means "all" assets (emphasis omitted)), *aff'd*,

286 F.3d 682 (3d Cir. 2002).  Intel's total "costs" on the transaction include the $1 billion that it

paid out-of-pocket for shares that were never delivered.  *See* Black's Law Dictionary 422

(defining "cost" as "[t]he amount paid or charged for something; price or expenditure").  On the

flip side, because Intel received nothing from LOTC, its cash outlay and foregone interest are

"losses" that Intel sustained as a result of the LOTC event of default.  It was reasonable for Intel

to determine that its total losses and costs included its $1 billion prepayment, for which it

received nothing in return.

**B.      The "Agreed Value" of the Shares Due on Early Termination Was $1 Billion**

Independently, Intel's Loss determination was reasonable because it valued the

undelivered shares the same way the contract valued delivered shares. Section 5(d) of the

Confirmation speaks directly to how Intel shares were to be valued on "Early Termination." It

specifies that the Agreed Value of any shares delivered upon Early Termination is their VWAP

value over the calculation period. Ex. A (Confirmation § 5(d)). Plaintiffs agree that this value

was $19.7812 per share. Ex. I (Pls.' Interrog. Resps. No. 16). Thus, *the Agreed Value of the*

*approximately 50.5 million shares, had they been delivered upon the Early Termination Date*

*on September 29, was exactly $1 billion.* That Intel valued the shares owed to it using that very

same customized contract measure substantiates the reasonableness of its Loss determination.

At the outset, the parties agreed that upon Early Termination, Intel was still entitled to

delivery of all acquired shares (LOTC's "Hedge Positions"), and that those shares would be

valued the same as shares delivered in the ordinary course—at the VWAP. *See* Ex. A

(Confirmation § 5(d)). Section 5(d) of the Confirmation sets forth a two-step process. In step

one, upon declaring an Early Termination Date, Intel determines its Loss and formally notifies

LOTC of that amount. *Id.*; *see also* Ex. B (ISDA Master § 6(d)). In step two, LOTC "shall"

deliver to Intel any shares it has accumulated ("Hedge Positions"), which shall be valued at the

"Agreed Value" based on the VWAP—not spot prices:

> [O]n the date on which any Lehman Payment Amount is due, in
> lieu of any payment of such Lehman Payment Amount, Lehman
> shall (x) deliver to [Intel] a number of Shares . . . comprising
> Lehman's Hedge Positions in respect of the Transaction as of the
> relevant Early Termination Date . . . and (y) pay to [Intel] an
> amount in cash equal to any excess of the Lehman Payment
> Amount over the aggregate Agreed Value of such Shares . . . so
> delivered. . . . "**Agreed Value**" means a price per share equal to
> the Forward Price (calculated based upon the Calculation Period
> ending on the relevant Early Termination Date) minus the Forward
> Price Adjustment Amount.

19

Ex. A (Confirmation § 5(d)); *see id.* § 1 (defining "Forward Price" with reference to the

"arithmetic average of the 10b-18 VWAP [during] the Calculation Period"). As this customized

section provides, to the extent the delivery of the accumulated shares did not fully satisfy Intel's

Loss, LOTC was required to pay the difference in cash. In short, the formula was: [Intel's Loss]

– [Agreed Value of shares acquired (and thus required to be delivered)] = [cash (if any) owing to

Intel]. Consistent with this provision, when making its Loss determination, Intel valued the

shares LOTC was required to (but did not) deliver in the same way it would have valued the

same shares had LOTC in fact delivered them. That was a reasonable approach for Intel to take

in light of this customized provision for valuing share delivery.

### C.    The Value to Intel of the Undelivered Shares Was $1 Billion

In its Loss determination, Intel valued the transaction the same way it customarily valued

its successful share repurchases: in accordance with GAAP. Under FAS 133, Intel reduces

shareholders' equity on its balance sheet by the actual price it pays for repurchased shares—not

the spot price of the shares on the delivery date. *See* Ex. S (Stevens Dep. 134). This makes

sense, because Intel does not realize gains or losses on shares it reacquires and retires. Intel

prepaid $1 billion and would have reduced shareholders' equity on its balance sheet by that

amount had LOTC met its delivery obligation. Thus, the value of the transaction to Intel was $1

billion.

