John J. Buckley, Jr.
Daniel F. Katz
Edward C. Barnidge
WILLIAMS & CONNOLLY LLP
725 Twelfth Street, N.W.
Washington, DC 20005
Tel: (202) 434-5000
Fax: (202) 434-5029

Craig T. Goldblatt
Isley M. Gostin
WILMER CUTLER PICKERING
HALE & DORR LLP
1875 Pennsylvania Avenue, N.W.
Washington, DC 20006
Tel: (202) 663-6000
Fax: (202) 663-6363

*Attorneys for Defendant Intel Corporation*

**UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re:<br>LEHMAN BROTHERS HOLDINGS INC., *et al.*,<br>Debtors. | Chapter 11<br>Case No. 08-13555 (SCC)<br>(Jointly Administered) |
| LEHMAN BROTHERS HOLDINGS INC. and<br>LEHMAN BROTHERS OTC DERIVATIVES INC.,<br>Plaintiffs,<br>v.<br>INTEL CORPORATION,<br>Defendant. | Adv. Proc. No. 13-01340 (SCC) |

**DEFENDANT INTEL CORPORATION'S MEMORANDUM OF LAW
IN OPPOSITION TO PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT**

# TABLE OF CONTENTS

TABLE OF CONTENTS ................................................................................................ i

TABLE OF AUTHORITIES ........................................................................................ iii

INTRODUCTION ......................................................................................................... 1

ARGUMENT ................................................................................................................. 3

I.    PLAINTIFFS' ONE-SIZE-FITS-ALL ARGUMENT IS CONTRARY TO THE
      LANGUAGE AND STRUCTURE OF THE ISDA MASTER ........................... 3

      A.    Plaintiffs' Theory Fails under Basic Contract Interpretation Principles ........ 4

            1.    Plaintiffs' Theory Is Inconsistent with the Plain Language of Loss ........... 4

            2.    Plaintiffs' Theory Is Inconsistent with the ISDA Drafting History ........... 8

      B.    Plaintiffs' Theory Has Been Rejected by ISDA ....................................... 10

      C.    The Dicta in the English Cases Cited by Plaintiffs Provides No Support ............ 13

II.   PLAINTIFFS IGNORE THE UNIQUE FEATURES OF THIS "VWAP PREPAID
      SHARE FORWARD" CONTRACT ....................................................................... 15

      A.    Plaintiffs Acknowledge that the Contract Called for Physical Delivery—But
            Ignore the Significance of that Fact ........................................................ 16

      B.    Intel's Approach to Loss Is Consistent with the Parties' Express Termination
            Provision, and Plaintiffs' Approach Is Not ............................................. 17

            1.    Section 5(d) of the Confirmation Applied Here ....................................... 17

            2.    Plaintiffs' Approach to Loss Would Not Make Intel Whole, Creates a
                  Moral Hazard, and Produces Internally Inconsistent Results ................... 18

            3.    Intel's Approach Produces Results Consistent with the Objective of the
                  Contract ........................................................................................... 20

      C.    Plaintiffs Ignore How the Credit Support Provision—Including Intel's Fixed
            Exposure of $1 Billion—Further Supports Intel's Loss Determination ............... 21

      D.    Plaintiffs Ignore that the Transaction Was Structured To Ensure that Intel Could
            Value Shares at Their Acquisition Cost, Not at the Spot Price ........................... 22

III.  NEW YORK LAW DOES NOT LIMIT INTEL'S RECOVERY TO THE SPOT
      MARKET VALUE OF THE SHARES ..................................................................... 22

A.      Loss Does Not Limit the Non-defaulting Party to the Methodologies for
        Calculating Breach of Contract Damages under New York Law ......................... 22

B.      Under New York Law, Intel Was Entitled to Restitution in the Precise Amount of
        Its Loss Determination ........................................................................................ 23

CONCLUSION ................................................................................................................. 26

## TABLE OF AUTHORITIES

### FEDERAL CASES

*360Networks Corp. v. Geltzer (In re Asia Global Crossing, Ltd.)*, 404 B.R. 335
    (S.D.N.Y. 2009) ...................................................................................................24, 25

*Allied Semi-Conductors Int'l, Ltd. v. Pulsar Components Int'l, Inc.*, 907 F. Supp.
    618 (E.D.N.Y. 1995) ..........................................................................................24

*Bache & Co. v. Int'l Controls Corp.*, 339 F. Supp. 341 (S.D.N.Y. 1972),
    *aff'd*, 469 F.2d 696 (2d Cir. 1972) ....................................................................24

*Galli v. Metz*, 973 F.2d 145 (2d Cir. 1992) ............................................................8

*Innovative BioDefense, Inc. v. VSP Techs., Inc.*, No. 12 Civ. 3710, 2013 WL
    3389008 (S.D.N.Y. July 3, 2013) .......................................................................6

*Lockheed Martin Corp. v. Retail Holdings, N.V.*, 639 F.3d 63 (2d Cir. 2011) ............................15

*Men's Sportswear, Inc. v. Sasson Jeans, Inc. (In re Men's Sportswear, Inc.)*,
    834 F.2d 1134 (2d Cir. 1987) .............................................................................23

*Tech. Express, Inc. v. FTF Bus. Sys. Corp.*, No. 99 Civ. 11692, 2000 U.S. Dist.
    LEXIS 18518 (S.D.N.Y. Dec. 26, 2000) ...........................................................24

*Waxman v. Envipco Pick Up & Processing Servs., Inc.*, No. 02 Civ. 10132, 2006
    U.S. Dist. LEXIS 3883 (S.D.N.Y. Jan. 31, 2006) .............................................25

### STATE CASES

*McManus v. McManus (In re Estate of McManus)*, 440 N.Y.S.2d 954 (2d Dep't
    1981), *aff'd*, 432 N.E.2d 601 (N.Y. 1982) ........................................................24

*Rudman v. Cowles Commc'ns., Inc.*, 30 N.Y.2d 1 (1972) ............................................24

*Sterling Investor Servs., Inc. v. 1155 Nobo Assocs., LLC*, 818 N.Y.S.2d 513 (2d
    Dep't 2006) ..........................................................................................................6

*Vt. Teddy Bear Co. v. 538 Madison Realty Co.*, 1 N.Y.3d 470 (2004) .........................................6

### OTHER AUTHORITIES

*Anthracite Rated Investments (Jersey) Ltd. v. Lehman Bros. Finance S.A.*, [2011]
    EWHC 1822 (Ch) .....................................................................................13, 14, 15

*Britannia Bulk plc (in liquidation) v. Pioneer Navigation Ltd.*, [2011] EWHC 692
    (Comm) ....................................................................................................13, 14

1 Dan B. Dobbs, *Law of Remedies, Damages—Equity—Restitution* § 4.1 (1)
(2d ed. 1993) ...................................................................................................................24

New York Uniform Commercial Code § 2-711. ........................................................................24

## INTRODUCTION

Intel prepaid $1 billion for LOTC to acquire and physically deliver shares of Intel common stock so that Intel could retire those shares, reduce shareholders' equity by the amount of its $1 billion prepayment, and benefit its remaining shareholders. Intel used LOTC to acquire the shares because, as plaintiffs knew and concede in their complaint, securities laws constrained Intel's ability to buy shares directly during its quiet period. In return for Intel's $1 billion prepayment, however, LOTC delivered nothing, neither shares nor cash.

