JONES DAY
222 East 41st Street
New York, New York 10017
Telephone:  (212) 326-3939
Facsimile:  (212) 755-7306
Robert W. Gaffey
Jayant W. Tambe
Todd R. Geremia
Mahesh Venkatakrishnan

*Attorneys for Plaintiffs*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

------------------------------------------------------------X
                                                            :
In re:                                                      :    Chapter 11
                                                            :
LEHMAN BROTHERS HOLDINGS INC., *et al.,*                    :    Case No. 08-13555 (SCC)
                                                            :
                                Debtors.                    :    (Jointly Administered)
                                                            :
------------------------------------------------------------X
                                                            :
LEHMAN BROTHERS HOLDINGS INC. and                           :
LEHMAN BROTHERS OTC DERIVATIVES INC.                        :
                                                            :
                                                            :    Adv. Proc. No. 13-01340 (SCC)
                                Plaintiffs,                 :
                                                            :
v.                                                          :
                                                            :
INTEL CORP.,                                                :
                                                            :
                                Defendant.                  X
-----------------------------------------------------------

**PLAINTIFFS' MEMORANDUM OF LAW IN OPPOSITION TO**
**DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

# TABLE OF CONTENTS

**Page**

INTRODUCTION ................................................................................................ 1

BACKGROUND ............................................................................................... 3

    A.    The Derivative Agreement and Lehman's Collateral ................................ 3

    B.    The Lehman Bankruptcy-Related Event of Default ................................ 4

    C.    Intel Declares an "Early Termination" on the Settlement Date and Seizes Lehman's Collateral, Plus Interest .................................................. 4

ARGUMENT .................................................................................................... 6

  I.    INTEL'S LOSS WAS $873 MILLION, NOT THE FULL PRE-PAYMENT AMOUNT AND THE INTEREST ACCRUED ON IT ................... 7

    A.    The Master Agreement Governs How to Determine the Loss at Issue Here ............................................................................................. 9

    B.    The Structure of the Parties' Agreement Points to the Same Result ....... 12

    C.    New York Law Provides for the Identical Determination of Loss Here ......................................................................................................... 13

  II.   INTEL'S REMAINING BASES FOR SUMMARY JUDGMENT ARE CONTRADICTED BY THE CONTRACT'S PLAIN LANGUAGE AND ALSO PREDICATED ON DISPUTED FACTS ................................................ 14

    A.    "Agreed Value" Is Not a Proxy for Loss ................................................ 15

    B.    Intel's Assertions About Its Accounting Treatment for the Trade Do Not Support Its Loss Determination ................................................ 17

    C.    The Parties' Definition of the "Secured Party's Exposure" Did Not Fix Intel's "Loss" .................................................................................. 21

    D.    Intel May Not Use Restitution as a Substitute for Determining Its Loss ......................................................................................................... 22

    E.    Contemporaneous Valuations Support Plaintiffs, Not Intel ................... 25

    F.    Intel May Not Insulate Its Loss Determination From Scrutiny By Invoking an Inapposite Provision in the Equity Derivatives Definitions ............................................................................................. 28

CONCLUSION .............................................................................................. 31

i

# TABLE OF AUTHORITIES

Page

CASES

*Anthracite Rated Investments (Jersey) Ltd. v. Lehman Bros. Fin. S.A.,*
   [2011] EWHC 1822 (Ch) ................................................................12, 13

*Britannia Bulk plc (in liquidation) v. Bulk Trading S.A.,*
   [2011] EWHC 692 (Comm) ................................................................11, 13

*General Motors Corp. v. Fiat S.p.A.,*
   678 F. Supp. 2d 141 (S.D.N.Y. 2009) ........................................................28

*Getty Oil Co. v. Dept. of Energy,*
   569 F. Supp. 1204 (D. Del. 1983) ............................................................17

*In re Men's Sportswear, Inc.,*
   834 F.2d 1134 (2d Cir. 1987) ...............................................................23

*Lehman Bros. Int'l (Europe) v. Lehman Bros. Fin., S.A.,*
   [2012] EWHC 1072 (Ch), *rev'd*, [2013] EWCA 188 (Civ) ...................................12

*Lomas v. JFB Firth Rixson Inc.,*
   [2012] EWCA 419 (Civ) ....................................................................10, 12

*Magnuson v. Newman,*
   No. 10 Civ. 6211, 2013 WL 5380387 (S.D.N.Y. Sept. 25, 2013) ..............................6

*Peregrine Fixed Income Ltd. (in liquidation) v. Robinson Dep't Store Plc,*
   [2000] Lloyds Rep. Bank. 304 (Q.B.) ........................................................12

*Rudman v. Cowles Commc'ns, Inc.*
   30 N.Y.2d 1 (1972) ........................................................................22

*Rule v. Brine, Inc.,*
   85 F.3d 1002 (2d Cir. 1996) ................................................................6

*Sharma v. Skaarup Ship Mgmt. Corp.,*
   916 F.2d 820 (2d Cir. 1990) ...............................................................14

*Simon v. Electrospace Corp.,*
   28 N.Y.2d 136 (1971) ......................................................................13

ii

*Tech. Express Inc. v. FTF Bus. Sys. Corp.*,
  No. 99 Civ. 11692, 2000 U.S. Dist. LEXIS 18518 (S.D.N.Y. Dec. 26, 2000)......................22

*Toledo Fund, LLC v. HSBC Bank USA*,
  No. 11 Civ. 7686, 2012 WL 2850997 (S.D.N.Y. July 9, 2012) ................................................7

*Waxman v. Envipco Pick Up & Processing Servs., Inc.*,
  No. 02 Civ. 10132, 2006 U.S. Dist. LEXIS 3883 (S.D.N.Y. Jan. 17, 2006)..............22, 23, 25

*Waxman v. Envipco Pick Up & Processing Servs., Inc.*,
  No. 02 Civ. 10132 (GEL), 2006 U.S. Dist. LEXIS 44006 (S.D.N.Y. June 28,
  2006) ...................................................................................................................................13

*World Props., Inc. v. Arlon, Inc.*,
  663 F. Supp. 2d 98 (D. Conn. 2009)......................................................................................28

## OTHER AUTHORITIES

11 Joseph M. Perillo, *Corbin on Contracts* § 55.13 (2005)............................................................23

Restatement (Second) of Contracts § 373(2) cmt. b. (1981) ........................................................23

**INTRODUCTION**

The plain language of the parties' contract and well-established authority construing this ISDA Master and applying New York contract law dispose of this dispute.  Intel did not receive 50.55 million shares of its stock that, pursuant to the parties' contract, it was to receive on September 29, 2008.  Under the parties' contract, New York law, and in accord with public positions that ISDA itself has taken before it weighed in on this case in support of Intel, Intel's Loss was not to be determined as an exercise of Intel's broad discretion, as Intel asserts.  Rather, Loss was to be determined on the specific basis of the fair market value of the fixed number of shares that were to be delivered on the specific date they were to be delivered.  Intel's Loss in the particular circumstance here, as a matter of law and undisputed fact, was thus not the full $1 billion of collateral, plus interest, that it seized from LOTC.  It was $873 million:  the fair market value of the 50.55 million shares it was to receive from LOTC on September 29, 2008.

Intel's motion ignores the dispositive law and the pertinent provision of the Loss definition.  Instead, Intel seeks summary judgment on the basis of extra-contractual documents, immaterial facts concerning its internal reasons and accounting for this trade, and improper, attenuated inferences drawn from inapplicable contractual provisions.  Rather than value the undelivered shares as Unpaid Amounts, as the Loss definition and interpretive case law mandate—and as ISDA has said they should be—Intel points the Court to inapposite provisions of the parties' contract that address not how Loss is determined, but (i) the means by which Intel would be compensated for its Loss in a situation that did not occur ("Agreed Value"); (ii) how the parties defined Intel's "Secured Party's Exposure" (an irrelevant concept here); and (iii) a separate part of the contract that deals not with Loss but with failures to deliver outside the context of an Early Termination Date (Section 9.12 of the Equity Derivatives Definitions).

