JONES DAY
222 East 41st Street
New York, New York 10017
Telephone: (212) 326-3939
Facsimile: (212) 755-7306
Robert W. Gaffey
Jayant W. Tambe
Todd R. Geremia
Mahesh Venkatakrishnan

*Attorneys for Plaintiffs*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | | |
|---|---|---|
| In re: | : | Chapter 11 |
| LEHMAN BROTHERS HOLDINGS INC., *et al.*, | : | Case No. 08-13555 (SCC) |
| Debtors. | : | (Jointly Administered) |
| | | |
| LEHMAN BROTHERS HOLDINGS INC. and LEHMAN BROTHERS OTC DERIVATIVES INC. | : : | |
| | : | Adv. Proc. No. 13-01340 (SCC) |
| Plaintiffs, | : | |
| v. | : | |
| INTEL CORP., | : | |
| Defendant. | X | |

**PLAINTIFFS' REPLY BRIEF IN FURTHER SUPPORT OF THEIR
MOTION FOR SUMMARY JUDGMENT**

## TABLE OF CONTENTS

Page

INTRODUCTION ................................................................................................................. 1

    I.     INTEL'S LOSS HERE IS $873 MILLION ............................................................. 2

         A.     Intel Did Not Have Discretion to Take a Refund ........................................ 2

         B.     New York Law Also Mandates That Intel's Loss Is $873 Million ............. 7

         C.     The Cross Check Confirms Intel's Loss Is $873 Million ......................... 10

    II.    THE CONFIRMATION DOES NOT REDEFINE LOSS ................................. 11

         A.     Section 5(d) of the Confirmation Does Not Support Intel's Loss ........... 11

         B.     "Secured Party's Exposure" Does Not Support Intel's Loss
               Determination ............................................................................................ 14

CONCLUSION ................................................................................................................... 15

# TABLE OF AUTHORITIES

Page

**CASES**

*Britannia Bulk plc (in liquidation) v. Bulk Trading S.A.*,
  [2011] EWHC 692 (Comm) ................................................................................. 10

*Lehman Bros. Int'l (Europe) v. Lehman Bros. Fin., S.A.*,
  [2012] EWHC 1072 (Ch) .................................................................................... 10

*Lehman Bros. Special Fin. Inc. v. Ballyrock ABS CDO
  2007-1 Ltd. (In re Lehman Bros. Holdings)*, 452 B.R. 31, 35 (Bankr. S.D.N.Y.
  2011) ..................................................................................................................... 4

*Lomas v. JFB Firth Rixson Inc.*,
  [2012] EWCA 419 (Civ) ............................................................................... 10, 11

*Men's Sportswear, Inc. v. Sasson Jeans, Inc. (In re Men's Sportswear, Inc.)*,
  834 F.2d 1134 (2d Cir. 1987) ............................................................................... 8

*Sharma v. Skaarup Ship Mgmt. Corp.*,
  916 F.2d 820 (2d Cir. 1990) .............................................................................. 1, 8

*Waxman v. Envipco Pick Up & Processing Servs.*,
  Inc., No. 02 Civ. 10132 (GEL), 2006 U.S. Dist. LEXIS 44006 (S.D.N.Y. June
  28, 2006) ............................................................................................................ 8, 9

*Waxman v. Envipco Pickup Processing Servs.*,
  2006 U.S. Dist. LEXIS 3883 (S.D.N.Y. Jan. 31, 2006) ........................................ 9

**STATUTES**

N.Y. U.C.C. § 2-105(1) .............................................................................................. 8

**INTRODUCTION**

This case involves a single trade and Lehman's failure to deliver on a date certain a fixed number of shares with an established market price. In this circumstance, the language of the contract and New York law establish that Intel's Loss was the fair-market value of that number of shares on the date they were to be delivered. Intel evades that point, offering a menu of arguments about *other* scenarios (such as how to value future obligations), or contract provisions that do not apply (governing how Intel's Loss was to be paid, not how it is determined) or hypotheticals that do not even *resemble* the undisputed facts here. In its zeal to avoid the real issue and the applicable law, Intel goes so far as to completely ignore a binding Second Circuit decision holding that there is no "New York authority that even remotely undercuts" the rule that losses for undelivered securities are measured by their market value on the date they were to be delivered. *Sharma v. Skaarup Ship Mgmt. Corp.*, 916 F.2d 820, 825 (2d Cir. 1990).

As part of this diversionary approach, Intel devotes page after page to arguing what Loss is *not*. And ultimately, Intel asserts it should be afforded "considerable flexibility," by which it really means unbridled discretion to determine its Loss however it decides. But, whatever discretion a derivative counterparty might have in determining Loss in different circumstances, the parties' contract and New York law do not afford Intel such discretion here, when the only issue is the measure of Loss arising from a failure to deliver a fixed amount of shares on a set date and that loss is measured by the fair-market value of those shares on that date.

