**FOR PUBLICATION**

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---

| | |
|---|---|
| In re<br><br>LEHMAN BROTHERS HOLDINGS INC., *et al.*,<br><br>Debtors. | Chapter 11<br><br>Case No. 08-13555 (SCC) |
| LEHMAN BROTHERS HOLDINGS INC. and<br>LEHMAN BROTHERS OTC DERIVATIVES INC.,<br><br>Plaintiffs,<br>- against -<br><br>INTEL CORPORATION,<br><br>Defendant. | Adversary Proceeding<br><br>No. 13-01340 |

**PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW ON CROSS
MOTIONS FOR SUMMARY JUDGMENT**

A P P E A R A N C E S :

JONES DAY
222 East 41st Street
New York, NY 10017
By:    Jayant W. Tambe, Esq.
        Mahesh Venkatakrishnan, Esq.
        Jennifer E. Berk, Esq.

*Attorneys for Lehman Brothers Holdings Inc.*

WILLIAMS & CONNOLLY LLP
725 Twelfth Street, N.W.
Washington, DC 20005
By:    John J. Buckley, Esq.
        David Kurtzer-Ellenbogen, Esq.
        Daniel F. Katz, Esq.

WILMER CUTLER PICKERING
HALE & DORR LLP
1875 Pennsylvania Ave., N.W.
Washington, DC 20006
By:    Craig T. Goldblatt, Esq.

*Attorneys for Intel Corporation*

MAYER BROWN LLP
1675 Broadway
New York, NY 10019
By:    Joshua Cohn, Esq.
        Robert W. Hamburg, Esq.

*Attorneys for Amicus Curiae International Swaps and Derivatives Association, Inc.*

## TABLE OF CONTENTS

INTRODUCTION ...................................................................................................................2

PROCEDURAL HISTORY.....................................................................................................5

SUMMARY JUDGMENT STANDARD.................................................................................7

FACTUAL BACKGROUND..................................................................................................8

    A. Intel's Share Repurchase Program ................................................................8

    B. The Terms of the Transaction ........................................................................9

    C. LOTC Fails to Deliver the Shares and Intel Declares an Early Termination Date......10

    D. The Terms of the Confirmation Governing a Termination or Failure of the Transaction Prior to Settlement ...................................................................12

        1. Termination Upon Early Termination Date....................................................12

        2. Failed Delivery................................................................................................15

    E. Intel Calculates Its Loss Under Section 6(e) of the ISDA Master and Its "costs, losses or expenses" Under Section 9.12 of the Equity Definitions and Sets Off Such Amount Against the LOTC Collateral ......................................................................16

DISCUSSION.........................................................................................................................17

    A. The Legal Standard for Interpreting the Confirmation .................................18

    B. Intel Has Discretion to Calculate its Loss as It Sees Fit, so Long as Such Calculation is Performed Reasonably and in Good Faith .............................................18

        1. The General Rule: Loss Affords Discretion and Flexibility to Non-Defaulting Parties in Determining the Means for Calculating Their "Loss" ...................19

        2. Lehman's Textual Interpretation of Loss is Not Supported by the ISDA Master or the ISDA User's Guide .................................................................24

        3. Moreover, Neither the Market Quotation Method Nor New York Law Buttresses Lehman's Interpretation of Loss ....................................................29

            a. Market Quotation .............................................................................29

      b.  New York Law.................................................................................35

C.  Intel's Calculation of Its Loss Was Reasonable and in Good Faith ...........................37

    1.  Intel's Upfront Costs Were $1 Billion ...............................................38

    2.  "Agreed Value".....................................................................39

    3.  Value of Undelivered Shares to Intel................................................40

    4.  Intel's "Exposure" Was Fixed at $1 Billion ......................................42

    5.  Intel's Restitutionary Interest Was $1 Billion .................................43

    6.  Lehman's Internal Analysis ............................................................46

    7.  Intel's Calculation of Its Loss Was Reasonable ...............................46

CONCLUSION.........................................................................................47

**SHELLEY C. CHAPMAN**
**UNITED STATES BANKRUPTCY JUDGE**

In August of 2008, just a few weeks before the demise of Lehman Brothers, Intel

Corporation entered into a forward share repurchase agreement with Lehman subsidiary LOTC.

On August 29, Intel paid $1 billion to LOTC as a "prepayment" under the agreement.  In return,

LOTC undertook to purchase and deliver to Intel a fixed number of shares of Intel's common

stock on September 29.  The number of shares to be delivered would be calculated pursuant to a

formula agreed upon by the parties.  To secure its obligations in connection with the transaction,

LOTC delivered $1 billion of collateral to Intel in late August.  LOTC and Intel documented

their transaction using an ISDA Master Agreement[1] that incorporated certain modifications and

additions agreed upon by the parties.

Thereafter, a few things happened.  Although Lehman and many of its subsidiaries filed

for chapter 11 protection on September 15, 2008, LOTC did not file for chapter 11 protection

until October 5, 2008; it continued to purchase Intel shares pursuant to its agreement with Intel.

Ultimately, LOTC would owe Intel 50,552,943 Intel shares, deliverable on September 29.

Because of general insolvency events affecting Lehman entities worldwide, LOTC was unable to

deliver the shares to Intel and Intel terminated the transaction and kept, via set off, the $1 billion

in collateral LOTC had delivered.

The parties' dispute in this Adversary Proceeding, and the question before the Court on

these cross-motions for summary judgment, is who owes what to whom as a result of this failed

---

[1] "ISDA" is an acronym for the International Swaps and Derivatives Association, Inc., a global trade association that
has pioneered efforts to standardize documentation for derivatives.  Principal among these efforts has been the
development of the ISDA Master Agreement, which serves as the contractual foundation for more than 90% of
derivatives transactions globally.  *See* International Swaps and Derivatives Association Inc.'s *Amicus Curiae*
Memorandum of Law in Support of Defendant Intel Corporation's Motion for Summary Judgment [ECF No. 57].
Market participants also use "the ISDA" as a shorthand reference to the ISDA Master Agreement.

transaction. Intel contends that the ISDA Master Agreement permits it to calculate its damages however it sees fit, so long as its calculation is made reasonably and in good faith; it calculates its damages as $1,001,966,256 – the $1 billion prepayment, plus "unearned" interest. Lehman contends, on the other hand, that the ISDA Master Agreement limits Intel's damages to the fair market value of the undelivered shares on the delivery date of September 29, 2008, or approximately $873 million.[2] The Court's analysis is as follows.

### INTRODUCTION

Plaintiff Lehman Brothers OTC Derivatives Inc. ("LOTC") and Defendant Intel Corporation ("Intel") entered into a certain ISDA Master Agreement, dated February 1, 2008 (the "ISDA Master"),[3] as modified by a schedule, dated February 1, 2008 (the "Schedule")[4] and, together with the ISDA Master, the "ISDA"). Pursuant to the Schedule, Lehman Brothers Holdings Inc. ("LBHI" and, together with LOTC, "Lehman") acted as a guarantor for LOTC's obligations under the ISDA. The ISDA provided a framework and general terms for certain transactions between LOTC and Intel; each such transaction would be evidenced by a trade confirmation incorporating and, in some cases, modifying or customizing, the terms of the ISDA.

On or about August 1, 2008, LOTC and Intel entered into a trade confirmation that gave rise to the parties' dispute here (the "Confirmation").[5] The transaction documented by the Confirmation (the "Transaction") generally provided that Intel would remit $1 billion to LOTC on August 29, 2008 and LOTC would deliver to Intel, on September 29, 2008, a number of shares of Intel common stock determined by dividing $1 billion by the value weighted average

---

[2] *See* Plaintiffs' Motion for Summary Judgment [ECF No. 56] (the "Lehman Motion") and (ii) Defendant Intel Corporation's Amended Motion for Summary Judgment [ECF No. 71] (the "Intel Motion" and, together with the Lehman Motion, the "Motions").
[3] Declaration of Mahesh Venkatakrishnan [ECF No. 63] ("Venkatakrishnan Decl.") Ex. 1.
[4] Venkatakrishnan Decl. Ex. 2.
[5] Venkatakrishnan Decl. Ex. 3.

price of Intel shares between September 2, 2008 and September 26, 2008, less a forward price adjustment. As described in greater detail below, the Confirmation customized the general framework of the ISDA to fit the Transaction. The parties agreed that, to secure its obligations under the Confirmation, LOTC would post $1 billion of collateral (the "LOTC Collateral"), to be held by Intel and invested in cash or low-risk securities. The LOTC Collateral is governed by the Confirmation, which incorporates the ISDA Standard Credit Support Annex (the "CSA"),[6] but with modifications to certain of its terms. The parties further agreed that the Confirmation would modify certain terms of the incorporated ISDA and would also incorporate the 2002 ISDA Equity Derivatives Definitions (the "Equity Definitions").[7]

The Transaction did not proceed to settlement. First, LBHI filed for bankruptcy on September 15, 2008, giving Intel a contractual right to terminate the Confirmation and calculate, in accordance with the requirements of the Confirmation, an Early Termination Payment (*i.e.*, the amount that one party would owe to the other on an early close out of the Transaction). While Intel did not exercise its right to terminate the Confirmation on September 15, 2008, LBHI's bankruptcy filing and the subsequent bankruptcy filings of other Lehman entities prevented LOTC from being able to transfer the Intel shares to Intel. Thus, on September 29, 2008, LOTC failed to deliver any of the shares it owed to Intel pursuant to the terms of the Confirmation (such failure, the "Failed Delivery").

By letter dated September 29, 2008 (the "Termination Letter"),[8] Intel terminated the Confirmation on the basis of LBHI's bankruptcy and declared an Early Termination Date (*i.e.*, the date as of which the Early Termination Payment would be calculated) of September 29,

---

[6] Venkatakrishnan Decl. Ex. 4.
[7] Amended Declaration of Edward C. Barnidge in Support of Intel Corporation's Amended Motion for Summary Judgment [ECF No. 73] Ex. E; Venkatakrishnan Decl. Ex. 15.
[8] Venkatakrishnan Decl. Ex. 6.

2008. In the Termination Letter, Intel informed Lehman that it calculated the Early Termination

Payment as owed from Lehman to Intel in the amount of (a) the $1 billion Intel had delivered to

LOTC on August 29, 2008 plus (b) $1,966,256, the interest Intel estimated it could have earned

on such $1 billion, an amount equal to the interest that the LOTC Collateral had earned between

August 29, 2008 and September 29, 2008. Intel also claimed in the Termination Letter that it

was permitted to recover the same $1,001,966,256 under the provisions of section 9.12 of the

Equity Definitions, which Intel asserted applied to its "costs, losses or expenses" in connection

with the Failed Delivery. On September 30, 2008, Intel sent Lehman a further letter informing

Lehman that it had, on September 30, 2008, set off and applied the LOTC Collateral against the

$1,001,966,256 Intel contended it was owed by Lehman.[9]

The question presented by the Motions is whether either party is entitled to summary

judgment on Lehman's claim that Intel breached the Confirmation when it seized the entire

$1,001,966,256 constituting the LOTC Collateral. The Lehman Motion contends that the only

reasonable calculation of Intel's Early Termination Payment is an amount equal to the fair

market value of the undelivered shares as of the close of trading on September 29, 2008, or $873

million. Arguing that Intel breached the Confirmation when it seized the portion of the LOTC

Collateral that exceeded $873 million, Lehman moves for summary judgment on its non-core

breach of contract claim and seeks damages of not less than $129 million, with interest. The

Intel Motion contends, on the other hand, that Lehman's claim is meritless because (i) Intel's

calculation of the Early Termination Payment was consistent with the requirements of the

Confirmation or, in the alternative, (ii) section 9.12 of the Equity Definitions gives Intel the right

to recover any costs, losses, or expenses in connection with the Failed Delivery. Intel submits

---

[9] Venkatakrishnan Decl. Ex. 7.

4

that the Termination Letter is conclusive evidence that its costs, losses, or expenses in connection

with the Failed Delivery are $1,001,966,256.  Accordingly, Intel moves for summary judgment

denying Lehman's breach of contract claim.

As there are no genuine issues of material fact, the question presented is ripe for

summary judgment.  For the reasons stated below, the Court finds that Intel's calculation of the

Early Termination Payment was in accordance with the requirements of the Confirmation.  On

that basis, the Court recommends that the Lehman Motion be denied and that the Intel Motion be

granted.