LOTC knew that Intel planned to account for its share repurchases using FAS 133. *See*

Ex. S (Stevens Dep. 70). Indeed, in structuring this transaction, LOTC worked with Intel to

include features designed to ensure it qualified for equity accounting. *Id.* at 70–72. Thus, at the

outset, Intel made clear that, irrespective of subsequent stock price movements, this transaction

was worth $1 billion to it based on the contractual objective of achieving equity accounting

treatment.  Plaintiffs have no explanation, much less evidence, for how a Loss determination that derives from the very structure and purpose of the contract can be unreasonable or not in good faith.  *See generally VCG Special Opportunities Master Fund Ltd. v. Citibank, N.A.*, 594 F. Supp. 2d 334, 344 (S.D.N.Y. 2008) (in case involving ISDA swap transaction, dismissing breach of implied covenant of good faith and fair dealing claim because "[plaintiff] does not adduce specific facts of arbitrary or irrational conduct relating to [defendant's] position as Calculation Agent"), *aff'd*, 355 F. App'x 507 (2d Cir. 2009).

### D.    Intel's Exposure Was Fixed at $1 Billion

The parties' agreement to fix Intel's "Exposure" at $1 billion until and unless LOTC delivered shares, provides additional undisputed evidence of the reasonableness of Intel's Loss determination.  At the outset of the transaction, LOTC posted $1 billion in collateral.  The parties agreed to denominate this fixed amount as Intel's "Exposure," Ex. A (Confirmation § 6(d)), setting $1 billion as the value of the obligations owed to Intel upon early termination.[7]  The parties' agreement to fix Intel's Exposure at $1 billion reflects the understanding that the value of the deliverable to Intel was $1 billion regardless of fluctuations in the spot value of Intel stock.

The Exposure provision in the parties' contract uses the VWAP rather than spot prices as the basis for reducing Intel's exposure to a LOTC default.  LOTC had the right to make an "Early Share Delivery," Ex. A (Confirmation § 1), and, upon such a delivery, Intel's Exposure would be reduced as follows:

---

[7] Under the 1994 standard form ISDA Credit Support Annex ("CSA"), "Exposure" measures, "for any Valuation Date or other date for which Exposure is calculated . . . , the amount, if any, that would be payable to a party that is the Secured Party by the other party . . . or by a party that is the Secured Party to the other party . . . as if [the transaction was] being terminated."  Ex. D (CSA ¶ 12, at 8).

> "Secured Party's Exposure" means USD 1 billion, (a) reduced on the Early Delivery Date by an amount equal to (i) the Forward Price that would be determined as if the [prior day] were the Termination Date *minus* the Forward Price Adjustment Amount *multiplied* by (ii) the number of Shares delivered on such date and (b) reduced to zero on the Settlement Date upon the delivery by [LOTC] to [Intel] of the Final Delivery Amount . . . .

Ex. A (Confirmation § 6(d)(C)); *see id.* § 1 (defining "Forward Price" with reference to the "arithmetic average of the 10b-18 VWAP [during] the Calculation Period"). Reducing Intel's Exposure following an Early Delivery makes sense. Of particular note is ***how*** the parties agreed to make that reduction. They agreed that Intel's Exposure would be reduced by the ***VWAP value*** of any early delivered shares. Because there was no Early Delivery here, Intel's Exposure remained the full $1 billion at all times.

The Agreed Value and Exposure/collateral provisions are symmetrical—they reveal an intention to value both delivered shares (Agreed Value) and performance outstanding (Exposure) based on the VWAP. It was reasonable for Intel to value the deliverable owed upon termination using the same VWAP measurement the parties agreed to use throughout the contract period via their Exposure provision.

### E.    Intel's Restitution Interest Was $1 Billion

The equitable principle of restitution also supports the reasonableness of Intel's Loss determination. Intel prepaid $1 billion, and LOTC delivered nothing at all. Under New York law, "[i]t is well settled that if the plaintiff has made money payments to the defendant, and there is a failure of consideration whereby defendant materially breaches the contract, the plaintiff can maintain an action for restitution of the money so paid to the defendant, with interest." *Men's Sportswear, Inc. v. Sasson Jeans, Inc. (In re Men's Sportswear, Inc.)*, 834 F.2d 1134, 1141 (2d Cir. 1987). Indeed, it would be "incredible" for LOTC to expect to hold onto any portion of the $1 billion that it received as payment for shares that it "freely concedes were never delivered."

22

*Tech. Express, Inc. v. FTF Bus. Sys. Corp.*, No. 99 Civ. 11692, 2000 WL 1877020, at *5 (S.D.N.Y. Dec. 26, 2000).

It is important to keep in mind that this was not a run-of-the-mill swap transaction. This was a share repurchase transaction that was to be settled by physical delivery. Intel prepaid its entire obligation and was contractually entitled to receive the shares so it could retire them. It is the combination of these elements that makes the principle of restitution particularly appropriate. Physical settlement was essential for Intel to retire the shares. When LOTC failed to deliver any shares, Intel reasonably and in good faith determined that it was entitled to recover its full prepayment plus interest.