In their contract, the parties elected Loss as the payment measure if an event of default and early termination were to occur. Loss is an indemnification provision that affords considerable flexibility to the non-defaulting party in determining "its total losses and costs," subject to its acting reasonably and in good faith. Loss does not require the non-defaulting party to apply any particular methodology in determining the amount of its Loss. Against this background, Intel reasonably determined in good faith that its Loss was $1 billion (plus interest), which was equal to the amount of its prepayment, the amount by which it had debited its cash balance, the Agreed Value (*i.e.*, the volume weighted average price or "VWAP") of the shares required to be delivered to it to satisfy its Loss, the book value of the transaction to Intel, Intel's fixed Exposure as agreed to by the parties, and the amount to which Intel was entitled to recover under restitution principles in light of LOTC's total breach.

Plaintiffs' motion for summary judgment ("Pls. Opening Br.," Dkt. No. 58) ignores both the objective of this customized share repurchase transaction and the plain language and intent of Loss. In essence, plaintiffs ask the Court to rewrite the contract by inserting a separate defined term, Unpaid Amounts, into the definition of Loss (where it does not appear) and to hold that Intel was required to use the "fair market value" of the undelivered shares as the sole basis for determining its Loss. Plaintiffs do so notwithstanding that, given Intel's plan to retire the shares,

1

the fair market value of the lost shares on the delivery date was irrelevant to Intel, which did not

stand to realize any gain or loss based on such fair market value.  Nor would cash in the amount

of the fair market value of the undelivered shares fully compensate Intel for its actual "total

losses and costs," as required by Loss.  By valuing the missing 50.5 million shares according to

their spot-market price on the early termination date, plaintiffs seek to reduce Intel's true costs

and losses of $1 billion to only $873 million, allowing plaintiffs to reap a windfall of more than

$127 million despite their complete non-performance.  This, in a transaction where, had LOTC

fully performed and delivered all of the shares, it expected to earn a profit of only $3 million, and

where the spot price of the shares at market close on the delivery date would have been irrelevant

to LOTC as well, representing neither a gain nor a loss irrespective of the price level.

Plaintiffs' position is contrary to the plain language of the contract.  The 1992 ISDA

Master offered parties the choice between two alternative payment measures for determining

close-out amounts:  Market Quotation, which incorporates Unpaid Amounts as part of the

termination payment mechanism, and Loss, which does not.  The parties chose Loss, which does

not require the non-defaulting party to use any particular methodology and instead allows it

flexibility in measuring "its total losses and costs."  The drafting history of the 1992 ISDA

Master shows that Loss was added as a primary payment measure at that time precisely because

it provided for greater flexibility; plaintiffs' position that Loss rigidly and mechanistically

required fair market valuation of all missing past-due deliverables would defeat that fundamental

objective.  In addition, to adopt plaintiffs' position would create a moral hazard because it would

incentivize LOTC to disregard its obligations whenever the spot price was lower than the VWAP

value on the settlement date and to seek to pocket windfall profits.  Neither off-point dicta from

English cases nor misleading, out-of-context snippets from ISDA materials can justify

2

disregarding the plain language of Loss that expressly grants wide discretion to the

non-defaulting party.  Indeed, ISDA itself has filed an amicus brief in this case rejecting

plaintiffs' position, *see* ISDA Amicus Br., Dkt. No. 57-1.

By contrast, Intel's position is consistent with the $1 billion it prepaid, the $1 billion

VWAP value of the shares it was owed, its $1 billion Exposure as agreed by the parties, the $1

billion reduction in shareholders' equity that was to result after the shares were physically

delivered and retired, and the $1 billion recovery supported by restitution principles.  Because

plaintiffs cannot show that Intel's Loss determination was unreasonable as a matter of law, the

Court should deny plaintiffs' motion for summary judgment.[1]

## ARGUMENT

### I.    PLAINTIFFS' ONE-SIZE-FITS-ALL ARGUMENT IS CONTRARY TO THE LANGUAGE AND STRUCTURE OF THE ISDA MASTER

When Loss is selected, the close-out payment due to the non-defaulting party is equal to

its Loss.  Ex. B (1992 ISDA Master § 6(e)(i)(2), (4)).[2]   Loss is an indemnification provision.  By

definition, Loss allows the non-defaulting party reasonably to determine in good faith "its total

losses and costs."  *Id.* § 14, at 15.  Having established the broad standard for measuring losses

and costs, the definition of Loss then goes on to list types of losses and costs that it "includ[es],"

referring, *inter alia*, to "any loss of bargain, cost of funding" and other items.  *Id.*  It then states

that Loss also "***includes losses and costs (or gains) in respect of any payment or delivery***

---

[1] In its own moving papers, Intel has set out in full why its Loss determination was reasonable and why therefore the Court should grant it summary judgment.  *See* Intel Opening Br., Dkt. No. 71-1.  Those same reasons also preclude entry of summary judgment for plaintiffs.

[2] Lettered exhibits A through AA are to the Revised Declaration of Edward C. Barnidge filed as amended on February 17, 2015, Dkt. No. 73; lettered exhibits CC through EE are to the Supplemental Declaration of Edward C. Barnidge filed herewith.  All numbered exhibits are to the Declaration of Mahesh Venkatakrishnan, Dkt. No. 63.

*required to have been made . . . on or before the relevant Early Termination Date and not*

*made,*" *id.* (emphasis added).  For convenience, this type of backward-looking loss or cost will

be referred to as a "past-due deliverable."

Focusing only on the sentence highlighted above, plaintiffs note that the same concept of

past-due deliverables is also the subject of another defined term, Unpaid Amounts, which—using

different words—similarly addresses "amounts that became payable . . . and which remain

unpaid as at such Early Termination Date."  Ex. B (1992 ISDA Master § 14, at 17–18).  Such

Unpaid Amounts are defined to mean "an amount equal to the fair market value of that which

was . . . required to be delivered," *id.*  Plaintiffs leap to the conclusion that, because the same

general concept of past-due deliverables is addressed in both Loss and Unpaid Amounts, the

"fair market value" methodology of Unpaid Amounts must be imported into Loss as the

exclusive and required means for measuring losses and costs in respect of past-due deliverables.

In a nutshell, plaintiffs argue that Unpaid Amounts trumps the definition of Loss and that Loss in

effect must be amended via judicial interpretation to require the use of spot-market prices

whenever past-due deliverables are an element of the non-defaulting party's total losses and

costs.  Consequently, they also argue that the flexibility and broad discretion that are the

hallmarks of Loss must be jettisoned so that plaintiffs can keep $127 million of Intel's money for

doing nothing and Intel can be put in a worse position than it would have occupied had LOTC

performed.

For the reasons set forth below, plaintiffs' position should be rejected.

**A.**   **Plaintiffs' Theory Fails under Basic Contract Interpretation Principles**

**1.**   **Plaintiffs' Theory Is Inconsistent with the Plain Language of Loss**

By its terms, Loss affords flexibility to the non-defaulting party, empowering it to

determine "its total losses and costs" in any reasonable, good faith manner.  Ex. B (1992 ISDA

Master § 14, at 15).  It does not specify or require the use of any particular methodology for valuing or measuring losses and costs.  Most importantly, Loss does not refer to the defined term Unpaid Amounts, or even generally use the words "unpaid amounts," either in the section where Loss is defined (§ 14) or in the section where Loss is applied to determine close-out payments (§ 6(e)(ii)(4)) (Second Method and Loss).  Likewise, Loss nowhere refers to "fair market value" or requires that any losses and costs in respect of past-due deliverables be measured on a "fair market value" basis or by reference to spot-market prices.