Intel also relies on the ill-conceived notion that it was permitted to take back its full purchase price under the equitable principle of restitution as if it had never entered into the deal in the first place. But courts applying New York law, which governs the parties' contract here, have made clear that a non-defaulting party may not seek equitable remedies, like restitution or rescission, in connection with a contract to purchase shares where, as here, the value of the shares to be delivered on the date they were to be delivered is known. The *sole* available remedy in this matter is a legal one and the same one that obtains under a proper application of Loss: the fair market value of the shares that the party was to receive on the date it was to receive them.

Finally, Intel relies on extra-contractual arguments predicated on its own internal accounting treatment for this trade ████████████████████████████████ ████████████████████████████████████ Neither of these asserted factual bases can contravene the contractual language and interpretive authority establishing that Intel's Loss was to be determined here on the basis of the fair market value of the undelivered shares. In any event, there is contrary evidence that would give rise to disputed issues of fact for trial on each of these grounds in Intel's motion.

No matter how much Intel flails about to avoid the plain language of the contract, it simply cannot avoid that (i) the definitions of Loss and Unpaid Amounts; (ii) other provisions in the ISDA Master governing close outs of early-terminated transactions; (iii) settled New York law; (iv) prior statements by ISDA; and (v) the undisputed, material facts, all point to the same result in this case: Intel's Loss was the fair market value on September 29, 2008 of the 50.55 million shares it was to receive. Intel's Loss was therefore $873 million, not the $1.002 billion in collateral and interest that it wrongfully seized from LOTC. Lehman, accordingly, is entitled to summary judgment in the principal amount of no less than $129 million, plus interest.

2

## BACKGROUND

Intel's motion is predicated on a lengthy presentation of allegations, many of them disputed, concerning characterizations of the parties' conduct and intent and other facts outside the contract documents that govern this transaction.  The material, undisputed facts necessary to decide these summary judgment motions are not many or complex.  They are briefly recited below.

### A.    The Derivative Agreement and Lehman's Collateral

LOTC and Intel entered into this derivative Agreement on August 1, 2008.[1]  Plaintiffs' Statement of Undisputed Material Facts [Doc. 62] ("SOF") ¶ 1.  The Agreement is governed by New York law.  SOF ¶ 3.  Pursuant to the Agreement, Intel paid $1 billion to LOTC on August 29, 2008.  SOF ¶¶ 4-5.  In return, LOTC was  required to deliver to Intel a fixed number of shares of Intel common stock on the  "Settlement Date" for this trade, September 29, 2008.  SOF ¶ 13.  The number of shares LOTC was obligated to deliver on September 29, 2008 was indeterminate when the parties first entered into the Agreement on August 1, 2008.  *See id*.  But that number was fixed as of September 26, 2008, by application of a formula (based on a volume-weighted average price of Intel common stock) set forth in the Confirmation to the Agreement.  Confirmation § 1 ("Number of Shares to be Delivered"); SOF ¶¶ 13-14.

---

[1] The Agreement consists of: (i) the 1992 ISDA Master Agreement, Multicurrency—Cross Border, dated as of February 1, 2008 (the "Master Agreement"); (ii) a Schedule to the Master Agreement, also dated as of February 1, 2008 (the "Schedule"); (iii) a Confirmation dated as of August 1, 2008 (the "Confirmation"); (iv) paragraphs 1-12 of the 1994 standard form ISDA Credit Support Annex (the "Credit Support Annex"), which the Confirmation incorporates by reference; and (v) the definitions and provisions contained in the 2002 ISDA Equity Derivatives Definitions (the "Equity Definitions"), which the Confirmation incorporates by reference.  SOF ¶ 2.  The Master Agreement, Schedule, Confirmation, and Credit Support Annex are attached as Exhibits 1-4 to the Adversary Complaint in this matter and to the Declaration of Mahesh Venkatakrishnan submitted in support of Plaintiffs' Motion for Summary Judgment [Doc. 63] ("SJ Ex.").  The Equity Definitions are attached as SJ Ex. 15.

The Agreement also required LOTC to post $1 billion of collateral to Intel on August 29, 2008. SOF ¶ 7. The principal amount of the collateral remained fixed throughout the trade. SOF ¶ 8. Intel had the right to set off against the collateral, but this right was limited to amounts payable by LOTC to Intel pursuant to the Agreement. SOF ¶¶ 9-11. The remainder of the collateral had to be returned to LOTC at the end of the trade. SOF ¶ 11.

### B.   The Lehman Bankruptcy-Related Event of Default

The Agreement designated LBHI as LOTC's Credit Support Provider. This meant, among other things, that LBHI's bankruptcy filing on September 15, 2008 was a defined "Event of Default." SOF ¶¶ 18, 20. Although Intel had a right to declare a so-called "Early Termination Date" due to LBHI's bankruptcy filing on September 15, 2008, it did not do so on that day. SOF ¶ 23. Intel "note[d]" the Event of Default in a September 26, 2008 letter to LOTC, but did not declare an Early Termination on that date, either. SJ Ex. 5; SOF ¶¶ 21, 23.

The period used in the formula for determining the number of shares LOTC would be obligated to deliver to Intel was September 2, 2008 through September 26, 2008. SOF ¶ 14. When Intel sent its letter to LOTC on September 26, 2008, the last day of that Calculation Period, the number of shares LOTC was to deliver had therefore become fixed. Intel's September 26 letter to LOTC acknowledged this. It stated, "[P]ursuant to the terms of the Confirmation, the Number of Shares to be delivered is 50,552,943 Shares and the Cash Delivery Amount is zero ($0.00)." SOF ¶ 21; *see also id.*¶ 15.

### C.   Intel Declares an "Early Termination" on the Settlement Date and Seizes Lehman's Collateral, Plus Interest

Intel waited until September 29, 2008, two weeks after the LBHI bankruptcy, to declare an Early Termination Date. SOF ¶ 25. (As noted, this was also the Settlement Date under the Agreement. SOF ¶ 12.)

4

In its letter declaring the Early Termination Date, Intel acknowledged that the parties had elected "Second Method and Loss" to determine payments owed on an Event of Default.  SOF ¶ 27.  However, in disregard of the requirements for calculating "Loss" set forth in the Master Agreement (*see* Master Agreement § 14), Intel, in effect, declared the parties' Agreement to be nullified.  Intel summarily asserted that its "Loss" was $1,001,966,256.00, *i.e.*, the exact amount of LOTC's posted collateral, plus interest.  SOF ¶¶ 28-29.  This, of course, was just a demand for a full refund on the contract, grabbing all the collateral as a proxy for the purchase price.  Intel made no attempt to actually value the 50.55 million shares of Intel stock that were supposed to have been delivered on the Settlement Date.  Although it had acknowledged on September 26 that LOTC's obligation was to deliver 50.55 million shares, Intel shifted on September 29 to a new position, when it asserted that LOTC's obligation under the Agreement was to deliver $1 billion in Intel common stock.  SOF ¶¶ 21, 29.

That is not what the Agreement states.  LOTC's obligation was to deliver a specific number of shares, determined pursuant to the formula in the Confirmation at the end of the Calculation Period.  SOF ¶ 13.  Indeed, only three days before it changed its mind and strategically demanded *de facto* rescission of the Agreement, Intel expressly acknowledged in its September 26 letter that "the Number of Shares to be Delivered is 50,552,943 Shares[.]"  SOF ¶ 21.  That number is undisputed, and it is also undisputed that the fair market value of the 50,552,943 shares of Intel common stock that LOTC was to deliver on the Settlement Date was $873 million, not $1 billion.  *See* SOF ¶ 17.

On September 30, 2008, one day after Intel designated an Early Termination Date for this trade and unilaterally declared a *de facto* nullification of the contract, Intel took matters into its

own hands. It seized all of Lehman's collateral and all of the interest accrued on it, as if the parties had never entered into this derivative trade.  SOF ¶ 30.