Intel does not seriously come to grips with any of the three sources of authority that each confirm this result: the parties' chosen Loss method, New York law, and a cross check under the alternative Market Quotation closeout method. Instead, Intel offers a "heads I win, tails you lose" approach, under which it would be afforded the option to rescind the trade if it would not benefit from the fair-market value of what it contracted to receive. Quite apart from its

absurdity, such an option to walk away from the trade to which it agreed would wholly undermine the jurisprudence for closing out derivatives.  Contrary to the closeout for any other trade of which Plaintiffs are aware, Intel's approach to terminating a derivative governed by Loss would eliminate any chance for a defaulting party to receive the economic benefit of the trade and, in this regard, would eviscerate the "Second Method" chosen by the parties here—and for hundreds of thousands of other derivatives trades—pursuant to which a defaulting party must be paid amounts owing to it upon early termination.

Intel should not, in short, be permitted to act as though it never did this trade, never took market risk, and never signed this contract.  It may not take back its purchase price.  Under the plain language of the parties' contract and New York law, Intel's Loss for the sole past-due deliverable at issue here was the fair-market value of that deliverable on the date it was due.

## I.    INTEL'S LOSS HERE IS $873 MILLION

Intel tries to distinguish away the measure of its Loss for past-due obligations, New York law, and the application of Market Quotation as a cross check.  But, notwithstanding Intel's efforts to replace each of these specific measures of Loss with its own unfettered discretion, all of these sources point to the same result:  Intel's Loss was $873 million, as measured by the fair-market value of the shares it was entitled to receive on September 29, 2008.

### A.    Intel Did Not Have Discretion to Take a Refund

Intel uses the euphemism "flexibility" for the notion that it had unchecked power to determine its Loss for itself and that it was not required to use "any particular methodology for valuing or measuring losses and costs."  Memorandum of Law in Opposition to Plaintiffs' Motion for Summary Judgment [Doc. No. 82] ("Intel Br.") at 5.  But the Loss definition is express that Loss "includes" "losses and costs (or gains) in respect of any payment or delivery required to have been made on or before the relevant Early Termination Date and not made."

2

ISDA Master § 14 (definition of "Loss") (SJ Ex. 1).[1]  And that, as Intel's brief acknowledges and ISDA has expressly stated, refers to past-due obligations valued as Unpaid Amounts.

Intel makes two assertions in contending that it is permitted to ignore this sentence entirely.  First, Intel states that the type of Loss referred to here is a "past-due deliverable" and pretends this is something other than an Unpaid Amount.  That does not work.  Intel itself acknowledges, as it must, that the "past-due deliverables" referred to in the Loss definition "are to be treated as Unpaid Amounts."  Intel Br. at 9 n.6.  To blunt the impact of this admission, Intel argues that this is only so when Loss is used as a fallback to Market Quotation, as if the language of the provision magically changes in those circumstances.  *See id.*  But there is nothing in the Loss definition that supports Intel's scotch-taped argument that employing Loss as a fallback is the *only* situation in which "past-due deliverables" are valued as Unpaid Amounts.  That part of the definition prevents against double-counting by saying that what Intel refers to as "past-due deliverables" are *not* to be included as part of Loss in only one situation:  when they otherwise would be counted as Unpaid Amounts under the Market Quotation method, *i.e.* they cannot be counted twice.  That is, sensibly—and as the provision actually says —"so as to avoid duplication."[2]  But that is the *sole* exception.  Otherwise, the contract declares quite expressly that Loss "includes" what Intel acknowledges are "Unpaid Amounts."[3]

---

[1] Citations to "SJ Ex." are to Exhibits to the Declaration of Mahesh Venkatakrishnan [Doc. No. 63].

[2] ISDA Master § 14 (definition of "Loss").  ISDA made the same point in *Lomas*, where it stated, "Because Market Quotation already takes into account these obligations ['losses and costs (or gains) in respect of any payment or delivery required to have been made . . . on or before the relevant Early Termination Date and not made'] as Unpaid Amounts, they are excluded from the fall-back Loss calculation to prevent double counting."  Statement of Undisputed Facts in Support of Plaintiffs' Motion for Summary Judgment ("SOF") [Doc. No. 62] ¶ 34.

[3] The definition of "Settlement Amount" underscores this.  When Loss is used as fallback to Market Quotation, a party's Loss is included in the Settlement Amount but "without reference to any Unpaid Amounts."  ISDA Master § 14 (definition of "Settlement Amount").  That is because Loss is used as a fallback only where market quotes for future obligations either cannot be obtained or they lead to an unreasonable result.  *See id.*  In this situation, past-due obligations are separately included as Unpaid Amounts in the calculation of the closeout amount, pursuant to Section 6 of the contract.  *See id.* § 6(e)(i)(1) & (3).  There would be no reason to state that Loss shall