## **PROCEDURAL HISTORY**

The lengthy procedural history of this case begins on May 1, 2013, when Lehman filed a

complaint (the "Complaint") against Intel in connection with the Transaction [ECF No. 1].  The

Complaint included Count I, a claim for breach of contract; Count II, a claim for turnover; and

Count III, a claim for a declaratory judgment that Intel had violated the automatic stay.  On June

21, 2013, Intel responded to the Complaint by moving (i) to dismiss Counts II and III of the

Complaint and (ii) for a determination that Count I of the Complaint is non-core pursuant to 28

U.S.C. § 157(b)(3) [ECF No. 7] (the "Motion to Dismiss").  Lehman filed its opposition to the

Motion to Dismiss on July 26, 2013 [ECF No. 23] and Intel filed a reply in further support of the

Motion to Dismiss on August 23, 2013 [ECF No. 25].

On September 18, 2013, the Court held a hearing on the Motion to Dismiss and, on

December 19, 2013, issued a memorandum decision granting the Motion to Dismiss, holding that

(i) Counts II and III, for turnover and violation of the automatic stay, failed to state a claim upon

which relief could be granted and (ii) Count I, for breach of contract, was non-core.  *See Lehman*

*Bros. Holdings Inc. v. Intel Corp. (In re Lehman Bros. Holdings Inc.)*, 502 B.R. 376 (Bankr.

S.D.N.Y 2013).  On January 13, 2014, the Court entered an order consistent with its decision

granting the Motion to Dismiss [ECF No. 31].

The very next day, Intel moved to withdraw the reference [ECF No. 32] (the "Motion to

Withdraw the Reference"); it filed its answer to the Complaint on January 16, 2014 [ECF No.

34].  On May 10, 2014, District Judge Koeltl issued an opinion and order denying the Motion to

Withdraw the Reference [ECF No. 41].

On January 20, 2015, Lehman filed the Lehman Motion, a memorandum of law in

support of the Lehman Motion [ECF No. 58], a statement of undisputed material facts in support

of the Lehman Motion [ECF No. 62] (the "Lehman SoF"), the declaration of Mahesh

Venkatakrishnan in support of the Lehman Motion [ECF No. 63], and the declaration of

Jonathan Fox in support of the Lehman Motion [ECF No. 64].  Also on January 20, 2015, Intel

filed its motion for summary judgment, attaching its memorandum of law in support of the

motion, its statement of undisputed material facts, and the declaration of Edward C. Barnidge in

support of the motion (the "Barnidge Decl.") [ECF No. 55].[10]

On February 23, 2015, Lehman filed its memorandum of law in opposition to the Intel

Motion [ECF No. 86] (the "Lehman Opposition"), the declaration of Mahesh Venkatakrishnan in

Opposition to the Intel Motion [ECF No. 80] and its responses and objections to the Intel SoF

[ECF No. 79].  Also on February 23, 2015, Intel filed its Opposition to the Lehman Motion [ECF

No. 82] (the "Intel Opposition"), its response to the Lehman SoF [ECF No. 83], and the

---

[10] On February 13, 2015, Intel requested leave to re-file its motion for summary judgment materials to remove
reference to a document Lehman claimed was privileged and inadvertently produced [ECF No. 68].  The Court so-
ordered Intel's request on February 17, 2015 [ECF No. 69] and Intel accordingly amended and re-filed its January
20, 2015 motion, filing the Intel Motion, with an attached revised memorandum of law in support of the Intel
Motion [ECF No. 71], an amended statement of undisputed facts in support of the Intel Motion [ECF No. 72] (the
"Intel SoF"), and the amended declaration of Edward C. Barnidge in support of the Intel Motion [ECF No. 73].

supplemental declaration of Edward C. Barnidge in support of Intel's opposition to the Lehman

Motion [ECF No. 84].

Finally, on March 16, 2015, Lehman filed its reply in support of the Lehman Motion

[ECF No. 91] (the "Lehman Reply") and the Declaration of Mahesh Venkatakrishnan [ECF No.

92] (the "Venkatakrishnan Reply Decl."), and Intel filed its reply in support of the Intel Motion

[ECF No. 93] (the "Intel Reply") and the supplemental declaration of Edward C. Barnidge in

support of the Intel Motion [ECF No. 94].

In addition to the voluminous pleadings submitted by the parties to this dispute, the Court

also received a motion from ISDA requesting leave to file a memorandum of law as *amicus*

*curiae* [ECF No. 57] (the "ISDA Motion"), attached to which was ISDA's *Amicus Curiae*

Memorandum of Law in Support of Defendant Intel Corporation's Motion for Summary

Judgment (the "ISDA Amicus Brief").  Lehman filed a response to the ISDA Motion [ECF No.

66], and ISDA filed a reply in further support of the ISDA Motion [ECF No. 70], responding to

Lehman's arguments.  On February 18, 2015, the Court entered an order granting the ISDA

Motion [ECF No. 78].  Accordingly, the record also includes the ISDA Amicus Brief, as well as

Lehman's response to the same, and ISDA's reply to Lehman's response.

The Court heard oral argument on the Motions on July 28, 2015 (the "Hearing").  Neither

ISDA nor its counsel appeared at the Hearing.

## SUMMARY JUDGMENT STANDARD

Rule 7056 of the Federal Rules of Bankruptcy Procedure incorporates Rule 56 of the

Federal Rules of Civil Procedure in adversary proceedings.  Summary judgment pursuant to Rule

7056 is properly granted when there are no genuine disputed issues of material fact, and when,

viewing the evidence most favorably to the non-moving party, the movant is entitled to prevail as

a matter of law.  *See* Fed. R. Civ. P. 56; *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986).

The moving party bears the burden of demonstrating that no material issues of fact exist.  *Knight*

*v. United States Fire Ins. Co.*, 804 F.2d 9, 11 (2d Cir. 1986), *cert denied*, 480 U.S. 932 (1987).

A fact is deemed material if it "might affect the outcome of the suit under the governing law."

*Big Yank Corp. v. Bank One, Lexington, N.A. (In re Water Valley Finishing, Inc.)*, 170 B.R. 831,

833 n.4 (Bankr. S.D.N.Y. 1994) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248

(1986)).  To defeat a motion for summary judgment, the non-movant must set forth specific

evidence demonstrating the existence of a factual issue that is both material and genuine.  *Liberty*

*Lobby*, 477 U.S. at 247-48.  If a contract is unambiguous, its proper interpretation is a question of

law that may be resolved by the Court on summary judgment.  *Am. Express Travel Related*

*Servs. Co. v. Accu-Weather, Inc.*, 849 F. Supp. 233, 239 (S.D.N.Y. 1994).

## FACTUAL BACKGROUND[11]

### A.  Intel's Share Repurchase Program

The Transaction arose from Intel's desire to repurchase and retire certain of its shares of

common stock during its so-called "quiet period," typically several weeks before the end of each

of Intel's fiscal quarters through Intel's quarterly earnings announcement.[12]  By purchasing and

then retiring its shares of common stock, Intel increased the remaining shares' claim on the cash

flows of the company.[13]  However, because Intel management often possesses material

nonpublic information during the "quiet period,"[14] Intel's in-house traders do not repurchase

Intel shares during quiet periods.[15]  To enable its share repurchases to be executed during the

---

[11] Citations to each party's statement of material undisputed facts are limited to those statements that are undisputed by the other party.  *See* Responses and Objections to Defendant's Statement of Facts as to Which There is No Genuine Dispute [ECF No. 79]; Response to Plaintiff's Statement of Undisputed Facts [ECF No. 83].

[12] *See* Intel SoF ¶¶ 1-4.

[13] *See* Intel SoF ¶ 2.

[14] *See* Intel SoF ¶¶ 3-4.

[15] *Id.*

quiet periods, Intel, beginning in the fourth quarter of 2007 and in accordance with SEC Rule 10b5-1, entered into quarterly transactions with counterparty banks pursuant to which the bank would purchase and deliver Intel shares to Intel.[16]  The specific number of Intel shares to be purchased and delivered by the counterparty bank was determined by the volume-weighted average price or "VWAP" of Intel shares during a specified calculation period within the relevant quiet period.[17]  In connection with its share repurchase program, Intel entered into a share repurchase transaction with LOTC to execute repurchases of its shares during Intel's quiet period for the first quarter of 2008.[18]  Intel entered into the Transaction to execute repurchases of its shares during Intel's quiet period for the third quarter of 2008.[19]

### B.    The Terms of the Transaction

The Transaction called for Intel to deliver a "Prepayment Amount" of $1 billion to LOTC on August 29, 2008.[20]  In exchange, on September 29, 2008, LOTC was to deliver, "at or prior to 4:30 p.m. New York Time," a number of Intel shares equal to (i) the Final Notional Amount (here, the Prepayment Amount of $1 billion)[21] divided by (ii) the VWAP of Intel shares over the course of the "Calculation Period," which ran from September 2, 2008 through September 26, 2008, less the "Forward Price Adjustment," a discount derived from a table attached to the Confirmation.[22]  Accordingly, LOTC was not speculating on the price movement of Intel shares;[23] instead, if it were to make a profit on the Transaction, it would do so by acquiring the

---

[16] *See* Intel SoF ¶ 6.
[17] *Id.*
[18] *See* Intel SoF ¶ 13.
[19] *See* Intel SoF ¶ 8.
[20] Confirmation at 4.
[21] The Confirmation contemplates scenarios in which the "Final Notional Amount" is not equal to the Prepayment Amount.  Here, however, the two amounts are equal.
[22] *See* Confirmation at 4.
[23] Intel SoF ¶ 15.

Intel shares to be delivered at an average price that was less than the VWAP of Intel shares over the Calculation Period less the Forward Price Adjustment.

To secure LOTC's obligations to deliver the Intel shares under the Confirmation, the Transaction included two distinct features: (i) pursuant to the ISDA, as incorporated into the Confirmation, LBHI served as LOTC's guarantor[24] and (ii) LOTC was required to post, and did post, the LOTC Collateral, valued at $1 billion, to Intel.[25]  As the party receiving the LOTC Collateral, Intel was obligated to invest the LOTC Collateral in cash or cash equivalents.[26]

### C. LOTC Fails to Deliver the Shares and Intel Declares an Early Termination Date

LOTC, through the Lehman broker-dealer Lehman Brothers Inc. ("LBI"), began to purchase Intel shares on or about August 29, 2008.[27]  Some of the Intel shares LBI purchased on behalf of LOTC were held in an account at LBI and some were rehypothecated to Lehman Brothers International (Europe) ("LBIE").[28]  Just over two weeks later, on September 15, 2008, LBHI filed for bankruptcy; as LBHI was LOTC's guarantor, its bankruptcy filing constituted an Event of Default under the Confirmation[29] that gave Intel the right to declare an Early Termination Date and terminate the Transaction.[30]  Following LBHI's bankruptcy, LOTC advised Intel that it was continuing to buy Intel shares in accordance with the Confirmation.[31]  During the week of September 15, 2008, LOTC also informed Intel that, as a result of LBIE's entry into administration in the United Kingdom and the commencement of liquidation proceedings against LBI on September 19, 2008, LOTC no longer had access to the Intel shares

---

[24] Schedule ¶ 4(g)(i); Lehman SoF ¶ 18; Intel SoF ¶ 19.
[25] Confirmation ¶ 6(m); CSA ¶ 2; Lehman SoF ¶ 7.
[26] *See* Confirmation ¶ 6(i)(iii).
[27] Lehman SoF ¶ 6; Intel SoF ¶ 27.
[28] Lehman SoF ¶¶ 15, 31.
[29] *See* ISDA Master § 5(a)(vii).
[30] *See* ISDA Master § 6(a); Lehman SoF ¶ 23.
[31] Intel SoF ¶ 28.

it had acquired.[32]  Indeed, on September 18, 2008, LOTC senior management directed its traders

to stop acquiring Intel shares;[33] although LOTC had already acquired approximately 39.7 million

Intel shares as of September 18, 2008, it had no ability to deliver such shares to Intel.  On that

same day, LOTC informed Intel that it was having difficulty settling the Transaction.  Thereafter,

LOTC did not engage in further communication with Intel.[34]

On September 26, 2008, the final day of the Calculation Period, Intel sent LOTC a letter

setting forth its calculation of the number of Intel shares LOTC was obligated to deliver to it on

September 29, 2008 (the "Calculation Letter").[35]  The Calculation Letter sets forth the

calculations contemplated by the Confirmation, concluding that LOTC was obligated to deliver

50,552,943 Intel shares.  The Calculation Letter further states that an Event of Default under

section 5(a)(vii) of the ISDA Master had occurred and remained outstanding as a result of

LBHI's bankruptcy and reserves Intel's "rights in respect of such Event of Default or any other

Event of Default."[36]  The parties agree that the calculations set forth in the Calculation Letter are

correct.[37]