**F.** 

This lawsuit was manufactured long after the fact by persons who had nothing to do with this contract, and felt free to disregard its basic nature and purpose.

### G.    Intel's Costs, Losses, or Expenses under Section 9.12 of the Equity Derivatives Definitions Were $1 Billion

Intel's set off against the collateral also was proper under the 2002 ISDA Equity

Derivatives Definitions, which were incorporated into the contract.[8]  Under Section 9.12 of the

Equity Definitions, LOTC agreed to indemnify Intel for a "Failure to Deliver" the shares:

> If, in respect of any obligation to deliver Shares under a
> Transaction, prior to the occurrence or effective designation of an
> Early Termination Date in respect of that Transaction, a party fails
> to perform any obligation required to be settled by delivery, it will
> indemnify the other party on demand for any costs, losses or
> expenses (including the costs of borrowing the relevant Shares, if
> applicable) resulting from such failure.  A certificate signed by the
> deliveree setting out such costs, losses or expenses in reasonable
> detail will be conclusive evidence that they have been incurred.
> Notwithstanding the foregoing, unless the parties otherwise agree
> to the contrary expressly and in writing in the related
> Confirmation, a party shall not be responsible for any special,
> indirect or consequential damages, even if informed of the
> possibility thereof.

Ex. E (Equity Definitions § 9.12).  Thus, Section 9.12 required LOTC to indemnify Intel for

"any costs, losses or expenses" resulting from LOTC's failure to deliver shares.  The section

provides that the failure to deliver must predate the designation of the Early Termination Date, as

it plainly did here.  In its letter to LOTC dated September 29, 2008, Intel certified that the

amount it had calculated as its Loss "also constitutes the amount of Intel's 'costs, losses or

expenses' resulting from the Failed Delivery for purposes of Section 9.12 of the Equity

Definitions."  Ex. G (9/29/08 Letter, at 2).

Intel's certification constituted "conclusive evidence" of the amount owed by LOTC.  Ex.

E (Equity Definitions § 9.12); *see* Black's Law Dictionary 674 (defining "conclusive evidence"

---

[8] The Equity Definitions are incorporated by reference into the Confirmation.  *See* Ex. A
(Confirmation at 1).  For unexplained reasons, plaintiffs attached to the Complaint all documents
incorporated by reference to the contract except this one.  Compl. ¶ 15.

as "1. Evidence so strong as to overbear any other evidence to the contrary.—Also termed

*conclusive proof*." and "2. Evidence that so preponderates as to oblige a fact-finder to come to a

certain conclusion."); *Amalgamated Hous. Corp. v. Kelly*, 82 N.Y.S.2d 577, 579–80 (Sup. Ct.

1948) ("conclusive evidence" is "that which is incontrovertible, or that from which only one

reasonable conclusion can be drawn, taking all of the facts and circumstances into

consideration").  Thus, independent of the Loss provision, LOTC owed Intel $1 billion plus

interest pursuant to Intel's certification of its losses, costs, or expenses under Section 9.12.

## CONCLUSION

Plaintiffs' *post hoc* claim ignores both the undisputed material facts and the unambiguous

language of the contract.  Intel prepaid in full and received nothing in return; LOTC's complete

non-performance defeated Intel's objective of repurchasing, physically acquiring, and retiring its

shares.  For all the reasons provided herein, Intel reasonably measured its total losses and costs to

reflect its $1 billion prepaid costs, the $1 billion Agreed Value of the shares LOTC did, or was

supposed to, purchase but did not deliver, the $1 billion book value of the transaction to Intel, the

$1 billion fixed exposure agreed to by the parties, and Intel's $1 billion restitution interest.

Because plaintiffs have no evidence to support their burden of showing that Intel's Loss

determination was unreasonable or made in bad faith, the Court should grant summary judgment

to Intel.

Dated: January 20, 2015[9]

By:    /s/ John J. Buckley, Jr.
       John J. Buckley, Jr. (admitted *pro hac vice*)
       Daniel F. Katz (admitted *pro hac vice*)
       Edward C. Barnidge (admitted *pro hac vice*)
       WILLIAMS & CONNOLLY LLP
       725 Twelfth Street, N.W.
       Washington, DC 20005
       Tel: (202) 434-5000
       Fax: (202) 434-5029

       Craig T. Goldblatt (admitted *pro hac vice*)
       Isley M. Gostin
       WILMER CUTLER PICKERING
       HALE & DORR LLP
       1875 Pennsylvania Avenue, N.W.
       Washington, DC 20006
       Tel: (202) 663-6000
       Fax: (202) 663-6363

       *Attorneys for Defendant Intel Corporation*

---

[9] Re-filed as revised on February 17, 2015, per the Court's order.  *See* Dkt. No. 69.