Section 6(e) of the 1992 ISDA Master sets out the steps to be followed under either Market Quotation or Loss for determining close-out payments after early termination of a transaction.  Where Loss has been elected, Section 6(e) provides only that the close-out payment equals the non-defaulting party's Loss.  Ex. B (1992 ISDA Master § 6(e)(i)(2), (4)).  Unpaid Amounts are nowhere mentioned in Loss and are not part of the Loss determination.

On the other hand, Unpaid Amounts is a term that applies specifically and exclusively to the calculation of close-out payments under Market Quotation.  Where the parties elect Market Quotation, the close-out payment consists of the sum of

> (1) the "Settlement Amount"—*i.e.*, the sum of Market Quotations,[3] to account for the value of future delivery obligations; plus
>
> (2) any "Unpaid Amounts," to account for past (and not made) deliverables, based on their fair market value.

*Id.* § 6(e)(i)(1), (3).

Inserting "Unpaid Amounts" in the definition of Loss would violate basic principles of contract interpretation.  The parties knew how to incorporate Unpaid Amounts into the close-out

---

[3] If a Market Quotation cannot be obtained for the transaction, or if it would not produce a commercially reasonable result, Loss is used as a fallback with respect to the future delivery obligations.  *See* Ex. B (1992 ISDA Master §14, at 16 (Settlement Amount, subparagraph (b)).

payment provisions, and where they intended that result, they did so expressly, by using the defined term Unpaid Amounts.  It defies common sense to contend that the parties, having carefully defined and expressly used the term Unpaid Amounts only in relation to Market Quotation, would simultaneously have intended to incorporate and exclusively adopt that methodology for Loss despite omitting that term from both the definition of Loss and the termination payment provisions based on Loss.  "Under accepted canons of contract construction, when certain language is omitted from a provision but placed in other provisions, it must be assumed that the omission was intentional."  *Innovative BioDefense, Inc. v. VSP Techs., Inc.*, No. 12 Civ. 3710, 2013 WL 3389008, at *5 (S.D.N.Y. July 3, 2013) (quoting *Sterling Investor Servs., Inc. v. 1155 Nobo Assocs., LLC*, 818 N.Y.S.2d 513, 516 (2d Dep't 2006)).  "[C]ourts should be extremely reluctant to interpret an agreement as impliedly stating something which the parties have neglected to specifically include . . . .  [C]ourts may not by construction add or excise terms, nor distort the meaning of those used and thereby make a new contract for the parties under the guise of interpreting the writing."  *Vt. Teddy Bear Co. v. 538 Madison Realty Co.*, 1 N.Y.3d 470, 475 (2004) (internal quotation marks omitted).

Plaintiffs contend that in valuing a past-due deliverable, Loss and Market Quotation should employ the same procedure (and thus necessarily yield the same result), because allegedly both measures "are designed to arrive at a close-out that preserves the economic equivalent of any payment or delivery that was to be made if the agreement had not been terminated early."  Pls. Opening Br. at 14; *see also id.* at 3.  But the "economic equivalent" language that plaintiffs misleadingly paraphrase appears in the definition of Market Quotation, not Loss.  Ex. B (1992 ISDA Master § 14, at 15).  The present case does not involve any Market Quotation

6

calculations.[4]  Loss nowhere requires that the non-defaulting party make its determination
(whether for past or future obligations) by reference to "the economic equivalent" of anything in
particular.  *See id.*[5]  Indeed, Loss expressly states that "[a] party may (but need not) determine its
Loss by reference to quotations of relevant rates or prices from one or more leading dealers in
the relevant markets."  *Id.*  Thus, Loss is not tied to any requirement to use market prices and
expressly states that the non-defaulting party does not have to use market prices.

Nor is there any basis for concluding as to the past-due deliverable at issue here that Loss
and Unpaid Amounts (applied via Market Quotation) must produce the same result, or even
broadly the same result.  Loss is a general indemnification provision; Market Quotation is not.
Loss allows flexibility, subject only to reasonableness and good faith; Market Quotation does not
permit such flexibility but requires adherence to a set of rigid procedures.  Market Quotation and
its companion Unpaid Amounts look to market-price determinations; Loss has no such
constraints.  Contrary to plaintiffs' position, nothing in Loss (or elsewhere in the 1992 ISDA

---

[4] It bears emphasis that Intel was not required to measure "its total losses and costs" by reference
to the value of the past-due deliverable.  Loss refers broadly to "total losses and costs . . . in
connection with this Agreement or that Terminated Transaction," *id.*  Although the value of the
past-due deliverable is an element of such "losses and costs," so too is Intel's $1 billion
prepayment, which plainly qualifies as both a loss and a cost.  *See infra* Section III.  It was
therefore reasonable for Intel independently to measure its Loss based on its $1 billion
prepayment.  In this case, however, the result is the same irrespective of which view is chosen:
Intel's Loss determination of $1 billion plus interest is reasonable from either perspective.

[5] The core proposition of plaintiffs' argument is that "under any reasonable view and as a matter
of law," Intel's Loss can ***only*** have been $873 million.  Pls. Opening Br. at 3.  But plaintiffs only
recently have adopted the position that Loss permits only one reasonable determination.  *See*
Ex. J (Pls. Initial Disclosures at 6) ("Intel's 'Loss' . . . was approximately $873 million," or, as
"[a]n alternative calculation," was "approximately $688 million."); Ex. I (Pls. Second Interrog.
Resps. No. 16, at 10–12) (identifying $773 million and $686 million as possible valuations of
LOTC's delivery obligation).  The acknowledgment that legitimate Loss determinations could
span a nearly $200 million range undermines plaintiffs' current contention that there was only
one valid Loss determination Intel could have made, and that Intel acted unreasonably by
determining its Loss to be ***any*** other number.

7

Master) suggests that Loss determinations are to be "cross checked" against Market Quotation as a test of reasonableness or that, if the results vary, Market Quotation is to be substituted for Loss. Indeed, such a scheme would defeat the whole purpose of allowing the parties to elect between Loss and Market Quotation in the first place.  If Loss were required to produce the same result as Market Quotation in every case involving past-due deliverables, then Loss would be rendered mere surplusage.  It is a fundamental tenet of contract interpretation that each provision of a contract should be given meaning.  *Galli v. Metz*, 973 F.2d 145, 149 (2d Cir. 1992).  Plaintiffs' contention would rob Loss of its plain meaning.

### 2.        Plaintiffs' Theory Is Inconsistent with the ISDA Drafting History

Plaintiffs' proposed insertion of the term Unpaid Amounts into the definition of Loss is also inconsistent with the drafting history of the ISDA Master.  The 1992 ISDA Master evolved from a prior version, the 1987 ISDA Interest Rate and Currency Exchange Agreement.  *See* Ex. CC (the "1987 ISDA Master").  The 1987 ISDA Master did not afford parties a choice with respect to early termination close-out:  in all circumstances, the close-out payment was to be the sum of (1) the "Settlement Amount" with respect to forward-looking obligations (presumptively equal to the Market Quotations obtained) and (2) "Unpaid Amounts" with respect to past-due deliverables.  Ex. CC (1987 ISDA Master §§ 6(e)(i)(1); 14, at 13).  Loss existed only as a fallback where a Market Quotation was not, or could not be, determined.  *Id.* at § 14, at 13 ("Settlement Amount," subparagraph (b)).  Because it came into play only in lieu of Market Quotation (if necessary), Loss thus applied to forward-looking obligations only; past-due deliverables were always determined as Unpaid Amounts.  *See id.* § 6(e)(i)(1).