## ARGUMENT

Intel makes seven assertions in support of its argument that it properly calculated its Loss as equal to the precise amount of the collateral posted by LOTC for this derivative trade, plus the interest accrued on it.  Only one of these assertions even refers to the actual language of the Loss definition.  The others invoke immaterial and disputed evidence, inapposite contractual concepts, or the equitable doctrine of restitution that courts have held is not applicable in determining contractual losses for a failure to deliver stock.  None of Intel's arguments deal with the plain language of the Loss definition and the ISDA Master that specifically address the situation here: how to determine losses in connection with a delivery that was required to have been made, but not made, on or before an Early Termination Date.  Thus, regardless of whether any of the methods posited by Intel might be appropriate to determine Loss in *other* circumstances, they are not appropriate here because the contract and New York law address the very type of Loss suffered by Intel.

Moreover, even assuming Intel's asserted bases were appropriate approaches to Loss— and they are not in this circumstance—there are myriad issues of disputed fact with respect to each one of them.  Summary judgment is therefore not appropriate for Intel here, even under the misguided approach to closing out this transaction that it advocates.[2]

---

[2] *Rule v. Brine, Inc.*, 85 F.3d 1002, 1011 (2d Cir. 1996) ("The function of the district court in considering the motion for summary judgment is not to resolve disputed issues of fact but only to determine whether there is a genuine issue to be tried."); *Magnuson v. Newman*, No. 10 Civ. 6211, 2013 WL 5380387, *7 (S.D.N.Y. Sept. 25, 2013) ("Summary judgment is inappropriate where . . . disputes of fact exist.").

## I.    INTEL'S LOSS WAS $873 MILLION, NOT THE FULL PRE-PAYMENT AMOUNT AND THE INTEREST ACCRUED ON IT

Intel's first asserted basis for summary judgment is predicated on an artificially constricted reading of the Loss definition.  According to Intel, Loss means in pertinent part only "total losses and costs" incurred in connection with this trade, and it was therefore free to declare for itself what its losses were in this trade.  *See* Intel's Revised Memorandum of Law in Support of Motion for Summary Judgment [Doc. 71-1] ("Intel Br.") at 18-19.  That is not correct.

Intel suggests—although it will not say it plainly—that it had broad discretion to decide unilaterally what its Loss was.  Intel cites *Toledo Fund, LLC v. HSBC Bank USA*, No. 11 Civ. 7686, 2012 WL 2850997 (S.D.N.Y. July 9, 2012), to support its notion that Intel had "discretion" to determine its Loss here.  Intel Br. at 17 & n.6.  In that case, however, the parties' agreement expressly and "repeatedly left critical determinations to the '*sole discretion*' of HSBC."  *Toledo Fund*, 2012 WL 2850997 at *7 (emphasis added).  While Intel argues as if its Agreement with LOTC similarly bestowed upon it "sole discretion" to determine Loss, the Agreement simply does not do that.  Loss has to be determined "reasonably" under this Agreement.  And, because the Agreement *specifically addresses* how to determine the type of backward-looking Loss suffered by Intel here—for undelivered shares that were already due on a specific date—Intel was not left with the discretion to simply take back its purchase price by declaring that that was its "Loss" here. [3]

---

[3] Lehman is not "insist[ing] that there is only one proper way of calculating Loss," as a general matter, as ISDA has asserted in an *amicus* brief "in support of Defendant Intel Corporation's Motion for Summary Judgment." *See* Reply in Support of the Motion of International Swaps and Derivatives Association Inc. for Leave to File Memorandum of Law as *Amicus Curiae* [Doc. 70] ("ISDA Reply") at 2.  But when the derivative has been "early terminated" on the Settlement Date and the precise deliverable obligation is therefore known and fixed, with an ascertainable fair market value, the ISDA Master mandates that Loss is determined as Unpaid Amounts, *i.e.*, the deliverable's fair market value on the delivery date.  ISDA has taken positions previously that lead to that result, and even in its reply brief here it reiterates that Unpaid Amounts are "'encompassed within the definition of Loss.'"  *Id.*

Intel's argument also ignores the parenthetical in the phrase "total losses and costs (or gain[s])" in the definition of Loss. ISDA Master § 14 (definition of "Loss"). "Gains," of course, contemplates an attempt to *value the trade* in closing it out, not to nullify the deal as if it never existed. A party could not have a "gain" if it treats the deal as rescinded, as Intel did here. Similarly, Intel's notion that it had discretion to effectively rescind this deal would undermine the "no fault" nature of the Second Method chosen by the parties for closing out this transaction. Under the Second Method, unlike the First Method, a defaulting party is entitled to a payment by the non-defaulting party that represents the defaulting party's gain on the trade at termination. 1992 ISDA Master Agreement § 6(e)(i)(2) & (4). That is, the Second Method is a "true-up" that forecloses a defaulting party from being punished as a result of an Event of Default and consequent termination. The parties here chose the Second Method to apply to close out the trade for *all* Events of Default that could trigger the designation of an Early Termination Date. Under Intel's approach, however, a non-defaulting party could simply elect to take back its purchase price—and thereby effectively wipe out the deal—in the event of a counterparty's failure to make the delivery called for by the trade, even if the defaulting counterparty would have had the right to a payment pursuant to the Second Method. Nothing in the 1992 ISDA

---

(continued…)

at 3 (quoting User's Guide). (And the User's Guide does indeed use the *capitalized* term "Unpaid Amounts," contrary to the impression that ISDA tries to leave in its reply brief.) That principle disposes of this case in Lehman's favor as matter of law. For the same reason, ISDA's fear mongering that "Lehman's misguided approach could undermine the contractual bargains of countless non-parties to this case" is without basis. ISDA Reply at 2. The "predictability in the derivatives market," for which ISDA says it strives, will only be enhanced, not undermined, by this Court's adoption of Lehman's approach, which has been elevated to "hornbook law" by the courts of England (*infra* at 12-13), the other principal jurisdiction for the 1992 ISDA Master. ISDA Reply at 2, *see also* 1992 ISDA Master Agreement § 13 (Governing Law and Jurisdiction). On the other hand, allowing a non-defaulting party, in circumstances such as these, to exercise discretion to opt for a refund of the contract price instead of the market-value of the deliverable obligations (an option that is more attractive only when the market value is worth less than the refund) would make outcomes anything but predictable.

Master or the Second Method chosen by the parties here would allow a non-defaulting party to wholly undermine a defaulting party's right to a Second Method payment in this manner.[4]

On the basis of Intel's misguided and overly simplistic approach, however, it concludes that its "total 'costs'" are the $1 billion it originally paid, regardless of the actual value of the stock it should have received.  This mis-reading of the Loss definition ignores, among other things, the undisputed facts concerning the termination of this trade, the full definition of Loss, a parallel close-out measure for early termination of this Agreement ("Market Quotation"), and New York law, all of which show that Intel's Loss was $873 million—the fair market value of the fixed number of shares to be delivered on the date they were to be delivered.  Lehman made this presentation more fully in its brief in support of its own motion for summary judgment, and briefly recapitulates it here.

**A.     The Master Agreement Governs How to Determine the Loss at Issue Here**

Intel quotes the Loss provision in snippets, attempting to excise the particular part of the definition that addresses the specific type of Loss suffered by Intel here.  That provision states in pertinent part: "Loss includes losses and costs (or gains) in respect of any payment or delivery required to have been made . . . on or before the relevant Early Termination Date and not made, except, so as to avoid duplication, if Section 6(e)(i)(1) or (3) or 6(e)(ii)(2)(A) applies."  1992 ISDA Master § 14 (definition of "Loss").  This type of Loss is referred to as an "unpaid amount," for which the ISDA Master sets out a particular methodology to calculate.

---

[4] Application of Second Method here did not mandate a payment to LOTC by Intel.  Intel had a positive Loss on this trade, although not the inflated Loss Intel claimed as equal to the exact amount of its Prepayment Amount, plus interest on it.  However, if restitution were deemed a permissible approach to determining Loss in this case, there is no principled basis under the 1992 ISDA Master for distinguishing Intel's approach from situations where the Second Method would mandate a payment to the defaulting party.  A defaulting party's right to a payment under the Second Method would be eviscerated if, as Intel advocates, a non-defaulting party were permitted to effectively walk away from the deal by declaring its Loss as the full amount of the contract price.