3

Second, Intel advances the notion that it is free to ignore the market value of the past-due deliverable it was owed on the trade and determine its Loss in some other way that maximizes the benefit to it. As a threshold matter, this would eviscerate the well-established proposition, embodied in the Second Method chosen by the parties here and governing hundreds of thousands of other trades, that a defaulting party in a derivative trade is entitled to the value of the economic benefit of the trade upon termination.[4] Intel's approach also would convert mandatory language in the Loss provision into an option. According to Intel, the operative sentence in Loss is there only "[t]o clarify that Loss *could* now be applied to past-due deliverables." Intel Br. at 9 (emphasis added). But the contract is not permissive here. It does not say that Loss "could" or "may" include the value of past-due obligations or that Intel has "flexibility" to ignore their fair-market value. It states in a plain, declarative sentence that Loss "*includes*" losses for past-due deliverables. That is, in context, mandatory language. In other words, past-due deliverables, when they have occurred, must be "include[d]" in Loss. And, of course, they must be *valued* to be included in Loss. Nothing in this contract even suggests that Intel was entitled to do what it did here: tote up its prepayment amount, add interest, and declare that as its "Loss," all without even pausing to determine the fair-market value of the deliverable on the date it was due.

It is undisputed that LOTC owed Intel 50.5 million shares on September 29, 2008—which was also the Early Termination Date declared by Intel—and that the closing price of Intel shares on that date was $17.27. SOF ¶¶ 15, 17, 25. Loss must be determined "as of the relevant Early Termination Date, or, . . . as of the earliest date thereafter as is reasonably practicable."

---

not include Unpaid Amounts in this specific situation unless, as a general matter, Loss *does* include Unpaid Amounts.

[4] *See, e.g.*, *Lehman Bros. Special Fin. Inc. v. Ballyrock ABS CDO 2007-1 Ltd. (In re Lehman Bros. Holdings)*, 452 B.R. 31, 35 (Bankr. S.D.N.Y. 2011) (Peck, J.) ("The parties agreed that any termination payment would be calculated using a recognized industry methodology referred to as the 'Second Method,' which calls for payment to the in-the-money counterparty regardless of whether it was also the defaulting party.").

4

ISDA Master § 14 (definition of "Loss").  The fair-market value of the past-due obligation here as of the Early Termination Date was $873 million: 50.5 million shares at their closing price of $17.27.  There is no other way to properly value it, as a matter of New York law, even putting to one side that this is precisely how the contract instructs the parties to value this specific type of loss in the form of Unpaid Amounts.[5]

If there were something other than a past-due deliverable at issue, *e.g.* a future obligation, Loss might well include some *other* "losses or costs," such as the items listed in the first sentence of the Loss definition.  And when it does, a party is entitled to recover those other types of Loss (as part of its "total" losses and costs) and may well, in certain contexts where their value has not already been established, be afforded some level of discretion in determining just how they are measured.[6]  Here, however, Intel's Loss includes nothing other than a past-due deliverable.  Intel did not have "flexibility" to ignore the fair-market value of this past-due deliverable and, in particular, it did not have the option to "measure its Loss based on its $1 billion prepayment," as it contends.  Intel Br. at 7 n.4.

Intel repeatedly cites ISDA's *amicus* brief in this case [Doc. No. 57-1] as if it were authority for Intel's position.  *See* Intel Br. at 10-11.  As Lehman pointed out in response to ISDA's brief [Doc. No. 66] ("Response"), however, ISDA has taken on an unseemly advocacy role "in support of Intel" here by advancing positions that are diametrically opposed to publicly

---

[5] Intel again tries to distract from the fair-market value of its losses by pointing to LOTC's "expected . . . profit of only $3 million." Intel Br. at 2. LOTC's anticipated profit at the outset of this trade is wholly immaterial to a proper determination of *Intel's* Loss. In any event, Intel omits that, as the trade *actually* unfolded, LOTC purchased 39.7 million shares of Intel stock at a total cost of $803.2 million and those shares were worth only $685.7 million as of the September 29, 2008 Early Termination Date of this trade. *See* SOF ¶¶ 16-17. LOTC thus suffered a total *loss* of $117.5 million on these share purchases for Intel.

[6] As the Loss definition contemplates, Loss may have to be determined for an entire group of transactions. Those other aspects of Loss could come into play if there was a mix of past-due deliverables and future obligations at early termination. *See* ISDA Master § 14 (definition of "Loss") ("Loss means, with respect to this Agreement or one or more Terminated Transactions, as the case may be . . . ."). That was not the case here, where Intel determined its Loss for only one trade and for only one past-due deliverable. There were no other components to its Loss determination.

stated positions ISDA has taken elsewhere. Indeed, ISDA, whose publications and positions in other forums tout "certainty" and "predictability" as the touchstone of ISDA Master Agreements,[7] has taken the peculiar position here that Loss should be measured by whatever means one disappointed party to the contract may choose. That is, of course, a recipe for wild uncertainty and unpredictability.