LOTC did not deliver any Intel shares on September 29, 2008.[38]  After 4:30 p.m. New

York time that same day, Intel sent the Termination Letter. [39]  The Termination Letter recites

LOTC's Failed Delivery and the continuing Event of Default under the Confirmation as a result

---

[32] *See* Intel SoF ¶¶ 31-32.
[33] Intel SoF ¶ 33.
[34] Intel SoF ¶ 33.  During this time, there was a flurry of internal Lehman correspondence, including one e-mail from a Lehman executive that speculated as to the consequences to the LOTC Collateral if LOTC were unable to deliver the requisite number of Intel shares to Intel pursuant to the Confirmation.  *See* Amended Declaration of Edward C. Barnidge in Support of Intel Corporation's Amended Motion for Summary Judgment [ECF No. 73], Ex. Z (E-mail dated Sept. 19, 2008).
[35] Venkatakrishnan Decl. Ex. 5.
[36] *See* Calculation Letter at 2.
[37] Intel SoF ¶ 18; Lehman SoF ¶ 15.
[38] Lehman SoF ¶ 24; Intel SoF ¶ 35.
[39] *See* Complaint at ¶ 37 (stating that the Termination Letter was sent "[a]fter the close of the markets on September 29, 2008.").

of LBHI's bankruptcy filing.[40]  The Termination Letter then declares an Early Termination Date

under the Confirmation:

> Based upon the [LBHI bankruptcy] and in light of the [Failed Delivery], pursuant
> to Section 6(a)[41] of the [ISDA Master], Intel hereby designates September 29, 2008
> as the Early Termination Date in respect of the Transaction, which is the only
> outstanding Transaction under the [ISDA].[42]

### D.  The Terms of the Confirmation Governing a Termination or Failure of the Transaction Prior to Settlement

The Termination Letter constituted (i) a notification of termination of the Transaction

upon an Early Termination Date and (ii) a notification of the Failed Delivery.  As noted above,

the Confirmation incorporates and modifies each of the ISDA Master, the Schedule,[43] the CSA,[44]

and the Equity Definitions;[45] accordingly, it is necessary to consult each of these documents and

the Confirmation's modification of them to ascertain the parties' agreement as to the

consequences of a termination of the Transaction upon an Early Termination Date and of the

Failed Delivery.

### 1.  Termination Upon Early Termination Date

The designation of an Early Termination Date triggers the calculation of an Early

Termination Payment under section 6(e) of the ISDA Master.  That section provides that "[i]f an

---

[40] *See* Termination Letter at 1.

[41] Section 6(a) of the ISDA Master is the section that permits Intel to designate an Early Termination Date.

[42] Termination Letter at 2.

[43] Confirmation at 1 ("This Confirmation shall supplement, form a part of, and be subject to the [ISDA]; *provided* that Loss and Second Method shall apply with respect to this Transaction for purposes of section 6(e) of the [ISDA]. . . . All provisions contained in the [ISDA] shall govern this Confirmation except as expressly modified below.  The [ISDA] and this Confirmation shall represent the entire agreement and understanding of the parties with respect to the subject matter of this [t]ransaction and shall supersede all prior or contemporaneous written or oral communication with respect thereto.").

[44] *See* Confirmation § 6 ("Party A and Party B agree that the provisions of this Section 6 will apply with respect to the Transaction to the same extent as if the Parties had executed a 1994 standard form ISDA Credit Support Annex (ISDA Agreements Subject to New York Law Only) to the Schedule to the [ISDA Master].").

[45] Confirmation at 1 ("The definitions and provisions contained in the 2002 ISDA Equity Derivatives Definitions (the 'Equity Definitions'), as published by the International Swaps and Derivatives Association, Inc., are incorporated into this Confirmation.").

Early Termination Date occurs, the following provisions shall apply based on the parties'

election in the Schedule of a payment measure, either 'Market Quotation' or 'Loss,' and a

payment method, either the 'First Method' or the 'Second Method.'"[46]  Section 6(d)(ii) of the

ISDA Master then provides that "[a]n amount calculated as being due in respect of an Early

Termination Date under Section 6(e) will be payable on the day that notice of the amount

payable is effective . . . ."[47]

Significantly here, the Confirmation selects Second Method and Loss for calculating an

Early Termination Payment in connection with the Transaction,[48] a modification of the parties'

ISDA, which provides for calculating an Early Termination Payment using Second Method and

Market Quotation.[49]  Section 6(e)(i)(4) of the ISDA Master provides the relevant calculation in

the case in which Second Method and Loss are the chosen measure of the Early Termination

Payment:  "If the Second Method and Loss apply, an amount will be payable equal to the Non-

defaulting Party's Loss in respect of this Agreement."[50]  Accordingly, Intel, as the non-defaulting

party, is obligated to calculate its Loss in respect of the Confirmation.  The term "Loss" is

defined in the ISDA Master as follows:

> "Loss" means, with respect to this Agreement or one or more Terminated
> Transactions, as the case may be, and a party, the Termination Currency Equivalent
> of an amount that party reasonably determines in good faith to be its total losses
> and costs (or gain, in which case expressed as a negative number) in connection
> with this [ISDA Master] or that Terminated Transaction or group of Terminated

---

[46] Generally speaking, First Method contemplates an Early Termination Payment to be made by the defaulting party to the non-defaulting party.  Second Method contemplates, in addition to an Early Termination Payment from a defaulting party to a non-defaulting party, an Early Termination Payment from a non-defaulting party to a defaulting party in the event that the non-defaulting party has realized a gain as a result of the termination of the transaction. Second Method thus allows each party to receive the benefit of its bargain, without regard to which party was the defaulting party.  *See* ISDA Master § 6(d)(ii).

[47] ISDA Master § 6(d)(ii).

[48] *See* Confirmation at 1 ("This Confirmation shall supplement, form a part of, and be subject to the [ISDA Agreement]; *provided* that Loss and Second Method shall apply with respect to this Transaction for purposes of section 6(e) of the [ISDA Master].").

[49] Schedule Part 1(f).

[50] ISDA Master § 6(e)(i)(4).

Transactions, as the case may be, including any loss of bargain, cost of funding or, at the election of such party but without duplication, loss or cost incurred as a result of its terminating, liquidating, obtaining or reestablishing any hedge or related trading position (or any gain resulting from any of them). Loss includes losses and costs (or gains) in respect of any payment or delivery required to have been made (assuming satisfaction of each applicable condition precedent) on or before the relevant Early Termination Date and not made, except, so as to avoid duplication, if Section 6(e)(i)(1) or (3) or 6(e)(ii)(2)(A) applies. Loss does not include a party's legal fees and out-of-pocket expenses referred to under Section 11. A party will determine its Loss as of the relevant Early Termination Date, or, if that is not reasonably practicable, as of the earliest date thereafter as is reasonably practicable. A party may (but need not) determine its Loss by reference to quotations of relevant rates or prices from one or more leading dealers in the relevant markets.[51]

In addition to incorporating these general provisions of the ISDA Master into the Confirmation, the parties also included a special provision of the Confirmation, section 5(d), that came into play if the Transaction was terminated upon an Early Termination Date. That provision provides, in relevant part:

In the event that (i) an Early Termination Date (whether as a result of an Event of Default or a Termination Event) occurs or is designated with respect to the Transaction . . . if Lehman would owe any amount to [Intel] pursuant to Section 6(d)(ii) of the [ISDA Master] or any Cancellation Amount pursuant to Section 12 of the Equity Definitions (any such amount, a "Lehman Payment Amount"), then on the date on which any Lehman Payment Amount is due, in lieu of any payment of such Lehman Payment Amount, Lehman shall (x) deliver to [Intel] a number of Shares . . . comprising Lehman's Hedge Positions in respect of the Transaction as of the relevant Early Termination Date or the date on which the Transaction is otherwise terminated or cancelled . . . and (y) pay to [Intel] an amount in cash equal to the any excess of the Lehman Payment Amount over the aggregate Agreed Value of such Shares.[52]

"Agreed Value" is defined as "a price per share equal to the Forward Price (calculated based upon the Calculation Period ending on the relevant Early Termination Date) minus the Forward Price Adjustment Amount."[53] "Hedge Positions" is undefined in the Confirmation but is understood by the parties to mean "any Intel shares that LOTC had acquired prior to the

---

[51] ISDA Master § 14.
[52] Confirmation § 5(d).
[53] *Id.*

14

declaration of the Early Termination Date."[54]    Accordingly, section 5(d) of the Confirmation

required LOTC to deliver, in lieu of an Early Termination Payment, (i) whatever Intel shares it

had acquired prior to the Early Termination Date and (ii) cash in an amount equal to the Early

Termination Payment owed by LOTC less the Agreed Value of the Intel shares that LOTC had

acquired prior to the Early Termination Date.

In addition, paragraph 8(a)(iii) of the CSA, which is incorporated into the Confirmation,

gives Intel, as the "Secured Party" under the CSA, the right to set off its properly calculated Loss

against the LOTC Collateral.[55]    In the event that Intel's properly calculated Loss was less than

the value of the LOTC Collateral and there were proceeds remaining after set off, Intel was

obligated to return such proceeds to LOTC.[56]

### 2.  Failed Delivery

A Failed Delivery does not mature into an Event of Default sufficient to declare an Early

Termination Date until the expiration of a three business day cure period.[57]    Section 9.12 of the

Equity Definitions, however, contemplates a Failed Delivery prior to the occurrence or effective

designation of an Early Termination Date.  In such a situation, section 9.12 of the Equity

Definitions provides for indemnification as follows:

> If, in respect of any obligation to deliver Shares under a Transaction, prior to the
> occurrence or effective designation of an Early Termination Date in respect of that
> Transaction, a party fails to perform any obligation required to be settled by
> delivery, it will indemnify the other party on demand for any costs, losses or
> expenses (including the costs of borrowing the relevant Shares, if applicable)
> resulting from such failure. A certificate signed by the deliveree setting out such
> costs, losses or expenses in reasonable detail will be conclusive evidence that they
> have been incurred. Notwithstanding the foregoing, unless the parties otherwise
> agree to the contrary expressly and in writing in the related Confirmation, a party

---

[54] *See* Intel SoF ¶ 23.
[55] Intel SoF ¶ 41; CSA ¶ 8(a)(iii).
[56] *See* CSA ¶ 8(c).
[57] *See* ISDA Master § 5(a)(i).

15

shall not be responsible for any special, indirect or consequential damages, even if informed of the possibility thereof.[58]

### E. Intel Calculates Its Loss Under Section 6(e) of the ISDA Master and Its "costs, losses or expenses" Under Section 9.12 of the Equity Definitions and Sets Off Such Amount Against the LOTC Collateral

In addition to declaring an Early Termination Date of September 29, 2008 and terminating the Transaction, the Termination Letter provides Intel's calculation of its "Loss" for purposes of section 6(e) of the ISDA Master, stating that, "[p]ursuant to Section 6(d)(i) of the [ISDA Master], we notify you that our Loss in respect of the Transaction, including as a result of the Failed Delivery, is US $1,001,966,256.00 . . . . Exhibit A to this letter is a statement showing the calculation of our Loss."[59]  The Termination Letter further declared that LOTC's Failed Delivery triggered the indemnification provisions of section 9.12 of the Equity Definitions and provides the amount of Intel's "costs, losses or expenses" purportedly entitled to indemnification, which happen to be identical to Intel's calculation of its Loss.[60]

---

[58] Equity Definitions § 9.12.

[59] Termination Letter at 2.

[60] The Termination Letter states:

> Intel hereby certifies that the amount of our Loss as set forth in the immediately preceding paragraph and further detailed on Exhibit A to this letter also constitutes the amount of Intel's 'costs, losses or expenses' resulting from the Failed Delivery for purposes of Section 9.12 of the Equity Definitions, and Intel hereby demands indemnification for such amounts in accordance with the terms of such Section 9.12 (without duplication of amounts demanded in the immediately preceding paragraph).

Intel's calculation of Loss set forth in Exhibit A of the Termination Letter is:

> (i)     US $1 billion, equal to the price Intel paid on [August 29, 2008] for the deliveries required to be made by Lehman under the Confirmation (the "Prepayment Amount") and equal to the value, measured as specified in the Confirmation, of deliveries that were to be made by Lehman on or before the Early Termination Date which were not made; and

> (ii)    US $1,966,256.00, representing interest Intel was unable to earn on the Prepayment Amount from [August 29, 2008] through the Early Termination Date as a result of entering into the Transaction, which lost interest amount has been determined by reference to the actual amount of interest earned during such period on the [LOTC Collateral] held by Intel in accordance with the terms of the Confirmation.