The 1992 ISDA Master invited parties for the first time to elect at the outset between two different payment measures:  either Market Quotation (determined as the sum of "Settlement Amount" and "Unpaid Amounts," just as before), or Loss, now offered as a stand-alone primary

8

option.  *Compare* Ex. B (1992 ISDA Master § 6(e)), *with* Ex. CC (1987 ISDA Master § 6(e)).

Where parties elected Market Quotation, early termination operated essentially as before,

including Loss as a fallback mechanism as to forward-looking obligations where a Market

Quotation could not be determined or did not produce a commercially reasonable result.  Ex. B

(1992 ISDA Master §§ 6(e)(i)(1), (3), 14, at 15–16).  Where the parties selected Loss as the

primary payment measure, however, that term for the first time had both prospective and

retrospective application.  The non-defaulting party was to determine "its total losses and costs"

reasonably and in good faith (those being the only limitations) to encompass both

forward-looking obligations and past-due deliverables.  *Id.* § 6(e)(i)(2), (4).

　　　　To clarify that Loss could now be applied to past-due deliverables, the 1992 ISDA

Master added a new second sentence to the definition of Loss stating that "Loss includes losses

and costs (or gains) in respect of any payment or delivery required to have been made . . . on or

before the relevant Early Termination Date and not made," Ex. B (1992 ISDA Master § 14, at

15).[6]  That new sentence confirms (as of 1992) the expanded application of Loss to cover

retrospective as well as prospective losses.  Nothing in that sentence, however, imposes a

methodology—let alone a rigid one—for determining the amount of such retrospective losses.

Rather, the first sentence of the definition of Loss continues to govern ***how*** Loss is determined:

the "total losses and costs" are to be determined "reasonably" and "in good faith."

---

[6] Where Market Quotation is the chosen payment measure and Loss is implicated only because
Market Quotation either cannot be determined or produces a commercially unreasonable result,
the second sentence of Loss notes that Loss should ***not*** include past-due deliverables because
those are to be treated as Unpaid Amounts pursuant to Sections 6(e)(i)(1) and (3) of the 1992
ISDA Master.  By contrast, where as here Loss is the chosen payment measure, the past-due
deliverables ***are*** to be included under Loss, not Unpaid Amounts.

Had ISDA intended that backward-looking Loss determinations must be made on the basis of fair market value, it easily could have said so, whether by using those words or by inserting the term Unpaid Amounts.  But ISDA did not do so; to the contrary, it specifically added language that expressly authorizes a Loss determination to be made *without* reference to market quotations.  *Compare* Ex. B (1992 ISDA Master § 14, at 15) (definition of Loss, last sentence), *with* Ex. CC (1987 ISDA Master § 14, at 12) (prior definition of Loss).  Alternatively, ISDA could have incorporated the term Unpaid Amounts into Sections 6(e)(i)(2) and (4) (which outline the specific close-out procedures to be followed on early termination under Loss), paralleling the procedure under Sections 6(e)(i)(1) and (3), where Market Quotation is selected. ISDA did not do that either.  *See* Ex. B (1992 ISDA Master § 6(e)(i)).  Rather, ISDA set a different goal for Loss.  As the ISDA-published User's Guide to the 1992 ISDA Master explains, "[t]his change [to add Loss as a primary payment measure] was made to address products documented under a 1992 Agreement . . . for which Loss may be a more appropriate payment measure (*e.g.*, transactions that settle by physical delivery) and to provide parties with greater flexibility in measuring their payments on early termination."  *User's Guide to the 1992 ISDA Master Agreements*, Ex. 10 at 23.  It is this very flexibility that plaintiffs want to throw out the window by having the Court adopt a contorted reading of the contract and forcibly insert Unpaid Amounts into Loss, thus rewriting it.  In effect, plaintiffs want, retroactively, to change the parties' payment measure selection from Loss to Market Quotation.

## B.    Plaintiffs' Theory Has Been Rejected by ISDA

Contrary to plaintiffs' assertion, *see, e.g.*, Pls. Opening Br. at 2, ISDA does not support their reading of Loss.  As ISDA stated in its amicus brief in this case, plaintiffs' proposed spot-price valuation requirement would "destroy the intended breadth and flexibility of the definition of Loss."  ISDA Amicus Br. at 17.  While Market Quotation and Unpaid Amounts are

10

both "market-value based determinant[s]" and thus "appropriately paired," Loss is simply the non-defaulting party's "total losses." *Id.* at 8. The absence of Unpaid Amounts from the provisions pertaining to Loss is "purposeful." *Id.* Loss is intended "to have an expansive meaning," and to allow a non-defaulting party to "craft a measure of damages suitable to [its] circumstances." *Id.* at 4. If Loss "could be determined only by obtaining a spot market price, Loss would lose its flexibility and its intended benefits would be lost." *Id.* Indeed, Loss and Market Quotation "could ***and should*** produce different results in certain scenarios," *id.* at 13—even "distinctly different outcomes," *id.* at 14. While Market Quotation is "guided by set procedures" and offers "ex ante certainty," Loss is "guided solely by good faith reasonableness" and offers "ex post flexibility." *Id.* at 15. In ISDA's view, the two concepts should not be conflated.

Plaintiffs claim that the ISDA User's Guide supports their view that Loss in respect of a past-due deliverable must be determined so as to produce the same result as Unpaid Amounts. Pls. Opening Br. at 2, 11. But that is not what the User's Guide says. To the contrary, it observes only that, given the addition of Loss as a primary payment measure, that "[t]hose amounts included in the definition of 'Unpaid Amounts,'"—*i.e.*, past-due deliverables—"are now encompassed in the definition of 'Loss.'" Ex. 10 at 25 (also noting that Loss is "a general indemnification provision"). The User's Guide does not say that Loss must be determined in the same way as Unpaid Amounts; ISDA was simply acknowledging that, in light of the substantial 1992 revision, Loss may be elected at the outset, and thereby operate both prospectively and retrospectively.

11

The two other ISDA amicus briefs that plaintiffs cite, like the User's Guide, do not support their theory.[7]  In the first of those briefs, ISDA merely outlined the procedures required in determining a close-out payment where the parties have elected Market Quotation:  "[W]here 'Market Quotation' is the payment measure, Section 6(e)(i)(3) requires a calculation that takes into account 'Unpaid Amounts owing to the Defaulting Party.'"  Ex. 11 ¶ 28 (emphasis omitted).  But "[w]here 'Loss' is the selected payment measure," the amount owed under Section 6(e)(i)(4) is simply "equal to the Non-defaulting Party's Loss."  *Id.* ¶ 29 (emphasis omitted).  Based on this explanation, ISDA noted that under both Market Quotation and Loss, the determination involves both future and past obligations.  *Id.* ¶ 105.  That description cannot reasonably be read as stating that a Loss determination is unreasonable unless the methodology of Unpaid Amounts is used.