This concept of an Unpaid Amount is incorporated into the Loss definition.  As ISDA's User's Guide for the 1992 Master provides, "amounts included in the definition of 'Unpaid Amounts' are now encompassed in the definition of 'Loss' . . . ."  SOF ¶ 35; *see also id.* ¶ 36 (where the User's Guide also states that "obligations which became . . . deliverable but which were not . . . delivered prior to the Early Termination Date" are "included in the definition of 'Unpaid Amounts'" and "encompassed within the definition of 'Loss'").[5]  ISDA also confirmed this position in two *amicus* briefs it submitted in connection with another dispute under a 1992 ISDA Master Agreement.  In those briefs, in *Lomas v. JFB Firth Rixson Inc.*, ISDA made clear that a determination of Unpaid Amounts is part of the Loss determination.  SOF ¶ 33 (explaining that past-due deliverable obligations  "are expressly referred to in the definition of Unpaid Amounts . . . *and the definition of Loss.*") (emphasis added.); *see also* SOF ¶ 32 ("The determination of amounts due . . . whether under the Market Quotation method or Loss method involves . . . calculation of amounts due historically under the [t]ransaction . . . but not paid (that is, the 'Unpaid Amounts' . . . .").[6]  The courts in England have followed the course set in the

---

[5] *See also* SOF ¶ 36 (User's Guide: "In the case of Loss, Unpaid Amounts are no longer separately determined under the 1992 Agreements but are part of the calculation by a party of its Loss (unless Loss is being determined in the case where a Market Quotation cannot be determined or would not produce a commercially reasonable result).").

[6]  The definition of  Loss itself further underscores that it deliberately incorporates the concept of an "unpaid amount," by stating that losses "in respect of any payment or delivery required to have been made . . . on or before the relevant Early Termination Date and not made" are recoverable, but not, "*so as to avoid duplication*," if certain other sections apply.  Intel omits this part of the definition in its brief, but each one of those other sections requires a determination of an Unpaid Amount.  *See* 1992 ISDA Master § 14 (emphasis added) (definition of Loss; other sections are Section 6(e)(i)(1) or (3) and Section 6(e)(ii)(2)(A), all of which call for application of Market Quotation, which in turn calls for application of Unpaid Amounts).  Once again, one of ISDA's recent *amicus* briefs in *Lomas* confirms that this sort of Loss recovery is excluded as "duplicative" of the recoveries provided for by the listed sections because it is the *same* as the recovery allowed upon application of Unpaid Amounts.  That is, both the part of Loss providing for recovery "in respect of any payment or delivery required to have been made on or before the relevant Early Termination Date and not made" and the listed provisions that follow all provide for recovery of "unpaid amounts" pursuant to the 1992 ISDA Master.  *See* SOF ¶ 34 (ISDA *amicus* brief:  "Because Market Quotation already takes into account [losses and costs (or gains)] in respect of any payment or delivery required to

ISDA User's Guide and ISDA's *amicus* brief in *Lomas*, ruling that "the words in the second sentence of the Loss definition [*i.e.*, a loss 'in respect of any payment [or] delivery required to have been made . . . and not made'] are a reference to Unpaid Amounts." *Britannia Bulk plc (in liquidation) v. Bulk Trading S.A.*, [2011] EWHC 692 (Comm) [41-43] (SJ Ex. 14).[7]

Although Intel is at pains to avoid it, the 1992 ISDA Master Agreement expressly addresses how Loss is to be determined for an unpaid amount, *i.e.*, a delivery that was required to have been made as of the Early Termination Date but was not made. A party in this situation is not permitted to recover what might be called the "paid amount," *i.e.*, the contract price, as Intel did here. Rather, the Master provides for recovery of an Unpaid Amount, which is "equal to the *fair market value* of that which was (or would have been) required to be delivered as of the originally scheduled date for delivery." 1992 ISDA Master § 14 (definition of "Unpaid Amounts") (emphasis added). Applying this definition in the ISDA Master, the 50.55 million shares of Intel common stock, fixed as of September 26, 2008, was an Unpaid Amount and therefore required to be measured at fair market value. The obligation at issue here "was required to be settled by delivery to [Intel] on or prior to [the] Early Termination Date," *i.e.* September 29 (also the Settlement Date). *Id*. And the "fair market value" of those shares was

---

(continued…)

have been made . . . on or before the relevant Early Termination Date and not made] as Unpaid Amounts, they are excluded from the fall-back Loss calculation to prevent double counting.").

[7] One of the ISDA *amicus* briefs quoted above was submitted on an appeal from several cases, including *Britannia Bulk*. So while ISDA was unquestionably aware of this holding from *Britannia Bulk*, it chose not to mention it in its *amicus* presentation to this Court, and again chose not to address it on its reply in support of its motion, despite being specifically pointed to that holding in Lehman's response to ISDA's *amicus* motion. *See* Plaintiffs' Response to Motion of International Swaps and Derivatives Association Inc. for Leave to File Memorandum of Law as *Amicus Curiae* ("Lehman Response to ISDA") [Doc. 66] at 7-8.

$873 million "as of the originally scheduled date for delivery," that is, on September 29, 2008.[8]

That $873 million is therefore Intel's Loss, upon a proper application of the Loss definition and

the ISDA Master's close-out provisions for this trade.[9]

### B.    The Structure of the Parties' Agreement Points to the Same Result

Other close-out provisions in the Master Agreement confirm this result.  Market

Quotation and Loss are two close-out payment measures set out in the 1992 ISDA Master.  They

are not identical for all purposes, but *both* measures are designed to arrive at a close-out that

preserves the economic equivalent of any payment or delivery that was to be made if the

agreement had not been terminated early.  Hence, cases addressing the two close-out measures

have recognized that Loss and Market Quotation are "intended to lead to broadly the same

result," *Peregrine Fixed Income Ltd. (in liquidation) v. Robinson Dep't Store Plc*, [2000] Lloyds

Rep. Bank. 304 (Q.B.),[10] "so that the outcomes derived from one may be usefully tested by way

of cross-check by reference to the other."  *Anthracite Rated Investments (Jersey) Ltd. v. Lehman

Bros. Fin. S.A.*, [2011] EWHC 1822 (Ch) [116(1)] (SJ Ex. 13) (citing *Peregrine*).  English

courts, including courts of appeal, have acknowledged that this "sensible" notion "has hardened

into hornbook law."  *Id.*; *Lehman Bros. Int'l (Europe) v. Lehman Bros. Fin., S.A.*, [2012] EWHC

1072 (Ch), [41(i)] (Response Ex. 2), *rev'd on other grounds*, [2013] EWCA 188 (Civ) [27]

(Response Ex. 3) (noting the court's approval of the *Peregrine* line of cases as it applies to the

---

[8] Intel designated the Early Termination Date after the close of the markets on September 29, and the closing price for Intel common stock on the NASDAQ exchange on September 29, 2008 was $17.27.  SOF ¶¶ 17, 25.

[9] Indeed, had the closing-price of the deliverable Intel shares risen on September 29, 2008, such that their aggregate fair market value was over $1 billion, Intel's Loss as measured by Unpaid Amounts would have exceeded the contract price and a counterparty in Intel's position would surely have sought that as its Loss.

[10] Attached as Exhibit 1 to the Declaration of Mahesh Venkatakrishnan submitted in support of  Lehman's Response to ISDA [Doc. 67] ("Response Ex.").