Worse, ISDA does this without citing any meaningful contractual language to justify its about-face. By contrast, in the User's Guide for the 1992 Master and two other ISDA *amicus* briefs—which ISDA chose not to mention in its *amicus* in this case—ISDA was quite clear that Unpaid Amounts *are* to be included in a Loss determination. In the User's Guide, which was "designed to explain the 1992 Agreements" (User's Guide (SJ Ex. 10) at i), and not as an advocacy piece, ISDA states that "[t]hose amounts included in the definition of 'Unpaid Amounts' are now encompassed within the definition of 'Loss.'" *Id.* at 25. The User's Guide also states that "Unpaid Amounts are no longer separately determined under the 1992 Agreements but are part of the calculation by a party of its Loss." *Id.* at 26. Intel asserts that "[t]he User's Guide does not say that Loss must be determined in the same way as Unpaid Amounts." Intel Br. at 11. But it *does* say that Unpaid Amounts, *i.e.*, the fair-market value of

---

[7] *See, e.g.*, J. Golden Expert Report ("Golden Rept.") at ¶¶ 38-41 (Intel's expert: ISDA architecture is "designed to promote the certainty of early termination payments"), attached as Exhibit 1 to the Declaration of Mahesh Venkatakrishnan, submitted herewith ("Reply Ex."); Jeffrey B. Golden, *The Future of Financial Regulation: The Role of the Courts*, in THE FUTURE OF FINANCIAL REGULATION 83, 86 (MacNeil & O'Brien eds., 2010) ("[w]idespread usage of master agreements and standard terms can facilitate legal certainty") (Reply Ex. 2); Jeffrey Golden, *Interpreting ISDA terms: when market practice is relevant, as of when is it relevant?*, 9 CAP. MARKETS L.J. 299, 302 (July 2014) (quoting *Lomas v. JFB Firth Rixson Inc.*, [2010] EWHC 3372, for the proposition that "[i]t is axiomatic that [the ISDA Master Agreement] should, as far as possible, be interpreted in a way that serves the objectives of clarity, certainty and predictability") (Reply Ex. 3); *id.* at 304 ("The markets crave certainty, including legal certainty, and the ISDA Master Agreement aims to be the 'platinum end bar' standard— *the Mètre des Archives*—a master standard subject to uniform treatment . . . ."); ISDA's Brief of *Amicus Curiae* in Support of the Brief of Defendant-Appellant, in *Aon Fin. Prods. v. Societe Generale*, No. 06-1080-CV, at 6 (2d Cir. May 8, 2006) (Reply Ex. 4) ("ISDA . . . has a substantial interest in ensuring that transactions that use ISDA standard form documents and definitions, including those at issue here, are enforced so as to promote legal certainty and hence, market stability.") (Reply Ex. 4); *id.* at 12 ("[L]egal certainty[is] inherent in standard ISDA documentation.").

6

the past-due deliverables, are "encompassed within the definition of 'Loss'" and are to be "part of the calculation by a party of its Loss." User's Guide at 25-26. Intel cannot wish that away.

ISDA's *amicus* brief to the appellate court in *Lomas* removed any conceivable doubt on the issue. ISDA there stated that "whether under the Market Quotation method or Loss method," the determination of amounts due in closing out a transaction "involves two aspects": (i) calculation of losses or gains with respect to future obligations; and (ii) "calculation of amounts due historically."[8] There is no reference here—or in the contract or in any other authority construing Loss—to recovering *past* payments, *i.e.*, Intel's Prepayment Amount. And, for the latter of the two pertinent types of closeout amounts, *i.e.* "amounts due historically," ISDA said precisely what it meant: "that is, the 'Unpaid Amounts' referred to in paragraph 28 above." *Id.* In that cross-referenced paragraph, ISDA explained that Unpaid Amounts means, "with respect to delivery obligations, the fair-market value of that which would have been required to be delivered." *Id.* ¶ 28. Intel pretends that this entire discussion is about only the Market Quotation method. *See* Intel Br. at 12 ("ISDA merely outlined the procedures required in determining a close-out payment where the parties have elected Market Quotation."). It is not. ISDA could not have been more clear that this method for determining losses attributable to past-due obligations applies "whether under the Market Quotation method or Loss method." *Id.* ¶ 105.

B.   **New York Law Also Mandates That Intel's Loss Is $873 Million**

Notwithstanding that the contract expressly states it is to be interpreted and construed in accordance with New York law, Intel maintains it had "flexibility" to disregard New York law in making its Loss determination. Intel Br. at 23. But even Intel acknowledges that the parties' contract required Intel to determine its "losses" for this early-terminated trade. And the "well settled," "well reasoned" rule of New York law is that the "*true loss*" in connection with

---

[8] Written Submissions on Behalf of ISDA, *Lomas v. JFB Firth Rixson Inc.*, Case. No. A2/2011/0070, (July 29, 2011) (English Court of Appeal (Civil Division)) [¶ 105] (SJ Ex. 11).