16

On September 30, 2008, Intel set off against the LOTC Collateral the amount it alleged was payable by LOTC under the Confirmation (either as Loss under section 6(e) of the ISDA Master or as "losses, costs or expenses" under section 9.12 of the Equity Definitions).  Intel notified LOTC of its action in a letter dated the same day stating, "… we today have set off and applied the [LOTC Collateral] held by us under the Confirmation and the [ISDA], consisting of Cash in the amount of US $1,001,966,256.00, against the amount of US $1,001,966,256.00 payable by you under the Confirmation and the [ISDA] as specified in the Termination Letter."[61]

## DISCUSSION

Against the backdrop of these undisputed facts, Lehman argues that Intel breached the Confirmation when it seized such portion of the LOTC Collateral that was in excess of the fair-market value on September 29, 2008 of the Intel shares that LOTC failed to deliver, *i.e.*, $873 million.  Intel contends, on the other hand, that (i) Intel's calculation of its Loss as $1,001,966,256 was, consistent with the requirements of the Confirmation, done "reasonably and in good faith" and is therefore entitled to enforcement or (ii) section 9.12 of the Equity Definitions is applicable and gives Intel the right to recover any costs, losses, or expenses in connection with the Failed Delivery, and the Termination Letter is conclusive evidence that its costs, losses, or expenses in connection with the Failed Delivery are $1,001,966,256.

In order to determine which of these diametrically opposite legal positions should prevail, the following three questions must be addressed:

- *Does the ISDA Master's definition of Loss require Intel to calculate its Loss as the fair market value of the Intel shares to be delivered on the Early Termination Date, or does the ISDA Master's definition of Loss afford Intel the discretion to calculate its Loss as it sees fit, so long as its calculation is reasonable and in good faith?*

- *If the ISDA Master's definition of Loss affords Intel the discretion to calculate its Loss in connection with the Transaction as it sees fit, so long as its calculation is*

---

[61] *Id.* at 2.

17

*reasonable and in good faith, was Intel's calculation of its Loss reasonable and in good faith?*

- *If Intel's calculation of its Loss is not reasonable and in good faith, whether because it is required to calculate its Loss as the fair market value of the Intel shares to be delivered on the Early Termination Date or otherwise, does section 9.12 of the Equity Definitions give Intel an alternative basis for seizing the LOTC Collateral in satisfaction of its "losses, costs or expenses"?*

The Court will address these questions in turn.

### A. The Legal Standard for Interpreting the Confirmation

The Confirmation, including the ISDA Master, the Schedule, the CSA, and the Equity Definitions incorporated and modified therein, is a contract between Intel and Lehman. Accordingly, the Court must apply principles of contract interpretation to answer the questions raised by the Motions. "The objective of contract interpretation is to give effect to the expressed intentions of the parties." *Record Club of America, Inc. v. United Artists Records, Inc.*, 890 F.2d 1264, 1271 (2d Cir. 1989) (citations omitted). "A written agreement that is clear, complete and subject to only one reasonable interpretation must be enforced according to the plain meaning of the language chosen by the contracting parties." *Development Specialists, Inc. v. Peabody Energy Corp. (In re Coudert Bros.)*, 487 B.R. 375 (S.D.N.Y. 2013) (citation omitted). Courts should also, where possible, interpret a contract in a way that does not place undue emphasis upon particular words or phrases and gives effect to all words chosen by the parties. *See In re MF Global Inc.*, 496 B.R. 315, 319 (S.D.N.Y. 2013) (quoting *Law Debenture Trust Co. of N.Y. v. Maverick Tube Corp.*, 595 F.3d 458, 467 (2d Cir. 2010)).

### B. Intel Has Discretion to Calculate Its Loss as It Sees Fit, so Long as Such Calculation is Performed Reasonably and in Good Faith

As the parties selected Second Method and Loss as the methodology for determining the amount of an Early Termination Payment, Lehman is obligated to make an Early Termination

Payment in an amount equal to "[Intel]'s Loss in respect of the [Confirmation]."[62]  Further, pursuant to the Confirmation, the parties agreed that the non-defaulting party, Intel, would calculate its Loss on the Transaction reasonably and in good faith and that such Loss would be the Early Termination Payment.[63]

Lehman argues that the text of the definition of Loss, as explained and interpreted by the ISDA User's Guide to the 1992 ISDA Master Agreements (the "ISDA User's Guide"),[64] mandates only one reasonable calculation of Intel's Loss for the Transaction – the fair market value of such shares at the close of the markets on the Early Termination Date.  Intel, on the other hand, argues that Loss does not require it to use any particular methodology in calculating its Loss for the Transaction, but rather permits it to use any methodology it chooses so long as such methodology produces a calculation performed reasonably and in good faith.  Therefore, the Court must determine whether, as Lehman contends, the definition of Loss prescribes a specific methodology for calculating Intel's Loss on the Transaction or whether, as Intel contends, the definition of Loss permits Intel to select any methodology for calculating its Loss on the Transaction, so long as such methodology produces a calculation performed reasonably and in good faith.

### 1. The General Rule: Loss Affords Discretion and Flexibility to Non-defaulting Parties in Determining the Means for Calculating Their "Loss"

On the face of the ISDA Master's definition of "Loss," Intel has broad discretion in determining its Loss, so long as its methodology is reasonable and in good faith.  "Loss" is defined in, relevant part, as:

---

[62] ISDA Master § 6(e)(i)(4).
[63] *See* ISDA Master § 14, "Loss."
[64] Venkatakrishnan Decl. Ex. 7.

19

> [T]he Termination Currency Equivalent of an amount that party reasonably determines in good faith to be its total losses and costs (or gain, in which case expressed as a negative number) in connection with this [ISDA Master] or that Terminated Transaction or group of Terminated Transactions, as the case may be, including any loss of bargain, cost of funding or, at the election of such party but without duplication, loss or cost incurred as a result of its terminating, liquidating, obtaining or reestablishing any hedge or related trading position (or any gain resulting from any of them).  Loss includes losses and costs (or gains) in respect of any payment or delivery required to have been made (assuming satisfaction of each applicable condition precedent) on or before the relevant Early Termination Date and not made, except, so as to avoid duplication, if Section 6(e)(i)(1) or (3) or 6(e)(ii)(2)(A) applies.[65]

The first sentence of the definition of Loss makes clear that it will be "an amount that party reasonably determines in good faith to be its total losses and costs (or gain, in which case expressed as a negative number) in connection with this Agreement or that Terminated Transaction or group of Terminated Transactions."  Further, there is nothing in the text of the definition of Loss that explicitly mandates any particular calculation method or otherwise modifies the plain meaning of that first sentence of the definition – that the non-defaulting party is permitted to calculate its loss reasonably and in good faith.

The ISDA User's Guide further supports reading the definition of Loss as affording the non-defaulting party discretion in calculating its Loss by contrasting Loss to the rigid requirements of the ISDA Master's alternative means of calculating an Early Termination Payment – Market Quotation.  An Early Termination Payment determined by means of Market Quotation is determined on the basis of quotations from "Reference Market-makers," leading dealers in the market,[66] in accordance with rigid procedures set forth in the ISDA Master.[67]  The

---

[65] ISDA Master § 14.

[66] *See* ISDA User's Guide at 24.

[67] A calculation of an Early Termination Payment using Market Quotation is equal to (a) the sum of the Settlement Amount and the Unpaid Amounts owing to the non-defaulting party, over (if using First Method) or less (if using Second Method) (b) the Unpaid Amounts owing to the defaulting party.  *See* ISDA Master § 6(e)(i)(1), (3).  The Settlement Amount is defined as the sum of (a) the Market Quotation for each Terminated Transaction for which a Market Quotation can be determined and (b) in respect of Terminated Transactions for which a Market Quotation cannot be determined or would produce a commercially unreasonable result, the party's Loss.  *See* ISDA Master §

ISDA User's Guide explains that, under the 1987 ISDA Master Agreement, Market Quotation

was the only method for determining an Early Termination Payment and that Loss was used only

as the measure of damages for the future value of transactions for which a Market Quotation was

not available.[68]  The ISDA User's Guide goes on to note that Loss was added as a method of

determining an Early Termination Payment for the 1992 ISDA Master Agreement and explains:

> This change was made to address products documented under a 1992 Agreement
> for which it may not be possible to obtain a Market Quotation (e.g., products in a
> thinly-traded market or products for which quotations are given on a future value
> basis) or for which Loss may be a more appropriate payment measure (e.g.,
> transactions that settle by physical delivery) and to provide parties with greater
> flexibility in measuring their payments on early termination.[69]

Thus, the ISDA User's Guide makes clear that Loss is intended to provide parties flexibility in

selecting a method to calculate their Early Termination Payments and thereby functions as an

express alternative to the rigid methodology and procedure of determining an Early Termination

Payment using Market Quotation.[70]  Given the text of the definition of Loss, as well as the

background and explanation in the ISDA User's Guide, there is strong textual support for reading

---

14, "Settlement Amount."  Finally, Market Quotation is, generally, the arithmetic mean of four or more price quotes offered by "Reference Market-makers" to replace the defaulting party in a transaction that would preserve the economic equivalent of the Terminated Transaction.  *See* ISDA Master § 14, "Market Quotation."  If only three quotes are provided, Market Quotation is the quotation remaining after disregarding the highest and lowest quotations.  As Unpaid Amounts are already included in the calculation of an Early Termination Payment using Market Quotation as a method, Unpaid Amounts are excluded from the quotes offered by the Reference Market-makers that determine Market Quotation (*i.e.*, Settlement Amount), so as to avoid double counting of Unpaid Amounts in determining the Early Termination Payment.  *Id.* ("For this purpose, Unpaid Amounts in respect of the Terminated Transaction or group of Terminated Transactions are to be excluded…").  *See also* Second Written Submissions on Behalf of the International Swaps and Derivatives Association, Inc., *Lomas v. JFB Firth Rixson Inc.*, Case Nos. A2/2011/0070, A2/2011/1059, A3/2011/1107, & A3/2011/2106 (October 25, 2011) (English Court of Appeal) (Civil Division)).  If fewer than three quotations are provided, it will be determined that Market Quotation cannot be provided.  *See* ISDA Master § 14, "Market Quotation."
[68] *See* ISDA User's Guide at 23.
[69] ISDA User's Guide at 23.
[70] That Loss is intended as an alternative to Market Quotation is further reinforced in the last sentence of the definition of Loss, which provides, "A party may (but need not) determine its Loss by reference to quotations of relevant rates or prices from one or more leading dealers in the relevant markets."  ISDA Master § 14, "Loss."

the definition of Loss as generally permitting non-defaulting parties such as Intel to select any methodology for calculating Loss, so long as such methodology is reasonable and in good faith.

This rather unremarkable conclusion is consistent with market participants' desire for certainty and predictability in the interpretation of ISDA standard form documents and definitions. Here, the parties have adopted the standard forms of the 1992 ISDA Master Agreement and supporting documents, including the CSA and Equity Derivatives, except as expressly modified in the Schedule or the Confirmation. To the extent they have adopted the ISDA standard forms, it is reasonable to infer that the parties have no quarrel with ISDA's intention that "transactions that use ISDA standard form documents and definitions . . . are enforced so as to promote legal certainty and hence, market stability."[71] Courts interpreting ISDA standard forms have made similar inferences, stating "[i]t is axiomatic that [ISDA standard forms] should, as far as possible, be interpreted in a way that serves the objectives of clarity, certainty and predictability." *Lomas v. JFB Firth Rixson Inc.*, [2010] EWHC 3372. The definition of Loss is unchanged from the standard 1992 ISDA Master Agreement and should therefore be interpreted in a way that serves the objectives of certainty and predictability.

According to Lehman, however, permitting non-defaulting parties such as Intel to select a methodology for calculating Loss is "a recipe for wild uncertainty and unpredictability."[72] Such hyperbole is misplaced. As the expert report of Professor Jeffrey Bruce Golden,[73] one of the principal drafters of the 1992 ISDA Master Agreement,[74] makes clear, the drafters desired the certainty that an Early Termination Payment, once determined, would be conclusive and legally

---

[71] ISDA's Brief of *Amicus Curiae* in Support of the Brief of Defendant-Appellant at 6, *Aon Fin. Prods. v. Societe Generale*, 476 F.3d 90, No. 06-1080-CV (2d Cir. May 8, 2006).

[72] Lehman Reply at 6.

[73] Venkatakrishnan Reply Decl., Ex. 1 (the "Golden Rept.").