Likewise, in the second of the amicus briefs, ISDA stated that "[w]here Market Quotation is applicable, [past-due but unaccrued] obligations are included in the definition of 'Unpaid Amounts,'" while "[i]n the case of Loss, a single amount is determined, to include both the future value of the Terminated Transactions and payments that accrued (or would have accrued) prior to the Early Termination Date."  Ex. 12 ¶ 18(1)–(2).  ISDA proceeded to note that obligations "that would have accrued but for Section 2(a)(iii) are expressly referred to in the definition of Unpaid Amounts (where Market Quotation . . . applies) and the definition of Loss (where Loss . . . applies)."  *Id.* ¶ 29(3).  There is nothing in ISDA's submission, though, that states that Loss must be determined as to retrospective obligations using the same methodology

---

[7] These amicus briefs were filed in a consolidated appeal that included an appeal of the *Britannia Bulk* case discussed below, *infra* at 13–15.  As in the lower court opinion in that case, the issue addressed by ISDA does not pertain to how Loss is to be measured, but rather what is to be included—specifically, whether the conditions precedent in Section 2(a)(iii) of the 1992 ISDA Master permit a non-defaulting party to exclude certain obligations or deliverables altogether from its close-out determination.

as Unpaid Amounts. ISDA's amicus in this case simply confirms that Loss means what it says: Intel was empowered to determine its "total losses and costs," so long as it did so reasonably and in good faith. There is no basis to graft onto that plain language a rigid methodology for determining Loss that is simply not there.

### C.    The Dicta in the English Cases Cited by Plaintiffs Provides No Support

Lacking any support in United States case law for their rewriting of Loss, plaintiffs cite dicta from two English decisions, *Britannia Bulk plc (in liquidation) v. Pioneer Navigation Ltd.*, [2011] EWHC 692 (Comm), Ex. 14, and *Anthracite Rated Investments (Jersey) Ltd. v. Lehman Bros. Finance S.A.*, [2011] EWHC 1822 (Ch), Ex. 13, neither of which helps them. *See* Pls. Opening Br. at 12–14.

In *Britannia Bulk*, after it had decided the controlling issue,[8] the court briefly turned to an issue that was "not strictly necessary to consider" at all, because it "has no real impact on the fundamental point," Ex. 14 ¶ 40. In this context, the court observed in dicta that the second sentence of Loss is "a reference to Unpaid Amounts" in the sense that it encompasses payments that would have become due prior to the Early Termination Date except for the condition precedent in Section 2(a)(iii) of the 1992 ISDA Master. *Id.* ¶¶ 41–43. This dicta does not assist plaintiffs' argument here. The *Britannia Bulk* court did not hold, or even suggest, that the fair

---

[8] The plaintiff's bankruptcy had triggered automatic early termination of a standard rate swap, absent which the defendants would have owed the plaintiff "considerable sums" in cash-settled payments. Ex. 14 ¶¶ 2, 10. As the non-defaulting parties, the defendants were entitled to determine their Loss, potentially a large ***negative*** amount because of the future payments they would have owed the plaintiff absent the default and termination. The defendants nonetheless argued that their Loss, instead of that large negative amount, was zero, because Section 2(a)(iii) of the 1992 ISDA Master suspended their payment obligations from the occurrence of an event of default until termination. *Id.* ¶ 11. The court rejected that argument, reasoning that because the parties agreed to automatic early termination upon the occurrence of an event of default, there was no point in time during which Section 2(a)(iii) actually would have excused ongoing payments otherwise due. *Id.* ¶¶ 34–37.

market value methodology of Unpaid Amounts must be applied for past-due deliverables whenever Loss is selected as the payment measure.

Plaintiffs also cite dicta in *Anthracite* for the proposition that the outcomes of Loss and Market Quotation are "aimed at achieving broadly the same result." Pls. Opening Br. at 14. For reasons already explained, *supra* at 4–8, such a gross generalization is unsustainable if stretched to mean that the non-defaulting party under Loss is required to use the fair market valuation approach of Unpaid Amounts to measure its costs and losses whenever past-due deliverables are involved. The *Anthracite* court did not impose or imply any such rule.[9]

The facts before the *Britannia Bulk* and *Anthracite* courts are far afield from the present case. Neither involved, for example, share repurchase transactions, prepayments for physical delivery, retirement of acquired shares, total non-performance, or customized provisions akin to those in the present contract, such as the imperative of physical delivery even at early termination and the use of Agreed Value (*i.e.*, VWAP) to value the shares to be delivered at that time. Indeed, the court in *Anthracite* warned against assuming that ISDA Master Agreement provisions have the same meaning irrespective of the particular circumstances of the underlying transaction. As the court said, in view of the "bewildering variety of different types of derivatives transactions, . . . caution needs to be exercised against a slavish assumption that the meaning of a particular provision of the Master Agreement in one type of transaction is necessarily to be transported lock stock and barrel as its precise meaning in some very different

---

[9] In *Anthracite*, the non-defaulting parties determined their Loss based on market quotations for a replacement transaction in respect of future obligations. Ex. 13 ¶ 19(6). The court unsurprisingly concluded that the non-defaulting parties did not act unreasonably, as such methodology is expressly permitted (though expressly not mandated) by the definition of Loss. *Id.* ¶¶ 112–129. *Anthracite* is completely inapposite to the present case, since it did not involve a determination of Loss in respect of past-due deliverables; the use of market quotes to price a replacement transaction as to future obligations is irrelevant here.

type of transaction." Ex. 13 ¶ 115.  That caution is particularly apt in the present case, as

discussed in the next section.[10]

## II.    PLAINTIFFS IGNORE THE UNIQUE FEATURES OF THIS "VWAP PREPAID SHARE FORWARD" CONTRACT

It would not suffice for plaintiffs to demonstrate that their proposed Loss determination

would have been one reasonable approach.  Because Intel is the determining party, plaintiffs

must show that Intel's determination of its Loss was unreasonable (plaintiffs do not appear to

challenge Intel's good faith).  Here, the parties negotiated a thirteen-page Confirmation with

customized provisions expressing the parties' intentions as to prepayment, physical delivery,

early termination, Intel's Exposure, and the Agreed Value (*i.e.*, VWAP) of shares delivered on

early termination.  Any assessment of the reasonableness of Intel's Loss determination must be

made with reference to those key provisions.  *See Lockheed Martin Corp. v. Retail Holdings,*

*N.V.*, 639 F.3d 63, 69 (2d Cir. 2011) ("[T]he fundamental objective of contract interpretation is

to give effect to the expressed intentions of the parties," which involves "examining isolated

provisions" in the context of the agreement "as a whole." (internal quotation marks omitted)).

Plaintiffs cannot establish that Intel acted unreasonably in determining its Loss to be the

$1 billion (1) that it prepaid; (2) that was the VWAP value of the shares it was owed in a

non-default situation; (3) that was the Agreed Value of the shares it expected on early

termination; and (4) that was its fixed Exposure throughout the contract's duration.  ▮▮▮▮▮

---

[10] Plaintiffs also quote *Anthracite* for the proposition that Intel's Loss determination must be made "on an assumption that, but for termination, the transaction would have proceeded to a conclusion," Pls. Opening Br. at 14.  The notion that this supports *them* is incorrect.  But for termination, Intel would have had 50.5 million shares in hand during its quiet period, would have retired those shares, would have debited shareholders' equity on its balance sheet by $1 billion, and would have accomplished the aims of this customized VWAP share repurchase agreement.  Because of LOTC's default, however, Intel was unable to achieve any of those aims.