1992 Master Agreement); *Lomas v. JFB Firth Rixson Inc.*, [2012] EWCA 419 (Civ) [129-131] (Response Ex. 4) (reaffirming *Peregrine*'s "hornbook law" and stating that "[f]aced with this unanimity of approach we would hesitate long before reaching a contrary view" concerning "the interpretation and application both of Loss and Market Quotation under the 1992 Master Agreement"); *see also Britannia Bulk plc (in liquidation) v. Bulk Trading S.A.*, [2011] EWHC 692 (Comm) (SJ Ex. 14).[11]

In accordance with this authority, and as elaborated in Plaintiffs' Memorandum of Law in Support of Their Motion for Summary Judgment [Doc. 58] ("Lehman Br.") (at 13-17), a "cross-check" under the Market Quotation measure leads to the *exact same result* as the Loss measure and New York law. That is because application of Market Quotation to this trade would, as with Loss, result in a close-out payment equal to the Unpaid Amounts in connection with the shares to be delivered on September 29, 2008. Specifically, $873 million, for 50.55 million shares multiplied by the fair market value of those shares on September 29, 2008.

## C.     New York Law Provides for the Identical Determination of Loss Here

New York law, which governs the Master Agreement, is also quite specific on how the particular losses at issue in this case—arising from a failure to deliver a fixed number of shares of stock—are to be determined.

New York law is "settled" that "'[t]he proper measure of damages for breach of contract is determined by the loss sustained or gain prevented at the time and place of breach . . . . The rule is precisely the same when the breach of contract is nondelivery of shares of stock.'"

---

[11] And, under either the Market Quotation or Loss close-out measure, "the loss of bargain must be valued on an assumption that, but for termination, the transaction would have proceeded to a conclusion, and that all conditions to its full performance by both sides would have been satisfied, however improbable that assumption may be in the real world." *Anthracite*, [2011] EWHC 1822 (Ch) [116(2)].

*Waxman v. Envipco Pickup & Processing Servs., Inc.,* No. 02 Civ. 10132, 2006 U.S. Dist.

LEXIS 44006, at *7 (S.D.N.Y. June 28, 2006) (quoting *Simon v. Electrospace Corp.*, 28 N.Y.2d

136, 145 (1971)).  Under this rule, the non-defaulting party's losses are measured by the fair

market value of the shares that were supposed to be delivered on the date that they were

supposed to be delivered.  "The damage award resulting from a breach of an agreement to

purchase securities is the difference between the contract price and the fair market value of the

asset at the time of breach . . . ."  *Sharma v. Skaarup Ship Mgmt. Corp.*, 916 F.2d 820, 825 (2d

Cir. 1990).  There is no "New York authority that even remotely undercuts" this rule.  *Id.*[12]

The manner of determining losses under New York law in connection with a failure to

deliver shares is thus the same for this transaction as under both Loss and Market Quotation.

The $1 billion prepayment by Intel to LOTC, *i.e.*, the "contract price" here, is not the "fair

market value of the (undelivered) asset" on the Early Termination Date of September 29, 2008.[13]

Rather, the fair market value of that undelivered asset was $873 million (50.55 million shares

multiplied by the $17.27 closing price on September 29, 2008).  Intel's recoverable loss under

New York law is thus $873 million, just as it is under the defined term "Loss" in the ISDA

Master and under the "cross-check" of applying the Market Quotation payment measure.

## II.    INTEL'S REMAINING BASES FOR SUMMARY JUDGMENT ARE CONTRADICTED BY THE CONTRACT'S PLAIN LANGUAGE AND ALSO PREDICATED ON DISPUTED FACTS

As shown above, the determination of Intel's Loss is controlled by the definition of Loss

and the provisions for recovery of Unpaid Amounts in the ISDA Master.  Intel, however, makes

---

[12] *See also* Lehman Br. at 18, n.9.

[13] And Intel knew from the outset that the number of shares would not be determined until after the Calculation Period.  Intel's prepayment did not purchase guaranteed value.

a series of assertions that are not based on the language of the Loss definition. They are, instead, based on inapposite contractual provisions, immaterial extra-contractual conduct and documents, and inapplicable equitable principles. None of these assertions shows that Intel's Loss determination was warranted in light of the plain language of the parties' Agreement; and, in any event, they either give rise to disputed issues of fact or show that a judgment for Lehman should be entered.

### A.   "Agreed Value" Is Not a Proxy for Loss

Intel asserts that because "the Agreed Value of the approximately 50.5 million shares, had they been delivered upon the Early Termination Date on September 29, was exactly $1 billion," Intel's "Loss determination was reasonable because it valued the undelivered shares the same way the contract valued delivered shares." Intel Br. at 19. That is not correct, and in fact this approach only underscores that Intel wrongfully seized the entirety of LOTC's collateral and that Lehman is entitled to a judgment here. As Lehman showed in its opening summary judgment brief (at 22-24), application of Section 5(d) in closing out this trade shows only that Intel would have been obligated to return to Lehman no less than approximately $100 million— and, indeed, as much as $228 million—of LOTC's collateral.

"Agreed Value," a defined term in Section 5(d) of the Confirmation, does not justify Intel's Loss determination because it is not a measure of Loss. Rather, Section 5(d) provides a *mechanism* for the manner that Intel's Loss is to be compensated, *i.e.* in terms of physical shares and cash; it is not used to measure or determine the amount of Loss. As Intel acknowledges, Section 5(d) requires that Loss be determined *before* the mechanism set forth in Section 5(d) can even be applied. *See* Intel Br. at 19 (noting that "[i]n step one, upon declaring an Early Termination Date, Intel determines its Loss . . . .").

15

Intel's presentation on this issue also ignores all of the contrary record evidence—from Plaintiffs' experts and the traders on this deal—who have testified that Section 5(d) is not appropriately used to determine the measure of Intel's Loss, but is only a mechanism for determining the mix of shares and cash to be provided to Intel after its Loss is determined.[14] Contrary to Intel's approach, and as Plaintiffs' experts and traders on this deal have testified, "Agreed Value" is used within Section 5(d) for the purpose of valuing the shares that had, up until the designation of the Early Termination Date, already been acquired by LOTC in connection with this trade (*i.e.* the Hedge Positions), and solely to calculate the "amount in cash," if any, to accompany those shares to fully compensate Intel for its Loss.[15]  The use of the term "Agreed Value" to determine the cash component of Intel's close-out compensation under Section 5(d) simply does not override the mechanism in the parties' Agreement for determining Loss where, as here, the only pertinent input is Unpaid Amounts.

---

[14] For example, Kevin Murphy, head of the structured volatility trading desk at Lehman in 2008, did not agree with Intel's position that the term "Agreed Value" in Section 5(d) of the Confirmation means "the value that was agreed to by the parties."  K. Murphy Dep. Tr. at 131:15-20, attached as Exhibit 4 to the Declaration of Mahesh Venkatakrishnan, submitted herewith ("Opposition Ex.").  Mr. Murphy further testified that, based on Section 5(d)(y), "the notion of Agreed Value of shares is in Section 5(d) solely as a way to determine what amount will be subtracted from the 'Lehman Payment Amount,'" which "refers to the Loss that is to be determined pursuant to the ISDA contract."  *Id.* at 204:6-10, 205:21-206:15."  Plaintiffs' experts further confirm Mr. Murphy's testimony.  *See* J. Bradbury Dep. Tr. at 216:12-19 and errata (Opposition Ex. 1) (testifying that Section 5(d) of the Confirmation does not "instruct the parties how to determine Loss"; rather, the non-defaulting party determines its "Loss under the Master Agreement for each section 6(d)(ii) and 6(e) and going down . . . to the Second Method and Loss provision."); *id.* at 216:22-217:2 and errata  (Section 5(d) merely "tells you how to divide the shares and cash.  You figure out how many shares and how much cash [to deliver upon Early Termination] based on using the Loss that you determine under the contract[, the] Master Agreement. . . .").

[15] *See* J. Bradbury Dep. Tr. at 160:5-8, 161:7-13 (testifying that Section 5(d) "deals with a situation that never occurred because there was never a partial delivery of shares," *i.e.* Section 5(d) only applies "[i]f there's a delivery of shares at early termination."); B. Lucas Dep. Tr. at 43:5-7 (Opposition Ex. 2) (testifying that Section 5(d) of the Confirmation "does not apply to this situation because there was no partial delivery.").