7

undelivered securities is the fair-market value of those securities when they were to be delivered.[9] Intel's brief does not even mention this rule, let alone address the Second Circuit case observing that there is no "New York authority that even remotely undercuts" it. In fact, Intel does not so much as mention that case.[10]

Intel alternately contends, without acknowledging it is bound by any rules at all, that it was "entitled to restitution," and so was permitted to take back its purchase price as if the parties had never entered into this trade. *See* Intel Br. at 23. Intel does not dispute that rescission—which would lead to exactly the same result, a refund—is unavailable to it. But it asserts that, because restitution is a "legal" remedy and rescission is "equitable," it was free to label its remedy as restitution without having to show an inadequate remedy at law. *See id.* at 24.

As an initial matter, Intel acknowledges—and its own authority shows—that restitution is available only when a party "materially breaches the contract." Intel Br. at 23; *see also Men's Sportswear, Inc. v. Sasson Jeans, Inc. (In re Men's Sportswear, Inc.)*, 834 F.2d 1134, 1141 (2d Cir. 1987).[11] There was no "breach" of the contract here, let alone a "material" one. Intel invoked prescribed procedures in the Master to early terminate the parties' contract upon the

---

[9] *Waxman v. Envipco Pickup & Processing Servs., Inc.*, No. 02 Civ. 10132 (GEL), 2006 U.S. Dist. LEXIS 44006, at *8 (S.D.N.Y. June 28, 2006) (emphasis added).

[10] *Sharma*, 916 F.2d at 825; *compare with* Intel Br. at (iii) – (iv) (Table of Authorities).

[11] Intel also states that Article 2 of the U.C.C. "provides an aggrieved buyer with the right to return of the purchase price." Intel Br. at 23-24. Intel fails to say, however, that the U.C.C. *excludes* securities from the scope of Article 2. *See* N.Y. U.C.C. § 2-105(1) ("'Goods' means all things . . . which are moveable at the time of identification to the contract for sale other than [*inter alia*] investment securities (Article 8) . . . ."); *see also* N.Y. U.C.C. § 2-105, Official Uniform Comment 1 ("'Investment securities' are expressly excluded from the coverage of this Article."). The cases Intel cites on this point are, in any event, inapposite because they invoked Article 2 of the U.C.C. only "by analogy," and in disputes that did not involve the failure to deliver promised securities. By contrast, when New York courts *have* addressed losses for failure to deliver securities, they have squarely held that the proper measure of the aggrieved party's loss is the market value of the shares on the date they were to be delivered. *See* Plaintiffs' Memorandum of Law in Support of Their Motion for Summary Judgment [Doc. No. 58] ("Lehman SJ Br.") at 17-18 (collecting cases). The development of this binding precedent has made it unnecessary to resort by analogy to remedies provided by the U.C.C., as illustrated by the *Waxman* case. There, the plaintiff sought rescission under the U.C.C. and both parties briefed the issue. *See* Doc. Nos. 53, 55, 57, *Waxman v. Envipco Pick Up & Processing Servs., Inc.*, No. 1:02-cv-10132 (S.D.N.Y.). The court did not resort to the U.C.C. "by analogy" or otherwise, but held that the New York rule that specifically addresses how to determine losses for non-delivered securities would apply. *See Waxman*, 2006 U.S. Lexis 44006, at *7-8.

8

occurrence of a defined Event of Default. It was Intel's choice to *terminate* the trade and invoke post-termination procedures for closing it out; the event that gave rise to this chosen path by Intel did not constitute a "breach" of the Agreement, nor has Intel ever claimed breach or commenced a lawsuit to seek remedies for breach. The Event of Default that gave rise to Intel's early-termination option here was also not LOTC's failure to deliver the 50.5 million shares due to Intel; it was the bankruptcy filing of LOTC's Credit Support Provider. Intel does not contend, nor could it, that this constituted a "material breach" of the Agreement.

Nor does Intel's attempt to revive the ancient split between law and equity distinguish away the New York rule that governs here. In *Waxman*, Judge Lynch applied the "well settled" modern rule that the "true loss" to a party who is owed but does not receive promised securities is the value of those securities "as of the date when [the party obligated to deliver] failed to deliver them." *Waxman*, 2006 U.S. Dist. LEXIS 44006, at *8. *Waxman* also rejected the exact notion that Intel posits here, *i.e.* that the party who is out the securities may seek restitution as a measure of its loss. Specifically, Judge Lynch found there is "no good reason why the Court should deviate from [the] general rule" and award restitution where, even assuming a "total breach" by the delivering party, "all that remained was for [that party] to transfer a fixed sum of securities whose value on any particular date is easily determined." *Waxman v. Envipco Pickup Processing Servs.*, 2006 U.S. Dist. LEXIS 3883, at *17-19 (S.D.N.Y. Jan. 31, 2006).[12]

Finally, in a variation on its unlimited "flexibility" theme, Intel tries to evade the New York rule and the contract's plain language by resorting to its own private valuations of the shares it was owed in this derivative trade. Intel explains, entirely on the basis of disputed

---

[12] Intel notes that *Waxman* separately reasoned that restitution would give rise to a "battle of the experts." *Id.* at *18. This concern does not apply here, Intel states, because Intel merely sought back its purchase price. That shows that what Intel seeks here is tantamount to rescission, which Intel concedes is unavailable to it. In any event, Intel ignores *Waxman*'s holding that, even where there is a "total breach," a party who did not receive a fixed sum of shares owed to it is entitled only to the price of those shares on the date they were to be delivered. *Id.* at *19.