[74] *See* Jeffrey Bruce Golden, *Interpreting ISDA terms: when market practice is relevant, as of when is it relevant?*, 9 CAP. MARKETS L.J. 299 (July 2014) at n. * (describing Professor Golden as "a principal author of ISDA's master agreements"); *see also* Venkatakrishnan Reply Decl. Ex. 3.

enforceable -- not necessarily the certainty that the Early Termination Payment would be

calculated in a particular way.  As Professor Golden explains:

> A second commercial objective on our part in drafting the ISDA standard-form documents was mitigating the risk of fact-specific disputes and the attendant risk of protracted litigation…. [f]or example, the wide discretion afforded the non-defaulting party (discussed throughout this report), the considerable advantages given to the non-defaulting party, and the marked reluctance to allow second guessing of a party that determines a settlement amount can only be understood if market interest in 'certainty' and the perceived difficulties encountered in otherwise discovering facts and confirming consensus in a global marketplace are fully appreciated . . . . Setting specific fixing times or prices was not the game.  Neither was searching for the 'correct' or 'perfect' (or even 'best') answers.  The goal was to stay within acceptable parameters based on the particular objectives of the parties.  In 1992, this goal was reflected in the general terms of reasonableness and good faith.  Assuming an outcome based on these principles, an early termination determination was expected to be conclusive.  Whether a different result might also have been reached was irrelevant.  The drafters intended to build into the definition of Loss a contractual privilege for the non-defaulting party to make its own determination, and we assumed that the situations when a court would interfere with the exercise of that contractual discretion would be extremely limited.[75]

To give effect to the clarity, certainty, and predictability sought by ISDA and by the parties

through their adoption of the ISDA Master, the Court finds that, as a general rule, selecting Loss

to calculate an Early Termination Payment affords the non-defaulting party discretion and

flexibility in selecting the means for calculating its Loss, subject to such methodology being

reasonable and in good faith.  Lehman does not quarrel with this general rule, but argues that the

general rule is not applicable here because the definition of Loss mandates that Intel's Loss on the

Transaction equal the September 29, 2008 fair-market value of the 50,552,943 shares Intel would

have received had the Transaction settled.[76]  The Court disagrees, for the reasons that follow.

---

[75] Golden Rept. ¶¶ 38, 39, 41.

[76] Lehman Motion at 10 ("While the definition generally defines Loss as that which a party 'reasonably determines in good faith to be its total losses and costs,' it also *expressly* spells out what Loss is in the factual scenario here, *i.e.*, a fully determined deliverable – a fixed number of publicly traded shares – that was required to be made on before the Early Termination Date.").  ISDA itself also endorses the general rule in the ISDA Amicus Brief.  *See* ISDA Amicus Brief at 7 ("In sum, the Loss definition, as quoted above, is permissive as to the inclusiveness and manner of Loss determination, and the choices under the Loss definition belong to the Non-Defaulting Party, here, Intel.").

**2. Lehman's Textual Interpretation of Loss is Not
Supported by the ISDA Master or the ISDA User's Guide**

Stated broadly, Lehman argues that contrary to the general rule, in situations such as this

one, in which the terminated transaction does not call for future deliveries, the definition of Loss

requires that a non-defaulting party's Loss be limited to the loss on the undelivered property,

which loss (it argues) is defined as "Unpaid Amounts" in the ISDA Master.  As Unpaid Amounts

are defined as an amount equal to the fair-market value of the undelivered property, Lehman

concludes that Intel must calculate its Loss on the Transaction as the fair-market value of the

50,552,943 shares Intel would have received had the Transaction settled.  The term Unpaid

Amounts does not appear in the definition of Loss and is not referenced in calculating an Early

Termination Payment using Loss.  The term Unpaid Amounts is only used as part of the

calculation of an Early Termination Payment using Market Quotation.  Thus, as pointed out by

both Intel and ISDA,[77] to prevail on this argument Lehman must overcome the challenge of

deriving a textual mandate based on words that do not appear in the text of the definition of Loss

itself but that are instead used in calculating an Early Termination Payment using Market

Quotation, the payment measure the parties could have chosen as an alternative to Loss.

Lehman's textual argument is comprised of three steps.  The first step of the argument is

text, not from the definition of "Loss," but from a passage in the ISDA User's Guide.  The

passage, which appears under the title "Calculations of Early Termination Payments" provides,

in most relevant part:

> [A] payment on early termination can be viewed as consisting of the following three
> components: (i) payments for obligations which became payable or deliverable but
> which were not paid or delivered prior to the Early Termination Date, (ii) payments
> for obligations which would have been payable or deliverable prior to the Early
> Termination Date if all conditions to payment or delivery (such as the absence of
> any Event of Default) had been satisfied or if the Early Termination Date had not

---

[77] *See* Intel Opposition at 4-5; ISDA Amicus Brief at 8.

been designated and (iii) payments for future value of the Terminated Transactions
or the Agreement, as the case may be.  The amounts referred to in clauses (i) and
(ii) are included in the definition of "Unpaid Amounts."  Amounts referred to in
clause (iii) are included in the definition of "Market Quotation."  Amounts referred
to in clauses (i)-(iii) are encompassed within the definition of Loss.[78]

From this passage, Lehman concludes that calculating an Early Termination Payment using Loss

must consist of simply adding up the value of each of the three components.[79]  In Lehman's

estimation, because the Transaction did not call for payments for future value, only components

(i) and (ii), together referred to by the parties as "past-due amounts," are to be valued in

calculating Intel's Loss.  Lehman further asserts that the only past-due amounts, and thus the

only item to be valued, are the 50,552,943 shares of Intel common stock that LOTC failed to

deliver.[80]

The second step of Lehman's argument proceeds in two parts.  First, Lehman contends

that past-due amounts are fully encompassed in the second sentence of the definition of Loss,

which provides, in relevant part:

Loss includes losses and costs (or gains) in respect of any payment or delivery
required to have been made (assuming satisfaction of each applicable condition
precedent) on or before the relevant Early Termination Date and not made . . . .

Next, Lehman adds this contention to its conclusion from the first step, reasoning that, because

Intel's Loss is limited to past-due amounts, and because such amounts are fully encompassed in

the above-quoted sentence, that sentence is the only part of the definition of Loss applicable in

this situation (and, necessarily, in all situations in which there are no future deliverables in

connection with a terminated transaction).  Accordingly, Lehman asserts its second conclusion –

---

[78] ISDA User's Guide at 26.

[79] July 28, 2015 H'rg Tr. at 16:13-21 (Mr. Tambe) ("Right, those three components.  Those are the three
components that go into market quotation and unpaid amounts, but those are also the components that go into
loss.").

[80] *See* July 28, 2015 H'rg Tr. at 20:12-14 (Mr. Tambe) ("If you don't have any future performance, all you're
valuing is number one and two.  And we say here, under loss, we're only valuing one and two.").

that Intel's Loss is limited to its losses and costs described by the second sentence of the definition of Loss.[81]

Finally, in the third step, Lehman brings in Unpaid Amounts, asserting that the second sentence of Loss refers to the defined term Unpaid Amounts.  In support, Lehman cites to a passage from the ISDA User's Guide, which provides that "[t]hose amounts included in the definition of 'Unpaid Amounts' are now encompassed in the definition of Loss and are not considered separately except where Loss becomes relevant as a fallback for Market Quotation."[82] Lehman also cites to the English case of *Britannia Bulk plc (in liquidation) v. Bulk Trading S.A.*,[83] in which the court agreed with the argument that "the words in the second sentence of the Loss definition . . . are a reference to Unpaid Amounts."[84]  Thus, Lehman's third conclusion is that the second sentence of the definition of Loss refers to Unpaid Amounts and, therefore, requires that Intel calculate its Loss as Unpaid Amounts.[85]

Putting the three steps together, Lehman's argument proceeds as follows: (i) the ISDA User's Guide limits Intel's Loss in a situation in which the transaction calls for no future deliverables to its losses and costs on account of undelivered property; (ii) such losses and costs on account of undelivered property are fully encompassed by the second sentence of the definition of Loss, rendering the remainder of the definition of Loss inapplicable to Intel's Loss

---

[81] *See* Lehman Reply at 5 ("If there were something other than a past-due deliverable at issue, *e.g.*, a future obligation, Loss might well include some *other* "losses or costs". . . .  Here, however, Intel's Loss includes nothing other than a past-due deliverable.").

[82] ISDA User's Guide at 25.

[83] [2011] EWHC 692 (Comm) attached to Venkatakrishnan Decl. at Ex. 14.

[84] [2011] EWHC 692 (Comm) [41-43].

[85] Unpaid Amounts are defined, in relevant part, as:

> In respect of each Terminated Transaction, for each obligation…required to be settled by delivery to such party on or prior to such Early Termination Date and which has not been so settled as at such Early Termination Date, an amount equal to the fair market value of that which was (or would have been) required to be delivered as of the originally scheduled date for delivery . . . .

ISDA Master § 14, "Unpaid Amounts."

on the Transaction and limiting Intel's Loss solely to the losses described in the second sentence

of the definition of Loss; and (iii) the second sentence of the definition of Loss refers to Unpaid

Amounts, which are required to be calculated as the fair-market value of the undelivered

property.[86]  Lehman's argument, albeit facially logical and cohesive, does not withstand close

scrutiny, for a number of reasons.

First, Lehman's argument fails because the premise upon which it is based is defective as

a straightforward matter of contract interpretation; simply put, the text does not say what

Lehman would have it say.  As described above, Lehman's textual analysis is premised on the

initial conclusion that, despite the general rule affording parties flexibility in selecting a method

to determine Loss, the ISDA User's Guide in fact mandates calculation of an Early Termination

Payment using Loss as a simple exercise of adding up three components set forth in the ISDA

User's Guide.  This conclusion requires the Court to accept the notion that the ISDA User's

Guide overrides the plain meaning of the definition of Loss and the general rule described above.

There is simply no basis to do so.  Moreover, Lehman's foundational premise – a mandatory

calculation of Loss buried in the ISDA User's Guide – suffers from the fatal defect that it is not

actually supported by the relevant text.  The first sentence of the provision of the ISDA User's

Guide from which Lehman derives its foundational premise merely states that ". . . a payment on

early termination *can* be viewed as consisting of the following three components . . . ."[87]  The

language Lehman relies on for the foundation of its textual argument that there is a mandatory

method for calculating an Early Termination Payment using Loss is expressly permissive; it does

not mandate anything.

---

[86] Lehman Motion at 13 ("[I]t is indisputable that the 50.5 million shares of Intel common stock, fixed as of
September 26, 2008, was an Unpaid Amount and therefore required to be measured at fair market value.")
[87] ISDA User's Guide at 26 (emphasis supplied).

Even if the foundational premise were not deficient, Lehman's textual argument fails because it requires the Court to interpret the ISDA Master's definition of Loss in a way that places (i) undue weight on Lehman's interpretation of a single provision of the ISDA User's Guide and (ii) undue emphasis on one sentence of the ISDA Master's definition of Loss, in a manner that renders the remainder of the definition largely superfluous.  As both Intel and ISDA argue, the descriptions of Loss in the ISDA Master and the ISDA User's Guide are not consistent with a mandatory methodology for calculating Loss.[88]  The first sentence of the ISDA Master's definition of Loss states that Loss will be "an amount that party reasonably determines in good faith to be its total losses and costs (or gain, in which case expressed as a negative number) in connection with this Agreement or that Terminated Transaction or group of Terminated Transactions."  Additionally, the ISDA User's Guide itself describes Loss as "a general indemnification provision" and "a payment measure in which a party reasonably determines in good faith its total losses."[89]  These descriptions of Loss can only be reconciled with Lehman's assertion that the ISDA User's Guide in fact mandates a methodology for calculating Loss by placing dispositive weight on Lehman's incorrect interpretation of one provision of the ISDA User's Guide.  Additionally, Lehman's argument that the second sentence of the definition of Loss – "Loss includes losses and costs (or gains) in respect of any payment or delivery required to have been made . . . ." – is the only part of the definition of Loss applicable when there are no future deliverables in connection with a terminated transaction, requires the Court both to change the plain meaning of the word "includes" and to render the remainder of the definition of Loss superfluous for all terminated transactions in which there are no future deliverables.

---

[88] *See* Intel Opposition at 3; ISDA Amicus Brief at 6-7.
[89] ISDA User's Guide at 25.

Such an approach is at odds with bedrock principles of contract interpretation.  "Courts should read the integrated contract 'as a whole to ensure that undue emphasis is not placed upon particular words and phrases and to safeguard against adopting an interpretation that would render any individual provision superfluous.'"  *In re MF Global Inc.*, 496 B.R. 315, 319 (S.D.N.Y. 2013) (quoting *Law Debenture Trust Co. of N.Y. v. Maverick Tube Corp.*, 595 F.3d 458, 467 (2d Cir. 2010)).  Accordingly, Lehman's arguments fail.