████████████████████████████████████████████████████████

████████████████████████████████████████████████████

███████████████████████████████████

### A. Plaintiffs Acknowledge that the Contract Called for Physical Delivery—But Ignore the Significance of that Fact

The parties' share repurchase contract here called for physical delivery—*i.e.*, "Physical Settlement." Ex. A (Confirmation § 1, at 4). LOTC was obligated "to purchase shares of Intel's common stock and then *to deliver those shares* to Intel," Pls. Opening Br. at 1 (emphasis added). Physical delivery was essential because, as plaintiffs acknowledge in their complaint, Intel's objective was "to reduce its outstanding shares"—*i.e.*, for Intel to take physical possession of the shares and retire them. Adversary Complaint, Dkt. No. 1 ("Compl.") ¶ 18; *see also id.* ¶¶ 17, 45 (explaining that securities regulations restricted Intel's acquisition of its own shares during the period at issue here).[11] Intel did not intend to sell or hold the acquired shares, and the "fair market value" or spot price of the shares on the termination date was thus irrelevant to Intel. Intel cannot be required to determine its Loss on a basis—fair market value or spot price—that ignores the purpose of the contract and that does not reflect Intel's actual "total losses and costs."

Furthermore, if LOTC had delivered the 50.5 million shares owed on September 29, 2008, Intel would have received $1 billion in value (50.5 million shares x VWAP of

---

[11] The parties also rejected the default approach under the 1992 ISDA Master of closing out a transaction upon early termination with a purely cash settlement. *See* Ex. B (1992 ISDA Master § 6(d)(ii)). Even in the case of early termination, the parties required physical delivery. *See* Ex. A (Confirmation § 5(d)). Their customized provision governing "Early Termination"— Section 5(d) of the Confirmation, discussed in greater detail in Section II.B, *infra*—specifies that early termination requires compensation "in terms of physical shares" to the extent possible, and cash only thereafter. Pls. Opening Br. at 22; *see also id.* ("Section 5(d) . . . calls for physical delivery of those shares that had . . . been acquired by LOTC in connection with this trade."); Ex. A (Confirmation § 5(d)).

$19.7812/share), would have retired those shares, and would have reduced shareholders' equity on its balance sheet by $1 billion, benefitting the remaining shareholders. When LOTC did not perform, Intel lost $1 billion in value.

Allowing plaintiffs to keep Intel's $1 billion prepayment, while permitting Intel to retain only $873 million of plaintiffs' collateral, with no shares to retire, gives Intel far less than the $1 billion in value it was entitled to receive and leaves it far worse off than if LOTC had performed. Plaintiffs' calculation of Intel's Loss is manifestly unreasonable.

**B.    Intel's Approach to Loss Is Consistent with the Parties' Express Termination Provision, and Plaintiffs' Approach Is Not**

In their customized early termination provision, the parties designated VWAP—not spot pricing—as the "Agreed Value" of any shares delivered upon early termination. Ex. A (Confirmation § 5(d)). Thus, in determining its Loss, it was reasonable for Intel to use that same methodology for valuing the shares LOTC was required to, but did not, deliver. *See* Ex. G (Intel 9/29/08 Letter at 2, 4).

Section 5(d) provides the perfect proving ground to test the parties' competing claims. Under that provision, plaintiffs' spot-price approach produces absurd and internally inconsistent results. By contrast, Intel's VWAP-based approach produces results that are entirely consistent with the valuation provisions in the contract.

**1.    Section 5(d) of the Confirmation Applied Here**

Plaintiffs make the incredible claim that Section 5(d) of the Confirmation did not apply here because Intel "took all cash and did not close-out this trade with a mix of shares and cash, as would have been called for had Intel applied Section 5(d)." Pls. Opening Br. at 22 n.11. Yet plaintiffs admit that Intel demanded that LOTC deliver the shares in accordance with Section 5(d). Plaintiffs' Statement of Undisputed Material Facts, Dkt. No. 62 ("Pls. Stmt.") ¶ 25; *see*

*also* Ex. G (Intel 9/29/08 Letter at 2).  By September 18, 2008, LOTC had acquired

approximately 39.7 million of the 50.5 million shares it ultimately was required to deliver.

Plaintiffs further admit that in response to Intel's demand for delivery, "LOTC[] fail[ed] to make

the required delivery following Intel's designation of an Early Termination Date," Pls. Stmt.

¶ 10.  Intel set off its Loss against the cash collateral only when LOTC not only failed to make

the baseline delivery that was due but then, after Intel terminated and determined its Loss, also

failed to deliver shares as required upon early termination.  Plaintiffs' argument boils down to

the notion that LOTC succeeded in rendering Section 5(d) inapplicable by defaulting and then

failing to comply with its post-termination obligations to deliver the Intel shares that it had

acquired.  That is non-sensical.

### 2.    Plaintiffs' Approach to Loss Would Not Make Intel Whole, Creates a Moral Hazard, and Produces Internally Inconsistent Results

Plaintiffs' theory does not mesh with Section 5(d).  As plaintiffs acknowledge, by its

plain terms, that provision requires that Loss be determined first.  Pls. Opening Br. at 22.  Next,

LOTC must deliver all Intel shares acquired to that point (valued at their Agreed Value—*i.e.*, at

VWAP) and whatever cash is still owed.  *See* Intel Opening Br. at 8–9, 19–20.  If, as plaintiffs

claim, the parties intended Intel's Loss to be $873 million, then plaintiffs must be able to show

that this early termination formula would result in Intel obtaining shares and cash worth at least

that amount.  Plaintiffs' approach does not pass even that test, but rather would create an

extraordinary moral hazard by incentivizing LOTC not to comply with its delivery obligations

whenever the spot price of shares is below VWAP on the settlement date.

Plaintiffs argue that Intel's Loss was capped at $873 million based on the spot price of

the approximately 50.5 million shares owed.  *See* Pls. Opening Br. at 13, 22.  But if that were so,

18

because of the difference between the VWAP and spot prices, LOTC could strategically deliver 6.4 million fewer shares and leave Intel far short of the 50.5 million shares it bargained for:

| | |
|---|---|
| (1) Spot price ($17.27) of 50,552,943 shares: | $873,049,326 |
| (2) **_minus_** 44,135,306 shares at Agreed Value ($19.7812): | <u>$873,049,315</u> |
| (3) **_equals_** cash owing to Intel: | ≈$0[12] |

Plaintiffs' approach to determining Loss would leave LOTC the unilateral option to shortchange Intel by 6.4 million shares (50,552,943 minus 44,135,306 shares).  The $110 million spot-price market value of those undelivered shares would go straight into LOTC's pocket.  In short, LOTC would have an incentive not to comply with its physical delivery obligations any time the spot price is lower than the VWAP price.