**B.**    **Intel's Assertions About Its Accounting Treatment for the Trade Do Not Support Its Loss Determination**

Intel next argues that "the value to Intel" of this transaction was exactly $1 billion, simply because that is how Intel chose to account for it as an internal matter. *See* Intel Br. at 20. Intel may not invoke its own internal, subjective valuation of this trade as support for its determination of Loss. This internal accounting approach ignores that the undelivered shares here are, in accordance with the definition of Loss and the ISDA Master, to be valued as Unpaid Amounts on the basis of their *fair market value* on the Early Termination Date. *See Getty Oil Co. v. Dept. of Energy*, 569 F. Supp. 1204, 1216 (D. Del. 1983) (evidentiary hearing would not be required regarding "accounting treatment of transfers under [the applicable] agreements" because "there is no ambiguity in the language of the contract which needs to be clarified by parol evidence").

Moreover, Intel's argument proves too much. If the parties *had* wanted to fix Intel's Loss at $1 billion, plus interest, as Intel asserts it is proper to do, it would have been a simple matter for the contract to so state. As Intel would have it, its Loss would always be equal to its purchase price in the event of an Early Termination of the trade. But the contract does not provide for such a simplistic refund as the measure of Loss, without regard to the fair market value of the undelivered obligation.[16] To the contrary, because Intel's Loss here was in connection with an obligation that had already become due at the time Intel declared an Early Termination Date, the

---

[16] According to both Intel's purported Calculation of Loss, dated September 29, 2008, and its internal accounting treatment for the transaction, Intel was due a delivery worth "US $1 billion" on September 29, 2008. Assuming for the sake of argument that this were the value of LOTC's delivery obligation, Intel still cannot justify its seizure of close to $2 million in interest earned on the $1 billion collateral posted by Lehman. SOF ¶ 29. Interest of course could not have accrued on a $1 billion delivery obligation the very day it was due, which was also the date "as of" which Intel's Loss was calculated. *See* Master Agreement § 14 (definition of "Loss"). The amount of interest is small relative to the overall amount in dispute, but that Intel also seized interest on the collateral only underscores that what it really did here was take back its purchase price—which is an unlawful, self-help rescissionary remedy and not, in this circumstance, a reasonable Loss determination.

contract provides for a specific mechanism to value that undelivered obligation—*i.e.*, its fair market value on the date it was to be delivered—and for determining Intel's Loss.

In any event, even assuming that it would be appropriate for Intel to rely on its own internal accounting treatment in determining its Loss here, there are myriad issues of fact that would preclude summary judgment for Intel on this basis. █████████████████████

█████████████████████████████████████████████

██████████████████████████████████████

██████████████████████████████████████

█████████████████████████████████████

██████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

██████████████████████████████████

████████████████████████████████████████

██████████████████████████████████████████

█████████████████████████████████████████

█████████   ██████████████████████████████

─────────────────────

17 █████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████

████████████████████    At a bare minimum, this conflicting testimony by one of Intel's

own witnesses gives rise to a disputed issue of fact, even assuming that Intel's internal

accounting treatment were relevant to its determination of Loss here—and it is not.

Intel's Treasury Department was also well aware that its accounting treatment of share-

repurchase transactions was quite different from, and not a proxy for, the valuation of delivered

shares as a matter of the parties' Agreement. ████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████

██████████████████████████████████████████████████

--------------------------------

(continued…)

████████████████████████████████████████████████████

████████████████████████████████

18 ██████████████████████████████████████

████████████████████████████████████████  Intel's Treasury Accounting Controller affirmed this
proposition when she testified:  "[W]hen you own stock, the risks and rewards of ownership do include the change
in stock price."  T. Stevens Dep. Tr. at 117:6-8. ████████████████████████████████

████████████████████████████████████████████, Intel's Treasury

Department witnesses unambiguously testified that they did not understand their accounting for

Intel's trade with LOTC to be a determination of Intel's Loss. They acknowledged that they

have no experience in making Loss determinations under an ISDA Master and were not asked

for, and did not provide, a determination of Intel's Loss here. Intel's Treasury Accounting

Controller, Tonya Stevens, testified that she does not have "any legal expertise in what is owed

on an event of default . . . under an ISDA Master Agreement," and she "would look to the

lawyers on that." T. Stevens Dep. Tr. at 6:21-22, 78:20-25. Ms. Stevens also testified that she

has no experience in calculating Loss under an ISDA Master Agreement, nor has she ever been

asked to make such a calculation. *Id.* at 79:2-9. And she further stated that she does not know of

anyone in the treasury accounting department who was asked to make a determination of Loss in

connection with the transaction at issue because "[t]hat would be outside of our scope and should

probably be treasury or legal scope." *Id.* at 79:14-21.

Likewise, Intel's Treasury Accounting Central Function Controller, Gary Shymkiw,

testified that he has never been asked to calculate Loss pursuant to a transaction governed by an

ISDA master agreement, and he did not make a determination of Loss in connection with Intel's

transaction with LOTC at issue here. G. Shymkiw Dep. Tr. at 7:11-15, 58:23-61:19. Similarly,

when asked if he understood that Intel's right to set off against the collateral depended upon a

determination of Loss pursuant to the legal documents that governed the transaction, Mr.

Shymkiw stated he "wasn't thinking of it in those terms" because he is not a legal expert. *Id.* at

_____

(continued…)

████████████████████████████████████████████████████████
██████████████████████████████████

110:9-15.  Mr. Shymkiw also agreed that the amount of Intel's claim on the collateral is a legal

question, rather than an accounting question.  *Id.* at 119:21-120:9.

### C.   The Parties' Definition of the "Secured Party's Exposure" Did Not Fix Intel's "Loss"

Intel next claims that by designating Intel's "Exposure" as $1 billion, the parties' contract

set "$1 billion as the value of the obligations owed to Intel upon early termination." Intel Br. at

21.  According to Intel, the Exposure provision "reveal[s] an intention to value . . . performance

outstanding . . . based on the VWAP" for purposes of calculating Loss.  *Id.* at 22.

Intel's argument collapses on itself.  That the contract defines Intel's Exposure as exactly

$1 billion only further underscores that, if the parties had wanted to similarly declare that Intel's

Loss upon declaration of an Early Termination Date would be exactly $1 billion, the contract

could have, and should have, said so.  As Lehman's experts have testified, Exposure is

inapposite when determining Loss.  *See* B. Lucas Dep. Tr. at 180:22-181:13 ("[T]he definition of

Exposure is not intended to be synonymous with Loss. . . . in this case, the parties chose to define

Exposure as a billion dollars . . . [but that] does not mean that that is the amount of Loss.").

Indeed, even Intel's own expert agrees that Exposure and Loss are not synonymous.  *See* J.

Golden Expert Report at p. 33, ¶ 110 (Opposition Ex. 13).

In any event, the definition on which Intel relies is not applicable here.  Intel's argument

is derived from the definition of "Exposure" in the 1994 ISDA Credit Support Annex.  *See* Intel

Br. at 21 n.7 (where Intel cites the Confirmation's reference to "Exposure," without fully quoting

it as "Secured Party's Exposure," and then pivots to invoke a different definition from the Credit

Support Annex in a footnote).  *But the parties did not incorporate that definition into their

agreement.*  To the contrary, the Confirmation sets out a separate, customized definition of

"Secured Party's Exposure" that differed from, and superseded, the definition of "Exposure" in

the Credit Support Annex.  In particular, the Confirmation states in pertinent part simply that "Secured Party's Exposure means USD 1 billion," without any of the language concerning the termination-date value of the trade from the Credit Support Annex on which Intel's argument depends.  Confirmation § 6(d)(C).

Indeed, the Confirmation reflects that the parties did *not* intend for the definition of "Secured Party's Exposure" to be a proxy for the value of the trade to Intel upon termination of the trade.  While "Exposure," as defined in the Credit Support Annex, is measured for any particular date as the value of the trade to the secured party as if the trade were being terminated on that date, that definition and approach does not apply here, where the parties elected to fix Intel's exposure at $1 billion, rather than have the collateral float with the value of the trade.  As Lehman's experts have testified, parties may decide to customize a definition that fixes an Exposure amount, as they did here, to "avoid all of the mechanics of the transfers of collateral during the life" of the trade.  J. Bradbury Dep. Tr. at 203:19-24.