9

evidence (*see* Plaintiffs' Memorandum of Law in Opposition to Defendant's Motion for Summary Judgment [Doc. No. 86] ("Lehman Opp. Br.") at 17-21), how it would subjectively have accounted for the shares and what it would have done with them. *See* Intel Br. at 16-17, 22. In the same manner, a person who owns a work of art hanging in her home might *subjectively* deem it priceless or invaluable. But, if the piece were stolen, its value would have to be fixed by objective criteria to allow for recovery of the loss through a lawsuit. Here, too, Intel may not resort to its own private, subjective valuation of its loss—and invoke immaterial, disputed extra-contractual evidence as support. Rather, New York law and the unambiguous terms of the parties' contract mandate that Intel's recoverable loss for this past-due obligation is the fair-market value of the securities Intel was owed on the date it was owed them.

C.   **The Cross Check Confirms Intel's Loss Is $873 Million**

As plaintiffs demonstrated in their briefing on these motions, (i) courts that have addressed the issue have pointed to Market Quotation as a useful "cross check" for measurement of Loss, because both closeout methods are "intended to lead to broadly the same result," and (ii) with regard to past-due obligations, *both* Loss and Market Quotation measure closeout value by fair-market value on the delivery date.[13] Intel derides this proposition as "dicta," but that just cannot be squared with the courts' *repeated* statements that the "sensible" notion of the utility of this cross check "has hardened into hornbook law."[14]

Intel also says it is a "gross generalization" to invoke the cross check to mean that past-due obligations must be valued as Unpaid Amounts under the Loss method. Intel Br. at 14. It is

---

[13] *See* Lehman SJ Br. at 14-17; Lehman Opp. Br. at 12-13.

[14] *Lomas v. JFB Firth Rixson Inc.*, [2012] EWCA 419 (Civ) [129-131] (Response Ex. 4) (reaffirming *Peregrine*'s "hornbook law" and stating that "[f]aced with this unanimity of approach we would hesitate long before reaching a contrary view" concerning "the interpretation and application both of Loss and Market Quotation under the 1992 Master Agreement"). *See also Lehman Bros. Int'l (Europe) v. Lehman Bros. Fin., S.A.*, [2012] EWHC 1072 (Ch), [41(i)] (Response Ex. 2), *rev'd on other grounds*, [2013] EWCA 188 (Civ) [27] (Response Ex. 3) (noting the court's approval of the *Peregrine* line of cases as it applies to the 1992 Master Agreement); *Britannia Bulk plc (in liquidation) v. Bulk Trading S.A.*, [2011] EWHC 692 (Comm) (SJ Ex. 14).

10

of course no such thing when that is what the contract, ISDA's User's Guide, and New York law all require. Intel tries to distinguish this black-letter law by listing ways in which the particular facts of this transaction purportedly differ from "[t]he facts before the *Britannia Bulk* and *Anthracite* courts." Intel Br. at 14. But Intel ignores that there are other courts that have noted the cross check approach has become hornbook law. *See supra* nn.13-14. And the rule stated in these cases is one of general applicability, reflecting a "unanimity of approach."[15] Intel's attempt to single out *Britannia Bulk* and *Anthracite* as unique also fails. Those cases were, like the issue before this Court, based on the closeout provisions in the 1992 ISDA Master, which, as Intel's expert acknowledges, was meant to apply to "a wide range of transactions by a wide range of parties, which potentially may be situated in a wide range of jurisdictions." Golden Rept. ¶ 27.

## II.    THE CONFIRMATION DOES NOT REDEFINE LOSS

Intel asserts that there are "unique features" in the Confirmation for this trade that "customized" the parties' intentions. *See* Intel Br. at 15. That is true in some respects, but they are irrelevant. None of them change how Loss was defined or to be determined. They only underscore that Intel did not properly determine its Loss.

### A.    Section 5(d) of the Confirmation Does Not Support Intel's Loss

The parties did not agree to any "customized" provisions in the Confirmation or elsewhere that altered the provisions in the contract governing how to *determine* Loss. Intel relies on an unrelated concept, "Agreed Value," *see* Intel Br. at 17-19, but that term does not concern how Loss is valued. It concerns how Loss is paid, after it has been determined. Specifically, Agreed Value is used in Section 5(d) of the Confirmation solely to calculate how much cash would be delivered to Intel where, as a mechanical matter, its Loss would be compensated in both shares and cash. It is *not* a measure of Intel's Loss. Indeed, as Intel

---

[15] *Lomas*, [2012] EWCA 419 (Civ) [129-131].