### 3. Moreover, Neither The Market Quotation Method Nor New York Law Buttresses Lehman's Interpretation of Loss

Lehman's attempts to buttress its textual argument by asserting that its interpretation of Loss lead to the same result as applying (i) the Market Quotation method of calculating an Early Termination Payment under the ISDA Master or (ii) New York law.  Neither supports Lehman's flawed textual analysis.

### a. Market Quotation

As further support for its textual interpretation of Loss, Lehman cites to the "cross-check principle," derived from the English case of *Anthracite Rated Investments (Jersey) Limited. v. Lehman Brothers Finance S.A.*, [2011] EWHC 1822 (CH), that "Loss and Market Quotation are, although different formulae, aimed at achieving broadly the same result, so that outcomes derived from one may be usefully tested by way of cross-check by reference to the other."[90] Lehman first observes that calculating an Early Termination Payment using Market Quotation requires obtaining a quote only for prospective losses in connection with the termination of a

---

[90] *Anthracite Rated Investments (Jersey) Ltd. v. Lehman Bros. Fin. S.A.*, [2011] EWHC 1822 (CH) [116(1)].  The *Anthracite* court derived this principle from the following cases addressing calculation of Market Quotation and Loss: *Australia & New Zealand Banking Grp. Ltd. v. Societe Generale*, [2000] CLC 833 (CA); *Peregrine Fixed Income Ltd. v. Robinson Dep't Store Public Co. Ltd.*, [2000] CLC 1, 328; *Brittania Bulk plc v. Pioneer Navigation Ltd. & ors*, [2011] EWHC 692 (Comm); and *Pioneer Freight Futures Co. Ltd. v. TMT Asia Ltd.*, [2011] EWHC 778 (Comm).

transaction from Reference Market-makers[91] and then adding Unpaid Amounts, *i.e.*, past-due deliverables, to that quote.  Lehman therefore concludes that calculating an Early Termination Payment solely for past-due deliverables using Market Quotation does not require a quotation from a Reference Market-maker and that, instead, the Early Termination Payment should be exactly equal to Unpaid Amounts.[92]

Lehman thus contends here that because Market Quotation would be calculated in the same way as Lehman asserts Loss should be calculated, namely, as equal to Unpaid Amounts,[93] the *Anthracite* "cross-check" supports its interpretation of the definition of Loss.  Both Intel and ISDA summarily dismiss the *Anthracite* "cross-check" as dicta from cases with facts inapposite to the facts here.[94]  A careful reading of *Anthracite*, its progeny, and the cases from which the "cross-check" principle was derived reveals it to be a well-reasoned principle, but one that is not applicable to the facts here.

Lehman would have the "cross-check" principle apply in the failed delivery context but the *Anthracite* "cross-check" principle was not developed nor has it been applied in such a context.  In fact, the *Anthracite* "cross-check" principle was developed solely in the context of contracts for which deliveries or payments were to be made *after* the Early Termination Date.[95]

---

[91] *See* ISDA Master § 14, "Market Quotation" ("[T]he quotation will be for an amount, if any, that would be paid to such party (expressed as a negative number) or by such party (expressed as a positive number) in consideration of an agreement between such party . . . and the quoting Reference Market-maker to enter into a transaction that would have the effect of preserving for such party the economic equivalent of any payment or delivery (whether the underlying obligation was absolute or contingent and assuming the satisfaction of each applicable condition precedent) by the parties under Section 2(a)(i) in respect of such Terminated Transactions that would, but for the occurrence of the relevant Early Termination Date, have been required after that date."); *see also* ISDA Amicus Brief at 8 ("Loss, unlike Market Quotation, allows a party to capture both retrospective and prospective losses.").
[92] *See* Lehman Motion at 15.
[93] Lehman Motion at 15 ("[A]pplication of Market Quotation to this trade would, as with Loss, result in a close-out payment equal to the Unpaid Amounts in connection with the shares to be delivered on September 29, 2008.").
[94] *See* Intel Opposition at 14; ISDA Amicus Brief at 14-15.
[95] *See Anthracite Rated Investments (Jersey) Ltd. v. Lehman Bros. Fin. S.A.*, [2011] EWHC 1822 (CH); *Peregrine Fixed Income Ltd. v. Robinson Department Store Public Co. Limited*, [2000] CLC 1, 328; *Brittania Bulk plc v. Pioneer Navigation Limited & ors*, [2011] EWHC 692 (Comm).

Similarly, the two post-*Anthracite* English cases that Lehman cites that applied the "cross-check" principle also involved contracts for which deliveries or payments were to be made after the Early Termination Date.[96]  No party has cited a case in which the *Anthracite* "cross-check" principle has been applied, where, as here, there were no deliveries or payments to be made after the Early Termination Date.  Accordingly, while the principle may have hardened into hornbook law in the context of contracts for which deliveries or payments were to be made *after* the Early Termination Date, that context is not present here.  Lehman has not provided a convincing argument as to why the principle should be extended.

To the contrary, the reasoning underlying the *Anthracite* "cross-check" principle demonstrates that it should be confined to instances in which there are deliveries or payments to be made after the Early Termination Date.  *Peregrine Fixed Income Limited v. Robinson Department Store Public Company Limited*,[97] which appears to be the basis of the English line of cases applying the *Anthracite* "cross-check" principle,[98] provides a clear explanation of the reasoning underlying the principle.  In *Peregrine*, Robinson Department Store Public Company Limited ("Robinson") and Peregrine Fixed Income Limited ("Peregrine") entered into a confirmation under a 1992 ISDA Master Agreement and selected Second Method and Market Quotation as the method for calculating an Early Termination Payment.  The confirmation was terminated when Peregrine took steps to appoint a provisional liquidator.[99]  At the Early Termination Date, the confirmation obligated Robinson, which was also immersed in an insolvency proceeding, to pay Peregrine $6.85 million each year for twenty five years.[100]

---

[96] *See Lomas v. JFB Firth Rixson Inc.*, [2012] EWCA 419 (Civ) [129-131]; *Lehman Bros. Int'l (Europe) v. Lehman Bros. Fin., S.A.*, [2012] EWHC 1072 (Ch), [41(i)].
[97] [2000] CLC 1, 328.
[98] *See Anthracite Rated Investments (Jersey) Ltd. v. Lehman Bros. Fin. S.A.*, [2011] EWHC 1822 (CH); *see also* Lehman Reply at 10, n.14 (referring to the *Peregrine* line of cases).
[99] *See Peregrine* at [15].
[100] *Id.*

Robinson, as the non-defaulting party, obtained quotations from Reference Market-makers on

what they would pay to acquire Peregrine's side of the trade, *i.e.*, the right to receive $6.85

million from Robinson each year for the remainder of the contract, a payment stream with a

present value of $87.3 million.  Reference Market-makers applied a significant discount in light

of Robinson's financial distress; as a result, Robinson reported that the Early Termination

Payment it owed Peregrine, calculated using Market Quotation, was approximately $9.7

million.[101]  Peregrine argued that the Early Termination Payment calculated using Market

Quotation was commercially unreasonable because it would allow Robinson to pay only $9.7

million to relieve itself of payment obligations with a present value of $87.3 million;

accordingly, Peregrine asserted that Robinson should have calculated the Early Termination

Payment using Loss.[102]

In determining whether the Market Quotation with respect to Robinson's future

obligations was commercially reasonable, the court first concluded, based on Section 6(e)(iv)[103]

of the 1992 ISDA Master Agreement, that the payment called for by Market Quotation "is

intended broadly to reflect the loss of bargain."[104]  The court then observed that "some assistance

can be derived from Section 6(e)(i)(4) [setting forth the calculation of an Early Termination

Payment using Second Method and Loss] which is concerned with the alternative calculation

based on the Loss payment measure."  The court further explained its reasoning as follows:

> I say that because Loss is defined in terms which make it clear that loss of bargain
> is one of the principal heads of damage intended to be covered and both Section

---

[101] *Id.*

[102] *See id.* at [16].

[103] Section 6(e)(iv) of the 1992 ISDA Master Agreement provides:

> The parties agree that if Market Quotation applies an amount recoverable under this Section 6(e) is
> a reasonable pre-estimate of loss and not a penalty.  Such amount is payable for loss of bargain and
> the loss of protection against future risks and except as otherwise provided in this agreement neither
> party will be entitled to recover any additional damages as a consequence of such losses.

[104] *See Peregrine* at [28].

> 6(e)(i)(3) and Section 6(e)(iv) indicate that the Market Quotation measure and the Loss measure are intended to lead to broadly the same result . . . [i]f the parties had chosen to adopt the Loss measure for these purposes the primary element in Robinson's calculation would have been the gain represented by being relieved of the obligation to perform the contract.  In this case the termination of the transaction has relieved Robinson from the performance of an obligation whose present nominal value is $87.3 million . . . .  [I]f Robinson were financially strong, it is likely that Market Quotation would have produced a Settlement Amount somewhere near that figure, although there would presumably always have been some discount for contingencies.[105]

Thus, the reasoning underlying the "cross-check" principle is that (i) because Market Quotation is intended broadly to reflect the loss of bargain and (ii) Loss includes the non-defaulting party's loss of bargain, the two measures are intended to lead to the same result when measuring an Early Termination Payment based on loss of bargain.  In other words, the "cross-check" principle, as articulated by the English cases, is directed entirely towards measuring Early Termination Payments in respect of payments or deliveries due after the Early Termination Date and is silent on Early Termination Payments for payments or deliveries due on or before the Early Termination Date.

The text and drafting history of the ISDA Master and ISDA User's Guide lend further support to the conclusion that the *Anthracite* "cross-check" principle should not be extended to apply to payments or deliveries due on or before the Early Termination Date and that, as strenuously argued by both Intel and ISDA, Market Quotation and Loss can and should produce different results in certain circumstances.[106]  The 1987 ISDA Master Agreement offered only Market Quotation as a means of calculating an Early Termination payment; Loss was available only to measure damages for the future value of a transaction for which a Market Quotation could not be obtained and not as a means of calculating an Early Termination Payment for

---

[105] *Id.* at [30].
[106] *See* ISDA Amicus Brief at 13-15; Intel Opposition at 10.

33

payments or deliveries due on or before the Early Termination Date.[107]  Accordingly, as Intel

observes, under the 1987 ISDA Master Agreement, payments or deliveries due on or after the

Early Termination Date would be valued, in accordance with Market Quotation, as Unpaid

Amounts – essentially the formulation Lehman urges here.[108]  Loss was introduced as an

alternative method of calculating an Early Termination Payment in the 1992 ISDA Master

Agreement.  If, as Lehman urges, Loss and Market Quotation are intended to deliver the same

result in respect of payments or deliveries due "after" and "on or before" the Early Termination

Date, *i.e.*, if the *Anthracite* "cross-check" principle applies in all cases, there would be no need to

have two separate methods for determining the amount of an Early Termination Payment.  Such

a reading would render Loss as an alternative method of calculating an Early Termination

Payment superfluous and its introduction by ISDA as an alternative payment method of

calculating an Early Termination Payment for the 1992 ISDA Master Agreement irrelevant.

     The ISDA User's Guide states that Loss was introduced in the 1992 ISDA Master

Agreement as an alternative method of calculating an Early Termination Payment to "address

products . . . for which Loss may be a more appropriate payment measure (*e.g.*, transactions that

settle by physical delivery) and to provide parties with greater flexibility in measuring their

payments on early termination."[109]  The ISDA User's Guide thus indicates that in certain

circumstances Loss is indeed intended to produce a different and more appropriate measure of an

Early Termination Payment than Market Quotation would have produced under the 1987 ISDA

Master Agreement or will produce under the 1992 ISDA Master Agreement.[110]  Moreover, as

---

[107] *See* Intel Opposition at 8; *see also* ISDA User's Guide at 23.
[108] *See* Intel Opposition at 8 ("Because it came into play only in lieu of Market Quotation (if necessary), Loss thus applied to forward-looking obligations only; past-due deliverables were always determined as Unpaid Amounts.").
[109] ISDA User's Guide at 23.
[110] ISDA takes the position in the ISDA Amicus Brief that Loss and Market Quotation "could *and should* produce different results in certain scenarios . . . ."  *See* ISDA Amicus Brief at 13.