Alternatively, suppose that following the early termination notice, LOTC had delivered the 39.7 million shares it had acquired to that point, *see* Pls. Stmt. ¶ 16, as it was required to do under Section 5(d), but not the remaining 10.8 million shares owed to Intel.   If Intel's Loss were capped at $873 million, as plaintiffs claim, Intel would receive only $88 million in cash:

| | |
|---|---|
| (1) Spot price ($17.27) of 50,552,943 shares: | $873,049,326 |
| (2) **_minus_** 39,706,969 shares at Agreed Value ($19.7812): | <u>$785,451,495</u> |
| (3) **_equals_** cash owing to Intel: | $ 87,597,831 |

Yet under plaintiffs' spot-price methodology, the fair market value of the undelivered 10.8 million shares would be $187 million.  Thus, plaintiffs' approach would result in a **_shortfall_** of nearly $100 million between what plaintiffs themselves claim is the proper value of the undelivered shares ($187 million) and what Intel actually receives in cash ($88 million).  Such

---

[12] The assumptions in this analysis are undisputed:  the VWAP was $19.7812; LOTC was required to deliver 50,552,943 shares (*i.e.*, $1,000,000,000 / $19.7812); the Agreed Value equaled the VWAP; and the spot price at market close on the September 29, 2008 delivery date was $17.27.  Pls. Stmt. ¶¶ 15, 17, 22; Ex. A (Confirmation § 5(d)).

internally incoherent results are the byproduct of valuing shares using two fundamentally

different methods depending on whether the shares are delivered or not.  Intel was not required

to use a methodology that—when applied to the customized "early termination" provision—

could produce such absurd results.

### 3.   Intel's Approach Produces Results Consistent with the Objective of the Contract

By contrast, Intel's approach in determining its Loss was reasonable.  Before sending its

early termination notice, Intel determined its Loss based on the VWAP value of the shares it was

owed.  *See* Ex. F (Intel 9/26/08 Letter at 1); Ex. G (Intel 9/29/08 Letter at 2, 4).  If LOTC had

delivered the 39.7 million shares it had acquired as required by Section 5(d), those shares would

have been valued based on VWAP (their Agreed Value) while the additional cash owed would

equal the VWAP value of the remaining shares owed (plus interest).  Because both the delivered

and undelivered shares would be valued in the same way, LOTC's incentive would be to deliver

the shares it had acquired, as it was expressly required to do upon early termination.  In contrast

to plaintiffs' approach, Intel's approach neither creates an incentive for LOTC to avoid its

obligations nor shortchanges Intel on the $1 billion value expected.[13]

---

[13] Plaintiffs' table purportedly applying Section 5(d) is not a serious effort to examine that provision.  *See* Pls. Opening Br. at 24.  Plaintiffs posit that, since no shares were delivered, applying Section 5(d) requires first the fictional step of deducting the Agreed Value of the 39.7 million shares that LOTC acquired but did not deliver to compute the cash amount owed ("Cash Payment Under Section 5(d)(y)") and then the made-up step of adding that cash amount to the spot value of the never-delivered 39.7 million shares to determine the fair market value of what Intel would have received had LOTC performed.  So, Loss would be computed twice—first as $873 million, then recomputed to determine the final Loss that Intel is entitled to set off against LOTC's collateral ($773 million, characterized by plaintiffs as "Value Subject to Set-off").  That is not how close out works.  Intel determines its Loss and then LOTC must deliver shares (and, if necessary, cash).  The contract does not call for the recomputation of Loss on the back end of this process but rather expressly entitles Intel to set off any amounts still payable to it against the collateral posted by LOTC, *see* Compl. ¶ 24.

20

### C.    Plaintiffs Ignore How the Credit Support Provision—Including Intel's Fixed Exposure of $1 Billion—Further Supports Intel's Loss Determination

Plaintiffs acknowledge that they posted a fixed $1 billion in collateral, *see* Pls. Opening Br. at 5–6; Compl. ¶ 23, but they omit to mention in their brief that they agreed this fixed amount equaled Intel's "Exposure" under the contract.  Exposure is a measure of obligations owed "as if [the transaction was] being terminated."  Ex. D (CSA ¶ 12); *see also* Intel Opening Br. at 11–12, 21–22.  Here, the parties agreed that Intel's Exposure would be set at a fixed $1 billion throughout the term of the agreement, to be reduced only if shares were delivered, and then only by the VWAP value of the shares delivered.  Ex. A (Confirmation § 6(d)(C)).  Indeed, Intel had "no obligation to return any Posted Credit Support" until shares were delivered.  *Id.*

In another adversary matter before this Court, plaintiff LBHI characterized the Exposure calculation as an "admission" of the value of obligations owed on termination.  *Lehman Bros. Holdings Inc. v. Nomura Int'l PLC*, Adv. Proc. No. 10-03228 (Bankr. S.D.N.Y., Adv. Compl. filed Apr. 23, 2010) Dkt. No. 1 ¶¶ 30–31 (attached as Exhibit DD).  In that case, LBHI alleged that Nomura had calculated the Exposure in favor of a Lehman entity, and transferred credit support "in recognition of this Exposure" shortly before the LBHI bankruptcy, but thereafter determined its Loss to be a number in its own favor.  *Id.* ¶¶ 4–6.  LBHI accused Nomura of "egregious claim inflation," *id.* ¶ 45, because Nomura's delivery of credit support (to satisfy the Exposure calculation) constituted an "express admission" as to what Nomura's Loss should have been, *id.* ¶ 31.  There, LBHI contended that a non-defaulting party acted unreasonably by determining its Loss differently than its Exposure.  Here, LBHI claims the precise opposite—that Intel acted unreasonably by determining its Loss to be exactly the ***same*** as its Exposure.  Plaintiffs cannot have it both ways.  By LBHI's own lights, Intel did not act unreasonably in

21

valuing its Loss upon early termination consistent with the Exposure valuation specifically agreed to by the parties.

### D. Plaintiffs Ignore that the Transaction Was Structured To Ensure that Intel Could Value Shares at Their Acquisition Cost, Not at the Spot Price

Plaintiffs also ignore that the value of this transaction to Intel, in accordance with Generally Accepted Accounting Principles (GAAP), was $1 billion. *See* Intel Opening Br. at 5-6, 20-21. As the non-defaulting party, under Loss, Intel was entitled to determine "its" total losses and costs. The Loss determination was to be made from Intel's perspective, not LOTC's. The performance that Intel sought was worth $1 billion to Intel. Intel did not recognize gains or losses in share repurchases. *See* Intel's Statement of Undisputed Material Facts, Dkt. No. 72 ("Intel Stmt.") ¶ 7. Intel prepaid $1 billion for LOTC to acquire shares, and had LOTC performed as required, Intel would have reduced shareholders' equity on its balance sheet by exactly $1 billion. *Id.* It was not unreasonable at early termination for Intel to value the transaction at $1 billion consistent with both the price it paid and the value it placed on performance.

## III. NEW YORK LAW DOES NOT LIMIT INTEL'S RECOVERY TO THE SPOT MARKET VALUE OF THE SHARES

Plaintiffs' additional contentions that Intel was "supposed to" determine its Loss in accordance with New York law, Pls. Opening Br. at 1, and that the "sole available remedy" under that law was the fair market value of the shares on the day of non-delivery, *id.* at 4, are incorrect.

### A. Loss Does Not Limit the Non-defaulting Party to the Methodologies for Calculating Breach of Contract Damages under New York Law

For a Loss determination to be reasonable, it is not required that the non-defaulting party also establish that it would be entitled to recover the same amount if it had brought a damages

action under New York common law.  Reasonableness under Loss as a contractual matter should not be conflated with establishing the elements of a cause of action at common law to obtain equivalent relief.  To do so would deprive Loss of the flexibility that the ISDA drafters intended and graft new requirements onto the contract where they do not appear.  This is especially true here, where Intel prepaid $1 billion for physical delivery of the shares but received nothing.  Its $1 billion prepayment is clearly a "cost" that it incurred as well as a "loss" that it suffered.  Loss entitles the non-defaulting party to recover "its total losses and costs" without qualification.  No elaborate analysis is required to reach the common sense conclusion, based on the plain contractual language, that a Loss determination of $1 billion is *ipso facto* reasonable.