### D.    Intel May Not Use Restitution as a Substitute for Determining Its Loss

Intel next asserts that its Loss determination is supported by "the equitable principle of restitution."  Intel Br. at 22.  As an initial matter, restitution is not permissible as a measure for Loss in the circumstances here because it conflicts with the definitions of Loss and Unpaid Amounts in the 1992 ISDA Master, would eviscerate the choice of Second Method by allowing a non-defaulting party to deprive a defaulting party of any payment due to it, and fails the cross check under the Market Quotation payment measure.  *See infra* at 6-12.

New York law, which again governs this Agreement, is also crystal clear that a party in Intel's position for this transaction is *not* permitted to treat the contract as though it did not exist and seek rescission or restitution through self-help.  Those equitable remedies are available only when there is no remedy at law for the non-defaulting party.  *See Rudman v. Cowles Commc'ns,*

*Inc.* 30 N.Y.2d 1, 13 (1972) (restitution may be invoked "only when there is lacking a complete and adequate remedy at law"); *Tech. Express Inc. v. FTF Bus. Sys. Corp.*, No. 99 Civ. 11692, 2000 U.S. Dist. LEXIS 18518, at *16 (S.D.N.Y. Dec. 26, 2000) (noting that to recover in restitution plaintiff must show "that the circumstances were such that equity and good conscience require the defendant make restitution"). That is patently not the case here. The parties' agreement *provides* a specific methodology to determine Intel's losses and allowed for Intel to set off its loss against the collateral posted by Lehman. That contractual methodology is also fully in accord with settled New York law.[19]

ISDA declares in its brief that restitution is an appropriate measure of Loss because there was a "total breach" by Lehman. But ISDA's brief does not cite any cases that concern a failure to deliver contracted-for shares of stock. And courts have made clear that, in the context of an agreement to deliver shares whose value is known on the date of breach, this equitable theory of recovery is not cognizable as a matter of law. *See Waxman v. Envipco Pick Up & Processing Servs., Inc.*, No. 02 Civ. 10132, 2006 U.S. Dist. LEXIS 3883, at * 19-20 (S.D.N.Y. Jan. 17, 2006) ("*Waxman I*") (granting partial summary judgment to the defendant on the question of plaintiffs' entitlement to restitution damages for the defendant's failure to deliver securities even assuming that defendant's failure to deliver constituted a "total breach," because "all that

---

[19] The cases Intel cites are inapposite. They stand for the unremarkable proposition that where a total breach occurs, the non-breaching party is entitled to restitution if the contracted-for goods or services do not have a defined value. For example, in *Technology Express, Inc. v. FTF Bus. Sys.*, the plaintiff agreed to purchase 500 computers from the defendant for $525,000. 2000 U.S. Dist. LEXIS 18518, at *14 (S.D.N.Y. Dec. 26, 2000). Plaintiff transferred $525,000 in advance of the delivery, but the defendant never satisfied its obligations to deliver the computers. The court granted "restitution as an alternative to contractual liability." *Id.* at *15. The contract in *Technology Express*, unlike the Swap Agreement, also did not involve stock, but computers. Furthermore, the court in *Waxman I* considered and rejected reliance on *Technology Express* for determining losses in connection with the failed delivery of shares of stock. *Waxman I*, 2006 U.S. Dist. LEXIS 3883, at *15-18. Similarly, *Men's Sportswear* did not deal with the sale of securities. *In re Men's Sportswear, Inc.*, 834 F.2d 1134, 1140-41 (2d Cir. 1987).

remained was for [the defendant] to transfer a fixed sum of securities whose value on any

particularly date is easily determined").[20]

   In any event, as ISDA should be well aware, there was no "total breach" here.  The event

that triggered the Early Termination Date here was the bankruptcy filing by the Credit Support

Provider under the parties' agreement, not LOTC's failure to deliver the shares at issue.  Indeed,

LOTC's failure to deliver the shares called for by the agreement could not have been the

triggering Event of Default on September 29, 2008—the date Intel designated as the Early

Termination Date—because that failure to deliver would not have ripened into an Event of

Default until the end of a three-day cure period granted by the Agreement.  *See* 1992 ISDA

Master Agreement § 5(a)(i).

   Moreover, neither the occurrence of a Bankruptcy Event nor even a Failure to Deliver

was a "breach" of the agreement, let alone a "total breach."  "Failure to Deliver" and a

"Bankruptcy Event" are prescribed Events of Default in the ISDA Master.  Upon designation of

an Early Termination Date on the basis of the occurrence of these or other defined Events of

Default, the parties' contract specified close-out payment measures and particular procedures for

applying those measures to determine a close-out amount.  Neither Event constituted a "breach"

of the Agreement.  Intel therefore may not now claim a right to restitution, which is what its

seizure of the collateral really was.

   It also would have been a straightforward drafting matter if the parties had wanted to

provide for an outright return of the $1 billion prepayment with interest in the event of an Early

---

[20] *See also* Restatement (Second) of Contracts § 373(2) cmt. b. (1981) ("If, after one party has fully
performed his part of the contract, the other party then refuses to pay a definite sum of money that has been fixed as
the price for that performance, the injured party is barred from recovery of a greater sum as restitution."); 11 Joseph
M. Perillo, *Corbin on Contracts* § 55.13 (2005) ("In the process of determining values, market prices will always be
used if such prices are available.").

Termination Date.  The parties could have simply drafted a provision that Intel's Loss would be $1 billion in the event of designation of an Early Termination Date if that is what they intended. But that is *not* what the contract says.  And, as Lehman's experts have testified, such a provision would be the only appropriate way to rely on a restitutionary remedy as a measure of a party's Loss.[21]  The parties here also did indeed expressly provide for a restitutionary remedy in other specific contexts.  Specifically, the Confirmation provided for a so-called "Nullification" prior to August 29, 2008 in situations where the volatility of Intel's stock exceeded certain levels.  In such cases, the Agreement would "automatically terminate" and "all of the respective rights and obligations of [the parties would] be cancelled and terminated."  Confirmation § 1 (definition of "Table Amount").  Were this to occur, "any amounts previously transferred from one party to the other with respect to the Transaction shall promptly be returned."  *Id.  That* is a restitutionary remedy, expressly provided for in the parties' contract, but it is not properly part of a Loss determination in the absence of similar language providing for it in that context.

### E.    Contemporaneous Valuations Support Plaintiffs, Not Intel



---

[21] *See* J. Bradbury Dep. Tr. at 185:20-186:18 ("Restitution is not part of . . . [an] early termination calculation unless . . . you write it into your confirm because this . . . industry does not value derivatives transactions on the basis of unwinding the trades as though there had never been one. . . . We all understood that we would be looking at the market value of the transaction on the early termination."); B. Lucas Dep. Tr. at 192:15-193:19 ("Loss was never intended to mean rescission. . . . [W]hat happens in the derivatives market is that parties change position and contracts change value on a daily basis and it's impossible just to reset the clock and pretend that this never happened.  So, if parties wanted rescission . . . they could have drafted that. . . . But without having contracted specifically for something along those lines, in my mind, Loss and rescission are completely different concepts.").

███████████████████████████████████████████

████████████████████████████████████████████████

█████████████████████████████████████████████

█████████████████████████████████████████████

███████████████████████████████████████

████████████████████████████████████████████████

█████████████████████████████████████████████

██████████████████████████████████ [22] As shown above, the plain language of

the Loss Definition and Unpaid Amounts, the cross-check under the Market Quotation close-out

measure, case law interpreting these provisions, and New York law all show how Intel's Loss

was to be determined as a matter of law:  on the basis of the fair market value of the shares that

were to be delivered on the date they were to be delivered.