11

acknowledges (*id.* at 18), Section 5(d) requires that Loss be determined *first* and *separately*.

Moreover, as plaintiffs have shown, following Intel's approach to Section 5(d) only confirms that Intel improperly seized all of LOTC's collateral. Two alternative analyses show that: (i) starting with the proper Loss of $873 million, plaintiffs are entitled to $228.7 million, or (ii) even assuming that Intel's inflated $1 billion claim is its true Loss, LOTC was still due back approximately $100 million, plus interest. *See* Lehman SJ Br. at 22-24; Lehman Opp. Br. at 15.

Intel scrambles to rebut these analyses by a series of convoluted hypothetical exercises that it says illustrate—in a contract case between two sophisticated parties—the philosophical notion of the purported "moral hazard" of the market-value approach to valuing Loss.[16] Intel's first hypothetical (Intel Br. at 19) completely ignores the operative language of the Confirmation. Section 5(d) applies only "[i]n the event that . . . an Early Termination Date . . . occurs or is designated." Confirmation § 5(d). Intel, though, does a Section 5(d) analysis where no early termination had been declared, and where Lehman actually delivered shares on the original due date. Those are not the facts of this case and, if they were, there would never be any occasion to make either a Loss determination or invoke Section 5(d). Further, to the extent Intel is implying that, had there been no early termination of the trade, Lehman could have chosen to deliver on September 29, 2008 fewer shares than Intel was owed, that is likewise without any basis in the contract. The "Number of Shares to be Delivered" had already been crystallized by September 26, 2008. Confirmation § 1 ("Number of Shares to be Delivered"); *see also* SJ Ex. 5.

Similarly, even if an Early Termination Date had been declared in Intel's hypothetical, the notion that LOTC could "strategically" withhold shares to deprive Intel of some portion of the shares owed to it has no basis in the record or the contract. Intel does not dispute that the

---

[16] If the test were "moral hazard," Intel would surely fail it. Intel's notion that a non-defaulting party can wait until the Settlement Date to early terminate, see the market price and, if it does not like what it sees, take its purchase price back would enable a windfall. The party could ignore the contract, pull the refund trigger, and buy shares at the lower market price. It is hard to imagine a formula more likely to fail a "moral hazard" test.

12

reason LOTC did not deliver the Hedge Positions is that LOTC did not have possession or control over them.[17] As a contractual matter, Section 5(d) also requires delivery of "Lehman's Hedge Positions," *in their entirety*, not a portion of them as Intel suggests. So, the hypothetical scenario under which LOTC would choose to withhold 6.4 million shares of the 50.5 million owed to Intel on the Settlement Date—a number that Intel chooses so that the cash component of the shares and cash would equal exactly zero in its hypo—is utterly baseless. In that imaginary scenario, Intel would have either a breach of contract claim or a Loss representing the market value of 6.4 million undelivered shares. The "$110 million spot price of those undelivered shares" would not "go straight into LOTC's pocket," but would be a Loss amount or damages *owing to Intel*. Intel Br. at 19. This is consistent with the definition of Loss, New York law, and the cross check under the Market Quotation method. Intel simply cannot escape that, under all relevant approaches, the value of undelivered, past-due shares is to be determined by their fair-market value. The smoke-and-mirrors of its hypothetical does not bring about a different result.

Intel's second hypothetical is premised on an Early Termination Date being declared, triggering Section 5(d). *See* Intel Br. at 19. Assuming then, as Intel suggests, that Lehman delivered its 39,706,969 Hedge Positions, Section 5(d) requires any further amounts owed to Intel to be paid in *cash* not shares. *See* Confirmation § 5(d). This "amount in cash" is to be calculated by subtracting the aggregate Agreed Value of the Hedge Positions from Loss. The cash owing to Intel in this situation would be $87.6 million. *See* Lehman SJ Br. at 23.

Intel calls it "absurd" that the remaining 10.8 million shares due to Intel in this hypothetical (*i.e.*, 50.5 million shares minus the 39.7 million Hedge Positions) are to be valued at their closing market price on September 29, 2008. *See* Intel Br. at 20. But that is precisely the approach followed in the definitions of Loss and Unpaid Amounts, in New York law, and in the

---

[17] Intel's Statement of Material Facts [Doc. No. 72] ¶¶ 31-32.

13

cross check under the Market Quotation method. Nothing in Section 5(d) or any other provision of the parties' contract remotely undercuts that settled default rule. Intel also does not dispute, nor can it, that "Agreed Value" is used *solely* to determine the "amount in cash" where its Loss would be compensated with a mix of shares and cash pursuant to Section 5(d). It would have been a simple matter for the parties to have made "Agreed Value" the applicable measure *both* for determining the "amount in cash" and to value any undelivered shares if that is what they intended. Their decision not to must be viewed as deliberate in light of the express provisions in the contract and New York law calling for fair-market valuation of any undelivered shares.