Intel argues, had ISDA intended an Early Termination Payment using the new payment measure of Loss to value past-due deliverables as Unpaid Amounts, as is the case when using Market Quotation, it could have easily said so – but did not.[111]

To give effect to the intention that Loss functions as an alternative payment measure to Market Quotation, Loss must be allowed to produce Early Termination Payments in different amounts in some circumstances.  Given that the *Anthracite* "cross-check" principle is well-reasoned and has garnered widespread support from courts, it is reasonable to conclude that Loss and Market Quotation are intended to produce Early Termination Payments in broadly similar amounts when measuring the loss of payments or deliveries due after the Early Termination Date.  Thus, to give effect to Loss as an alternative payment measure to Market Quotation, Loss and Market Quotation must, in some circumstances, be permitted to produce Early Termination Payments in different amounts when measuring the loss of payments or deliveries due on or before the Early Termination Date.[112]

### b. New York Law

Lehman asserts that New York law supports its interpretation of Loss because New York law provides that loss in connection with undelivered securities is limited to the fair-market value of those securities on the date they were to be delivered.[113]  Lehman is correct that, under New York law, the measure of damages for breach of a contract for the delivery of securities is the fair-market value of the securities as of the date of the breach.  *Sharma v. Skaarup Ship Mgmt. Corp.*, 916 F.2d 820, 825 (2d Cir. 1990) (citing *Aroneck v. Atkin*, 456 N.Y.S.2d 558, 559

---

[111] *See* Intel Opposition at 10.
[112] There could, of course, be scenarios in which a non-defaulting party's Loss for payments or deliveries due on or before the Early Termination Date is equal to Unpaid Amounts, but the reason for the equivalence would be coincidence, not because the ISDA Master Agreement mandates such a result.
[113] *See* Lehman Motion at 17-18; Lehman Opposition at 13-14.

(App. Div. 4th Dep't 1982)); *see also Waxman v. Envipco Pickup & Processing Servs., Inc.*, No. 02 Civ. 10132 (GEL), 2006 WL 1788964, at *2 (S.D.N.Y. Jan. 17, 2006) (citing *Simon v. Electrospace Corp.*, 269 N.E.2d 21, 26 (N.Y. 1971)).  Had the parties elected to document the Transaction as a simple contract for the purchase of shares governed by New York law, Intel's damages would be equal to the fair-market value of the Intel shares on September 29, 2008, the date of LOTC's breach.  However, the parties did not do so; rather, they documented the Transaction under the Confirmation and the incorporated ISDA Master, in which they elected Second Method and Loss as the method of calculating an Early Termination Payment.  Having elected to proceed in a bespoke manner under the regime of ISDA, Lehman cannot now elect a more favorable outcome than may have otherwise come into play under New York law.

Choosing Second Method and Loss as the method of calculating an Early Termination Payment represents a fundamental departure from calculating damages for breach of a contract to deliver securities under New York law.  This is because, among other things, an Early Termination Payment calculated under Second Method, unlike damages for breach of contract under New York or other common law, can express itself as a payment owed from the non-defaulting party to the defaulting party.[114]  Accordingly, interpreting the calculation of an Early Termination Payment using Second Method and Loss by reference to damages for breach of contract under New York law or other common law would deprive the parties' choice of Second Method and Loss of meaning.  This paradigm shift was described well by the English court in *Anthracite* and has been repeatedly affirmed by other English courts:

---

[114] *See* ISDA Master §§ 6(e)(3), (4) ("[I]f [the Early Termination Payment] is a negative number, the Non-defaulting Party will pay the absolute value of that amount to the Defaulting Party."); *Lehman Bros. Special Fin. Inc. v. Ballyrock ABS CDO 2007-1 Ltd. (In re Lehman Bros. Holdings Inc.)*, 452 B.R. 31, 35 ("The parties agreed that any termination payment would be calculated using a recognized industry methodology referred to as the 'Second Method,' which calls for payment to the in-the-money counterparty regardless of whether it was also the defaulting party.").

> The termination payment formulae under Section 6(e) are not to be equated with, or interpreted rigidly in accordance with, the quantification of damages at common law for breach of contract.  They are methods of calculating close-out positions on the termination of a derivative transaction or series of transactions.[115]

Thus, the fact that Lehman's interpretation of the proper measure of Loss is in accord with the measure of Intel's damages "under New York law" is not persuasive support for Lehman's interpretation of the proper measure of Intel's Loss.

### C.  Intel's Calculation of Its Loss Was Reasonable and in Good Faith

Because the general rule of Loss applies to the Confirmation through the ISDA Master, Intel is entitled to determine its Loss "reasonably and in good faith."  Accordingly, the Court must determine whether Intel's calculation of its Loss as $1 billion plus interest was reasonable and in good faith.

As an initial matter, it bears emphasis that Intel's calculation of its Loss need only be performed "reasonably and in good faith." [116]  As discussed above, there is no single "correct" methodology for calculating Loss.  Instead, non-defaulting parties are afforded discretion in choosing a method to calculate Loss, so long as such calculation is ultimately performed "reasonably and in good faith."[117]

Lehman does not challenge Intel's good faith in its calculation of Loss.  The only remaining question is whether Intel's calculation was reasonable.  "Reasonable" means "[f]air,

---

[115] *Anthracite Rated Invs. (Jersey) Ltd. v. Lehman Bros. Fin. S.A.*, [2011] EWHC 1822 (CH) [116(3)]; *see also Lomas v. JFB Firth Rixson Inc.*, [2012] EWCA 419 (Civ); *Lehman Bros. Int'l (Europe) v. Lehman Bros. Fin., S.A.*, [2012] EWHC 1072 (Ch), [41(i)].

[116] *See* ISDA Master § 14, "Loss."

[117] *See supra* at Part III.A.  *See also* ISDA User's Guide at 23 ("[Loss was added as a primary payment measure] . . . to provide parties greater flexibility in measuring their payments on early termination."); Golden Rept. ¶ 41 ("Setting specific fixing times or prices was not the game.  Neither was searching for the 'correct' or 'perfect' (or even 'best') answers.  The goal was to stay within acceptable parameters based on the particular objectives of the parties.  In 1992, this goal was reflected in the general terms of reasonableness and good faith.").

proper, or moderate under the circumstances."[118]  In support of its assertion that its calculation of

Loss was reasonable, Intel offers six methodologies by which it could have arrived at a Loss of

$1 billion plus interest.[119] Accordingly, the inquiry for the Court is whether there is a disputed

issue of material fact as to the reasonableness of Intel's calculation of its Loss.  The Court has

considered each of Intel's methodologies and concludes that there is no such issue.

### 1.  Intel's Upfront Costs Were $1 Billion

Intel notes that the definition of "Loss" provides that Intel is entitled to its "total costs and

losses" associated with the Transaction.[120]  Applying this concept, Intel argues that (i) its total

"costs" are equal to the $1 billion prepayment and (ii) its total "losses" are equal to the $1 billion

prepayment and the amount of interest income that it would have been able to earn on the $1

billion, for which, as a proxy, Intel used the amount of interest earned on the $1 billion of LOTC

Collateral.[121]

The phrase "total costs and losses" should be given its plain meaning.  *See Seabury*

*Constr. Corp. v. Jeffrey Chain Corp.*, 289 F.3d 63, 68 (2d Cir. 2002).  Intel's calculation is

consistent with the plain meaning of the phrase "total costs and losses," and Lehman does not

offer a contrary view.  Instead, Lehman contends that Intel's costs are irrelevant to the

calculation of Loss, which, in Lehman's view, must be the fair market value of the undelivered

---

[118] Black's Law Dictionary, 1456 (10th Ed. 2014).  Intel asserts that Lehman bears the burden of proof with respect to establishing that Intel's calculation was unreasonable.  *See* Intel Motion at 17.  The cases Intel cites for that proposition, *Barbara v. MarineMax, Inc.*, No. 12-cv-0368, 2013 WL 4507068 (E.D.N.Y. Aug. 22, 2013), *Toledo Fund, LLC v. HSBC Bank USA*, No. 11 Civ. 7686, 2012 WL 2850997 (S.D.N.Y. July 9, 2012), and *CDO Plus Master Fund Ltd. v. Wells Fargo Bank, N.A.*, No. 07 Civ. 11078, 2010 WL 3239416 (S.D.N.Y. Aug. 16, 2010) are not on point.  Each of those cases involved the burden of proof for a breach of contract claim under New York contract law, not the calculation of Loss under a 1992 ISDA Master Agreement.  Although *CDO Plus Master Fund* involved a 1992 ISDA Master Agreement, neither that case, nor the other two, considered the burden of proof with respect to a calculation of Loss.  As Intel has shown that its calculation of Loss is reasonable, and good faith is not challenged, the Court need not decide the issue of which party bears the burden of proof on whether Loss is calculated reasonably and in good faith – the party making the calculation or the party challenging the calculation.
[119] *See* Intel Motion at 18-25.
[120] *See* ISDA Master § 14, "Loss."
[121] *See* Intel Motion at 18.

shares.  As the Court has rejected Lehman's argument that the only proper calculation of Loss on

the Transaction is the fair market value of the Intel shares that LOTC failed to deliver, and Intel's

calculation is consistent with the plain meaning of "total costs and losses," the Court concludes

that Intel's use of this methodology is reasonable and supports the reasonableness of its

calculation.

### 2.  "Agreed Value"

Intel next points to section 5(d) of the Confirmation, which becomes operative in the

event that Lehman is obligated to pay an Early Termination Payment (defined in section 5(d) as

the "Lehman Payment Amount").  Section 5(d) provides that, in such event, Lehman will deliver

to Intel (i) any Intel shares it has already purchased and (ii) an amount in cash equal to the

Lehman Payment Amount less the aggregate number of Intel Shares delivered multiplied by the

"Agreed Value."  "Agreed Value" is defined as:

> [A] price per share equal to the Forward Price (calculated based upon the
> Calculation Period ending on the relevant Early Termination Date) minus the
> Forward Price Adjustment Amount.[122]

Thus, section 5(d) provides that, for purposes of determining how much of the Lehman Payment

Amount/Loss is to be paid in cash, any shares LOTC is able to deliver are valued at Agreed

Value, not the fair market value of such shares on the delivery date.  Intel contends that, because

Intel's calculation of its Loss is equal to the Agreed Value of the undelivered shares, or, $1

billion, such calculation is consistent with the structure of the Confirmation and therefore

supports the reasonableness of Intel's calculation of its Loss.[123]

Lehman argues that section 5(d) is irrelevant to the question of whether Intel's

calculation of its Loss was reasonable because section 5(d) has no bearing on how Loss is

---

[122] Confirmation § 5(d).
[123] *See* Intel Motion at 18-19.

calculated but is instead focused on how the "Lehman Payment Amount" *i.e.*, Loss, will be paid.[124]  Although this is true, it does not address Intel's contention that Loss (less interest) and Agreed Value being equal is evidence that Intel's calculation of Loss is consistent with the structure of the Confirmation and is therefore reasonable.  While section 5(d) of the Confirmation and the definition of Agreed Value are not dispositive of the issue of the interpretation of the definition of Loss, the definition of Agreed Value does reflect that the parties intended to value the Intel shares by the Agreed Value, not the fair-market value on September 29, 2008, for purposes of measuring the cash LOTC would have needed to pay to Intel in the event of an Early Termination.  Simply put, Intel's calculation of its Loss on account of LOTC's failure to deliver the Intel shares is consistent with the Agreed Value of those shares and comports with how the value of the shares was conceptualized by the parties in the event of an Early Termination of the Confirmation.  This too supports the reasonableness of Intel's calculation of its Loss.

### 3.  Value of Undelivered Shares to Intel

Intel asserts that its goal in entering the Confirmation was to reduce its balance sheet line item of shareholders' equity by the $1 billion prepayment, *i.e.*, a deduction of $1 billion from the balance sheet line item "cash" and, consistent with accounting rule FAS 133, a corresponding and balancing deduction of $1 billion from the balance sheet line item "shareholders' equity."[125]  Intel thus argues that the value of the shares to Intel was not such shares' fair market value, as the shares were to be retired upon acquisition in any event, but its bargained-for ability to reduce shareholders' equity by $1 billion.[126]

---

[124] *See* Lehman Opposition at 15-16.
[125] Intel Motion at 20.
[126] *Id.*

In response, Lehman argues that Intel's internal accounting valuation may not displace what, in Lehman's view, is the only reasonable measure of Intel's Loss, the fair market value of the undelivered shares.[127]  Further, Lehman asserts that this methodology raises an issue of fact in that discovery has revealed the existence of an Intel accounting memo[128] which provided that Rule 10b5-1 transactions should be accounted for in accordance with the gain or loss per share by reference to the fair-market value of the shares.[129]  In its reply, Intel states that this memo refers to accounting for mark-to-market transactions and states that the Transaction was to be accounted for using the equity method.[130]

As Intel's accounting for the Transaction may be an imperfect reflection of the Transaction's true planned economic impact, such methodology cannot, on this summary judgment record, constitute undisputed evidence that Intel's calculation of its Loss is reasonable. Intel's goal in buying and then retiring $1 billion worth of shares was "to return cash to non-selling shareholders by giving them a larger claim on the future cash flows of the company."[131] Intel likens retiring shares to dividends, which are "a direct check that we write to the – to the shareholders of the company."[132]  Accordingly, Intel's share repurchase program could only achieve its economic goal of returning cash to shareholders if the greater claim on future cash flows of the company translated to an increased stock price.  Thus, the economic value of the Transaction to Intel was not necessarily the $1 billion reduction of shareholders' equity; rather, it also involved the amount by which Intel's share price was expected to rise as a result of retiring the purchased shares.