Nonetheless, by analogy, the common law action for restitution provides additional support for the reasonableness of Intel's Loss determination, particularly in light of Intel's lost $1 billion prepayment.  *See Men's Sportswear, Inc. v. Sasson Jeans, Inc. (In re Men's Sportswear, Inc.)*, 834 F.2d 1134, 1141 (2d Cir. 1987) (restitution provides recovery of prepayment plus interest).  While the non-defaulting party is not **required** to use restitution principles when making its Loss determination, and while it is not required to prove the elements of a restitution cause of action under New York law, the principles underlying restitution show the reasonableness of Intel's determination that its Loss was $1 billion plus interest.

### B.    Under New York Law, Intel Was Entitled to Restitution in the Precise Amount of Its Loss Determination

Under the common law of restitution, "[i]t is well settled that if the plaintiff has made money payments to the defendant, and there is a failure of consideration whereby defendant materially breaches the contract, the plaintiff can maintain an action for restitution of the money so paid to the defendant, with interest." *Men's Sportswear, Inc.*, 834 F.2d at 1141.  Similarly, New York's Uniform Commercial Code (the "UCC") "provides an aggrieved buyer with the

right to return of the purchase price," *Allied Semi-Conductors Int'l, Ltd. v. Pulsar Components Int'l, Inc.*, 907 F. Supp. 618, 630 (E.D.N.Y. 1995) (citing UCC § 2-711).[14]

Plaintiffs make a series of novel arguments as to why Intel would not have a formal claim for restitution under common law. For starters, plaintiffs repeatedly claim that Intel "invented a rescission remedy" and took its prepayment back, Pls. Opening Br. at 1–2; *see also id.* at 3, 8, 19, which is utterly false.[15] Having set up that straw man, plaintiffs cite a case involving rescission, asserting that Intel would need to show it had no adequate remedy at law. *Id.* at 19 (citing *Rudman v. Cowles Commc'ns., Inc.*, 30 N.Y.2d 1, 13–14 (1972)). Unlike a claim for rescission, however, a claim for restitution that seeks money damages for a total breach of contract is a claim at law, rather than equity, and therefore does not require a showing that there was no adequate remedy at law.[16] 1 Dan B. Dobbs, *Law of Remedies, Damages—Equity—Restitution* § 4.1(1), at 556 (2d ed. 1993) ("Restitution claims for money are usually claims 'at law.'"); *see also 360Networks Corp. v. Geltzer (In re Asia Global Crossing, Ltd.)*, 404 B.R. 335,

---

[14] The remedies provided by Article 2 of the UCC (including restitution) apply to securities transactions governed by Article 8. *Bache & Co. v. Int'l Controls Corp.*, 339 F. Supp. 341, 346, 349 (S.D.N.Y. 1972) (holding Article 2 applies "to the sale of securities as well as goods"), *aff'd*, 469 F.2d 696 (2d Cir. 1972). *See also McManus v. McManus (In re Estate of McManus)*, 440 N.Y.S.2d 954, 957–58 (2d Dep't 1981) (applying Article 2 to stock sale), *aff'd*, 432 N.E.2d 601 (N.Y. 1982).

[15] Plaintiffs go as far to assert that Intel "made no attempt to actually value the 50.5 million shares of Intel common stock," Pls. Opening Br. at 7, colliding head-on with their own characterization of the undisputed facts, where they admit that Intel stated that its $1 billion Loss reflected not only its prepayment but also "the value, measured as specified in the Confirmation, of deliveries that were to be made . . . which were not made." Pls. Stmt. ¶ 29; *see also* Ex. G (Intel 9/29/08 Letter at 4).

[16] "Equitable" restitution is a separate form of restitution that is available where breach of contract is not established. *See, e.g., Tech. Express, Inc. v. FTF Bus. Sys. Corp.*, No. 99 Civ. 11692, 2000 U.S. Dist. LEXIS 18518, at *16–18 (S.D.N.Y. Dec. 26, 2000).

342 (S.D.N.Y. 2009) (distinguishing remedy of rescission in context of allowing restitution of prepayment for breach of delivery obligation).

   Plaintiffs also contend that Intel would not have a claim for restitution under common law because they did not actually breach the contract. Pls. Opening Br. at 19–20. That blinkers reality. The contract required LOTC to deliver approximately 50.5 million shares on September 29, 2008. Yet LOTC delivered zero shares. That was an obvious breach of the contract. Whether the contract provided a cure period before that breach would ripen into an independent event of default, *see id.* at 20 (citing 1992 ISDA Master § 5(a)(i)), does not alter the fact that LOTC had a contractual obligation and failed to perform it.[17]

   Finally, plaintiffs contend that restitution is unavailable on a contract to buy shares. *See* Pls. Opening Br. at 19–20. But the unpublished case on which plaintiffs principally rely is inapposite. In *Waxman v. Envipco Pick Up & Processing Servs., Inc.*, No. 02 Civ. 10132, 2006 U.S. Dist. LEXIS 3883, at *2–3, 14 (S.D.N.Y. Jan. 31, 2006), the plaintiff sold his business in exchange for a future delivery of depository receipts for shares in defendant's business. By the time of the lawsuit years later, it was not feasible to return the old business back to the plaintiff. *Id.* at *8–9, 14. When the plaintiff nonetheless sought restitution equal to the "reasonable value" of that business, *id.* at *14, the court dismissed the claim because determining that value would have touched off a "battle of the experts," *id.* at *18. No such issue of valuing a complex business years after the sale arises here, where restitution is simply a matter of restoring a known cash prepayment already conferred upon a seller who fails entirely to deliver. *See In re Asia Global Crossing, Ltd.*, 404 B.R. at 342. *Waxman* does not purport to establish a *per se* rule

---

[17] Plaintiffs' claim that no breach occurred because the time to make a delivery had not run, Pls. Opening Br. at 20, is also inconsistent with their claim that they prevail under the definition of Unpaid Amounts because the deliverable was past due, *id.* at 12–13.

precluding restitution in the context of securities, let alone in a share repurchase transaction, and restitution principles thus provide additional, independent support for the reasonableness of Intel's Loss determination.

## **CONCLUSION**

For the foregoing reasons, Intel respectfully requests that the Court deny plaintiffs' motion for summary judgment.

Dated: February 23, 2015        By:     /s/ John J. Buckley, Jr.

John J. Buckley, Jr. (admitted *pro hac vice*)
Daniel F. Katz (admitted *pro hac vice*)
Edward C. Barnidge (admitted *pro hac vice*)
WILLIAMS & CONNOLLY LLP
725 Twelfth Street, N.W.
Washington, DC 20005
Tel: (202) 434-5000
Fax: (202) 434-5029

Craig T. Goldblatt (admitted *pro hac vice*)
Isley M. Gostin
WILMER CUTLER PICKERING
HALE & DORR LLP
1875 Pennsylvania Avenue, N.W.
Washington, DC 20006
Tel: (202) 663-6000
Fax: (202) 663-6363

*Attorneys for Defendant Intel Corporation*