████████████████████████████████████████

███████████████████████████████████████

██████████████████████████████████████████████

████████████████

█████████████████████████████████

█████████████████████████████████████████████

█████████████████████████████████████████████

---

[22] *See General Motors Corp. v. Fiat S.p.A.*, 678 F. Supp. 2d 141, 148 (S.D.N.Y. 2009) (excluding from consideration on summary judgment a letter and an invoice sent after the execution of a contract where the contractual language was unambiguous); *World Props., Inc. v. Arlon, Inc.*, 663 F. Supp. 2d 98, 104 (D. Conn. 2009) (excluding from consideration at summary judgment a letter outlining one party's interpretation of the meaning of a contractual provision; "because the Court finds that the contract is unambiguous, the Court will not consider extrinsic evidence").



This consensual termination of the trade did not occur. But former Lehman traders testified unambiguously that the trade should have been properly valued at the share price of the undelivered shares on the Early Termination Date. For example, Mr. Murphy testified unambiguously that where, as here, the number of shares to be delivered is known with certainty, all that is necessary to value the derivative trade on the Settlement Date is the spot price of the shares to be delivered on that date. K. Murphy Dep. Tr. at 190:20-191:11. Therefore, if Lehman

---

[23] ███████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████

[24] Lehman traders Kevin Murphy and ███████████████ also testified that, ███████████████ ███ Lehman would value "whatever shares it delivered based on the spot price as of that day." K. Murphy Dep. Tr. at 153:23-154:4. ████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████

was supposed to deliver 50,552,943 shares to Intel on September 29, 2008, and the spot price of

Intel stock on September 29, 2008 was $17.27 per share, it is "accurate to say that to value this

ASR trade on September 29, 2008, you multiply the 50.55 million shares by the $17.27 per share

price for Intel stock on September 29, 2008." *Id.* at 191:25-192:21.[25]

██████████████████████████████████████████████

████████████████████████████████████████████████

██████████████████████████████████████. Accordingly, even

assuming that it were appropriate for the Court to rely on these extra-contractual determinations

here—and Plaintiffs submit that it is neither necessary nor appropriate to rely on such material in

light of the plain language of the parties' contract and applicable law—the record in fact shows

that Intel should have determined its Loss on the basis of the fair market value of the shares to be

delivered on the date that they were to be delivered.  The same result obtains under a proper

interpretation of the ISDA Master and New York law.  ████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████

### F.    Intel May Not Insulate Its Loss Determination From Scrutiny By Invoking an Inapposite Provision in the Equity Derivatives Definitions

Finally, Intel claims that Section 9.12 of the Equity Derivatives Definitions "required

LOTC to indemnify Intel for 'any costs, losses or expenses' resulting from LOTC's failure to

---

[25] ████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████

deliver shares." Intel Br. at 24. Notably, in its advocacy brief in support of Intel, even ISDA refused to adopt Intel's extreme position that Section 9.12 gave Intel an independent ground to claim the $1 billion. *See* ISDA's *Amicus Curiae* Memorandum of Law in Support of Intel's Motion for Summary Judgment [Doc. 57-1] at 6, n.2 (stating merely that"[t]he appropriateness of the choice of Loss, with its indemnification characteristic, in the transaction in question is underscored by the fact that the Confirmation invokes the ISDA Equity Definitions").

Intel's position is also not only extreme, but wrong. The Master Agreement trumps the Equity Definitions (*see* Confirmation p. 1), and once an Early Termination Date is declared, Intel cannot resort to indemnification under Section 9.12 of the Equity Definitions. Early Termination Date and Indemnification are mutually exclusive, and a party cannot "double dip" by taking advantage of both provisions. Under Intel's reading, a party could improperly demand an amount *twice*, as both its Loss and Indemnification under Section 9.12 of the Equity Definitions.

By its terms, Section 9.12 applies "prior to the occurrence or effective designation of an Early Termination Date." Equity Definitions § 9.12. Intel accordingly acknowledges that this "section provides that the failure to deliver must predate the designation of the Early Termination Date," but then goes on to state that the failure to deliver "plainly" predated the designation of the Early Termination Date. Intel Br. at 24. However, contrary to Intel's approach, when an Early Termination Date is designated, the entire day is designated as the Early Termination Date, not the just the time of day after which the Early Termination Date was declared. *See* Master Agreement § 12 (stating that a notice will be deemed effective "on the *date* it is delivered" (emphasis added)). Here, although Intel waited to declare an Early Termination Date until after Lehman failed to deliver shares by its deadline of 4:30 p.m. on September 29, 2008, both the non-delivery and the declaration of an Early Termination Date occurred on that date.

29

Section 9.12 of the Equity Definitions is also not applicable upon declaration of an Early

Termination Date.  As one of Lehman's experts has testified,  Section 9.12 is "not part of a Loss

calculation" because it only applies "prior to the occurrence or effective decision of an early

termination date."  B. Lucas Dep. Tr. at 172:18-20.  Specifically, Section 9.12 is "not the

provision that applies to the circumstance here" because "[t]he failure was contemporaneous

with the declaration of the early termination date.  It occurred on September 29th, which is the

day that the early termination was declared."  *Id.* at 173:2-7.  Section 9.12 of the Equity

Definitions applies only to what is known as "operational fails" that occur during the life of the

deal, and it is inapplicable to closing out a trade upon the occurrence of an Event of Default.[26]

Upon declaration of an Early Termination Date, the Non-Defaulting party can no longer resort to

indemnification under Section 9.12, but must instead close out the transaction pursuant to the

close-out methodology chosen by the parties to the agreement, here Second Method and Loss.[27]

---

[26] Specifically, Lehman's expert testified that Section 9.12 of the Equity Definitions "is inapposite" to a Loss determination, and described the type of situation to which this provision applies: "an operational fail which is very common in the securities and equity derivatives business. [A]ll [Section 9.12] is saying is if there's a fail[ure] to deliver prior to a termination and the party who was entitled to the delivery then has to go out into the market and incur costs because of that fail, that it's entitled to be indemnified.  So if you were supposed to deliver shares to me and I'm short and I have an obligation to cover, this would protect me in going out into the market and borrowing those shares from someone else."  B. Lucas Dep. Tr. at 171:23-172:12, 174:11.

[27] As Lehman's expert testified, Section 9.12 "applies to failures to deliver that are operational in nature" and does not apply to failures to deliver that are "events of default. When you have an event of default, what you trigger is the closeout methodology that was selected by the parties to the agreement which, in this case, was Loss." B. Lucas Dep. Tr. at 175:2-8.  When asked if Section 9.12 should inform the parties application of Loss, Lucas testified it should not "[b]ecause [Section 9.12] is intended to cover a very different situation which . . . is understood in market parlance to refer to something that is short of an event of default . . . And this gives the party who is harmed by that failure to deliver an ability to -- to make itself whole. But that is different than a Loss calculation."  *Id.* at 177:20-178:4.

## CONCLUSION

Lehman respectfully requests that the Court deny Intel's motion for summary judgment, grant Lehman's motion for summary judgment, and enter judgment for Lehman against Intel in the amount of no less than the principal amount of $129 million, plus interest.

Dated:  February 23, 2015
        New York, New York

Respectfully submitted,

JONES DAY

By:

Robert W. Gaffey
Jayant W. Tambe
Todd R. Geremia
Mahesh Venkatakrishnan
JONES DAY
222 East 41st Street
New York, New York 10017
Telephone: (212) 326-3939
Facsimile:  (212) 755-7306

*Attorneys for Plaintiffs,*
*Lehman Brothers Holdings Inc. and*
*Lehman Brothers OTC Derivatives Inc.*

## CERTIFICATE OF SERVICE

I, Mahesh Venkatakrishnan, hereby certify that on February 23, 2015, a true and correct

copy of the foregoing document was served upon all counsel of record via the Court's CM/ECF

system, electronic mail and/or overnight mail.

Dated:  February 23, 2015
      New York, New York

    */s/ Mahesh Venkatakrishnan*
    Mahesh Venkatakrishnan
    JONES DAY
    222 East 41st Street
    New York, New York 10017
    Telephone: (212) 326-3939
    Facsimile: (212) 755-7306

    *Attorney for Plaintiffs,*
    *Lehman Brothers Holdings Inc. and*
    *Lehman Brothers OTC Derivatives Inc.*