### B.  "Secured Party's Exposure" Does Not Support Intel's Loss Determination

Finally, Intel repeats its misleading argument that its "Exposure" for this trade somehow supports the notion that it was permitted to take back its purchase price in the guise of its Loss. *See* Intel Br. at 21-22. This argument is based on a sleight of hand. Intel asserts that the parties fixed the "Secured Party's Exposure" at $1 billion. *See* Confirmation § 6(d)(C). Intel then pivots to invoke a general definition of "Exposure" from a form document, the Credit Support Annex, and, in particular, language in that definition that Intel says shows that Exposure is equal to the amount owed to the secured party upon termination of the trade. *See* Intel Br. at 21.

The fundamental problem with this argument is that the parties' definition of "Secured Party's Exposure" *supersedes* the definition Intel chose to lift out the Credit Support Annex.[18] And "Secured Party's Exposure" in the Confirmation does *not* link the collateral to an amount recoverable upon termination as the definition of "Exposure" might have. Rather, in pertinent part, the Confirmation fixes Intel's "Secured Party's Exposure" at $1 billion.[19] The way the

---

[18] *See* Confirmation § 6 ("Paragraphs 1 through 12 of the CSA are incorporated herein by reference, and terms defined in the CSA . . . [are] subject in each case to the elections and modifications set out below.").

[19] In another ASR trade between Intel and LOTC in 2008 governed by the very same ISDA Master at issue here, Intel's "Secured Party's Exposure" was fixed at $0, and LOTC posted no collateral. *See* Reply Exs. 5, 7. Surely, Intel would not contend that its Loss would be $0 if no shares had been delivered and it early-terminated that

14

parties proceeded here thus shows that "Secured Party's Exposure" was decoupled from any valuation of what might be owed to Intel upon termination of the trade. Here again, the parties could have provided that Intel's Loss would be equal to its Exposure if an Early Termination Date was designated. Not only did they not do this, but in direct contrast to the Credit Support Annex, the parties deliberately chose to define Intel's "Secured Party's Exposure" so that it was *not* deemed equal to the amount due to the secured party at termination.

For the same reason, Lehman is not taking a position here that is inconsistent with its position in the *Nomura* action, as Intel contends. *See* Intel Br. at 21. Unlike here, Lehman and Nomura did not displace the definition of "Exposure" in their Confirmation. "Exposure" in *Nomura* thus remained linked to the amounts payable to the secured party upon termination of the trade, as set forth in the pertinent Credit Support Annex. In *Nomura*, Lehman thus alleged—completely consistently with its position here—that its counterparty's Loss determination was improperly out-of-line with a market-value-based Exposure determination Nomura had made just prior to termination of the trade. *See* Intel Br. Ex. DD ¶¶ 28-31. Here, by contrast, Intel's fixed "Secured Party's Exposure" was *not* linked to the amounts payable to Intel upon termination. This separately defined term thus does not support Intel's notion that it was allowed to seize the full amount of its Exposure, *i.e.*, LOTC's collateral, plus interest, as a proxy for Loss.

## CONCLUSION

Lehman respectfully requests that the Court grant its motion for summary judgment on its breach of contract cause of action and enter judgment for Lehman against Intel in the amount of no less than the principal amount of $129 million, plus interest.

---

trade. Intel sought collateral for the trade at issue in this dispute only because of the credit risk posed by Lehman in the third quarter of 2008, not as a proxy for the trade's termination value. *See* Reply Exs. 6-7. This further shows that "Secured Party's Exposure" is unrelated to Loss.

15

Dated:  March 16, 2015
       New York, New York

Respectfully submitted,

JONES DAY

By: /s/ Todd R. Geremia

    Robert W. Gaffey
    Jayant W. Tambe
    Todd R. Geremia
    Mahesh Venkatakrishnan
    JONES DAY
    222 East 41st Street
    New York, New York 10017
    Telephone: (212) 326-3939
    Facsimile:  (212) 755-7306

*Attorneys for Plaintiffs,*
*Lehman Brothers Holdings Inc. and*
*Lehman Brothers OTC Derivatives Inc.*

**CERTIFICATE OF SERVICE**

I, Mahesh Venkatakrishnan, certify that on March 16, 2015, a true and correct copy of the foregoing document was served upon all counsel of record via the Court's CM/ECF system.

Dated:  March 16, 2015
        New York, New York

/s/ Mahesh Venkatakrishnan
Mahesh Venkatakrishnan
JONES DAY
222 East 41st Street
New York, New York 10017
Telephone: (212) 326-3939
Facsimile: (212) 755-7306

*Attorney for Plaintiffs,*
*Lehman Brothers Holdings Inc. and*
*Lehman Brothers OTC Derivatives Inc.*