---

[127] Lehman Opposition at 17.

[128] Venkatakrishnan Opp. Decl. Ex. 12 (Technical Accounting Memo, dated Feb. 14, 2008, Appendix D).

[129] *Id.* at 18, Appendix D.

[130] Intel Reply at 10; *see also* Intel Motion at 5 (stating that Transaction would be accounted for using equity, not mark-to-market principles).

[131] *See* Barnidge Decl. Ex. R (Smith Dep. 139:15-20).

[132] *Id.* at 139:12-14.

As Intel has not put forth any evidence demonstrating the Transaction's planned (or actual) impact on share price, Intel's mere assertion of its "loss" of the $1 billion reduction in shareholders' equity cannot be viewed as undisputed evidence of the reasonableness of its calculation of Loss.[133]

### 4. Intel's "Exposure" Was Fixed at $1 Billion

Pursuant to the Confirmation, Intel and LOTC elected for the definition of "Secured Party's Exposure" to be:

> USD 1 billion, (a) reduced on the Early Delivery Date by an amount equal to (i) the Forward Price that would be determined as if the [prior day] were the Termination Date minus the Forward Price Adjustment Amount multiplied by (ii) the number of Shares delivered on such date and (b) reduced to zero on the Settlement Date upon the delivery by [LOTC] to [Intel] of the Final Delivery Amount . . . . [134]

Intel argues that because Secured Party's Exposure was to be reduced by the Agreed Value of any shares LOTC delivered prior to the Settlement Date, Secured Party's Exposure served as a proxy for the value of LOTC's remaining performance. Intel thus contends that, because no shares were delivered, and Intel's exposure remained at $1 billion, the value of LOTC's outstanding performance was $1 billion, further buttressing the reasonableness of its calculation of Loss.[135] In response, Lehman cites to the testimony of its experts and Intel's experts, each of whom says that Exposure or Secured Party's Exposure is not meant to be synonymous with Loss.[136]

---

[133] Further, the record does not clearly indicate whether Intel was using equity accounting or mark-to-market accounting to account for the Transaction. While the Intel memo cited by Lehman referring to mark-to-market accounting does not seem to be applicable to the Transaction, Intel has not produced a definitive statement or document showing that it was using equity accounting to account for the Transaction. Accordingly, there is a fact issue with respect to Intel's accounting that cannot be resolved on a motion for summary judgment.

[134] Confirmation § 6(d)(C).

[135] *See* Intel Motion at 22.

[136] *See* Lehman Opposition at 21.

The term Secured Party's Exposure is used only in paragraph 3 of the CSA, in connection with the collateral support available to parties in the calculation of the defined term Credit Support Amount.  Paragraph 3 of the CSA generally provides that, to the extent the LOTC Collateral declines in value below the Secured Party's Exposure, LOTC will post additional collateral to bring the value of the LOTC Collateral back to the Secured Party's Exposure.[137] Lehman is thus correct that Secured Party's Exposure is not synonymous with Loss; but this does not necessarily mean that the proffered methodology is not consistent with Intel's reasonableness in calculating its Loss.

The use of Secured Party's Exposure, and the CSA generally, demonstrate that the parties contemplated giving Intel the right to set off $1 billion of collateral in the event that LOTC did not perform or an Event of Default otherwise occurred.[138]  Further, the right to set off was reduced according to the Agreed Value of any early delivered shares, reflecting that Secured Party's Exposure can, as Intel contends, be reasonably conceived of as a proxy for LOTC's remaining performance under the Confirmation.  Accordingly, the fact that a calculation based on Secured Party's Exposure leads to a loss of $1 billion lends further support to the conclusion that Intel's calculation of Loss is reasonable.

### 5.  Intel's Restitutionary Interest Was $1 Billion

Intel argues that it is entitled to the return of the $1 billion, with interest, under a theory of restitution.  Intel refers the Court to well-settled Second Circuit law that "if the plaintiff has made money payments to the defendant, and there is a failure of consideration whereby defendant materially breaches the contract, the plaintiff can maintain an action for restitution of

---

[137] *See* CSA ¶ 3.  As the Confirmation provided that only LOTC would post collateral, the remainder of paragraph 3, which contemplates Intel posting additional collateral in the event the LOTC Collateral increased in value, is inoperative.
[138] *See* CSA ¶ 8 (providing right of set off upon Event of Default).

the money so paid to the defendant, with interest." *Men's Sportswear, Inc. v. Sasson Jeans, Inc. (In re Men's Sportswear, Inc.)*, 834 F.2d 1134, 1141 (2d Cir. 1987). Thus, Intel argues that, although it is not bringing an action for restitution, its right to bring such action is further evidence of the reasonableness of its calculation of Loss.[139]

In response, Lehman argues that an equitable remedy such as restitution is not appropriate because there is a remedy at law for Intel, namely, calculating Loss at the fair market value.[140] Lehman cites to *Waxman v. Envipco Pick Up & Processing Services., Inc.*, No. 02 Civ. 10132 (GEL), 2006 WL 236618 (S.D.N.Y. Jan. 17, 2006) as support for this proposition. *Waxman* is inapposite, however; in *Waxman*, Judge Lynch stated not that restitution was appropriate only where there is no remedy at law but that "[t]he decision whether to award restitution damages lies within the discretion of the trial court."[141] In *Waxman*, the plaintiffs had entered into a contract to transfer all of their company's assets to defendants in exchange for a number of defendants' depositary receipts. The defendants never delivered the depositary receipts and the plaintiffs thereafter sought restitution damages equal to the value of the assets transferred, rather than the depositary receipts that were to be delivered pursuant to the parties' contract, which had a lesser value than the assets.[142] Judge Lynch exercised his discretion not to award restitution damages, reasoning that:

> Even assuming that [defendants] knowingly and willfully breached the contract in the ways spelled out by plaintiffs, plaintiffs ask the Court to remedy the situation by granting them not the value of [the assets] as determined by the parties in their contract negotiations, but the value of [the assets] as determined through,

---

[139] *See* Intel Motion at 22-23.

[140] *See* Lehman Opposition at 22-25.

[141] 2006 WL 236618 at *5. As support for this conclusion, Judge Lynch cited to *Rudman v. Cowles Comms., Inc.*, 30 N.Y.S.2d 1, 13-14 (1971), quoting that case's holding as "'[s]uch relief, lying in equity, is a matter of discretion' and 'is to be invoked only when there is lacking complete and adequate remedy at law.'" Judge Lynch also cited to two Second Circuit cases decided subsequent to Lynch, *Libutti v. United States*, 178 F.3d 114 (2d Cir. 1999) and *United States v. Bedford Assocs.*, 713 F.2d 895 (2d Cir. 1983), each of which held that the decision to award restitution damages is within the discretion of the trial court.

[142] *See Waxman*, 2006 WL 236618 at *1-3.

presumably, a battle of the experts.  This will inevitably lead to a less fair result, and potentially a windfall for plaintiffs.[143]

Judge Lynch denied plaintiffs restitution damages in *Waxman* not because there was an adequate remedy at law, but because restitution damages potentially would have led to a windfall for plaintiffs.

Another decision issued by Judge Lynch, and cited by Intel,[144] is closer to the mark here. In *Technology Express, Inc. v. FTF Business Systems Corp.*, No. 99 Civ. 11692 (GEL), 2000 WL 1877020 (S.D.N.Y. Dec. 26, 2000), the plaintiff entered into a contract to purchase $525,000 worth of products from defendant.  The defendant did not deliver any portion of the products and the plaintiff sued for damages of $875,000 on a breach of contract theory.[145]  On a motion for summary judgment, Judge Lynch held that, although the issue of damages for breach of contract presented a triable issue of fact as to the parties' understanding of the defendant's obligation to perform, the plaintiff was nonetheless entitled to restitution of the $525,000 purchase price.[146] Judge Lynch reasoned that, because (i) defendant agreed to supply plaintiff with products, (ii) plaintiff paid $525,000 to the defendants with the expectation that the products would be delivered, and (iii) defendant did not deliver any portion of the products, "no genuine issues preclude [defendant]'s liability to make restitution of the purchase price."[147]

Here, as in *Technology Express*, Intel advanced $1 billion to LOTC with the expectation that LOTC would deliver a number of Intel shares equal to $1 billion divided by the Agreed Value of a share and LOTC failed to deliver any portion of those shares.  On those facts, as in

---

[143] *Id.* at *6.
[144] Intel Motion at 23.
[145] *See* 2000 WL 1877020 at *1.
[146] *Id.*
[147] *Id.* at *5.

*Technology Express*, Intel had a restitutionary interest in the $1 billion purchase price,[148] equal to

its calculation of Loss (less interest), which lends additional support to the reasonableness of

Intel's calculation of its Loss.

### 6.  Lehman's Internal Analysis

Intel argues that Lehman's internal analysis as to the proper amount owing to Intel is in

accord with Intel's calculation of its Loss.  Intel points to a rather flippant internal Lehman e-

mail, dated September 19, 2008, stating that "[s]o, Intel pre-paid $1 billion for their shares,

which they will not get.  And Leh[man] posted $1 billion in collateral, which we will not get."[149]

In response, Lehman cites to deposition testimony from many Lehman traders who support

Lehman's theory that the proper measure of Loss is the fair market value of the undelivered

shares.[150]  The conflicting nature of the September 19, 2008 e-mail, on the one hand, and the

testimony of the Lehman traders, on the other hand, means that Lehman's internal "view" of the

proper measure of Intel's Loss is not an undisputed fact.  Even if it were undisputed, it would not

be probative of the reasonableness of Intel's calculation of Loss for purposes of the Motions.

### 7.  Intel's Calculation of Loss was Reasonable

For the foregoing reasons, the Court concludes that Intel's calculation of its Loss was

reasonable and in accordance with the requirements of the Confirmation's definition of Loss.[151]

---

[148] LOTC's Failed Delivery would not have matured into an Event of Default sufficient to allow Intel to declare an Early Termination of the Confirmation until after the three business-day cure period, on October 2, 2008.  *See* ISDA Master § 5(a).  Thus, Intel may not have been able to have maintained an action for restitution on September 29, 2008, when it calculated its Loss.  Nonetheless, there is little dispute that, as of September 29, 2008, LOTC had no ability to deliver any shares to Intel and little prospect of gaining the ability to deliver any shares within the cure period.  Accordingly, Intel's technical inability to maintain an action for restitution as of the date it calculated its Loss does not detract from the evidentiary value of restitution damages as to the reasonableness of Intel's calculation of its Loss.

[149] *See* Intel Motion at 23; Barnidge Decl. Ex. Z.

[150] *See* Lehman Opposition at 25-28.

[151] The answers to the first two questions set forth at the outset of this discussion are (i) that Intel is entitled to calculate its Loss in any way it sees fit, so long as such calculation is performed reasonably and in good faith and (ii) that Intel's calculation of its Loss on the Transaction was performed reasonably and in good faith.  Accordingly, there is no need for the Court to determine the answer to the third question set forth at the outset of this discussion,

## <u>CONCLUSION</u>

For the reasons stated above, the Court recommends that the Lehman Motion be DENIED and the Intel Motion be GRANTED.  The Court directs that the Clerk shall serve forthwith copies of these Proposed Findings of Fact and Conclusions of Law on all parties by mail and note the date of mailing on the docket.  Within 14 days after being served with a copy, a party may serve and file with the Clerk written objections that identify the specific proposed findings and conclusions objected to and state the grounds for such objections.  A party may respond to another party's objections within 14 days after being served with a copy thereof.

Dated: September 16, 2015
New York, New York

/S/ Shelley C. Chapman_____
UNITED STATES BANKRUPTCY JUDGE

---

*i.e.*, whether, in the event that Intel did not calculate its Loss reasonably and in good faith, section 9.12 of the Equity Definitions gives Intel an alternative basis to seize the LOTC Collateral.